# U.S. District Court
## Southern District of Mississippi (Northern (Jackson))
## CIVIL DOCKET FOR CASE #: 3:21-cv-00674-KHJ-MTP

| | |
|---|---|
| The State of Mississippi, Ex Rel. Lynn Fitch Attorney General v. Eli Lilly and Company et al | Date Filed: 10/21/2021 |
| | Jury Demand: Both |
| Assigned to: District Judge Kristi H. Johnson | Nature of Suit: 890 Other Statutory Actions |
| Referred to: Magistrate Judge Michael T. Parker | Jurisdiction: U.S. Government Defendant |
| Case in other court: Hinds County Chancery Court, 25CH1:21-cv-00738 | |
| Cause: 28:1442 Notice of Removal | |

**Plaintiff**

| | | |
|---|---|---|
| **The State of Mississippi, Ex Rel. Lynn Fitch Attorney General** | represented by | **Daniel J. Mulholland** |
| | | FORMAN WATKINS & KRUTZ, LLP - Jackson |
| | | P.O. Box 22608 |
| | | 210 E. Capitol St., Suite 2200 (39201-2375) |
| | | Jackson, MS 39225-2608 |
| | | 601/960-8600 |
| | | Fax: 601/960-8613 |
| | | Email: mulhollanddj@fpwk.com |
| | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |
| | | |
| | | **Edwin S. Gault , Jr.** |
| | | FORMAN WATKINS & KRUTZ, LLP - Jackson |
| | | P.O. Box 22608 |
| | | 210 E. Capitol St., Suite 2200 (39201-2375) |
| | | Jackson, MS 39225-2608 |
| | | 601/960-8600 |
| | | Fax: 601/960-8613 |
| | | Email: win.gault@formanwatkins.com |
| | | *LEAD ATTORNEY* |
| | | *ATTORNEY TO BE NOTICED* |
| | | |
| | | **Joanne M. Cicala - PHV** |
| | | THE CICALA LAW FIRM, PLLC |
| | | 101 College Street |
| | | Dripping Springs, TX 78620 |
| | | 512-275-6550 |
| | | Fax: 512-858-1801 |
| | | Email: joanne@cicalapllc.com |
| | | *LEAD ATTORNEY* |
| | | *PRO HAC VICE* |
| | | *ATTORNEY TO BE NOTICED* |
| | | |
| | | **Josh T Wackerly - PHV** |
| | | THE CICALA LAW FIRM, PLLC |
| | | 101 College Street |
| | | Dripping Springs, TX 78620 |
| | | 512-275-6550 |
| | | Fax: 512-858-1801 |
| | | Email: josh@cicalapllc.com |
| | | *LEAD ATTORNEY* |
| | | *PRO HAC VICE* |
| | | *ATTORNEY TO BE NOTICED* |
| | | |
| | | **Matthew C. McDonald** |
| | | DAVID NUTT & ASSOCIATES |
| | | 605 Crescent Blvd., Suite 200 |
| | | Ridgeland, MS 39157 |
| | | 601-898-7302 |
| | | Email: mattm@davidnutt.com |
| | | *LEAD ATTORNEY* |

*ATTORNEY TO BE NOTICED*

**Patricia LoVerne Beale**
MISSISSIPPI ATTORNEY GENERAL'S OFFICE
1141 Bayview Ave., Ste. 402
Biloxi, MS 39530
228-596-8803
Email: tricia.beale@ago.ms.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Richard Johan Conrod - PHV , Jr.**
THE CICALA LAW FIRM, PLLC
101 College Street
Dripping Springs, TX 78620
757-286-8299
Fax: 512-858-1801
Email: johan@cicalapllc.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ta'Shia S. Gordon-State Gov**
MISSISSIPPI ATTORNEY GENERAL'S OFFICE -
Jackson
P. O. Box 220
550 High Street (39201)
Jackson, MS 39205-0220
601-359-3070
Email: ta'shia.gordon@ago.ms.gov
*TERMINATED: 04/18/2022*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Tanya D. Ellis**
FORMAN WATKINS & KRUTZ, LLP - Jackson
P.O. Box 22608
210 E. Capitol St., Suite 2200 (39201-2375)
Jackson, MS 39225-2608
601/960-3210
Fax: 601/960-8613
Email: tanya.ellis@formanwatkins.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Walter G. Watkins , III**
FORMAN WATKINS & KRUTZ, LLP - Jackson
P.O. Box 22608
210 E. Capitol St., Suite 2200 (39201-2375)
Jackson, MS 39225-2608
601-973-5904
Email: trey.watkins@formanwatkins.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William Lawrence Deas**
LISTON & DEAS, PLLC
605 Crescent Blvd.
Suite 200
Ridgeland, MS 39157
601-981-1636
Fax: 601-982-0371
Email: lawrence@deaslawfirm.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William Liston , III**
LISTON & DEAS, PLLC - Ridgeland
605 Crescent Blvd., Suite 200

Ridgeland, MS 39157
601-981-1636
Fax: 601-982-0371
Email: william@listondeas.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Caleb A. Pracht-State Gov**
MISSISSIPPI ATTORNEY GENERAL'S OFFICE
550 High Street
Ste 1400
Jackson, MS 39201
601-359-9711
Email: caleb.pracht@ago.ms.gov
*TERMINATED: 09/22/2022*
*ATTORNEY TO BE NOTICED*

**Courtney Choi Hunt**
FORMAN WATKINS & KRUTZ, LLP - Jackson
P.O. Box 22608
210 E. Capitol St., Suite 2200 (39201-2375)
Jackson, MS 39225-2608
601-960-8600
Fax: 601-960-8613
Email: courtney.hunt@formanwatkins.com
*ATTORNEY TO BE NOTICED*

**Thomas Joel Fyke**
FORMAN WATKINS & KRUTZ, LLP - Jackson
P.O. Box 22608
210 E. Capitol St., Suite 2200 (39201-2375)
Jackson, MS 39225-2608
601-969-7843
Fax: 601-960-8613
Email: joel.fyke@formanwatkins.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Eli Lilly and Company**                    represented by  **Andrew A. Kassof - PHV**
                                                            KIRKLAND & ELLIS, LLP - Chicago
                                                            300 N. LaSalle Street
                                                            Chicago, IL 60654
                                                            312-862-2474
                                                            Email: akassof@kirkland.com
                                                            *LEAD ATTORNEY*
                                                            *PRO HAC VICE*
                                                            *ATTORNEY TO BE NOTICED*

                                                            **Diana M. Watral - PHV**
                                                            KIRKLAND & ELLIS, LLP - Chicago
                                                            300 N. LaSalle Street
                                                            Chicago, IL 60654
                                                            312-862-2000
                                                            Email: diana.watral@kirkland.com
                                                            *LEAD ATTORNEY*
                                                            *PRO HAC VICE*
                                                            *ATTORNEY TO BE NOTICED*

                                                            **James F. Hurst - PHV**
                                                            KIRKLAND & ELLIS, LLP - Chicago
                                                            300 N. LaSalle Street
                                                            Chicago, IL 60654
                                                            312-862-5230
                                                            Email: james.hurst@kirkland.com
                                                            *LEAD ATTORNEY*
                                                            *PRO HAC VICE*
                                                            *ATTORNEY TO BE NOTICED*

**Robert L. Gibbs**
GIBBS TRAVIS PLLC
210 E. Capitol Street
Suite 1801
Jackson, MS 39201
601-487-2640
Email: rgibbs@gibbstravis.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ryan J. Moorman - PHV**
KIRKLAND & ELLIS, LLP - Chicago
300 N. LaSalle Street
Chicago, IL 60654
312-862-2000
Email: ryan.moorman@kirkland.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Samantha G. Rose - PHV**
KIRKLAND & ELLIS, LLP - Chicago
300 N. LaSalle Street
Chicago, IL 60654
312-862-4026
Email: sam.rose@kirkland.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Novo Nordisk Inc.**                    represented by    **Andrew Yaphe - PHV**
DAVIS POLK & WARDWELL, LLP - Menlo Park
1600 El Camino Real
Menlo Park, CA 94025
650-752-2088
Fax: 650-752-2111
Email: andrew.yaphe@davispolk.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Chui-Lai Cheung - PHV**
DAVIS POLK & WARDWELL, LLP - New York
450 Lexington Avenue
New York, NY 10017
212-450-4000
Email: chui-lai.cheung@davispolk.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**David B. Toscano - PHV**
DAVIS POLK & WARDWELL, LLP - New York
450 Lexington Avenue
New York, NY 10017
212-450-4515
Email: david.toscano@davispolk.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ian Hogg - PHV**
DAVIS POLK & WARDWELL, LLP - Menlo Park
1600 El Camino Real
Menlo Park, CA 94025
650-752-2066
Fax: 650-752-3666
Email: ian.hogg@davispolk.com

*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**James P. Rouhandeh - PHV**
DAVIS POLK & WARDELL, LLP - New York
450 Lexington Avenue
New York, NY 10017
212-450-4000
Email: rouhandeh@davispolk.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Neal Potischman - PHV**
DAVIS POLK & WARDELL, LLP - Menlo Park
1600 El Camino Real
Menlo Park, CA 94025
650-752-2000
Email: neal.potischman@davispolk.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**P. Ryan Beckett**
BUTLER SNOW LLP-Ridgeland
P. O. Box 6010
1020 Highland Colony Pkwy., Ste. 1400 (39157)
Ridgeland, MS 39158-6010
(601) 948-5711
Fax: (601) 985-4500
Email: ryan.beckett@butlersnow.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Phillip S. Sykes**
BUTLER SNOW LLP-Ridgeland
P. O. Box 6010
1020 Highland Colony Pkwy., Ste. 1400 (39157)
Ridgeland, MS 39158-6010
601/948-5711
Fax: 601/985-4500
Email: phillip.sykes@butlersnow.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christopher D. Morris**
BUTLER SNOW LLP-Ridgeland
P. O. Box 6010
1020 Highland Colony Pkwy., Ste. 1400 (39157)
Ridgeland, MS 39158-6010
601/985-4437
Fax: 601/985-4500
Email: Chris.Morris@butlersnow.com
*ATTORNEY TO BE NOTICED*

**John Adam Crawford , Jr.**
BUTLER SNOW LLP-Ridgeland
P. O. Box 6010
1020 Highland Colony Pkwy., Ste. 1400 (39157)
Ridgeland, MS 39158-6010
601/948-5711
Fax: 601/985-4500
Email: jack.crawford@butlersnow.com
*ATTORNEY TO BE NOTICED*

**Robert L. Gibbs**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

Sanofi-Aventis U.S. LLC

represented by **Aaron M. Healey - PHV**
JONES DAY - New York
250 Vesey Street
New York, NY 10281
212-326-3811
Email: ahealey@jonesday.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael Ryan Harmanis - PHV**
JONES DAY - Columbus
325 John H. McConnell Blvd., Suite 600
P. O. Box 165017 (43216-5017)
Columbus, OH 43215-2673
614-403-4096
Fax: 614-469-4198
Email: rharmanis@jonesday.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**R. David Kaufman**
BRUNINI, GRANTHAM, GROWER & HEWES,
PLLC-Jackson
P. O. Drawer 119
Pinnacle Bldg., Suite 100
190 East Capitol St. (39201)
Jackson, MS 39205-0119
601/ 948-3101
Fax: 601/960-6902
Email: dkaufman@brunini.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Theresa Coughlin Martin - PHV**
JONES DAY - Washington
51 Louisiana Avenue, N.W.
Washington, DC 20003
202-879-3617
Email: tcoughlin@jonesday.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**William Coglianese - PHV**
JONES DAY - Washington
51 Louisiana Avenue, N.W.
Washington, DC 20003
202-879-3710
Email: wcoglianese@jonesday.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Daniel W. Berens - PHV**
JONES DAY - Columbus
325 John H. McConnell Blvd., Suite 600
P. O. Box 165017 (43216-5017)
Columbus, OH 43215-2673
614-281-3813
Email: dberens@jonesday.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Martin Patrick McDowell**
BRUNINI, GRANTHAM, GROWER & HEWES,
PLLC-Jackson
P. O. Drawer 119

Pinnacle Bldg., Suite 100
190 East Capitol St. (39201)
Jackson, MS 39205-0119
601/948-3101
Fax: 601/960-6903
Email: pmcdowell@brunini.com
*ATTORNEY TO BE NOTICED*

**Robert L. Gibbs**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Shirlethia V. Franklin**
JONES DAY - Washington
51 Louisiana Avenue, NW
Washington, DC 20001-2113
202-879-3892
Fax: 202-626-1700
Email: sfranklin@jonesday.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Evernorth Health, Inc.**
*formerly known as*
Express Scripts Holding Company

represented by **Jason R. Scherr - PHV**
MORGAN, LEWIS & BOCKIUS, LLP - Washington
1111 Pennsylvania Ave., NW
Washington, DC 20004-2541
202-739-3000
Email: jr.scherr@morganlewis.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lindsey Titus Levy - PHV**
MORGAN, LEWIS & BOCKIUS, LLP - Washington
1111 Pennsylvania Ave., NW
Washington, DC 20004-2541
202-739-5724
Fax: 202-739-3001
Email: lindsey.levy@morganlewis.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Patrick A. Harvey - PHV**
MORGAN, LEWIS & BOCKIUS, LLP - Washington
1111 Pennsylvania Ave., NW
Washington, DC 20004-2541
202-739-3000
Fax: 202-739-3001
Email: patrick.harvey@morganlewis.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Stephanie M. Rippee**
WATKINS & EAGER, PLLC - Jackson
P. O. Box 650
400 East Capitol Street (39201)
Jackson, MS 39205-0650
601-965-1991
Fax: 601-965-1901
Email: srippee@watkinseager.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Express Scripts, Inc.**

represented by **Jason R. Scherr - PHV**
(See above for address)
*LEAD ATTORNEY*

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lindsey Titus Levy - PHV**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Patrick A. Harvey - PHV**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Stephanie M. Rippee**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Express Scripts Administrators, LLC**    represented by   **Jason R. Scherr - PHV**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lindsey Titus Levy - PHV**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Patrick A. Harvey - PHV**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Stephanie M. Rippee**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**ESI Mail Pharmacy Services, Inc.**    represented by   **Jason R. Scherr - PHV**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lindsey Titus Levy - PHV**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Patrick A. Harvey - PHV**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Stephanie M. Rippee**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

5/9/23, 10:10 AM CM/ECF - District Court for the Southern District of...

Case MDL No. 3080 Document 1-8 Filed 05/09/23 Page 9 of 155

**Express Scripts Pharmacy, Inc.**                    represented by **Jason R. Scherr - PHV**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lindsey Titus Levy - PHV**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Patrick A. Harvey - PHV**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Stephanie M. Rippee**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**CVS Health Corporation**                    represented by **A. Joshua Podoll - PHV**
WILLIAMS & CONNOLLY, LLP - Washington
680 Maine Avenue S.W.
Washington, DC 20024
202-434-5092
Email: apodoll@wc.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Atticus William DeProspo - PHV**
WILLIAMS & CONNOLLY, LLP
680 Maine Avenue, S.W.
Washington, DC 20024
845-480-2847
Email: adeprospo@wc.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Craig D. Singer - PHV**
WILLIAMS & CONNOLLY, LLP
680 Maine Avenue, S.W.
Washington, DC 20024
202-434-5000
Email: csinger@wc.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Daniel Martin Dockery - PHV**
WILLIAMS & CONNOLLY, LLP
680 Maine Avenue, S.W.
Washington, DC 20024
202-434-5698
Email: ddockery@wc.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Enu Mainigi - PHV**
WILLIAMS & CONNOLLY, LLP
680 Maine Avenue, S.W.
Washington, DC 20024
202-434-5420

Email: emainigi@wc.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**J. Cal Mayo , Jr.**
MAYO MALLETTE PLLC
5 University Office Park
2094 Old Taylor Road
Suite 200
Oxford, MS 38655
662-236-0055
Fax: 662-236-0035
Email: cmayo@mayomallette.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**R. Kennon Poteat - PHV , III**
WILLIAMS & CONNOLLY, LLP
680 Maine Avenue, S.W.
Washington, DC 20024
202-434-5699
Email: kpoteat@wc.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alexander Gazikas - PHV**
WILLIAMS & CONNOLLY, LLP - Washington
680 Maine Avenue S.W.
Washington, DC 20024
202-434-5636
Email: agazikas@wc.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Breanna F.G. Young**
MAYO MALLETTE, PLLC - Oxford
2094 Old Taylor Road
Suite 200
Oxford, MS 38655
601-366-1106
Fax: 662-236-0035
Email: byoung@mayomallette.com
*ATTORNEY TO BE NOTICED*

**Katherine K. Smith**
WATKINS & EAGER, PLLC
400 E. Capitol Street
Jackson, MS 39201
601-965-1900
Fax: 601-965-1901
Email: ksmith@watkinseager.com
*TERMINATED: 12/03/2021*
*ATTORNEY TO BE NOTICED*

**Sarah Katherine Embry**
MAYO MALLETTE, PLLC
P. O. Box 1456
2094 Old Taylor Road
Oxford, MS 38655
662/236-0055
Fax: 662/236-0035
Email: kembry@mayomallette.com
*ATTORNEY TO BE NOTICED*

**Defendant**
**CVS Pharmacy, Inc.**
*TERMINATED: 08/29/2022*

represented by **Atticus William DeProspo - PHV**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*

*ATTORNEY TO BE NOTICED*

**Craig D. Singer - PHV**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Daniel Martin Dockery - PHV**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Enu Mainigi - PHV**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**J. Cal Mayo , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**R. Kennon Poteat - PHV , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Breanna F.G. Young**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Katherine K. Smith**
(See above for address)
*TERMINATED: 12/03/2021*
*ATTORNEY TO BE NOTICED*

**Sarah Katherine Embry**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Caremark RX, L.L.C.**                     represented by   **A. Joshua Podoll - PHV**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Atticus William DeProspo - PHV**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Craig D. Singer - PHV**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Daniel Martin Dockery - PHV**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Enu Mainigi - PHV**
(See above for address)

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**J. Cal Mayo , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**R. Kennon Poteat - PHV , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alexander Gazikas - PHV**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Breanna F.G. Young**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Katherine K. Smith**
(See above for address)
*TERMINATED: 12/03/2021*
*ATTORNEY TO BE NOTICED*

**Sarah Katherine Embry**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Caremark PCS Health, L.L.C.**      represented by   **A. Joshua Podoll - PHV**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Atticus William DeProspo - PHV**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Craig D. Singer - PHV**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Daniel Martin Dockery - PHV**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Enu Mainigi - PHV**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**J. Cal Mayo , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**R. Kennon Poteat - PHV , III**
(See above for address)
*LEAD ATTORNEY*

*ATTORNEY TO BE NOTICED*

**Alexander Gazikas - PHV**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Breanna F.G. Young**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Katherine K. Smith**
(See above for address)
*TERMINATED: 12/03/2021*
*ATTORNEY TO BE NOTICED*

**Sarah Katherine Embry**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Caremark, L.L.C.**                                    represented by   **A. Joshua Podoll - PHV**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Atticus William DeProspo - PHV**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Craig D. Singer - PHV**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Daniel Martin Dockery - PHV**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Enu Mainigi - PHV**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**J. Cal Mayo , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**R. Kennon Poteat - PHV , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alexander Gazikas - PHV**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Breanna F.G. Young**
(See above for address)
*ATTORNEY TO BE NOTICED*

Katherine K. Smith
(See above for address)
*TERMINATED: 12/03/2021*
*ATTORNEY TO BE NOTICED*

**Sarah Katherine Embry**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Unitedhealth Group, Inc.**
*TERMINATED: 08/15/2022*

represented by  **Brian D. Boone - PHV**
ALSTON & BIRD, LLP - Charlotte
101 South Tryon Street, Suite 4000
Charlotte, NC 28280
704-444-1000
Fax: 704-444-1111
Email: brian.boone@alston.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**D. Andrew Hatchett - PHV**
ALSTON & BIRD, LLP - Atlanta
One Atlantic Center
1201 W. Peachtree Street, N.W., Suite 4900
Atlanta, GA 30309-3424
404-881-4826
Email: andrew.hatchett@alston.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Elizabeth Broadway Brown - PHV**
ALSTON & BIRD, LLP - Atlanta
One Atlantic Center
1201 W. Peachtree Street, N.W., Suite 4900
Atlanta, GA 30309-3424
404-881-4688
Fax: 404-253-8400
Email: liz.brown@alston.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jean E. Richmann - PHV**
ALSTON & BIRD, LLP - San Francisco
560 Mission Street, Suite 2100
San Francisco, CA 94105
231-357-4737
Email: jean.richmann@alston.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kelley Connolly Barnaby - PHV**
ALSTON & BIRD, LLP - Washington
The Atlantic Building
950 F. Street
Washington, DC 20004
202-239-3300
Fax: 202-239-3333
Email: kelley.barnaby@alston.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lane Zuraw - PHV**
ALSTON & BIRD, LLP - San Francisco
560 Mission Street, Suite 2100

San Francisco, CA 94105
415-243-1000
Fax: 415-243-1001
Email: lane.zuraw@alston.com
*TERMINATED: 07/06/2022*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Roy D. Campbell , III**
BRADLEY ARANT BOULT CUMMINGS, LLP -
Jackson
P.O. Box 1789
188 E. Capitol Street, Suite 1000 (39201)
Jackson, MS 39215-1789
601/948-8000
Fax: 601/948-3000
Email: rcampbell@bradley.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Optum, Inc.**
*TERMINATED: 08/15/2022*

represented by **Brian D. Boone - PHV**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**D. Andrew Hatchett - PHV**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Elizabeth Broadway Brown - PHV**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jean E. Richmann - PHV**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kelley Connolly Barnaby - PHV**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lane Zuraw - PHV**
(See above for address)
*TERMINATED: 07/06/2022*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Roy D. Campbell , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Optumrx Inc.**

represented by **Brian D. Boone - PHV**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*

ATTORNEY TO BE NOTICED

**D. Andrew Hatchett - PHV**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Elizabeth Broadway Brown - PHV**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jean E. Richmann - PHV**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kelley Connolly Barnaby - PHV**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lane Zuraw - PHV**
(See above for address)
*TERMINATED: 07/06/2022*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Roy D. Campbell , III**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jonathan M. Barnes**
BRADLEY ARANT BOULT CUMMINGS, LLP -
Jackson
P.O. Box 1789
188 E. Capitol Street, Suite 1000 (39201)
Jackson, MS 39215-1789
601-948-8000
Email: jbarnes@bradley.com
*ATTORNEY TO BE NOTICED*

**Defendant**
**OptumInsight, Inc.**
*TERMINATED: 08/15/2022*                    represented by   **Roy D. Campbell , III**
                                                             (See above for address)
                                                             *ATTORNEY TO BE NOTICED*

**Defendant**
**OptumRx Holdings, LLC**
*TERMINATED: 08/15/2022*                    represented by   **Roy D. Campbell , III**
                                                             (See above for address)
                                                             *ATTORNEY TO BE NOTICED*

**Defendant**
**Medco Health Solutions, Inc.**            represented by   **Jason R. Scherr - PHV**
                                                             (See above for address)
                                                             *LEAD ATTORNEY*
                                                             *ATTORNEY TO BE NOTICED*

                                                             **Lindsey Titus Levy - PHV**
                                                             (See above for address)
                                                             *LEAD ATTORNEY*
                                                             *PRO HAC VICE*
                                                             *ATTORNEY TO BE NOTICED*

**Stephanie M. Rippee**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 10/21/2021 | 1 | NOTICE OF REMOVAL by ESI Mail Pharmacy Services, Inc., Express Scripts Pharmacy, Inc., Express Scripts, Inc. from Hinds County Chancery Court, case number 25CH1:21-cv-00738. ( Filing fee $ 402 receipt number AMSSDC-4687868)<br><br><span style="color:red">If the complete state court record is not attached as an Exhibit to the Petition for Removal, pursuant to Rule L.U.Civ.R. 5(b): within 14 days removing party must electronically file the entire state court record as a single filing; and all parties shall, within fourteen days after the Case Management Conference, file as **separate docket items** any unresolved motions that were filed in state court which they wish to advance.</span> (Attachments: # 1 Exhibit A - Department of Defense Contract, Part 1, # 2 Exhibit A - Department of Defense Contract, Part 2, # 3 Exhibit A - Department of Defense Contract, Part 3, # 4 Exhibit A - Department of Defense Contract, Part 4, # 5 Exhibit B - Second Amended Complaint, # 6 Civil Cover Sheet) (KNS) (Entered: 10/21/2021) |
| 10/21/2021 | 2 | ANSWER to Complaint *Answer to Second Amended Complaint* by ESI Mail Pharmacy Services, Inc., Express Scripts Pharmacy, Inc., Express Scripts, Inc..(Rippee, Stephanie) (Entered: 10/21/2021) |
| 10/21/2021 | 3 | Corporate Disclosure Statement by ESI Mail Pharmacy Services, Inc., Express Scripts Pharmacy, Inc., Express Scripts, Inc. identifying Corporate Parent CIGNA Corporation for ESI Mail Pharmacy Services, Inc., Express Scripts Pharmacy, Inc., Express Scripts, Inc.. (Rippee, Stephanie) (Entered: 10/21/2021) |
| 10/26/2021 | 4 | NOTICE of Appearance by Christopher D. Morris on behalf of Novo Nordisk Inc. (Morris, Christopher) (Entered: 10/26/2021) |
| 10/27/2021 | 5 | NOTICE of Appearance by R. David Kaufman on behalf of Sanofi-Aventis U.S. LLC (Kaufman, R.) (Entered: 10/27/2021) |
| 10/27/2021 | 6 | NOTICE of Appearance by Martin Patrick McDowell on behalf of Sanofi-Aventis U.S. LLC (McDowell, Martin) (Entered: 10/27/2021) |
| 10/27/2021 | 7 | Unopposed MOTION for Extension of Time to File Answer by CVS Health Corporation, CVS Pharmacy, Inc., Caremark PCS Health, L.L.C., Caremark RX, L.L.C., Caremark, L.L.C., Eli Lilly and Company, Evernorth Health, Inc., Express Scripts Administrators, LLC, Novo Nordisk Inc., Optum, Inc., Optumrx Inc., Sanofi-Aventis U.S. LLC, Unitedhealth Group, Inc. (Kaufman, R.) (Entered: 10/27/2021) |
| 10/27/2021 | | TEXT ONLY ORDER granting 7 Unopposed Motion for Extension of Time to Answer r. CVS Health Corporation answer due 11/11/2021; CVS Pharmacy, Inc. answer due 11/11/2021; Caremark PCS Health, L.L.C. answer due 11/11/2021; Caremark RX, L.L.C. answer due 11/11/2021; Caremark, L.L.C. answer due 11/11/2021; Eli Lilly and Company answer due 11/11/2021; Evernorth Health, Inc. answer due 11/11/2021; Express Scripts Administrators, LLC answer due 11/11/2021; Novo Nordisk Inc. answer due 11/11/2021; Optum, Inc. answer due 11/11/2021; Optumrx Inc. answer due 11/11/2021; Sanofi-Aventis U.S. LLC answer due 11/11/2021; Unitedhealth Group, Inc. answer due 11/11/2021. No further written order will issue. Signed by Magistrate Judge Michael T. Parker on October 27, 2021 (KPM) (Entered: 10/27/2021) |
| 10/27/2021 | 8 | NOTICE *Supplemental Notice of Removal* by Caremark PCS Health, L.L.C. re 1 Notice of Removal,,,, (Attachments: # 1 Exhibit A - Exhibit)(Mayo, J.) (Entered: 10/27/2021) |
| 10/27/2021 | 9 | Corporate Disclosure Statement by Caremark PCS Health, L.L.C. (Mayo, J.) (Entered: 10/27/2021) |
| 10/28/2021 | 10 | NOTICE of Appearance by J. Cal Mayo, Jr on behalf of CVS Health Corporation, CVS Pharmacy, Inc., Caremark PCS Health, L.L.C., Caremark RX, L.L.C., Caremark, L.L.C. (Mayo, J.) (Entered: 10/28/2021) |
| 10/28/2021 | 11 | NOTICE of Appearance by Katherine K. Smith on behalf of CVS Health Corporation, CVS Pharmacy, Inc., Caremark PCS Health, L.L.C., Caremark RX, L.L.C., Caremark, L.L.C. (Smith, Katherine) (Entered: 10/28/2021) |
| 10/28/2021 | 12 | NOTICE of Appearance by Breanna F.G. Young on behalf of CVS Health Corporation, CVS Pharmacy, Inc., Caremark PCS Health, L.L.C., Caremark RX, L.L.C., Caremark, L.L.C. (Young, Breanna) (Entered: 10/28/2021) |
| 10/28/2021 | 13 | Corporate Disclosure Statement by Sanofi-Aventis U.S. LLC identifying Corporate Parent Sanofi for Sanofi-Aventis U.S. LLC. (McDowell, Martin) (Entered: 10/28/2021) |
| 10/29/2021 | 14 | MOTION for Patrick A. Harvey to Appear Pro Hac Vice (Paid $100 PHV fee; receipt number AMSSDC-4694051) by ESI Mail Pharmacy Services, Inc., Evernorth Health, Inc., Express Scripts Administrators, LLC, Express Scripts Pharmacy, Inc., Express Scripts, Inc. (Attachments: # 1 Attachment DC Bar Certificate of Good Standing, # 2 Attachment Additional Clients)(Rippee, Stephanie) (Entered: 10/29/2021) |
| 10/29/2021 | 15 | MOTION for Jason R. Scherr to Appear Pro Hac Vice (Paid $100 PHV fee; receipt number AMSSDC-4694117) by ESI Mail Pharmacy Services, Inc., Evernorth Health, Inc., Express Scripts Administrators, LLC, Express Scripts Pharmacy, |

| | | |
|---|---|---|
| | | Inc., Express Scripts, Inc. (Attachments: # 1 Attachment DC Bar Certificate of Good Standing, # 2 Attachment Additional Clients)(Rippee, Stephanie) (Entered: 10/29/2021) |
| 10/29/2021 | 16 | State Court Record by Defendants ESI Mail Pharmacy Services, Inc., Express Scripts Pharmacy, Inc., Express Scripts, Inc. Volumes 7 (Attachments: # 1 Attachment State Court Docket Report, # 2 Attachment Complaint, # 3 Attachment First Amended Complaint, # 4 Attachment Summonses, # 5 Attachment Second Amended Complaint, # 6 Attachment Notices of Appearance and Summonses, # 7 Attachment Notice of Filing of Notice of Removal (with Exhibits))(Rippee, Stephanie) (Entered: 10/29/2021) |
| 10/29/2021 | | TEXT ONLY ORDER granting 14 Motion to Appear Pro Hac Vice; granting 15 Motion to Appear Pro Hac Vice. Patrick A. Harvey and Jason R. Scherr are hereby admitted pro hac vice upon registering for electronic filing. No further written order will issue. Signed by Magistrate Judge Michael T. Parker on October 29, 2021 (KPM) (Entered: 10/29/2021) |
| 10/29/2021 | 17 | Joinder in Document by CVS Health Corporation, CVS Pharmacy, Inc., Caremark PCS Health, L.L.C., Caremark RX, L.L.C., Caremark, L.L.C. to 16 State Court Record, filed by Express Scripts, Inc., ESI Mail Pharmacy Services, Inc., Express Scripts Pharmacy, Inc. (Smith, Katherine) (Entered: 10/29/2021) |
| 11/04/2021 | 18 | Corporate Disclosure Statement by Novo Nordisk Inc. identifying Corporate Parent Novo Nordisk A/S, Other Affiliate Novo Nordisk US Holdings, Inc., Other Affiliate Novo Nordisk US Commercial Holdings, Inc. for Novo Nordisk Inc.. (Morris, Christopher) (Entered: 11/04/2021) |
| 11/10/2021 | 19 | MOTION to Extend to Answer or Otherwise Respond Deadline *Unopposed Motion to Extend Deadline to Answer or Otherwise Respond*, MOTION for Extension of Time to File Answer by CVS Health Corporation, CVS Pharmacy, Inc., Caremark PCS Health, L.L.C., Caremark RX, L.L.C., Caremark, L.L.C., Eli Lilly and Company, Evernorth Health, Inc., Express Scripts Administrators, LLC, Novo Nordisk Inc., Optum, Inc., Optumrx Inc., Sanofi-Aventis U.S. LLC, Unitedhealth Group, Inc. (Rippee, Stephanie) (Entered: 11/10/2021) |
| 11/10/2021 | | TEXT ONLY ORDER granting in part and denying in part 19 MOTION to Extend Deadline to Answer or Otherwise Respond. Movants are hereby granted additional time to answer. Said answers are due on or before 12/10/21. All other relief requested in the motion is hereby denied. No further written order will issue. Signed by Magistrate Judge Michael T. Parker on November 10, 2021 (KPM) (Entered: 11/10/2021) |
| 11/17/2021 | 20 | MOTION for Andrew Yaphe to Appear Pro Hac Vice (Paid $100 PHV fee; receipt number AMSSDC-4708390) by Novo Nordisk Inc. (Attachments: # 1 Certificate of Good Standing - California)(Morris, Christopher) (Entered: 11/17/2021) |
| 11/17/2021 | 21 | MOTION for James P. Rouhandeh to Appear Pro Hac Vice (Paid $100 PHV fee; receipt number AMSSDC-4708395) by Novo Nordisk Inc. (Attachments: # 1 Certificate of Good Standing - New York)(Morris, Christopher) (Entered: 11/17/2021) |
| 11/17/2021 | 22 | MOTION for Neal A. Potischman to Appear Pro Hac Vice (Paid $100 PHV fee; receipt number AMSSDC-4708405) by Novo Nordisk Inc. (Attachments: # 1 Certificate of Good Standing - California, # 2 Certificate of Good Standing - New York)(Morris, Christopher) (Entered: 11/17/2021) |
| 11/17/2021 | 23 | MOTION for David B. Toscano to Appear Pro Hac Vice (Paid $100 PHV fee; receipt number AMSSDC-4708414) by Novo Nordisk Inc. (Attachments: # 1 Certificate of Good Standing - District of Columbia, # 2 Certificate of Good Standing - New York)(Morris, Christopher) (Entered: 11/17/2021) |
| 11/18/2021 | | TEXT ONLY ORDER granting 20 Motion to Appear Pro Hac Vice; granting 21 Motion to Appear Pro Hac Vice; granting 22 Motion to Appear Pro Hac Vice; granting 23 Motion to Appear Pro Hac Vice. Andrew Yaphe, James P. Rouhandeh, Neal A. Potischman, and David B. Toscana are hereby admitted pro hac vice upon registering for electronic filing. No further written order will issue. Signed by Magistrate Judge Michael T. Parker on November 18, 2021 (KPM) (Entered: 11/18/2021) |
| 11/19/2021 | 24 | NOTICE of Appearance by Shirlethia V. Franklin on behalf of Sanofi-Aventis U.S. LLC (Franklin, Shirlethia) (Entered: 11/19/2021) |
| 12/02/2021 | 25 | MOTION to Withdraw as Attorney *Kathy K. Smith* by CVS Health Corporation, CVS Pharmacy, Inc., Caremark PCS Health, L.L.C., Caremark RX, L.L.C., Caremark, L.L.C. (Mayo, J.) (Entered: 12/02/2021) |
| 12/03/2021 | 26 | ORDER granting 25 Motion for Withdrawal of Attorney. Signed by Magistrate Judge Michael T. Parker on December 3, 2021. (AS) (Entered: 12/03/2021) |
| 12/07/2021 | 27 | NOTICE of Appearance by Phillip S. Sykes on behalf of Novo Nordisk Inc. (Sykes, Phillip) (Entered: 12/07/2021) |
| 12/07/2021 | 28 | NOTICE of Appearance by P. Ryan Beckett on behalf of Novo Nordisk Inc. (Beckett, P.) (Entered: 12/07/2021) |
| 12/09/2021 | 29 | MOTION for William Cogliaese to Appear Pro Hac Vice (Paid $100 PHV fee; receipt number AMSSDC-4722528) by Sanofi-Aventis U.S. LLC (Attachments: # 1 Exhibit 1 - Certificates of Good Standing)(Kaufman, R.) (Entered: 12/09/2021) |
| 12/09/2021 | 30 | NOTICE of Appearance by Robert L. Gibbs on behalf of Eli Lilly and Company (Gibbs, Robert) (Entered: 12/09/2021) |
| 12/10/2021 | 31 | MOTION for Andrew A. Kassof to Appear Pro Hac Vice (Paid $100 PHV fee; receipt number AMSSDC-4723937) by Eli Lilly and Company (Attachments: # 1 Exhibit A - Certificate of Good Standing)(Gibbs, Robert) (Entered: 12/10/2021) |
| 12/10/2021 | 32 | MOTION for James F. Hurst to Appear Pro Hac Vice (Paid $100 PHV fee; receipt number AMSSDC-4723947) by Eli Lilly and Company (Attachments: # 1 Exhibit Certificate of Good Standing)(Gibbs, Robert) (Entered: 12/10/2021) |

| | | |
|---|---|---|
| 12/10/2021 | [33](#) | MOTION for Diana M. Watral to Appear Pro Hac Vice (Paid $100 PHV fee; receipt number AMSSDC-4723957) by Eli Lilly and Company (Attachments: # [1](#) Exhibit Certificate of Good Standing)(Gibbs, Robert) (Entered: 12/10/2021) |
| 12/10/2021 | [34](#) | MOTION for Ryan J. Moorman to Appear Pro Hac Vice (Paid $100 PHV fee; receipt number AMSSDC-4723968) by Eli Lilly and Company (Attachments: # [1](#) Exhibit Certificate of Good Standing)(Gibbs, Robert) (Entered: 12/10/2021) |
| 12/10/2021 | [35](#) | MOTION to Dismiss *for Lack of Personal Jurisdiction Under Fed. R. Civ. P. 12(b)(2)* by Eli Lilly and Company, Novo Nordisk Inc., Sanofi-Aventis U.S. LLC (Beckett, P.) (Entered: 12/10/2021) |
| 12/10/2021 | [36](#) | MEMORANDUM in Support re [35](#) MOTION to Dismiss *for Lack of Personal Jurisdiction Under Fed. R. Civ. P. 12(b)(2)* filed by Eli Lilly and Company, Novo Nordisk Inc., Sanofi-Aventis U.S. LLC (Beckett, P.) (Entered: 12/10/2021) |
| 12/10/2021 | [37](#) | ***ERROR***DISREGARD THIS ENTRY*** MOTION to Dismiss by Eli Lilly and Company (Gibbs, Robert) Modified on 12/10/2021 (KNS). (Entered: 12/10/2021) |
| 12/10/2021 | [38](#) | ***ERROR***DISREGARD THIS ENTRY*** MOTION to Dismiss by Eli Lilly and Company, Novo Nordisk Inc., Sanofi-Aventis U.S. LLC (Gibbs, Robert) Modified on 12/13/2021 (KNS). (Entered: 12/10/2021) |
| 12/10/2021 | [39](#) | MEMORANDUM IN SUPPORT re [41](#) MOTION to Dismiss filed by Eli Lilly and Company, Novo Nordisk Inc., Sanofi-Aventis U.S. LLC (Gibbs, Robert) Modified on 12/13/2021 (KNS). (Entered: 12/10/2021) |
| 12/10/2021 | | DOCKET ANNOTATION as to #s [37](#) and [38](#) : Attorney advises that there is an error in this entry, and it should be disregarded. It has been correctly refiled as Doc. [41](#) . (KNS) Modified on 12/13/2021 (KNS). (Entered: 12/10/2021) |
| 12/10/2021 | [40](#) | Corporate Disclosure Statement by Eli Lilly and Company (Gibbs, Robert) (Entered: 12/10/2021) |
| 12/10/2021 | [41](#) | MOTION to Dismiss by Eli Lilly and Company, Novo Nordisk Inc., Sanofi-Aventis U.S. LLC (Gibbs, Robert) (Entered: 12/10/2021) |
| 12/10/2021 | [42](#) | MOTION to Dismiss for Lack of Jurisdiction *(Rule 12(b)(2) Motion to Dismiss the Second Amended Complaint for Lack of Personal Jurisdiction)* by Optum, Inc., Optumrx Inc., Unitedhealth Group, Inc. (Campbell, Roy) (Entered: 12/10/2021) |
| 12/10/2021 | [43](#) | MEMORANDUM in Support re [42](#) MOTION to Dismiss for Lack of Jurisdiction *(Rule 12(b)(2) Motion to Dismiss the Second Amended Complaint for Lack of Personal Jurisdiction)* filed by Optum, Inc., Optumrx Inc., Unitedhealth Group, Inc. (Campbell, Roy) (Entered: 12/10/2021) |
| 12/10/2021 | [44](#) | MOTION to Dismiss *(PBM Defendants' Motion to Dismiss Second Amended Complaint for Failure to State A Claim Upon Which Relief Can Be Granted)* by CVS Health Corporation, CVS Pharmacy, Inc., Caremark PCS Health, L.L.C., Caremark RX, L.L.C., Caremark, L.L.C., ESI Mail Pharmacy Services, Inc., Evernorth Health, Inc., Express Scripts Administrators, LLC, Express Scripts Pharmacy, Inc., Express Scripts, Inc., Optum, Inc., Optumrx Inc., Unitedhealth Group, Inc. (Campbell, Roy) (Entered: 12/10/2021) |
| 12/10/2021 | [45](#) | MEMORANDUM in Support re [44](#) MOTION to Dismiss *(PBM Defendants' Motion to Dismiss Second Amended Complaint for Failure to State A Claim Upon Which Relief Can Be Granted)* filed by CVS Health Corporation, CVS Pharmacy, Inc., Caremark PCS Health, L.L.C., Caremark RX, L.L.C., Caremark, L.L.C., ESI Mail Pharmacy Services, Inc., Evernorth Health, Inc., Express Scripts Administrators, LLC, Express Scripts Pharmacy, Inc., Express Scripts, Inc., Optum, Inc., Optumrx Inc., Unitedhealth Group, Inc. (Campbell, Roy) (Entered: 12/10/2021) |
| 12/13/2021 | | TEXT ONLY ORDER granting [29](#) Motion to Appear Pro Hac Vice; granting [31](#) Motion to Appear Pro Hac Vice; granting [32](#) Motion to Appear Pro Hac Vice; granting [33](#) Motion to Appear Pro Hac Vice; granting [34](#) Motion to Appear Pro Hac Vice. William Coglianese, Andrew A. Kassof, James F. Hurst, Diana M. Watral, and Ryan J. Moorman are hereby admitted pro hac vice upon registering for electronic filing. No further written order will issue. Signed by Magistrate Judge Michael T. Parker on December 13, 2021 (KPM) (Entered: 12/13/2021) |
| 12/13/2021 | [46](#) | NOTICE of Appearance by Sarah Katherine Embry on behalf of CVS Health Corporation, CVS Pharmacy, Inc., Caremark PCS Health, L.L.C., Caremark RX, L.L.C., Caremark, L.L.C. (Embry, Sarah) (Entered: 12/13/2021) |
| 12/14/2021 | [47](#) | Corporate Disclosure Statement by Optum, Inc., Optumrx Inc., Unitedhealth Group, Inc. (Campbell, Roy) (Entered: 12/14/2021) |
| 12/14/2021 | [48](#) | DEMAND for Trial by Jury by The State of Mississippi, Ex Rel. Lynn Fitch Attorney General (Liston, William) (Entered: 12/14/2021) |
| 12/15/2021 | [49](#) | ORDER STAYING DISCOVERY AND DISCLOSURE REQUIREMENTS. Signed by Magistrate Judge Michael T. Parker on December 15, 2021. (AS) (Entered: 12/15/2021) |
| 12/16/2021 | [50](#) | MOTION for Extension of Time to File Response/Reply *To Motions To Dismiss* by The State of Mississippi, Ex Rel. Lynn Fitch Attorney General (Liston, William) (Entered: 12/16/2021) |
| 12/16/2021 | [51](#) | ORDER granting [50](#) Motion for Extension of Time to File Response/Reply. Responses due by 1/18/2022. Replies due by 1/25/2022. Signed by District Judge Kristi H. Johnson on 12/16/21. (SCD) (Entered: 12/16/2021) |
| 12/23/2021 | [52](#) | Corporate Disclosure Statement by CVS Health Corporation, CVS Pharmacy, Inc., Caremark RX, L.L.C., Caremark, L.L.C. (Mayo, J.) (Entered: 12/23/2021) |
| 12/28/2021 | [53](#) | MOTION for Kelley Connolly Barnaby to Appear Pro Hac Vice (Paid $100 PHV fee; receipt number AMSSDC-4734165) by Optum, Inc., Optumrx Inc., Unitedhealth Group, Inc. (Attachments: # [1](#) Exhibit A - Client List, continued, # |

| | | |
|---|---|---|
| | | **2** Exhibit B - GA Cert of Good Standing, # **3** Exhibit C - DC Cert of Good Standing(Campbell, Roy) (Entered: 12/28/2021) |
| 12/28/2021 | 54 | MOTION for Brian D. Boone to Appear Pro Hac Vice (Paid $100 PHV fee; receipt number AMSSDC-4734166) by Optum, Inc., Optumrx Inc., Unitedhealth Group, Inc. (Attachments: # **1** Exhibit A - Client List, continued, # **2** Exhibit B - GA Cert of Good Standing, # **3** Exhibit C - NC Cert of Good Standing, # **4** Exhibit D - DC Cert of Good Standing) (Campbell, Roy) (Entered: 12/28/2021) |
| 12/28/2021 | 55 | MOTION for Elizabeth Broadway Brown to Appear Pro Hac Vice (Paid $100 PHV fee; receipt number AMSSDC-4734167) by Optum, Inc., Optumrx Inc., Unitedhealth Group, Inc. (Attachments: # **1** Exhibit A - Client List, continued, # **2** Exhibit B - GA Cert of Good Standing)(Campbell, Roy) (Entered: 12/28/2021) |
| 12/28/2021 | 56 | MOTION for Lane Zuraw to Appear Pro Hac Vice (Paid $100 PHV fee; receipt number AMSSDC-4734168) by Optum, Inc., Optumrx Inc., Unitedhealth Group, Inc. (Attachments: # **1** Exhibit A - Client List, continued, # **2** Exhibit B - CA Cert of Good Standing, # **3** Exhibit C - NY Cert of Good Standing)(Campbell, Roy) (Main Document 56 replaced on 12/29/2021) (CO). Modified with saved pdf file on 12/29/2021 (CO). (Entered: 12/28/2021) |
| 12/29/2021 | | DOCKET ANNOTATION as to 56 : Any PDF fillable on-line forms once completed should be electronically converted to PDF by printing to the PDF printer. Save the file with an appropriate name in a folder. E-file the electronically converted PDF form, not the form which was filled in and saved. Court staff has made the correction. Attorney is directed to follow this procedure in future filings. (CO) (Entered: 12/29/2021) |
| 12/29/2021 | | TEXT ONLY ORDER granting 53 Motion to Appear Pro Hac Vice; granting 54 Motion to Appear Pro Hac Vice; granting 55 Motion to Appear Pro Hac Vice; granting 56 Motion to Appear Pro Hac Vice. Kelley Connolly Barnaby, Brian D. Boone, Elizabeth Broadway Brown, and Lane Zuraw are hereby admitted pro hac vice upon registering for electronic filing. No further written order will issue. Signed by Magistrate Judge Michael T. Parker on December 29, 2021 (KPM) (Entered: 12/29/2021) |
| 01/05/2022 | 57 | MOTION for Joanne Cicala to Appear Pro Hac Vice (Paid $100 PHV fee; receipt number AMSSDC-4737695) by The State of Mississippi, Ex Rel. Lynn Fitch Attorney General (Attachments: # **1** Attachment Certificate of Good Standing) (Deas, William) (Entered: 01/05/2022) |
| 01/05/2022 | 58 | MOTION for Josh Wackerly to Appear Pro Hac Vice (Paid $100 PHV fee; receipt number AMSSDC-4737728) by The State of Mississippi, Ex Rel. Lynn Fitch Attorney General (Attachments: # **1** Attachment Certificate of Good Standing) (Deas, William) (Entered: 01/05/2022) |
| 01/05/2022 | | TEXT ONLY ORDER denying 57 Motion to Appear Pro Hac Vice; denying 58 Motion to Appear Pro Hac Vice. The certificates of good standing have expired. The motions are denied without prejudice to movants right to file corrected motions with valid certificates of good standing. No further written order will issue. Signed by Magistrate Judge Michael T. Parker on January 5, 2022 (KPM) (Entered: 01/05/2022) |
| 01/06/2022 | 59 | Amended MOTION for Josh Wackerly to Appear Pro Hac Vice by The State of Mississippi, Ex Rel. Lynn Fitch Attorney General (Attachments: # **1** Attachment Certificate of Good Standing)(Deas, William) (Entered: 01/06/2022) |
| 01/06/2022 | 60 | Amended MOTION for Joanne Cicala to Appear Pro Hac Vice by The State of Mississippi, Ex Rel. Lynn Fitch Attorney General (Attachments: # **1** Attachment Certificate of Good Standing)(Deas, William) (Entered: 01/06/2022) |
| 01/07/2022 | 61 | MOTION for Theresa C. Martin to Appear Pro Hac Vice (Paid $100 PHV fee; receipt number AMSSDC-4739254) by Sanofi-Aventis U.S. LLC (Attachments: # **1** Exhibit 1 - Certificates of Good Standing)(Kaufman, R.) (Entered: 01/07/2022) |
| 01/07/2022 | | TEXT ONLY ORDER granting 59 Amended Motion to Appear Pro Hac Vice; granting 60 Amended Motion to Appear Pro Hac Vice. Josh Wackerly and Joanne Cicala are hereby admitted pro hac vice upon registering for electronic filing. No further written order will issue. Signed by Magistrate Judge Michael T. Parker on January 7, 2022 (KPM) (Entered: 01/07/2022) |
| 01/07/2022 | | TEXT ONLY ORDER granting 61 Motion to Appear Pro Hac Vice. Theresa C. Martin is hereby admitted pro hac vice upon registering for electronic filing. No further written order will issue. Signed by Magistrate Judge Michael T. Parker on January 7, 2022 (KPM) (Entered: 01/07/2022) |
| 01/13/2022 | 62 | MOTION for Extension of Time to File Response/Reply as to 39 Memorandum in Support, 36 Memorandum in Support of Motion,, 45 Memorandum in Support of Motion,, 44 MOTION to Dismiss *(PBM Defendants' Motion to Dismiss Second Amended Complaint for Failure to State A Claim Upon Which Relief Can Be Granted)*, 43 Memorandum in Support of Motion, 35 MOTION to Dismiss *for Lack of Personal Jurisdiction Under Fed. R. Civ. P. 12(b)(2)*, 41 MOTION to Dismiss , 42 MOTION to Dismiss for Lack of Jurisdiction *(Rule 12(b)(2) Motion to Dismiss the Second Amended Complaint for Lack of Personal Jurisdiction)* by The State of Mississippi, Ex Rel. Lynn Fitch Attorney General (Ellis, Tanya) (Entered: 01/13/2022) |
| 01/14/2022 | | TEXT ONLY ORDER granting 62 Motion for Extension of Time to File Response/Reply as to 39 Memorandum in Support, 36 Memorandum in Support of Motion, 45 Memorandum in Support of Motion, 44 MOTION to Dismiss PBM Defendants' Motion to Dismiss Second Amended. NO FURTHER WRITTEN ORDER TO FOLLOW. Signed by District Judge Kristi H. Johnson on 1/14/22. (KJ) (Entered: 01/14/2022) |
| 01/21/2022 | 63 | ***ERROR***DISREGARD THIS ENTRY*** MOTION for Leave to File *Amended Complaint* by The State of Mississippi, Ex Rel. Lynn Fitch Attorney General (Attachments: # **1** Exhibit Third Amended Complaint)(Ellis, Tanya) |

| | | Modified on 1/25/2022 (KNS). (Entered: 01/21/2022) |
|---|---|---|
| 01/21/2022 | 64 | MOTION For Court Order Allowing Specific Allegations In The Amended Complaint by The State of Mississippi, Ex Rel. Lynn Fitch Attorney General (Ellis, Tanya) (Entered: 01/21/2022) |
| 01/25/2022 | 65 | MOTION for Leave to File *Amended Complaint* by The State of Mississippi, Ex Rel. Lynn Fitch Attorney General (Attachments: # 1 Exhibit Third Amended Complaint)(Ellis, Tanya) (Entered: 01/25/2022) |
| 01/25/2022 | | DOCKET ANNOTATION as to # 63 : Attorney advises that there is an error in this entry, and it should be disregarded. It has been correctly refiled as Doc. 65 . (KNS) (Entered: 01/25/2022) |
| 02/04/2022 | 66 | MOTION for Extension of Time to File Response/Reply as to 64 MOTION For Court Order Allowing Specific Allegations In The Amended Complaint , 65 MOTION for Leave to File *Amended Complaint* by CVS Health Corporation, CVS Pharmacy, Inc., Caremark PCS Health, L.L.C., Caremark RX, L.L.C., Caremark, L.L.C. (Mayo, J.) (Entered: 02/04/2022) |
| 02/07/2022 | 67 | MOTION for Atticus William DeProspo to Appear Pro Hac Vice (Paid $100 PHV fee; receipt number AMSSDC-4760097) by CVS Health Corporation, CVS Pharmacy, Inc., Caremark PCS Health, L.L.C., Caremark RX, L.L.C., Caremark, L.L.C. (Attachments: # 1 Exhibit A - Additional Clients, # 2 Exhibit B - NY Certificate of Good Standing, # 3 Exhibit C - AL Certificate of Good Standing, # 4 Exhibit D - DC Certificate of Good Standing)(Mayo, J.) (Entered: 02/07/2022) |
| 02/07/2022 | | TEXT ONLY ORDER granting 67 Motion to Appear Pro Hac Vice. Atticus William DeProspo is hereby admitted pro hac vice upon completion of the registration procedures found on the Court's website and at the following link: https://www.mssd.uscourts.gov/attorney-admissions-page. No further written order will issue. Signed by Magistrate Judge Michael T. Parker on February 7, 2022 (KPM) (Entered: 02/07/2022) |
| 02/07/2022 | | TEXT ONLY ORDER granting 66 Motion. The deadline to respond to the Motion for Order Allowing Specific Allegations 64 and Motion for Leave to Amend 65 is extended to 2/10/2022. No further written order will issue. Signed by Magistrate Judge Michael T. Parker on February 7, 2022. (AS) (Entered: 02/07/2022) |
| 02/10/2022 | 68 | MOTION to Extend Answer / Response Deadline *to the State's Third Amended Complaint* by CVS Health Corporation, CVS Pharmacy, Inc., Caremark PCS Health, L.L.C., Caremark RX, L.L.C., Caremark, L.L.C., ESI Mail Pharmacy Services, Inc., Eli Lilly and Company, Evernorth Health, Inc., Express Scripts Administrators, LLC, Express Scripts Pharmacy, Inc., Express Scripts, Inc., Novo Nordisk Inc., Optum, Inc., Optumrx Inc., Sanofi-Aventis U.S. LLC, Unitedhealth Group, Inc. (Mayo, J.) (Entered: 02/10/2022) |
| 02/11/2022 | 69 | ORDER granting 64 Plaintiff's Motion for Order Allowing Specific Allegations in the Amended Complaint; granting 65 Plaintiff's Motion for Leave to Amend; granting 68 Defendants' Unopposed Motion to Extend Deadline to Answer or Otherwise Respond. Signed by Magistrate Judge Michael T. Parker on February 10, 2022. (AS) Modified to reflect correct signature date on 2/11/2022 (KNS). (Entered: 02/11/2022) |
| 02/11/2022 | 70 | MOTION for Craig D. Singer to Appear Pro Hac Vice (Paid $100 PHV fee; receipt number AMSSDC-4765111) by CVS Health Corporation, CVS Pharmacy, Inc., Caremark PCS Health, L.L.C., Caremark RX, L.L.C., Caremark, L.L.C. (Attachments: # 1 Exhibit A - Additional Clients, # 2 Exhibit B - Court Admissions, # 3 Exhibit C - PA Certificate of Good Standing, # 4 Exhibit D - DC Certificate of Good Standing)(Mayo, J.) (Entered: 02/11/2022) |
| 02/11/2022 | | TEXT ONLY ORDER granting 70 Motion to Appear Pro Hac Vice. Craig D. Singer is hereby admitted pro hac vice upon completion of the registration procedures found on the Court's website and at the following link: https://www.mssd.uscourts.gov/attorney-admissions-page. No further written order will issue. Signed by Magistrate Judge Michael T. Parker on February 11, 2022 (KPM) (Entered: 02/11/2022) |
| 02/17/2022 | 71 | AMENDED COMPLAINT against All Defendants, filed by The State of Mississippi, Ex Rel. Lynn Fitch Attorney General.(Ellis, Tanya) (Entered: 02/17/2022) |
| 02/17/2022 | 72 | MOTION For Remand-Related Discovery by The State of Mississippi, Ex Rel. Lynn Fitch Attorney General (Ellis, Tanya) (Entered: 02/17/2022) |
| 02/17/2022 | 73 | MEMORANDUM in Support re 72 MOTION For Remand-Related Discovery filed by The State of Mississippi, Ex Rel. Lynn Fitch Attorney General (Ellis, Tanya) (Entered: 02/17/2022) |
| 02/21/2022 | 74 | WAIVER OF SERVICE Returned Executed by The State of Mississippi, Ex Rel. Lynn Fitch Attorney General. OptumInsight, Inc. waiver sent on 2/17/2022, answer due 4/18/2022. (Ellis, Tanya) (Entered: 02/21/2022) |
| 02/21/2022 | 75 | WAIVER OF SERVICE Returned Executed by The State of Mississippi, Ex Rel. Lynn Fitch Attorney General. OptumRx Holdings, LLC waiver sent on 2/17/2022, answer due 4/18/2022. (Ellis, Tanya) (Entered: 02/21/2022) |
| 02/21/2022 | 76 | MOTION for R. Kennon Poteat, III to Appear Pro Hac Vice (Paid $100 PHV fee; receipt number AMSSDC-4771463) by CVS Health Corporation, CVS Pharmacy, Inc., Caremark PCS Health, L.L.C., Caremark RX, L.L.C., Caremark, L.L.C. (Attachments: # 1 Exhibit A - Additional Clients, # 2 Exhibit B - VA Certificate of Good Standing, # 3 Exhibit C - DC Certificate of Good Standing)(Mayo, J.) (Entered: 02/21/2022) |
| 02/22/2022 | | TEXT ONLY ORDER granting 76 Motion to Appear Pro Hac Vice. R. Kennon Poteat, III is hereby admitted pro hac vice upon completion of the registration procedures found on the Court's website and at the following link: https://www.mssd.uscourts.gov/attorney-admissions-page. No further written order will issue. Signed by Magistrate Judge Michael T. Parker on February 22, 2022 (KPM) (Entered: 02/22/2022) |

| | | |
|---|---|---|
| 02/25/2022 | [77](#) | WAIVER OF SERVICE Returned Executed by The State of Mississippi, Ex Rel. Lynn Fitch Attorney General. Medco Health Solutions, Inc. waiver sent on 2/17/2022, answer due 4/18/2022. (Ellis, Tanya) (Entered: 02/25/2022) |
| 03/03/2022 | [78](#) | RESPONSE in Opposition re [72](#) MOTION For Remand-Related Discovery filed by ESI Mail Pharmacy Services, Inc., Express Scripts Pharmacy, Inc. (Rippee, Stephanie) (Entered: 03/03/2022) |
| 03/03/2022 | [79](#) | MEMORANDUM in Opposition re [72](#) MOTION For Remand-Related Discovery filed by ESI Mail Pharmacy Services, Inc., Express Scripts Pharmacy, Inc. (Rippee, Stephanie) (Entered: 03/03/2022) |
| 03/08/2022 | [80](#) | MOTION for Enu Mainigi to Appear Pro Hac Vice (Paid $100 PHV fee; receipt number AMSSDC-4785106) by CVS Health Corporation, CVS Pharmacy, Inc., Caremark PCS Health, L.L.C., Caremark RX, L.L.C., Caremark, L.L.C. (Attachments: # [1](#) Exhibit A - Additional Clients, # [2](#) Exhibit B - Additional Courts of Admission, # [3](#) Exhibit C - MD Certificate of Good Standing, # [4](#) Exhibit D - DC Certificate of Good Standing)(Mayo, J.) (Entered: 03/08/2022) |
| 03/09/2022 | | TEXT ONLY ORDER granting [80](#) Motion to Appear Pro Hac Vice. Enu Mainigi is hereby admitted pro hac vice upon completion of the registration procedures found on the Court's website and at the following link: https://www.mssd.uscourts.gov/attorney-admissions-page. No further written order will issue. Signed by Magistrate Judge Michael T. Parker on March 9, 2022 (KPM) (Entered: 03/09/2022) |
| 03/10/2022 | [81](#) | REPLY to Response to Motion re [72](#) MOTION For Remand-Related Discovery filed by The State of Mississippi, Ex Rel. Lynn Fitch Attorney General (Ellis, Tanya) (Entered: 03/10/2022) |
| 03/14/2022 | [82](#) | NOTICE of Appearance by Caleb A. Pracht-State Gov on behalf of All Plaintiffs (Pracht-State Gov, Caleb) (Entered: 03/14/2022) |
| 03/21/2022 | [83](#) | MOTION to Dismiss *Plaintiff's Third Amended Complaint* by Eli Lilly and Company, Novo Nordisk Inc., Sanofi-Aventis U.S. LLC (Gibbs, Robert) (Entered: 03/21/2022) |
| 03/21/2022 | [84](#) | MEMORANDUM IN SUPPORT re [83](#) MOTION to Dismiss *Plaintiff's Third Amended Complaint* filed by Eli Lilly and Company, Novo Nordisk Inc., Sanofi-Aventis U.S. LLC (Gibbs, Robert) (Entered: 03/21/2022) |
| 03/21/2022 | [85](#) | MOTION to Dismiss for Lack of Jurisdiction *UNDER FED.R.CIV.P. 12(b)(2)* by Eli Lilly and Company, Novo Nordisk Inc., Sanofi-Aventis U.S. LLC (Beckett, P.) (Entered: 03/21/2022) |
| 03/21/2022 | [86](#) | MEMORANDUM in Support re [85](#) MOTION to Dismiss for Lack of Jurisdiction *UNDER FED.R.CIV.P. 12(b)(2)* filed by Eli Lilly and Company, Novo Nordisk Inc., Sanofi-Aventis U.S. LLC (Beckett, P.) (Entered: 03/21/2022) |
| 03/21/2022 | [87](#) | MOTION to Dismiss for Lack of Jurisdiction *(Rule 12(b)(2) Motion to Dismiss the Third Amended Complaint for Lack of Personal Jurisdiction)* by Optum, Inc., OptumInsight, Inc., OptumRx Holdings, LLC, Unitedhealth Group, Inc. (Campbell, Roy) (Entered: 03/21/2022) |
| 03/21/2022 | [88](#) | MEMORANDUM in Support re [87](#) MOTION to Dismiss for Lack of Jurisdiction *(Rule 12(b)(2) Motion to Dismiss the Third Amended Complaint for Lack of Personal Jurisdiction)* filed by Optum, Inc., OptumInsight, Inc., OptumRx Holdings, LLC, Unitedhealth Group, Inc. (Campbell, Roy) (Entered: 03/21/2022) |
| 03/21/2022 | [89](#) | MOTION to Dismiss *(PBM Defendants' Motion to Dismiss the Third Amended Complaint for Failure to State A Claim Upon Which Relief Can Be Granted)* by CVS Health Corporation, CVS Pharmacy, Inc., Caremark PCS Health, L.L.C., Caremark RX, L.L.C., Caremark, L.L.C., ESI Mail Pharmacy Services, Inc., Evernorth Health, Inc., Express Scripts Administrators, LLC, Express Scripts Pharmacy, Inc., Express Scripts, Inc., Optum, Inc., OptumInsight, Inc., OptumRx Holdings, LLC, Optumrx Inc., Unitedhealth Group, Inc. (Campbell, Roy) (Entered: 03/21/2022) |
| 03/21/2022 | [90](#) | MEMORANDUM in Support re [89](#) MOTION to Dismiss *(PBM Defendants' Motion to Dismiss the Third Amended Complaint for Failure to State A Claim Upon Which Relief Can Be Granted)* filed by CVS Health Corporation, CVS Pharmacy, Inc., Caremark PCS Health, L.L.C., Caremark RX, L.L.C., Caremark, L.L.C., ESI Mail Pharmacy Services, Inc., Evernorth Health, Inc., Express Scripts Administrators, LLC, Express Scripts Pharmacy, Inc., Express Scripts, Inc., Optum, Inc., OptumInsight, Inc., OptumRx Holdings, LLC, Optumrx Inc., Unitedhealth Group, Inc. (Campbell, Roy) (Entered: 03/21/2022) |
| 03/22/2022 | | TEXT ONLY ORDER finding as moot [35](#) Motion to Dismiss, [41](#) Motion to Dismiss, [42](#) Motion to Dismiss for Lack of Jurisdiction, and [44](#) Motion to Dismiss. These motions no longer address the operative complaint. NO FURTHER WRITTEN ORDER SHALL ISSUE. Signed by District Judge Kristi H. Johnson on 3/22/2022. (ANT) (Entered: 03/22/2022) |
| 03/25/2022 | [91](#) | MOTION for Leave to File *A Corrected Memorandum Supporting Their Rule 12(b)(2) Motion to Dismiss the Third Amended Complaint for Lack of Personal Jurisdiction* by Optum, Inc., OptumInsight, Inc., OptumRx Holdings, LLC, Unitedhealth Group, Inc. (Attachments: # [1](#) Exhibit A (Corrected Memorandum Supporting 12(b)(2) Motion to Dismiss Third Amended Complaint), # [2](#) Exhibit B (Pages to Corrected Memorandum Reflecting Redlined Changes))(Campbell, Roy) (Entered: 03/25/2022) |
| 03/28/2022 | | TEXT ONLY ORDER granting [91](#) Motion for Leave to File. NO FURTHER WRITTEN ORDER SHALL ISSUE. Signed by District Judge Kristi H. Johnson on 3/28/2022. (ANT) (Entered: 03/28/2022) |
| 03/28/2022 | [92](#) | MEMORANDUM in Support re [87](#) MOTION to Dismiss for Lack of Jurisdiction *(Rule 12(b)(2) Motion to Dismiss the Third Amended Complaint for Lack of Personal Jurisdiction) (CORRECTED)* filed by Optum, Inc., OptumInsight, Inc., OptumRx Holdings, LLC, Unitedhealth Group, Inc. (Campbell, Roy) (Entered: 03/28/2022) |

| | | |
|---|---|---|
| 04/15/2022 | 93 | MOTION to Withdraw as Attorney by The State of Mississippi, Ex Rel. Lynn Fitch Attorney General (Gordon-State Gov, Ta'Shia) (Entered: 04/15/2022) |
| 04/18/2022 | | TEXT ONLY ORDER granting 93 Motion to Withdraw as Attorney. Attorney Ta'Shia S. Gordon-State Gov terminated. No further written order will issue. Signed by Magistrate Judge Michael T. Parker on April 18, 2022 (KPM) (Entered: 04/18/2022) |
| 04/20/2022 | 94 | MOTION for Daniel Martin Dockery to Appear Pro Hac Vice (Paid $100 PHV fee; receipt number AMSSDC-4818831) by CVS Health Corporation, CVS Pharmacy, Inc., Caremark PCS Health, L.L.C., Caremark RX, L.L.C., Caremark, L.L.C. (Attachments: # 1 Exhibit A - Additional Clients, # 2 Exhibit B - Additional Courts of Admission, # 3 Exhibit C - NY Certificate of Good Standing, # 4 Exhibit D - DC Certificate of Good Standing)(Embry, Sarah) (Entered: 04/20/2022) |
| 04/20/2022 | | TEXT ONLY ORDER granting 94 Motion to Appear Pro Hac Vice. Daniel Martin Dockery is hereby admitted pro hac vice upon completion of the registration procedures found on the Court's website and at the following link: https://www.mssd.uscourts.gov/attorney-admissions-page. No further written order will issue. Signed by Magistrate Judge Michael T. Parker on April 20, 2022 (KPM) (Entered: 04/20/2022) |
| 04/20/2022 | 95 | RESPONSE in Opposition re 89 MOTION to Dismiss *(PBM Defendants' Motion to Dismiss the Third Amended Complaint for Failure to State A Claim Upon Which Relief Can Be Granted)* filed by The State of Mississippi, Ex Rel. Lynn Fitch Attorney General (Attachments: # 1 Exhibit Court Order - Kentucky v. Norvo Nordisk, # 2 Exhibit Court Order - Hood v. BASF)(Deas, William) (Entered: 04/20/2022) |
| 04/20/2022 | 96 | MEMORANDUM in Opposition re 89 MOTION to Dismiss *(PBM Defendants' Motion to Dismiss the Third Amended Complaint for Failure to State A Claim Upon Which Relief Can Be Granted)* filed by The State of Mississippi, Ex Rel. Lynn Fitch Attorney General (Deas, William) (Entered: 04/20/2022) |
| 04/20/2022 | 97 | RESPONSE in Opposition re 83 MOTION to Dismiss *Plaintiff's Third Amended Complaint* filed by The State of Mississippi, Ex Rel. Lynn Fitch Attorney General (Attachments: # 1 Exhibit Court Order - Hood v. Microsoft, # 2 Exhibit Court Order - Hood v. BASF)(Deas, William) (Entered: 04/20/2022) |
| 04/20/2022 | 98 | MEMORANDUM in Opposition re 83 MOTION to Dismiss *Plaintiff's Third Amended Complaint* filed by The State of Mississippi, Ex Rel. Lynn Fitch Attorney General (Deas, William) (Entered: 04/20/2022) |
| 04/20/2022 | 99 | RESPONSE in Opposition re 85 MOTION to Dismiss for Lack of Jurisdiction *UNDER FED.R.CIV.P. 12(b)(2)* filed by The State of Mississippi, Ex Rel. Lynn Fitch Attorney General (Attachments: # 1 Exhibit 1)(Ellis, Tanya) (Entered: 04/20/2022) |
| 04/20/2022 | 100 | MEMORANDUM in Opposition re 85 MOTION to Dismiss for Lack of Jurisdiction *UNDER FED.R.CIV.P. 12(b)(2)* filed by The State of Mississippi, Ex Rel. Lynn Fitch Attorney General (Ellis, Tanya) (Entered: 04/20/2022) |
| 04/20/2022 | 101 | RESPONSE in Opposition re 87 MOTION to Dismiss for Lack of Jurisdiction *(Rule 12(b)(2) Motion to Dismiss the Third Amended Complaint for Lack of Personal Jurisdiction)* filed by The State of Mississippi, Ex Rel. Lynn Fitch Attorney General (Attachments: # 1 Exhibit 1)(Ellis, Tanya) (Entered: 04/20/2022) |
| 04/20/2022 | 102 | MEMORANDUM in Opposition re 87 MOTION to Dismiss for Lack of Jurisdiction *(Rule 12(b)(2) Motion to Dismiss the Third Amended Complaint for Lack of Personal Jurisdiction)* filed by The State of Mississippi, Ex Rel. Lynn Fitch Attorney General (Ellis, Tanya) (Entered: 04/20/2022) |
| 05/11/2022 | 103 | Rebuttal re 85 MOTION to Dismiss for Lack of Jurisdiction *UNDER FED.R.CIV.P. 12(b)(2)* filed by Eli Lilly and Company, Novo Nordisk Inc., Sanofi-Aventis U.S. LLC (Beckett, P.) (Entered: 05/11/2022) |
| 05/11/2022 | 104 | Rebuttal re 83 MOTION to Dismiss *Plaintiff's Third Amended Complaint* filed by Eli Lilly and Company, Novo Nordisk Inc., Sanofi-Aventis U.S. LLC (Gibbs, Robert) (Entered: 05/11/2022) |
| 05/11/2022 | 105 | REPLY to Response to Motion re 89 MOTION to Dismiss *(PBM Defendants' Motion to Dismiss the Third Amended Complaint for Failure to State A Claim Upon Which Relief Can Be Granted)* filed by CVS Health Corporation, CVS Pharmacy, Inc., Caremark PCS Health, L.L.C., Caremark RX, L.L.C., Caremark, L.L.C., ESI Mail Pharmacy Services, Inc., Evernorth Health, Inc., Express Scripts Administrators, LLC, Express Scripts Pharmacy, Inc., Express Scripts, Inc., Medco Health Solutions, Inc., Optum, Inc., OptumInsight, Inc., OptumRx Holdings, LLC, Optumrx Inc., Unitedhealth Group, Inc. (Rippee, Stephanie) (Entered: 05/11/2022) |
| 05/11/2022 | 106 | Rebuttal re 87 MOTION to Dismiss for Lack of Jurisdiction *(Rule 12(b)(2) Motion to Dismiss the Third Amended Complaint for Lack of Personal Jurisdiction)* filed by Optum, Inc., OptumInsight, Inc., OptumRx Holdings, LLC, Unitedhealth Group, Inc. (Campbell, Roy) (Entered: 05/11/2022) |
| 06/30/2022 | 107 | MOTION to Withdraw as Attorney *Lane Zuraw* by Optum, Inc., OptumInsight, Inc., OptumRx Holdings, LLC, Optumrx Inc., Unitedhealth Group, Inc. (Campbell, Roy) (Entered: 06/30/2022) |
| 07/06/2022 | | TEXT ONLY ORDER granting 107 Motion to Withdraw as Attorney. Attorney Lane Zuraw - PHV terminated. No further written order will issue. Signed by Magistrate Judge Michael T. Parker on July 6, 2022 (KPM) (Entered: 07/06/2022) |
| 07/06/2022 | 108 | ORDER denying 72 Motion for Remand-Related Discovery. Signed by District Judge Kristi H. Johnson on 7/6/2022. (ANT) (Entered: 07/06/2022) |
| 07/20/2022 | 109 | MOTION for Jean E. Richmann to Appear Pro Hac Vice (Paid $100 PHV fee; receipt number AMSSDC-4887372) by Optum, Inc., Optumrx Inc., Unitedhealth Group, Inc. (Attachments: # 1 Attachment State Bar of CA Certificate of Good |

| | | |
|---|---|---|
| | | Standing)(Campbell, Roy) (Entered: 07/20/2022) |
| 07/20/2022 | 110 | MOTION for D. Andrew Hatchett to Appear Pro Hac Vice (Paid $100 PHV fee; receipt number AMSSDC-4887387) by Optum, Inc., Optumrx Inc., Unitedhealth Group, Inc. (Attachments: # 1 Attachment State Bar of GA Certificate of Good Standing, # 2 Attachment State Bar of TX Certificate of Good Standing)(Campbell, Roy) (Entered: 07/20/2022) |
| 07/25/2022 | | TEXT ONLY ORDER granting 109 Motion to Appear Pro Hac Vice; granting 110 Motion to Appear Pro Hac Vice. Jean E. Richmann and D. Andrew Hatchett are hereby admitted pro hac vice upon completion of the registration procedures found on the Court's website and at the following link: https://www.mssd.uscourts.gov/attorney-admissions-page. No further written order will issue. Signed by Magistrate Judge Michael T. Parker on July 25, 2022 (KPM) (Entered: 07/25/2022) |
| 08/09/2022 | 111 | ORDER denying 83 Motion to Dismiss and denying 85 Motion to Dismiss for Lack of Jurisdiction. Signed by District Judge Kristi H. Johnson on 8/9/2022. (ANT) (Entered: 08/09/2022) |
| 08/15/2022 | 112 | ORDER granting 87 Motion to Dismiss. Signed by District Judge Kristi H. Johnson on 08/15/2022 (KNS) (Entered: 08/15/2022) |
| 08/22/2022 | 113 | Unopposed MOTION for Extension of Time to File Answer re 71 Amended Complaint by Eli Lilly and Company, Novo Nordisk Inc., Sanofi-Aventis U.S. LLC (Beckett, P.) (Entered: 08/22/2022) |
| 08/23/2022 | | TEXT ONLY ORDER granting 113 Manufacturer Defendants' Joint Unopposed Motion for Extension of Time to Answer or Otherwise Plead in Response to the Third Amended Complaint. Eli Lilly and Company answer due 9/9/2022; Novo Nordisk Inc. answer due 9/9/2022; Sanofi-Aventis U.S. LLC answer due 9/9/2022. No further written order will issue. Signed by Magistrate Judge Michael T. Parker on August 23, 2022. (AS) (Entered: 08/23/2022) |
| 08/29/2022 | 114 | ORDER granting in part and denying in part 89 Motion to Dismiss. Signed by District Judge Kristi H. Johnson on 08/29/2022 (KNS) (Entered: 08/29/2022) |
| 08/31/2022 | 115 | Unopposed MOTION for Extension of Time to File Answer re 71 Amended Complaint by CVS Health Corporation, Caremark PCS Health, L.L.C., Caremark RX, L.L.C., Caremark, L.L.C., ESI Mail Pharmacy Services, Inc., Evernorth Health, Inc., Express Scripts Administrators, LLC, Express Scripts Pharmacy, Inc., Express Scripts, Inc., Medco Health Solutions, Inc., Optumrx Inc. (Mayo, J.) (Entered: 08/31/2022) |
| 09/01/2022 | | TEXT ONLY ORDER granting 115 Joint Unopposed Motion for Extension of Time to Answer re 71 Amended Complaint. CVS Health Corporation answer due 9/29/2022; Caremark PCS Health, L.L.C. answer due 9/29/2022; Caremark RX, L.L.C. answer due 9/29/2022; Caremark, L.L.C. answer due 9/29/2022; Evernorth Health, Inc. answer due 9/29/2022; Express Scripts Administrators, LLC answer due 9/29/2022; Medco Health Solutions, Inc. answer due 9/29/2022; Optumrx Inc. answer due 9/29/2022. No further written order will issue. Signed by Magistrate Judge Michael T. Parker on September 1, 2022. (AS) (Entered: 09/01/2022) |
| 09/09/2022 | 116 | ANSWER to 71 Amended Complaint by Sanofi-Aventis U.S. LLC.(McDowell, Martin) (Entered: 09/09/2022) |
| 09/09/2022 | 117 | ANSWER to 71 Amended Complaint by Eli Lilly and Company.(Moorman - PHV, Ryan) (Entered: 09/09/2022) |
| 09/09/2022 | 118 | ANSWER to 71 Amended Complaint by Novo Nordisk Inc..(Beckett, P.) (Entered: 09/09/2022) |
| 09/14/2022 | | TEXT ONLY ORDER LIFTING STAY. The Court having ruled on Defendants' Motions to Dismiss, the Court hereby lifts the stay entered via 49 Order. No further written order shall issue. Signed by Magistrate Judge Michael T. Parker on September 14, 2022. (js) (Entered: 09/14/2022) |
| 09/21/2022 | 119 | MOTION to Withdraw as Attorney by The State of Mississippi, Ex Rel. Lynn Fitch Attorney General (Pracht-State Gov, Caleb) (Entered: 09/21/2022) |
| 09/22/2022 | | TEXT ONLY ORDER granting 119 Motion to Withdraw as Attorney. Attorney Caleb A. Pracht-State Gov terminated. No further written order will issue. Signed by Magistrate Judge Michael T. Parker on September 22, 2022 (KPM) (Entered: 09/22/2022) |
| 09/29/2022 | 120 | ANSWER to 71 Amended Complaint by ESI Mail Pharmacy Services, Inc., Evernorth Health, Inc., Express Scripts Administrators, LLC, Express Scripts Pharmacy, Inc., Express Scripts, Inc., Medco Health Solutions, Inc..(Scherr - PHV, Jason) Modified on 9/30/2022 to replace editable pdf (VM). (Entered: 09/29/2022) |
| 09/29/2022 | 121 | ANSWER to 71 Amended Complaint by CVS Health Corporation, Caremark PCS Health, L.L.C., Caremark RX, L.L.C., Caremark, L.L.C..(Embry, Sarah) (Entered: 09/29/2022) |
| 09/29/2022 | 122 | ANSWER to 71 Amended Complaint *(Third)* by Optumrx Inc..(Campbell, Roy) (Entered: 09/29/2022) |
| 09/30/2022 | 123 | MOTION for Ian Hogg to Appear Pro Hac Vice (Paid $100 PHV fee; receipt number AMSSDC-4947204) by Novo Nordisk Inc. (Attachments: # 1 Attachment Certificate of Good Standing)(Beckett, P.) (Entered: 09/30/2022) |
| 09/30/2022 | 124 | MOTION for Chui-Lai Cheung to Appear Pro Hac Vice (Paid $100 PHV fee; receipt number AMSSDC-4947216) by Novo Nordisk Inc. (Attachments: # 1 Attachment Certificate of Good Standing)(Beckett, P.) (Entered: 09/30/2022) |
| 10/03/2022 | | TEXT ONLY ORDER granting 123 Motion to Appear Pro Hac Vice; granting 124 Motion to Appear Pro Hac Vice. Ian Hogg and Chui-Lai Cheung are hereby admitted pro hac vice upon completion of the registration procedures found on the Court's website and at the following link: https://www.mssd.uscourts.gov/attorney-admissions-page. No further written order will issue. Signed by Magistrate Judge Michael T. Parker on October 3, 2022 (KPM) (Entered: 10/03/2022) |

| | | |
|---|---|---|
| 10/06/2022 | | Set Hearings: Telephonic Case Management Conference set for 12/1/2022 9:30 AM before Magistrate Judge Michael T. Parker. Counsel shall dial 888.273.3658, code 1055457 to connect to the call. Confidential settlement memoranda are due on or before 11/23/22. (KPM) (Entered: 10/06/2022) |
| 10/11/2022 | | Reset Hearings: Telephonic Case Management Conference RESET for 12/2/2022 9:30 AM before Magistrate Judge Michael T. Parker. Counsel shall dial 888.273.3658, code 1055457 to connect to the call. Confidential settlement memoranda are due on or before 11/23/22. (KPM) (Entered: 10/11/2022) |
| 10/25/2022 | 125 | NOTICE of Appearance by John Adam Crawford, Jr on behalf of Novo Nordisk Inc. (Crawford, John) (Entered: 10/25/2022) |
| 11/03/2022 | 126 | NOTICE to Take Deposition of Zinc Health Services, LLC by The State of Mississippi, Ex Rel. Lynn Fitch Attorney General (Gault, Edwin) (Entered: 11/03/2022) |
| 11/03/2022 | 127 | NOTICE OF INTENT TO SERVE SUBPOENA by The State of Mississippi, Ex Rel. Lynn Fitch Attorney General (Gault, Edwin) (Entered: 11/03/2022) |
| 11/04/2022 | | DOCKET ANNOTATION as to 127 : When filing a notice of intent, pursuant to Fed.R.Civ.P. Rule 45(a)(4), the attorney shall attach a copy of the subpoena as an exhibit to the notice for all party(s) concerned. Furthermore, exhibits should be scanned separately and docketed as properly identified attachments to the main document within the same docket entry. Attorney is directed to follow this procedure in future filings. L.U.Civ.R. 7.(b)(2). (VM) (Entered: 11/04/2022) |
| 11/07/2022 | 128 | NOTICE of Service of *First Set of* Request for Production by The State of Mississippi, Ex Rel. Lynn Fitch Attorney General (Gault, Edwin) (Entered: 11/07/2022) |
| 11/08/2022 | 129 | NOTICE of Service of Request for Production by The State of Mississippi, Ex Rel. Lynn Fitch Attorney General (Gault, Edwin) (Entered: 11/08/2022) |
| 11/08/2022 | 130 | Subpoena Returned Executed as to Zinc Health Services, LLC. (Gault, Edwin) (Entered: 11/08/2022) |
| 11/08/2022 | 131 | Subpoena Returned Executed as to Zinc Health Services, LLC. (Gault, Edwin) (Entered: 11/08/2022) |
| 11/16/2022 | 132 | NOTICE to Take Deposition of Kevin Wessels by The State of Mississippi, Ex Rel. Lynn Fitch Attorney General (Attachments: # 1 Exhibit Subpoena, # 2 Exhibit Cover Letter)(Gault, Edwin) (Entered: 11/16/2022) |
| 11/21/2022 | 133 | Subpoena Returned Executed as to Kevin Wessels. (Gault, Edwin) (Entered: 11/21/2022) |
| 11/21/2022 | 134 | MOTION for Lindsey Levy to Appear Pro Hac Vice (Paid $100 PHV fee; receipt number AMSSDC-4987709) by ESI Mail Pharmacy Services, Inc., Evernorth Health, Inc., Express Scripts Administrators, LLC, Express Scripts Pharmacy, Inc., Express Scripts, Inc., Medco Health Solutions, Inc. (Rippee, Stephanie) (Entered: 11/21/2022) |
| 11/22/2022 | | TEXT ONLY ORDER denying 134 Motion to Appear Pro Hac Vice. The motion is not signed by the resident attorney. See L.U.Civ. R. 83.1(d)(4)(K). The motion is denied without prejudice to movants right to file a corrected motion in conformance with the local rules. No further written order will issue. Signed by Magistrate Judge Michael T. Parker on November 22, 2022 (KPM) (Entered: 11/22/2022) |
| 11/22/2022 | 135 | MOTION for Lindsey Levy to Appear Pro Hac Vice (Paid $100 PHV fee; receipt number AMSSDC-4988660) by ESI Mail Pharmacy Services, Inc., Evernorth Health, Inc., Express Scripts Administrators, LLC, Express Scripts Pharmacy, Inc., Express Scripts, Inc., Medco Health Solutions, Inc. (Rippee, Stephanie) (Entered: 11/22/2022) |
| 11/22/2022 | | $100 PHV fee; receipt number AMSSDC-4987709 on 11/21/2022 credited this date. (KNS) (Entered: 11/22/2022) |
| 11/22/2022 | | TEXT ONLY ORDER granting 135 Motion to Appear Pro Hac Vice. Lindsey Levy is hereby admitted pro hac vice upon completion of the registration procedures found on the Court's website and at the following link: https://www.mssd.uscourts.gov/attorney-admissions-page. No further written order will issue. Signed by Magistrate Judge Michael T. Parker on November 22, 2022 (KPM) (Entered: 11/22/2022) |
| 12/02/2022 | | Minute Entry for proceedings held before Magistrate Judge Michael T. Parker: Telephonic Case Management Conference held on 12/2/2022. A case management order will be entered. PARTICIPANTS: Edwin Gault, Jr., Tanya Ellis, and William Liston, III for Plaintiff; Robert Gibbs and Ryan Moorman for Eli Lilly and Company; Andrew Yaphe and P. Ryan Beckett for Novo Nordisk Inc.; R. David Kaufman, Teresa Martin, Shirlethia Franklin, and Patrick McDowell for Sanofi-Aventis U.S. LLC; Jason Scherr, Patrick Harvey and Stephanie Rippee for Evernorth Health, Inc., Express Scripts, Inc., Express Scripts Administrators, LLC, ESI Mail Pharmacy Services, Inc., Express Scripts Pharmacy, Inc, and Medco Health Solutions, Inc.; Atticus William DeProspo, Cal Mayo, Jr., Kennon Poteat and Craig Singer for CVB Health Corporation, Caremark RX, L.L.C., Caremark PCS Health, L.L.C., and Carmark, L.L.C.; Brian Boone, Jean Richmann, Roy Campbell and Kelley Barnaby for Optumrx Inc. (KPM) (Entered: 12/02/2022) |
| 12/02/2022 | 136 | CASE MANAGEMENT ORDER: The parties do not consent; Disclosures due by 12/16/2022; Jury Trial set for a two week term beginning 8/19/2024 before District Judge Kristi H. Johnson; ETT: 20-25 days; Pretrial Conference set for 7/18/2024 before District Judge Kristi H. Johnson; Discovery due by 2/15/2024; Motions for Amended Pleadings due by 1/6/2023; Motions for Joinder of Parties due by 1/6/2023; Designate Experts Plaintiff Deadline due by 9/15/2023; Designate Experts for Defendant Deadline due by 11/15/2023; Motions due by 3/1/2024; ADR to be completed by discovery deadline. Signed by Magistrate Judge Michael T. Parker on December 2, 2022 (KPM) (Entered: 12/02/2022) |
| 12/06/2022 | 137 | Joint MOTION to Extend Time to Respond to Plaintiffs First Set of Requests for Production Deadline *(UNOPPOSED)* by Eli Lilly and Company, Novo Nordisk Inc., Sanofi-Aventis U.S. LLC (Beckett, P.) (Entered: 12/06/2022) |

| | | |
|---|---|---|
| 12/07/2022 | | TEXT ONLY ORDER granting 137 Unopposed Motion for Extension of Time to Respond to Plaintiff's First Set of Requests for Production. Eli Lilly and Company, Novo Nordisk Inc., and Sanofi-Aventis U.S. LLC shall respond to Plaintiff's First Set of Requests for Production on or before 12/22/22. No further written order will issue. Signed by Magistrate Judge Michael T. Parker on December 7, 2022 (KPM). (Entered: 12/07/2022) |
| 12/07/2022 | 138 | NOTICE of Service of Response to Request for Production by Optumrx Inc. (Campbell, Roy) (Entered: 12/07/2022) |
| 12/07/2022 | 139 | NOTICE of Service of Response to Request for Production by ESI Mail Pharmacy Services, Inc., Evernorth Health, Inc., Express Scripts Administrators, LLC, Express Scripts Pharmacy, Inc., Express Scripts, Inc. (Rippee, Stephanie) (Entered: 12/07/2022) |
| 12/15/2022 | 140 | Joint MOTION to Extend Submission of Confidentiality Order and ESI Protocol Deadline *by All Parties* by CVS Health Corporation, Caremark PCS Health, L.L.C., Caremark RX, L.L.C., Caremark, L.L.C., ESI Mail Pharmacy Services, Inc., Eli Lilly and Company, Evernorth Health, Inc., Express Scripts Administrators, LLC, Express Scripts Pharmacy, Inc., Express Scripts, Inc., Medco Health Solutions, Inc., Novo Nordisk Inc., Optumrx Inc., Sanofi-Aventis U.S. LLC, Unitedhealth Group, Inc. (Beckett, P.) (Entered: 12/15/2022) |
| 12/16/2022 | 141 | NOTICE of Service of *Pre-Discovery* Disclosure by Sanofi-Aventis U.S. LLC (McDowell, Martin) (Entered: 12/16/2022) |
| 12/16/2022 | 142 | NOTICE of Service of *Initial* Disclosure by Novo Nordisk Inc. (Beckett, P.) (Entered: 12/16/2022) |
| 12/16/2022 | | TEXT ONLY ORDER granting 140 Motion to Extend Deadline. The deadline for the parties to submit an ESI protocol and a confidentiality order is extended to 12/22/2022. No further written order shall issue. Signed by Magistrate Judge Michael T. Parker on December 16, 2022. (js) (Entered: 12/16/2022) |
| 12/16/2022 | 143 | NOTICE *of Service of Initial Disclosure* by Eli Lilly and Company (Moorman - PHV, Ryan) (Entered: 12/16/2022) |
| 12/16/2022 | 144 | NOTICE of Service of *Rule 26(a)(1)* Disclosure by The State of Mississippi, Ex Rel. Lynn Fitch Attorney General (Ellis, Tanya) (Entered: 12/16/2022) |
| 12/16/2022 | 145 | NOTICE of Service of *Rule 26(a)(1)* Initial Disclosure by CVS Health Corporation, Caremark PCS Health, L.L.C., Caremark RX, L.L.C., Caremark, L.L.C. (Mayo, J.) (Entered: 12/16/2022) |
| 12/16/2022 | 146 | NOTICE of Service of *Initial* Disclosure by Optumrx Inc. (Campbell, Roy) (Entered: 12/16/2022) |
| 12/19/2022 | 147 | NOTICE of Service of *Rule 26(a)(1)(A) Initial* Disclosure by ESI Mail Pharmacy Services, Inc., Evernorth Health, Inc., Express Scripts Administrators, LLC, Express Scripts Pharmacy, Inc., Express Scripts, Inc., Medco Health Solutions, Inc. (Rippee, Stephanie) (Entered: 12/19/2022) |
| 12/19/2022 | 148 | MOTION for A. Joshua Podoll to Appear Pro Hac Vice (Paid $100 PHV fee; receipt number AMSSDC-5007739) by CVS Health Corporation, CVS Pharmacy, Inc., Caremark PCS Health, L.L.C., Caremark RX, L.L.C., Caremark, L.L.C. (Attachments: # 1 Exhibit A - Additional Clients, # 2 Exhibit B - NY Certificate of Good Standing, # 3 Exhibit C - DC Certificate of Good Standing)(Mayo, J.) (Entered: 12/19/2022) |
| 12/20/2022 | | TEXT ONLY ORDER granting 148 Motion to Appear Pro Hac Vice. A. Joshua Podoll is hereby admitted pro hac vice upon completion of the registration procedures found on the Court's website at the following link: https://www.mssd.uscourts.gov/attorney-admissions-page. No further written order will issue. Signed by Magistrate Judge Michael T. Parker on December 20, 2022 (KPM) (Entered: 12/20/2022) |
| 12/22/2022 | 149 | NOTICE *of Service of Response to Request for Production* by Eli Lilly and Company (Moorman - PHV, Ryan) (Entered: 12/22/2022) |
| 12/22/2022 | 150 | NOTICE of Service of Response to Request for Production by Sanofi-Aventis U.S. LLC (McDowell, Martin) (Entered: 12/22/2022) |
| 12/22/2022 | 151 | NOTICE of Service of Response to Request for Production by Novo Nordisk Inc. (Beckett, P.) (Entered: 12/22/2022) |
| 12/27/2022 | 152 | NOTICE of Appearance by Jonathan M. Barnes on behalf of Optumrx Inc. (Barnes, Jonathan) (Entered: 12/27/2022) |
| 12/28/2022 | 153 | NOTICE of Service of *First Set of* Interrogatories by CVS Health Corporation, Caremark PCS Health, L.L.C., Caremark RX, L.L.C. (Embry, Sarah) (Entered: 12/28/2022) |
| 12/28/2022 | 154 | NOTICE of Service of *First Set of* Request for Production by CVS Health Corporation, Caremark PCS Health, L.L.C., Caremark RX, L.L.C. (Embry, Sarah) (Entered: 12/28/2022) |
| 01/05/2023 | | Set Hearings: Zoom Conference set for 1/10/2023 9:30 AM before Magistrate Judge Michael T. Parker. (Zoom link provided to all counsel via e-mail) (KPM) (Entered: 01/05/2023) |
| 01/06/2023 | 155 | *Amended* ANSWER to Complaint *(Third Amended)* by ESI Mail Pharmacy Services, Inc., Evernorth Health, Inc., Express Scripts Administrators, LLC, Express Scripts Pharmacy, Inc., Express Scripts, Inc., Medco Health Solutions, Inc..(Rippee, Stephanie) (Entered: 01/06/2023) |
| 01/06/2023 | 156 | MOTION for Alexander Gazikas to Appear Pro Hac Vice (Paid $100 PHV fee; receipt number AMSSDC-5017576) by CVS Health Corporation, CVS Pharmacy, Inc., Caremark PCS Health, L.L.C., Caremark RX, L.L.C., Caremark, L.L.C. (Attachments: # 1 Exhibit A - Additional Clients, # 2 Exhibit B - DC Certificate of Good Standing)(Embry, Sarah) (Entered: 01/06/2023) |

| | | |
|---|---|---|
| 01/09/2023 | | TEXT ONLY ORDER granting 156 Motion to Appear Pro Hac Vice. Alexander Gazikas is hereby admitted pro hac vice upon completion of the registration procedures found on the Court's website and at the following link: https://www.mssd.uscourts.gov/attorney-admissions-page. No further written order will issue. Signed by Magistrate Judge Michael T. Parker on January 9, 2023 (KPM) (Entered: 01/09/2023) |
| 01/10/2023 | | Minute Entry for proceedings held before Magistrate Judge Michael T. Parker: Zoom Conference held on 1/10/2023. The parties addressed disputed provisions of the proposed protective order. While no resolution was reached, the court proposed certain resolutions. The parties shall further confer in an effort to reach an agreement on a proposed protective order. Failing agreement, the parties may address the issues via appropriate motions filed on or before 1/20/2023. PARTICIPANTS: Joanne Cicala, Patricia Beale, William Liston and Tanya Ellis for Plaintiff; Robert Gibbs and Ryan Moorman for Eli Lilly and Company; Andrew Yaphe, Ryan Beckett and Jack Crawford for Novo Nordisk Inc.; Theresa Martin and Patrick McDowell for Sanofi-Aventis U.S. LLC; Jason Scherr, Stephanie Rippee and Patrick Harvey for Evernorth Health, Inc., Express Scripts, Inc., Express Scripts Administrators, LLC, ESI Mail Pharmacy Services, Inc.; Express Scripts Pharmacy, Inc., and Medco Health Solutions, Inc.; Kennon Poteat, Alexander Gazikas and Sarah Embry for CVS Health Corporation, Caremark RX, L.L.C., Caremark PCS Health, L.L.C., and Caremark, L.L.C.; and Liz Brown, Jean Richmann, Kelly Barnaby, and Roy Campbell for Optumrx Inc. (KPM) (Entered: 01/10/2023) |
| 01/13/2023 | 157 | MOTION for Daniel W. Berens to Appear Pro Hac Vice by Sanofi-Aventis U.S. LLC (Attachments: # 1 Exhibit Certificate of Good Standing)(McDowell, Martin) (Entered: 01/13/2023) |
| 01/13/2023 | 158 | NOTICE of Service of *First Set of* Interrogatories by The State of Mississippi, Ex Rel. Lynn Fitch Attorney General (Ellis, Tanya) (Entered: 01/13/2023) |
| 01/13/2023 | 159 | NOTICE of Service of *Second Set of* Request for Production by The State of Mississippi, Ex Rel. Lynn Fitch Attorney General (Ellis, Tanya) (Entered: 01/13/2023) |
| 01/17/2023 | 160 | NOTICE of Service of *First Set of* Interrogatories by The State of Mississippi, Ex Rel. Lynn Fitch Attorney General (Ellis, Tanya) (Entered: 01/17/2023) |
| 01/17/2023 | 161 | NOTICE of Service of *Second Set of* Request for Production by The State of Mississippi, Ex Rel. Lynn Fitch Attorney General (Ellis, Tanya) (Entered: 01/17/2023) |
| 01/18/2023 | | Pro Hac Vice fee paid for Daniel W. Berens receipt number AMSSDC-5024698 $ 100 (McDowell, Martin) (Entered: 01/18/2023) |
| 01/18/2023 | | TEXT ONLY ORDER granting 157 Motion to Appear Pro Hac Vice. Daniel W. Berens is hereby admitted pro hac vice upon completion of the registration procedures found on the Court's website and at the following link: https://www.mssd.uscourts.gov/attorney-admissions-page. No further written order will issue. Signed by Magistrate Judge Michael T. Parker on January 18, 2023 (KPM) (Entered: 01/18/2023) |
| 01/18/2023 | 162 | NOTICE of Service of *First Set of* Interrogatories by The State of Mississippi, Ex Rel. Lynn Fitch Attorney General (Ellis, Tanya) (Entered: 01/18/2023) |
| 01/18/2023 | 163 | NOTICE of Service of *Second Set of* Request for Production by The State of Mississippi, Ex Rel. Lynn Fitch Attorney General (Ellis, Tanya) (Entered: 01/18/2023) |
| 01/18/2023 | | Set Hearings: Telephonic Discovery Conference set for 1/20/2023 1:30 PM CST before Magistrate Judge Michael T. Parker. Counsel shall dial 888.273.3658, code 1055457 to connect to the call. (KPM) (Entered: 01/18/2023) |
| 01/20/2023 | | NOTICE: The discovery conference set for TODAY 1/20/23 at 1:30 p.m. CST will be conducted via Zoom. The Zoom link was provided to all counsel via e-mail. (KPM) (Entered: 01/20/2023) |
| 01/20/2023 | 164 | MOTION for Samantha G. Rose to Appear Pro Hac Vice by Eli Lilly and Company (Attachments: # 1 Exhibit A = Certificate of Good Standing)(Gibbs, Robert) (Entered: 01/20/2023) |
| 01/20/2023 | 165 | Unopposed MOTION for Extension of Time to File Response/Reply *to CVS Caremark Defendants' Discovery Requests* by The State of Mississippi, Ex Rel. Lynn Fitch Attorney General (Ellis, Tanya) (Entered: 01/20/2023) |
| 01/20/2023 | | Minute Entry for proceedings held before Magistrate Judge Michael T. Parker: Telephonic Discovery Conference (via Zoom) held on 1/20/2023 regarding the disputed timing for the deposition of Kevin Wessels and Express Scripts objections to Plaintiffs document request number 1. No resolution was reached. The parties are authorized to file discovery motions related to these issues if they so choose without further conference with the court. PARTICIPANTS: Joanne Cicala, William Liston, Tanya Ellis and Win Gault for Plaintiff; Robert Gibbs and Ryan Moorman for Eli Lilly and Company; Andrew Yaphe and Ryan Beckett for Novo Nordisk Inc.; Theresa Martin, Dan Berens and Patrick McDowell for Sanofi-Aventis U.S. LLC; Jason Scherr and Stephanie Rippee for Evernorth Health, Inc., Express Scripts, Inc., Express Scripts Administrators, LLC, ESI Mail Pharmacy Services, Inc.; Express Scripts Pharmacy, Inc., and Medco Health Solutions, Inc.; Kennon Poteat, Joshua Podoll, and Kate Embry for CVS Health Corporation, Caremark RX, L.L.C., Caremark PCS Health, L.L.C., and Caremark, L.L.C.; Jean Richmann, Kelly Barnaby, and Roy Campbell for Optumrx Inc. (KPM) (Entered: 01/20/2023) |
| 01/23/2023 | | Pro Hac Vice fee paid by Samantha G. Rose, $ 100, receipt number 3149. (KNS) (Entered: 01/23/2023) |
| 01/23/2023 | | TEXT ONLY ORDER granting 165 Motion for Extension of Time to Respond. The deadline for Plaintiff to respond to CVS Caremark Defendants' discovery requests is extended to 1/30/2023. No further written order shall issue. Signed by Magistrate Judge Michael T. Parker on January 23, 2023. (js) (Entered: 01/23/2023) |

| 01/23/2023 | | TEXT ONLY ORDER granting 164 Motion to Appear Pro Hac Vice. Samantha G. Rose is hereby admitted pro hac vice upon completion of the registration procedures found on the Court's website and at the following link: https://www.mssd.uscourts.gov/attorney-admissions-page. No further written order will issue. Signed by Magistrate Judge Michael T. Parker on January 23, 2023 (KPM) (Entered: 01/23/2023) |
| 01/31/2023 | 166 | NOTICE of Service of Response to Interrogatories by The State of Mississippi, Ex Rel. Lynn Fitch Attorney General (Ellis, Tanya) (Entered: 01/31/2023) |
| 01/31/2023 | 167 | NOTICE of Service of Response to Request for Production by The State of Mississippi, Ex Rel. Lynn Fitch Attorney General (Ellis, Tanya) (Entered: 01/31/2023) |
| 02/02/2023 | 168 | NOTICE of Service of Request for Production by Novo Nordisk Inc. (Beckett, P.) (Entered: 02/02/2023) |
| 02/02/2023 | 169 | NOTICE of Service of *CORRECTED* Request for Production by Novo Nordisk Inc. (Beckett, P.) (Entered: 02/02/2023) |
| 02/02/2023 | 170 | NOTICE of Service of Request for Production by Sanofi-Aventis U.S. LLC (McDowell, Martin) (Entered: 02/02/2023) |
| 02/02/2023 | 171 | NOTICE of Service of Request for Production by Eli Lilly and Company (Moorman - PHV, Ryan) (Entered: 02/02/2023) |
| 02/13/2023 | 172 | Joint MOTION to Extend Time to Respond to Plaintiffs First Set of Interrogatories Deadline *(UNOPPOSED)* by Eli Lilly and Company, Novo Nordisk Inc., Sanofi-Aventis U.S. LLC (Beckett, P.) (Entered: 02/13/2023) |
| 02/13/2023 | | TEXT ONLY ORDER granting 172 Motion to Extend Deadline. The deadline for moving Defendants to respond to Plaintiff's first set of interrogatories is extended to 3/10/2023. No further written order shall issue. Signed by Magistrate Judge Michael T. Parker on February 13, 2023. (js) (Entered: 02/13/2023) |
| 02/15/2023 | 173 | Unopposed MOTION to Extend Time to Respond to Plaintiff's First Set of Interrogatories and Second Set of Requests for Production Deadline *(PBM Defendants' Joint Unopposed Motion)* by Caremark PCS Health, L.L.C., Caremark RX, L.L.C., Caremark, L.L.C., Evernorth Health, Inc., Express Scripts Administrators, LLC, Express Scripts, Inc., Medco Health Solutions, Inc., Optumrx Inc. (Campbell, Roy) (Entered: 02/15/2023) |
| 02/16/2023 | | TEXT ONLY ORDER granting 173 Motion to Extend Deadline. The deadline for moving Defendants to respond to Plaintiff's first set of interrogatories and second set of requests for production is extended to 3/2/2023. No further written order shall issue. Signed by Magistrate Judge Michael T. Parker on February 16, 2023. (js) (Entered: 02/16/2023) |
| 02/16/2023 | 174 | STIPULATED CONFIDENTIALITY ORDER. Signed by Magistrate Judge Michael T. Parker on February 16, 2023 (KPM) (Entered: 02/16/2023) |
| 02/16/2023 | 175 | STIPULATED PROTOCOL FOR THE DISCOVERY OF ELECTRONICALLY STORED INFORMATION AND HARD COPY DOCUMENTS. Signed by Magistrate Judge Michael T. Parker on February 16, 2023 (KPM) (Entered: 02/16/2023) |
| 02/17/2023 | 176 | NOTICE of Service of Response to Request for Production by Novo Nordisk Inc. (Beckett, P.) (Entered: 02/17/2023) |
| 02/17/2023 | 177 | NOTICE of Service of Response to Request for Production by Sanofi-Aventis U.S. LLC (McDowell, Martin) (Entered: 02/17/2023) |
| 02/17/2023 | 178 | NOTICE of Service of Response to Request for Production by Eli Lilly and Company (Moorman - PHV, Ryan) (Entered: 02/17/2023) |
| 02/20/2023 | 179 | Corporate Disclosure Statement by ESI Mail Pharmacy Services, Inc., Evernorth Health, Inc., Express Scripts Administrators, LLC, Express Scripts Pharmacy, Inc., Express Scripts, Inc. identifying Corporate Parent The Cigna Group (f/k/a Cigna Corporation), Corporate Parent The Cigna Group (f/k/a Cigna Corporation) for ESI Mail Pharmacy Services, Inc., Evernorth Health, Inc., Express Scripts Administrators, LLC, Express Scripts Pharmacy, Inc., Express Scripts, Inc.. (Rippee, Stephanie) (Entered: 02/20/2023) |
| 02/20/2023 | 180 | NOTICE of Service of *First Set of Interrogatories to Plaintiff* Interrogatories by Optumrx Inc. (Campbell, Roy) (Entered: 02/20/2023) |
| 02/20/2023 | 181 | NOTICE of Service of *First Set of Requests for Production to Plaintiff* Request for Production by Optumrx Inc. (Campbell, Roy) (Entered: 02/20/2023) |
| 02/24/2023 | 182 | NOTICE OF INTENT TO SERVE SUBPOENA *to Arthur J. Gallagher & Co.* by Caremark PCS Health, L.L.C. (Attachments: # 1 Exhibit Subpoena to Produce Documents)(Embry, Sarah) (Entered: 02/24/2023) |
| 02/24/2023 | 183 | NOTICE OF INTENT TO SERVE SUBPOENA *on PillarRx Consulting* by Caremark PCS Health, L.L.C. (Attachments: # 1 Exhibit Subpoena)(Embry, Sarah) (Entered: 02/24/2023) |
| 02/24/2023 | 184 | NOTICE OF INTENT TO SERVE SUBPOENA *on Segal Group, Inc.* by Caremark PCS Health, L.L.C. (Attachments: # 1 Exhibit Subpoena)(Embry, Sarah) (Entered: 02/24/2023) |
| 02/27/2023 | | Pro Hac Vice fee paid for Richard Johan Conrod, Jr. receipt number AMSSDC-5055425 $ 100 (Liston, William) (Entered: 02/27/2023) |
| 02/27/2023 | 185 | MOTION for Richard Johan Conrod, Jr. to Appear Pro Hac Vice by The State of Mississippi, Ex Rel. Lynn Fitch Attorney General (Attachments: # 1 Exhibit Certificate of Good Standing Virginia)(Liston, William) (Entered: 02/27/2023) |

| | | |
|---|---|---|
| 02/28/2023 | | TEXT ONLY ORDER granting 185 Motion to Appear Pro Hac Vice. Richard Johan Conrod, Jr. is hereby admitted pro hac vice upon completion of the registration procedures found on the Court's website and at the following link: https://www.mssd.uscourts.gov/attorney-admissions-page. No further written order will issue. Signed by Magistrate Judge Michael T. Parker on February 28, 2023 (KPM) (Entered: 02/28/2023) |
| 03/01/2023 | 186 | Subpoena Returned 02/27/2023 as to Arthur J. Gallagher & Co.. (Embry, Sarah) (Entered: 03/01/2023) |
| 03/01/2023 | 187 | Subpoena Returned 2/27/2023 as to PillarRx Consulting, LLC. (Embry, Sarah) (Entered: 03/01/2023) |
| 03/01/2023 | 188 | Subpoena Returned 02/27/2023 as to The Segal Group, Inc.. (Embry, Sarah) (Entered: 03/01/2023) |
| 03/01/2023 | 189 | NOTICE of Appearance by Courtney Choi Hunt on behalf of The State of Mississippi, Ex Rel. Lynn Fitch Attorney General (Hunt, Courtney) (Entered: 03/01/2023) |
| 03/02/2023 | 190 | Unopposed MOTION to Extend Time to Respond to Plaintiff's First Set of Interrogatories and Second Set of Requests for Production Deadline *(Joint)* by Caremark PCS Health, L.L.C., Caremark RX, L.L.C., Caremark, L.L.C., Evernorth Health, Inc., Express Scripts Administrators, LLC, Express Scripts, Inc., Medco Health Solutions, Inc., Optumrx Inc. (Campbell, Roy) (Entered: 03/02/2023) |
| 03/02/2023 | | TEXT ONLY ORDER granting 190 Unopposed Motion to Extend Time to Respond to Discovery Requests. The deadline for responding to the discovery requests at issue is extended to 3/15/23. No further written order will issue. Signed by Magistrate Judge Michael T. Parker on March 2, 2023 (KPM) (Entered: 03/02/2023) |
| 03/03/2023 | 191 | Unopposed MOTION for Extension of Time to File Response/Reply *to Manufacturer Defendants' First Set of Requests for Production* by The State of Mississippi, Ex Rel. Lynn Fitch Attorney General (Ellis, Tanya) (Entered: 03/03/2023) |
| 03/07/2023 | | TEXT ONLY ORDER granting 191 Motion for Extension of Time to Respond. The deadline for Plaintiff to respond to the subject discovery requests is extended to 3/10/2023. No further written order shall issue. Signed by Magistrate Judge Michael T. Parker on March 7, 2023. (js) (Entered: 03/07/2023) |
| 03/07/2023 | 192 | NOTICE of Service of *Third Set of* Request for Production by The State of Mississippi, Ex Rel. Lynn Fitch Attorney General (Hunt, Courtney) (Entered: 03/07/2023) |
| 03/07/2023 | 193 | NOTICE of Service of *Third Set of* Request for Production by The State of Mississippi, Ex Rel. Lynn Fitch Attorney General (Hunt, Courtney) (Entered: 03/07/2023) |
| 03/07/2023 | 194 | NOTICE of Service of *First Set of* Interrogatories by The State of Mississippi, Ex Rel. Lynn Fitch Attorney General (Hunt, Courtney) (Entered: 03/07/2023) |
| 03/07/2023 | 195 | NOTICE of Service of *Second Set of* Request for Production by The State of Mississippi, Ex Rel. Lynn Fitch Attorney General (Hunt, Courtney) (Entered: 03/07/2023) |
| 03/07/2023 | 196 | NOTICE of Service of *First Set of* Interrogatories by The State of Mississippi, Ex Rel. Lynn Fitch Attorney General (Hunt, Courtney) (Entered: 03/07/2023) |
| 03/07/2023 | 197 | NOTICE of Service of *Second Set of* Request for Production by The State of Mississippi, Ex Rel. Lynn Fitch Attorney General (Hunt, Courtney) (Entered: 03/07/2023) |
| 03/07/2023 | 198 | NOTICE OF INTENT TO SERVE SUBPOENA *to Diamond Drugs, Inc.* by Caremark PCS Health, L.L.C. (Attachments: # 1 Exhibit Subpoena)(Embry, Sarah) (Entered: 03/07/2023) |
| 03/07/2023 | 199 | NOTICE OF INTENT TO SERVE SUBPOENA *VitalCore Health Strategies* by Caremark PCS Health, L.L.C. (Attachments: # 1 Exhibit Subpoena)(Embry, Sarah) (Entered: 03/07/2023) |
| 03/10/2023 | 200 | NOTICE of Service of Response to Interrogatories by Sanofi-Aventis U.S. LLC (McDowell, Martin) (Entered: 03/10/2023) |
| 03/10/2023 | 201 | NOTICE of Service of Response to Interrogatories by Novo Nordisk Inc. (Crawford, John) (Entered: 03/10/2023) |
| 03/10/2023 | 202 | NOTICE of Service of Response to Interrogatories by Eli Lilly and Company (Moorman - PHV, Ryan) (Entered: 03/10/2023) |
| 03/10/2023 | 203 | NOTICE of Service of Response to Request for Production by The State of Mississippi, Ex Rel. Lynn Fitch Attorney General (Ellis, Tanya) (Entered: 03/10/2023) |
| 03/16/2023 | 204 | NOTICE of Service of *Objections and* Response to Interrogatories by CVS Health Corporation, Caremark PCS Health, L.L.C., Caremark RX, L.L.C., Caremark, L.L.C. (Mayo, J.) (Entered: 03/16/2023) |
| 03/16/2023 | 205 | NOTICE of Service of *Objections and* Response to Request for Production by CVS Health Corporation, Caremark PCS Health, L.L.C., Caremark RX, L.L.C., Caremark, L.L.C. (Mayo, J.) (Entered: 03/16/2023) |
| 03/16/2023 | 206 | NOTICE of Service of *Objections and Responses to Plaintiff's First Set of Interrogatories* Response to Interrogatories by Optumrx Inc. (Campbell, Roy) (Entered: 03/16/2023) |
| 03/16/2023 | 207 | NOTICE of Service of *Objections and Responses to Plaintiff's Second Set of Requests for Production* Response to Request for Production by Optumrx Inc. (Campbell, Roy) (Entered: 03/16/2023) |
| 03/16/2023 | 208 | NOTICE of Service of *Objections and* Response to Interrogatories by Evernorth Health, Inc., Express Scripts |

| | | |
|---|---|---|
| | | Administrators, LLC, Express Scripts, Inc., Medco Health Solutions, Inc. (Rippee, Stephanie) (Entered: 03/16/2023) |
| 03/16/2023 | [209](#) | NOTICE of Service of *Objection and* Response to Request for Production by Evernorth Health, Inc., Express Scripts Administrators, LLC, Express Scripts, Inc., Medco Health Solutions, Inc. (Rippee, Stephanie) (Entered: 03/16/2023) |
| 03/21/2023 | [210](#) | Unopposed MOTION for Extension of Time to File Response/Reply *to OptumRx, Inc.'s First Set of Requests for Production and First Set of Interrogatories* by The State of Mississippi, Ex Rel. Lynn Fitch Attorney General (Ellis, Tanya) (Entered: 03/21/2023) |
| 03/21/2023 | [211](#) | Subpoena Returned Executed as to VitalCore Health Strategies, LLC. (Embry, Sarah) (Entered: 03/21/2023) |
| 03/21/2023 | | DOCKET ANNOTATION as to # [211](#) : Subpoena Returned Executed and exhibits are filed as one main document. Exhibits should be scanned separately and docketed as properly identified attachments to the main document within the same docket entry. Attorney is directed to follow this procedure in future filings. L.U.Civ.R. 7.(b)(2). (KNS) (Entered: 03/21/2023) |
| 03/22/2023 | | TEXT ONLY ORDER granting [210](#) Motion for Extension of Time to Respond to OptumRx, Inc.'s First Set of Requests for Production and First Set of Interrogatories. Plaintiff's responses to Defendant's discovery requests due by 3/31/2023. No further written order shall issue. Signed by Magistrate Judge Michael T. Parker on March 22, 2023. (js) (Entered: 03/22/2023) |
| 03/23/2023 | | Set Hearings: Zoom Discovery Conference set for 3/24/2023 10:30 AM CDT before Magistrate Judge Michael T. Parker. The Zoom link has been provided to all counsel via e-mail. (KPM) (Entered: 03/23/2023) |
| 03/24/2023 | [212](#) | NOTICE of Appearance by Daniel J. Mulholland on behalf of The State of Mississippi, Ex Rel. Lynn Fitch Attorney General (Mulholland, Daniel) (Entered: 03/24/2023) |
| 03/24/2023 | | Minute Entry for proceedings held before Magistrate Judge Michael T. Parker: Zoom Discovery Conference held on 3/24/2023 to address the scheduling of the deposition of Kevin Wessels. The court issued a ruling and a separate text order will be entered. PARTICIPANTS: Tanya Ellis, Johan Conrod, William Liston, William Deas, and Win Gault for Plaintiff; Robert Gibbs and Ryan Moorman for Eli Lilly and Company; Andrew Yaphe, Jack Crawford, and Ryan Beckett for Novo Nordisk Inc.; Theresa Martin, Dan Berens and Patrick McDowell for Sanofi-Aventis U.S. LLC; Stephanie Rippee for Evernorth Health, Inc., Express Scripts, Inc., Express Scripts Administrators, LLC, ESI Mail Pharmacy Services, Inc.; Express Scripts Pharmacy, Inc., and Medco Health Solutions, Inc.; Kennon Poteat, Joshua Podoll, Atticus DeProspo. and Kate Embry for CVS Health Corporation, Caremark RX, L.L.C., Caremark PCS Health, L.L.C., and Caremark, L.L.C.; Jean Richmann, Kelly Barnaby, and Jonathan Barnes for Optumrx Inc. (KPM) (Entered: 03/24/2023) |
| 03/24/2023 | | TEXT ONLY ORDER. The Court having conducted a conference and having heard argument from the parties orders that the deposition of Kevin Wessels shall be scheduled and completed by 5/10/2023. The parties are directed to confer and cooperate fully to schedule and complete the deposition. No further written order shall issue. Signed by Magistrate Judge Michael T. Parker on March 24, 2023. (js) (Entered: 03/24/2023) |
| 03/24/2023 | [213](#) | NOTICE of Appearance by Thomas Joel Fyke on behalf of The State of Mississippi, Ex Rel. Lynn Fitch Attorney General (Fyke, Thomas) (Entered: 03/24/2023) |
| 03/27/2023 | [214](#) | NOTICE to Take Deposition of Kevin Wessels by The State of Mississippi, Ex Rel. Lynn Fitch Attorney General (Gault, Edwin) (Entered: 03/27/2023) |
| 03/28/2023 | [215](#) | Subpoena Returned 3/20/2023 as to Diamond Drugs, Inc.. (Attachments: # [1](#) Exhibit 1 - Documents Requested)(Embry, Sarah) (Entered: 03/28/2023) |
| 03/29/2023 | [216](#) | NOTICE of Service of *First Supplemental Initial* Disclosure by The State of Mississippi, Ex Rel. Lynn Fitch Attorney General (Ellis, Tanya) (Entered: 03/29/2023) |
| 03/31/2023 | [217](#) | NOTICE of Service of *Verified* Response to Interrogatories by The State of Mississippi, Ex Rel. Lynn Fitch Attorney General (Ellis, Tanya) (Entered: 03/31/2023) |
| 03/31/2023 | [218](#) | NOTICE of Service of Response to Request for Production by The State of Mississippi, Ex Rel. Lynn Fitch Attorney General (Ellis, Tanya) (Entered: 03/31/2023) |
| 04/04/2023 | [219](#) | NOTICE of Service of *Verified First Supplemental* Response to Interrogatories by The State of Mississippi, Ex Rel. Lynn Fitch Attorney General (Ellis, Tanya) (Entered: 04/04/2023) |
| 04/04/2023 | [220](#) | Unopposed MOTION for Extension of Time to Complete Discovery by CVS Health Corporation, ESI Mail Pharmacy Services, Inc., Express Scripts Pharmacy, Inc. (Mayo, J.) (Entered: 04/04/2023) |
| 04/05/2023 | | TEXT ONLY ORDER granting [220](#) Motion for Extension of Time to Complete Discovery. Defendants CVS Health Corporation, ESI Mail Pharmacy Service, Inc., and Express Scripts Pharmacy, Inc.'s responses to Plaintiff's first set of interrogatories and second set of requests for production due by 4/20/2023. No further written order shall issue. Signed by Magistrate Judge Michael T. Parker on April 5, 2023. (js) (Entered: 04/05/2023) |
| 04/06/2023 | [221](#) | NOTICE to Take Deposition of Kevin Wessels by Novo Nordisk Inc. (Crawford, John) (Entered: 04/06/2023) |
| 04/06/2023 | [222](#) | NOTICE to Take Deposition of Kevin Wessels by Sanofi-Aventis U.S. LLC (McDowell, Martin) (Entered: 04/06/2023) |
| 04/10/2023 | [223](#) | NOTICE of Service of *Objections and* Response to Request for Production by Caremark RX, L.L.C., Caremark, L.L.C. (Mayo, J.) (Entered: 04/10/2023) |

| | | |
|---|---|---|
| 04/10/2023 | 224 | NOTICE of Service of *Objections and Responses to Plaintiff's Third Set of Requests for Production* Response to Request for Production by Optumrx Inc. (Campbell, Roy) (Entered: 04/10/2023) |
| 04/10/2023 | 225 | NOTICE of Service of Interrogatories by Novo Nordisk Inc. (Crawford, John) (Entered: 04/10/2023) |
| 04/11/2023 | 226 | NOTICE to Take Deposition of Kevin Wessels by Eli Lilly and Company (Moorman - PHV, Ryan) (Entered: 04/11/2023) |
| 04/18/2023 | 227 | Joint MOTION By All Parties Permitting Counsel to Participate in Depositions Remotely by CVS Health Corporation, Caremark PCS Health, L.L.C., Caremark RX, L.L.C., Caremark, L.L.C., ESI Mail Pharmacy Services, Inc., Eli Lilly and Company, Evernorth Health, Inc., Express Scripts Administrators, LLC, Express Scripts Pharmacy, Inc., Express Scripts, Inc., Medco Health Solutions, Inc., Novo Nordisk Inc., Optumrx Inc., Sanofi-Aventis U.S. LLC (Beckett, P.) (Entered: 04/18/2023) |
| 04/18/2023 | 228 | ORDER granting 227 Motion to Permit Counsel to Participate in Depositions Remotely. Signed by Magistrate Judge Michael T. Parker on April 18, 2023. (js) (Entered: 04/18/2023) |
| 04/19/2023 | 229 | MOTION for Michael Ryan Harmanis to Appear Pro Hac Vice (Paid $100 PHV fee; receipt number AMSSDC-5097156) by Sanofi-Aventis U.S. LLC (Attachments: # 1 Exhibit Certificate of Good Standing)(McDowell, Martin) (Entered: 04/19/2023) |
| 04/19/2023 | 230 | MOTION for Aaron M. Healey to Appear Pro Hac Vice (Paid $100 PHV fee; receipt number AMSSDC-5097170) by Sanofi-Aventis U.S. LLC (Attachments: # 1 Exhibit Certificates of Good Standing)(McDowell, Martin) (Entered: 04/19/2023) |
| 04/19/2023 | | TEXT ONLY ORDER granting 229 Motion to Appear Pro Hac Vice; granting 230 Motion to Appear Pro Hac Vice. Michael Ryan Harmanis and Aaron M. Healey are hereby admitted pro hac vice upon completion of the registration procedures found on the Court's website and at the following link: https://www.mssd.uscourts.gov/attorney-admissions-page. No further written order will issue. Signed by Magistrate Judge Michael T. Parker on April 19, 2023 (KPM) (Entered: 04/19/2023) |
| 04/20/2023 | 231 | MOTION for Extension of Time to File Response/Reply *to Plaintiff's First Set of Interrogatories* by ESI Mail Pharmacy Services, Inc., Express Scripts Pharmacy, Inc. (Rippee, Stephanie) (Entered: 04/20/2023) |
| 04/21/2023 | 232 | NOTICE of Service of Response to Request for Production by ESI Mail Pharmacy Services, Inc., Express Scripts Pharmacy, Inc. (Rippee, Stephanie) (Entered: 04/21/2023) |
| 04/21/2023 | | TEXT ONLY ORDER granting 231 Unopposed Motion for Extension of Time to File Responses to Plaintiff's First Set of Interrogatories. ESI Mail Pharmacy Service, Inc. and Express Scripts Pharmacy, Inc.'s Responses to Plaintiff's First Set of Interrogatories are due on or before 4/27/23. No further written order will issue. Signed by Magistrate Judge Michael T. Parker on April 21, 2023 (KPM) (Entered: 04/21/2023) |
| 04/21/2023 | 233 | NOTICE of Service of *Objections and* Response to Interrogatories by CVS Health Corporation (Mayo, J.) (Entered: 04/21/2023) |
| 04/21/2023 | 234 | NOTICE of Service of *Objections and* Response to Request for Production by CVS Health Corporation (Mayo, J.) (Entered: 04/21/2023) |
| 04/28/2023 | 235 | NOTICE of Service of Response to Interrogatories by ESI Mail Pharmacy Services, Inc., Express Scripts Pharmacy, Inc. (Rippee, Stephanie) (Entered: 04/28/2023) |
| 05/02/2023 | | Set Hearing: Telephonic Discovery Conference set for 5/2/2023 at 02:30 PM CDT before Magistrate Judge Michael T. Parker. Only counsel for the State of Mississippi, CVS Health Corporation, and Caremark PCS Health, L.L.C. are required to participate. Counsel should dial 888.273.3658, code 1055457 to connect to the call at that time. (js) (Entered: 05/02/2023) |
| 05/02/2023 | | Minute Entry for proceedings held before Magistrate Judge Michael T. Parker: Telephonic Discovery Conference held on 5/2/2023. The parties addressed disputes concerning Plaintiffs responses to certain interrogatories served by Defendants Caremark PCS Health, L.L.C and CVS Health Corporation. While no resolution was reached, the Court proposed certain resolutions. The parties shall confer further in an effort to resolve the disputes. Failing agreement, the parties may address the issues via appropriate motions on or after 5/24/2023. PARTICIPANTS: William Liston, Tanya Ellis, Richard Conrod, and Josh Wackerly for Plaintiff; Robert Gibbs and Ryan Moorman for Eli Lilly and Company; Ryan Beckett and Jack Crawford for Novo Nordisk Inc.; Daniel Berens for Sanofi-Aventis U.S. LLC; Jason Scherr for Evernorth Health, Inc., Express Scripts, Inc., Express Scripts Administrators, LLC, ESI Mail Pharmacy Services, Inc., Express Scripts Pharmacy, Inc., and Medco Health Solutions, Inc.; Joshua Podoll and Sarah Embry for CVS Health Corporation, Caremark RX, L.L.C., Caremark PCS Health, L.L.C., and Caremark, L.L.C.; and Liz Brown, Kelly Barnaby, and Jonathan Barnes for Optumrx Inc. (js) (Entered: 05/02/2023) |
| 05/08/2023 | 236 | Unopposed MOTION to Extend Deadline *to Serve Discovery Responses* by The State of Mississippi, Ex Rel. Lynn Fitch Attorney General (Ellis, Tanya) (Entered: 05/08/2023) |
| 05/09/2023 | | TEXT ONLY ORDER granting 236 Unopposed Motion to Extend Deadline to Respond to Discovery. Plaintiff's Responses to Novo Nordisk Inc.'s First Set of Interrogatories are due on or before 5/19/23. No further written order will issue. Signed by Magistrate Judge Michael T. Parker on May 9, 2023 (KPM) (Entered: 05/09/2023) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 05/09/2023 10:10:25 | | | |
| **PACER Login:** | Jackson0263 | **Client Code:** | 44915.610654 |
| **Description:** | Docket Report | **Search Criteria:** | 3:21-cv-00674-KHJ-MTP |
| **Billable Pages:** | 30 | **Cost:** | 3.00 |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## NORTHERN DIVISION

THE STATE OF MISSISSIPPI, EX REL.
LYNN FITCH, ATTORNEY GENERAL

       *Plaintiff,*

       v.

ELI LILLY AND COMPANY; NOVO
NORDISK INC.; SANOFI-AVENTIS U.S.
LLC; EVERNORTH HEALTH, INC.
(FORMERLY EXPRESS SCRIPTS
HOLDING COMPANY); EXPRESS
SCRIPTS, INC.; EXPRESS SCRIPTS
ADMINISTRATORS, LLC; ESI MAIL
PHARMACY SERVICES, INC.; EXPRESS
SCRIPTS PHARMACY, INC.; MEDCO
HEALTH SOLUTIONS, INC; CVS
HEALTH CORPORATION; CVS
PHARMACY, INC; CAREMARK RX,
L.L.C.; CAREMARK PCS HEALTH, L.L.C.;
CAREMARK, L.L.C.; UNITEDHEALTH
GROUP, INC.; OPTUM, INC.;
OPTUMINSIGHT, INC.; OPTUMRX
HOLDINGS, LLC AND OPTUMRX INC.

       *Defendants.*

Cause No. 3:21-cv-00674-KHJ-MTP

 Jury Trial Demanded

# THIRD AMENDED COMPLAINT

## TABLE OF CONTENTS

I. INTRODUCTION ................................................................. 1

II. PARTIES ........................................................................ 8

    A.    Plaintiff ................................................................ 8

    B.    Manufacturer Defendants ......................................... 9

    C.    PBM Defendants ................................................... 14

III. SOVEREIGN INTEREST ................................................. 41

IV. JURISDICTION AND VENUE .......................................... 42

V. FACTUAL ALLEGATIONS .............................................. 43

    A.    Diabetes and Insulin Therapy ................................... 43

        •   Diabetes: A Growing Epidemic ............................ 43

        •   Insulin: A Century Old Drug ............................... 44

        •   Current Insulin Landscape ................................. 46

        •   Insulin Adjuncts: Type 2 Medications .................... 48

    B.    The Dramatic Rise in the Price of Diabetes Medications ........................... 51

        •   Defendant Manufacturers Have Increased Prices in Lockstep ............ 57

    C.    Pharmaceutical Payment and Supply Chain ................. 62

        •   Drug Costs for Diabetics .................................... 63

    D.    PBMs' Role in the Pharmaceutical Payment Chain ................................. 64

        •   The Rise of the PBMs in the Pharmaceutical Supply Chain ............... 67

        •   Insular Nature of the Pharmaceutical Industry .................... 69

    E.    The Insulin Pricing Scheme .................................... 72

    F.    Defendants Admit That They Have Engaged in The Insulin Pricing Scheme and That It Is Harming Diabetics ................. 75

    G.    Defendants Profit Off the Insulin Pricing Scheme .................... 80

        •   PBMs Pocket a Majority of Manufacturers' Secret Payments ............ 80

- Insulin Pricing Scheme Allows PBMs To Profit Off Pharmacies..........84

- Insulin Pricing Scheme Increases PBM Mail Order Profits .................85

H. The State and Mississippi Diabetics Purchase The At-Issue Drugs From Defendants ......................................................................................86

I. Defendants Deceived Diabetic Mississippians and the State of Mississippi......................................................................................87

- Manufacturer Defendants Deceived the State and Mississippi Diabetics ......................................................................................88

- PBM Defendants Deceived the State and Mississippi Diabetics ..........90

J. The Insulin Pricing Scheme Has Damaged the State of Mississippi and Diabetic Mississippians ............................................................99

- The Insulin Pricing Scheme Has Damaged the State as Payor and Purchaser of the At-Issue Drugs .....................................................99

- The Insulin Pricing Scheme Has Damaged Mississippi Diabetics ......101

K. Defendants' Recent Efforts to Address Insulin Pricing Falls Far Short of Addressing the Problem............................................................ 102

VI. **TOLLING OF STATUTE OF LIMITATIONS** ...................................... **104**

A. Discovery Rule Tolling ............................................................................ 104

B. Fraudulent Concealment Tolling............................................................. 105

C. Estoppel.................................................................................................... 105

D. Continuing Violations ............................................................................. 105

VI. **CLAIMS FOR RELIEF**............................................................................ **106**

1. Mississippi Consumer Protection Act. Miss. Code §§ 75-24-1, *et seq* (Against All Defendants)............................................................................ 106

2. Unjust Enrichment (Against All Defendants) ........................................110

3. Civil Conspiracy (Against All Defendants) ............................................. 111

VII. **MOTION FOR INJUNCTION PURSUANT TO MISS. CODE 75-24-9**.................................................................................................**114**

VIII. **JURY DEMAND** ....................................................................................**115**

**IX.    PRAYER FOR RELIEF** ...................................................................... **115**

# TABLE OF FIGURES

Figure 1: Price Increase of Insulin vs. Selected Consumer Goods  from 1997-2018 .......... 4

Table 1: Diabetes medications at issue in this case ...................................................... 50

Figure 2: Rising reported prices of Humulin R (500U/mL) from 1997-2021 ................ 52

Figure 3: Rising reported prices of Humalog vials and pens  from 1996-2021 .............. 53

Figure 4: Rising reported prices of Levemir from 2006-2021 ........................................ 54

Figure 5: Rising reported prices of Novolog vials and pens  from 2002-2021 ............... 55

Figure 6: Rising reported prices of Lantus vials and pens  from 2001-2021 .................. 56

Figure 7: Rising reported prices of long-acting insulins ............................................... 58

Figure 8: Rising reported prices of rapid-acting insulins .............................................. 59

Figure 9: Rising reported price increases for human insulins ....................................... 60

Figure 10: Rising reported prices of Type 2 drugs ........................................................ 61

Figure 11: Lockstep insulin price increases .................................................................. 62

Figure 12: Insulin distribution and payment chain ....................................................... 65

Figure 13: PBM consolidation ...................................................................................... 68

The Honorable Lynn Fitch, Attorney General, brings this action on behalf of the State of Mississippi (the "State" or "Plaintiff"), in its proprietary capacity and in its capacity as *parens patriae*, for violations of the laws of the State of Mississippi against the above-named Defendants.

## I.    INTRODUCTION

1.    Diabetes is an epidemic and a public health crisis in Mississippi. Mississippi has the highest prevalence of diabetes in the United States with 13.6% of its population—over 400,000 people—living with diabetes. An additional 750,000 Mississippi residents have prediabetes, which is when a person's blood sugar level is higher than it should be and signifies that the person is at a much greater risk for developing diabetes.

2.    Diabetes is the leading cause of blindness, kidney failure and lower limb amputations and is the seventh leading cause of death in Mississippi despite the availability of effective treatment. Over 22% of all hospitalizations in Mississippi are attributable to diabetes.

3.    The economic impact of diabetes is staggering. The total estimated cost of diagnosed diabetes in Mississippi is $3.5 billion per year. One in four health care dollars is spent caring for people with diabetes.

4.    Approximately 100,000 Mississippians rely on daily insulin treatments to survive, and 300,000 diabetics in Mississippi use either oral medications, insulin, or a combination of both to treat and control diabetes.  As a result, hundreds of thousands of Mississippi residents must rely on the companies that manufacture diabetes medications to stay alive and thus are at the mercy of these manufacturers.

5.     Defendants Eli Lilly, Novo Nordisk and Sanofi (collectively, "Manufacturer Defendants" or "Manufacturers") manufacture the vast majority of insulins and other diabetic medications available in Mississippi.

6.     Defendants CVS Caremark, Express Scripts and OptumRx (collectively "PBM Defendants" or "PBMs") manage the pharmacy benefits for the vast majority of individuals in Mississippi.

7.     As part of this work, PBM Defendants establish standard formulary offerings that, among other things, set the baseline for which diabetes medications are covered and not covered by nearly every payor in Mississippi.

8.     PBM Defendants understand that their standard formulary offerings drive drug utilization.

9.     The more accessible a drug is on the PBMs' standard formularies, the more that drug will be used throughout Mississippi.

10.     Manufacturer Defendants likewise understand that the PBM Defendants' standard formularies drive drug utilization throughout Mississippi.

11.     Given the PBMs' market power and the crucial role their standard formularies play in the pharmaceutical pricing chain, both Defendant groups understand that the PBM Defendants wield enormous control over drug prices and drug purchasing behavior.

12.     The false and deceptive conspiracy at the root of this Third Amended Complaint—the Insulin Pricing Scheme—was born from this mutual understanding.

13.     Over the course of the last fifteen years, and pursuant to the Insulin Pricing Scheme, Manufacturer Defendants have in lockstep raised their prices of their respective

2

diabetes drugs in an astounding manner despite the fact that the cost to produce these drugs has decreased during that same time period.

14.     Insulins, which today cost Manufacturer Defendants less than $2 to produce and which were originally priced at $20 when released in the late 1990s, now range between $300 and $700.

15.     In the last decade alone, Manufacturer Defendants have in tandem increased the prices of their insulins up to 1000%, taking the same increase down to the decimal point within a few days of each other.

16.     Figure 1 illustrates the rate in which Defendant Eli Lilly raised the price of its analog insulin, Humalog, compared to the rate of inflation for other consumer goods and services from 1997-2018.

**Figure 1: Price Increase of Insulin vs. Selected Consumer Goods from 1997-2018**



17.     Remarkably, nothing about these medications has changed during that time period; today's $350 insulin is the exact drug Defendants originally sold for $20.

18.     The current outrageously inflated price stands in stark contrast to insulin's origins: the discoverers sold the original patent for $1 to ensure that the medication would remain affordable. Today, insulin has become the poster child for skyrocketing and false drug prices.

19.     Both Manufacturer and PBM Defendants play vital roles and profit immensely from the Insulin Pricing Scheme and the false list prices produced by it.

20.     The Insulin Pricing Scheme works as follows: first, to gain formulary access from the PBM Defendants for their diabetic treatments, Manufacturer Defendants artificially and willingly raise their prices, and then pay a significant, yet undisclosed, portion of that false list price back to the PBMs. These Manufacturer Payments[1] are provided under a variety of labels, yet, however they are described, these Manufacturer Payments, along with the falsely inflated list prices, are *quid pro quo* for formulary inclusion on the PBMs' standard offerings.

21.     The Manufacturers' prices have become so untethered from the actual prices realized by either Defendant group as to constitute a false price.

22.     PBMs then grant preferred status on their standard formularies based upon the highest false list price—which the PBMs know to be false and which the PBMs insist

---

[1] In the context of this Complaint, the term "Manufacturer Payments" is defined as all payments or financial benefits of any kind conferred by the Manufacturer Defendants to PBM Defendants (or a subsidiary, affiliated entity, or group purchasing organization or rebate aggregator acting on the PBM's behalf), either directly via contract or indirectly via Manufacturer-controlled intermediaries. Manufacturer Payments includes rebates, administrative fees, inflation fees, pharmacy supplemental discounts, volume discounts, price or margin guarantees and any other form of consideration exchanged.

that their payor clients use as the basis for the price they pay for the at-issue drugs. The at-issue drugs with the highest list prices generate the largest profits for these PBMs.

23. The Insulin Pricing Scheme creates a "best of both worlds" scenario for Defendants. Manufacturer Defendants are able to make these undisclosed Manufacturer Payments to buy preferred formulary position—which significantly increases their revenue—without sacrificing their profit margins.

24. PBM Defendants profit off the false list prices that result from the scheme in numerous ways, including: (1) retaining a significant—yet undisclosed—percentage of the secret Manufacturer Payments, (2) using the false list price produced by the Insulin Pricing Scheme to generate profits from pharmacies in their networks and (3) relying on those same false list prices to drive up the PBMs' profits through their own pharmacies.

25. Thus, while the PBM Defendants represent both publicly and to their clients that they use their market power to drive down prices for diabetes medications, these representations are patently false.

26. Rather the PBMs are intentionally driving up the price of the at-issue drugs. Indeed, the Manufacturer Payments the PBMs receive in exchange for preferred formulary position, along with the PBMs' actual formulary construction, are directly responsible for the skyrocketing price of insulin.

27. Moreover, because the price paid by nearly every diabetic and payor is based upon the false list prices generated by Defendants' scheme, every diabetic and payor in Mississippi, who purchases these life-sustaining drugs, has been directly harmed by Defendants' Insulin Pricing Scheme.

28.     The State of Mississippi, as a payor for the at-issue drugs through its employee health plans and as a purchaser of the at-issue drugs at state-run facilities, has been overcharged millions of dollars a year.

29.     Mississippi diabetics have also been overcharged millions of dollars a year in out-of-pocket costs as a result of Defendants' Insulin Pricing Scheme.

30.     For diabetic Mississippians, the physical, emotional, and financial tolls of paying such excessive prices for diabetes medications is devastating. Unable to afford the drugs their doctors prescribe, many diabetics in Mississippi are forced to ration or under-dose their insulin, inject expired insulin, reuse needles, and starve themselves to control their blood sugars. This behavior is extremely dangerous and can lead to serious complications or even death.

31.     In addition to the immeasurable human costs, the insulin rationing caused by the Insulin Pricing Scheme also adds substantial costs to the Mississippi health care system by increasing preventable complications. For example, one national model found that all people with diabetes adhering to their diabetes medications would save $8.3 billion in direct medical costs per year by averting one million emergency department visits and 618,000 hospitalizations.

32.     The State shoulders the burden for much of these increased healthcare costs, spending more than $1 billion annually for diabetes and diabetes-associated complications. That number has steadily increased throughout the relevant time period and could grow exponentially in the near future given the high prevalence of prediabetes in Mississippi.

33.     Thus, in addition to being overcharged for the at-issue drugs through its employee benefit program and purchases for state-run facilities, the State has been and

will be damaged by the significant increase in health care expenditures caused by the Insulin Pricing Scheme as well.

34. Insulin rationing and the resulting otherwise-avoidable health complications caused by the Insulin Pricing Scheme also leads to a loss in productivity and tax revenue, further damaging the State.

35. The Honorable Lynn Fitch, Attorney General brings this action on behalf of the State of Mississippi and its citizens: (a) to protect the health and economic well-being of the hundreds of thousands of diabetic Mississippians in its *parens patriae* capacity; (b) on behalf of the State as a payor for and purchaser of the at-issue diabetes medications through its health plans and state-run facilities; and (c) on behalf of the State to recover damages for the costs it has and will incur as a result of Defendants' unlawful conduct.

36. This action asserts causes for Defendants' violation of the Mississippi Consumer Protection Act, unjust enrichment and civil conspiracy.

37. This action seeks injunctive relief, restitution, disgorgement, actual damages, punitive damages, civil penalties and attorneys' fees to address and abate the harm caused by the Insulin Pricing Scheme.

38. The relevant period for damages alleged in this Third Amended Complaint is from 2003 continuing through the present.

## II.    PARTIES

### A.    Plaintiff

39. **Plaintiff, the State of Mississippi**. The State of Mississippi is the sole Plaintiff in this action, brought in its name on relation of the Attorney General, the Honorable Lynn Fitch. Acting as a constitutional officer of the State possessing all the power and authority under the common law and statute, the Attorney General institutes

this action to protect the State's sovereign interest in the health and economic interests of its residents, its own interests and the integrity of its marketplace.

**B.  Manufacturer Defendants**

40.  **Defendant Eli Lilly and Company ("Eli Lilly)** is an Indiana corporation with its principal place of business at Lilly Corporate Center, Indianapolis, Indiana 46285.

41.  Eli Lilly is registered to do business in Mississippi and has been since at least 1966. Eli Lilly may be served through its registered agent: NRAI Agents, Inc., 645 Lakeland East Dr., Suite 101, Flowood, Mississippi 39232.

42.  Eli Lilly holds a three active Drug Facility and Non-Resident Wholesaler permits with the Mississippi Board of Pharmacy (License #s: 15663/16.5a; 18295; 18281).

43.  These permits allow Eli Lilly to manufacture, distribute and sell its at-issue drugs in Mississippi.

44.  In Mississippi, Eli Lilly promotes and distributes its at-issue diabetes medications: Humulin N, Humulin R, Humalog, Trulicity and Basaglar.

45.  Eli Lilly's global revenues in 2019 were $4.13 billion from Trulicity, $2.82 billion from Humalog, $1.29 billion from Humulin and $1.11 billion from Basaglar.

46.  Eli Lilly's global revenues in 2018 were $3.2 billion from Trulicity, $2.99 billion from Humalog, $1.33 billion from Humulin and $801 million from Basaglar.

47.  Eli Lilly transacts business in Mississippi, targeting the State of Mississippi market for its products, including the at-issue diabetes medications.

48.  Eli Lilly employs sales representatives throughout Mississippi, to promote and sell Humulin N, Humulin R, Humalog, Trulicity and Basaglar.

49. Eli Lilly also directs advertising and informational materials to Mississippi physicians, payors and diabetics for the specific purpose of selling more of the at-issue drugs in Mississippi and profiting from the Insulin Pricing Scheme.

50. At all times relevant hereto, in furtherance of the Insulin Pricing Scheme, Eli Lilly caused its false list prices for the at-issue diabetes medications to be published throughout Mississippi with the express knowledge that payment and reimbursement by Mississippi diabetics and payors, including the State, would be based on those false list prices.

51. During the relevant time period, the State spent millions of dollars per year based on Eli Lilly's false list prices for the at-issue drugs paid for through its employee health plans and purchased for use in state-run facilities.

52. During the relevant time period, diabetics in Mississippi spent millions of dollars per year out of pocket on Eli Lilly's at-issue drugs also based on Eli Lilly's false list prices.

53. All of the Eli Lilly diabetes medications related to the at-issue transactions were paid for and/or purchased in Mississippi based on the specific false list prices Eli Lilly caused to be published in Mississippi in furtherance of the Insulin Pricing Scheme.

54. **Defendant Sanofi-Aventis U.S. LLC ("Sanofi")** is a Delaware limited liability company with its principal place of business at 55 Corporate Drive, Bridgewater, New Jersey 08807.

55. Sanofi may be served through its registered agent: Corporation Service Company, 7716 Old Canton Rd. Suite C, Madison, MS 39110.

56. Sanofi is registered to do business in Mississippi.

10

57.     Sanofi holds three active Drug Facility Permits with the Mississippi Board of Pharmacy (License #s: 16521 / 16.5a, 16520 / 16.5a, and 16519 / 16.5a).

58.     These permits allow Sanofi to manufacture, distribute and sell its at-issue drugs in Mississippi.

59.     Sanofi promotes and distributes pharmaceutical drugs in Mississippi, including several at-issue diabetes medications: Lantus, Toujeo, Apidra and Soliqua.

60.     Sanofi's global revenues in 2019 were $3.50 billion from Lantus, $1.03 billion from Toujeo, $400 million from Apidra and $102 million from Soliqua.

61.     Sanofi's global revenues in 2018 were $3.9 billion from Lantus, $923 million from Toujeo, $389 million from Apidra and $73 million from Soliqua.

62.     Sanofi transacts business in Mississippi, targeting the Mississippi market for its products, including the at-issue diabetes medications.

63.     Sanofi employs sales representatives throughout Mississippi to promote and sell Lantus, Toujeo, Apidra and Soliqua.

64.     Sanofi also directs advertising and informational materials to Mississippi physicians, payors and diabetics for the specific purpose of selling more of the at-issue drugs in Mississippi and profiting from the Insulin Pricing Scheme.

65.     At all times relevant hereto, in furtherance of the Insulin Pricing Scheme, Sanofi caused its false list prices for the at-issue diabetes medications to be published throughout Mississippi with the express knowledge that payment and reimbursement by Mississippi diabetics and payors, including the State, would be based on those false list prices.

66.     During the relevant time period, the State spent millions of dollars per year based on Sanofi's false list prices for the at-issue drugs reimbursed through its employee health plans and purchased for use in state-run facilities.

67.     During the relevant time period, diabetics in Mississippi spent millions of dollars per year out of pocket on Sanofi's at-issue drugs also based on Sanofi's false list prices.

68.     All of the Sanofi diabetes medications related to the at-issue transactions were paid for and/or purchased in Mississippi based on the specific false and inflated prices Sanofi caused to be published in Mississippi in furtherance of the Insulin Pricing Scheme.

69.     **Defendant Novo Nordisk Inc. ("Novo Nordisk")** is a Delaware corporation with its principal place of business at 800 Scudders Mill Road, Plainsboro, New Jersey 08536.

70.     Novo Nordisk may be served through its registered agent: The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

71.     Novo Nordisk holds an active Drug Facility Permit with the Mississippi Board of Pharmacy (License #: 17784 / 16.4a).

72.     This permit allows Novo Nordisk to manufacture, distribute and sell its at-issue drugs in Mississippi.

73.     Novo Nordisk promotes and distributes pharmaceutical drugs in Mississippi, including at-issue diabetic medications: Novolin R, Novolin N, Novolog, Levemir, Tresiba, Victoza and Ozempic.

74. Nordisk's global revenues in 2019 were $2.89 billion from Novolog, $973 million from Levemir, $968 million from Tresiba, $2.29 billion from Victoza and $1.17 billion from Ozempic.

75. Novo Nordisk's global revenues in 2018 were $4.19 billion from Novolog, $1.66 billion from Levemir, $1.19 billion from Tresiba, $3.61 billion from Victoza and $185 million from Ozempic.

76. Novo Nordisk transacts business in Mississippi, targeting Mississippi for its products, including the at-issue diabetes medications.

77. Novo Nordisk employs sales representatives throughout Mississippi to promote and sell Novolin R, Novolin N, Novolog, Levemir, Tresiba, Victoza and Ozempic.

78. Novo Nordisk also directs advertising and informational materials to Mississippi physicians, payors and diabetics for the specific purpose of selling more of the at-issue drugs in Mississippi and profiting from the Insulin Pricing Scheme.

79. At all times relevant hereto, in furtherance of the Insulin Pricing Scheme, Novo Nordisk caused its false list prices for the at-issue diabetes medications to be published throughout Mississippi with the express knowledge that payment and reimbursement by Mississippi diabetics and payors, including the State, would be based on those false list prices.

80. During the relevant time period, the State spent millions of dollars per year based on Novo Nordisk's false list prices for the at-issue drugs through its employee health plans and through purchases for use in state-run facilities.

81. During the relevant time period, diabetics in Mississippi spent millions of dollars per year out of pocket on Novo Nordisk's at-issue drugs also based on Novo Nordisk's false list prices.

82.     All of the Novo Nordisk diabetes medications related to the at-issue transactions were paid for and/or purchased in Mississippi based on the specific false and inflated prices Novo Nordisk caused to be published in Mississippi in furtherance of the Insulin Pricing Scheme.

83.     Collectively, Defendants Eli Lilly, Novo Nordisk and Sanofi are referred to as "Manufacturer Defendants" or "Manufacturers."

### C.     PBM Defendants

84.     **Defendant CVS Health Corporation** ("CVS Health") is a Delaware corporation with its principal place of business at One CVS Drive, Woonsocket, Rhode Island 02895. CVS Health transacts business and has locations throughout Mississippi.

85.     CVS Health may be served through its registered agent: The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

86.     CVS Health, through its executives and employees, including its CEO, Chief Medical Officer, Executive Vice Presidents, Senior Executives in Trade Finance, and Chief Communication Officers, is directly involved in the PBM services and formulary construction related to the Insulin Pricing Scheme that gave rise to the State's claims.

87.     During the relevant time, CVS Health (or its predecessor)[2] has repeatedly, continuously and explicitly stated that *CVS Health:*

> a.     "design[s] pharmacy benefit plans that minimize the costs to the client while prioritizing the welfare and safety of the clients' members and helping improve health outcomes;"[3]

---

[2] Until 2014, CVS Health was known as "CVS Caremark."  In September 2014, "CVS Caremark Corporation announced that it is changing its corporate name to CVS Health to reflect its broader health care commitment and its expertise in driving the innovations needed to shape the future of health."

[3] CVS Caremark/CVS Health, Annual Reports (Form 10-K) (Dec. 31, 2009-2019).

b.     "negotiate[s] with pharmaceutical companies to obtain discounted acquisition costs for many of the products on [CVS Health's] drug lists, and these negotiated discounts enable [CVS Health] to offer reduced costs to clients;"[4]

c.     "utilize[s] an independent panel of doctors, pharmacists and other medical experts, referred to as its Pharmacy and Therapeutics Committee, to select drugs that meet the highest standards of safety and efficacy for inclusion on [CVS Health's] drug lists."[5]

88.     CVS Health publicly represents that CVS Health constructs programs that lower the cost of the at-issue diabetes medications. For example, in 2016, CVS Health announced a new program to "reduce overall spending in diabetes" that is available in all states, including Mississippi, stating:

"*CVS Health* introduced a new program available to help the company's pharmacy benefit management (PBM) clients to improve the health outcomes of their members, *lower pharmacy costs [for diabetes medications]* through aggressive trend management and decrease medical costs . . . [and that] participating clients could save between $3000 to $5000 per year for each member who successfully improves control of their diabetes" (Emphasis added).

89.     In 2017, CVS Health stated that "*CVS Health* pharmacy benefit management (PBM) strategies reduced trend for commercial clients to 1.9 percent per member per year the lowest in five years. Despite manufacturer price increases of near 10 percent, *CVS Health* kept drug price growth at a minimal 0.2 percent."

90.     In 2005, 2010 and 2015, CVS Health made similar representations directly to the State. Examples include:

a.     In April 2005, CVS Health represented to the State that "[*CVS Health*] provide[s] . . . the managed prescription drug program that will meet [the State's] financial objectives, maintain a high degree of plan participant satisfaction and loyalty, and actively and creatively manage the cost of buying and delivering healthcare benefits."

---

[4] CVS Caremark/CVS Health, Annual Reports (Form 10-K) (Dec. 31, 2009-2013).
[5] CVS Caremark/CVS Health, Annual Reports (Form 10-K) (Dec. 31, 2009-2019).

b.   On March 22, 2010, CVS Health represented to the State, "As the largest integrated provider of prescription drug benefits in the United States, [*CVS Health*] has the resources and proven experience to provide the highest quality of pharmaceutical care and deliver what plans want most – improved savings and improved member experience." (Emphasis added).

c.   On March 4, 2015, the Vice President of Client Financial Analysis and Proposals for CVS Health represented to the State, "[CVS Health's] capabilities allow us to identify unique opportunities that improve member health and reduce total health care costs for our clients;" "*CVS Health* will provide consultative services regarding pharmacy benefit design including but not limited to . . . formularies, . . . implementation of programs which control utilization and optimize health, utilization review services and evaluation of drug use and cost data. [*CVS Health's*] consultative services can play a major role in support of the [State's] strategic objectives for managing pharmacy and total health care trend." (Emphasis added).

91.   CVS Health has entered into business relationships in Mississippi, including in 2015 when CVS Health announced a clinical affiliation with the University of Mississippi Medical Center to provide integrated health information in order to allow patients to better monitor their chronic diseases, such as diabetes.

92.   On March 4, 2015, CVS Health informed the State that "*CVS Health* operates 50 CVS/Pharmacy locations and support facilities [in Mississippi] in which more than 880 [CVS Health] colleagues work." (Emphasis added).

93.   In November 2018, CVS Health acquired Aetna for $69 billion and became the first combination of a major health insurer, PBM, mail order and retail pharmacy chain. As a result, CVS Health controls the health plan/insurer, the PBM and the pharmacies utilized by approximately 40 million Aetna members in the United States and in Mississippi.   CVS controls the entire drug pricing chain for these 40 million Americans.

94.   Throughout the relevant time period, the Manufacturer Defendants directly engaged with CVS Health executives in furtherance of the Insulin Pricing Scheme. Each

Manufacturer Defendant has an entire team of executives dedicated exclusively to interacting with CVS Health.

95. Manufacturer Defendants have explicitly recognized that effectuating the Insulin Pricing Scheme requires "intimacy and connect[ion]" between the Manufacturer Defendants' leaders and CVS Health's leaders in order to align on "strategic formulary management initiatives to ensure profitable access across all [standard] formularies."

96. On a regular basis throughout the relevant period, the Manufacturer Defendants' executive teams—which at times included their CEOs—met with CVS Health executives to discuss their coordinated efforts related to the at-issue drugs. Examples include:

> a. In 2011, 2012, and 2016 the leaders of CVS Health and Novo Nordisk participated in executive exchange meetings, which appear to have included discussions in furtherance of the Insulin Pricing Scheme. These meetings included the Executive Vice President of CVS Health (Per Lofberg), the Chief Medical Officer of CVS Health (Dr. Troy Brennan), members of CVS Health's Enterprise Operating Committee (Matthew Leonard) and key executives from Novo Nordisk.

> b. In 2012, the leaders of CVS Health and Eli Lilly participated in numerous executive meetings which appear to have included discussions in furtherance of the Insulin Pricing Scheme. These meetings included the CEO of CVS Health (Per Lofberg), the COO of CVS Health (Jon Roberts), members of CVS Health's Enterprise Operating Committee (Matthew Leonard), the President of Eli Lilly ▊▊▊▊ and the Senior Vice President of Managed Care at Eli Lilly ▊▊▊▊▊▊, among others.

97. **Defendant CVS Pharmacy, Inc.** ("CVS Pharmacy") is a Rhode Island corporation whose principal place of business is at the same location as CVS Health. CVS Pharmacy is a wholly owned subsidiary of CVS Health.

98. CVS Pharmacy owns and operates dozens of pharmacies throughout Mississippi that were directly involved in and profited from the Insulin Pricing Scheme.

99. CVS Pharmacy is also the immediate and direct parent of Defendant Caremark Rx, L.L.C.

100. CVS Pharmacy is registered to do business in Mississippi and has been since at least 1997.

101. CVS Pharmacy may be served through its registered agent: CT Corporation System, 645 Lakeland East Dr. Ste 101, Flowood, MS 39232.

102. During the relevant time period, CVS Pharmacy provided retail pharmacy services in Mississippi that gave rise to the Insulin Pricing Scheme, which damaged diabetic Mississippians and the State.

103. **Defendant Caremark Rx, L.L.C.** is a Delaware limited liability company and its principal place of business is at the same location as CVS Pharmacy and CVS Health.

104. Caremark Rx, L.L.C. is a wholly owned subsidiary of Defendant CVS Pharmacy.

105. Caremark Rx, L.L.C. may be served through its registered agent: The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

106. During the relevant time period, Caremark Rx, L.L.C. provided PBM and mail order pharmacy services in Mississippi that gave rise to the Insulin Pricing Scheme, which damaged diabetic Mississippians and the State.

107. **Defendant Caremark L.L.C.** is a California limited liability company whose principal place of business is at the same location as CVS Health. Caremark, L.L.C. is a wholly owned subsidiary of Caremark Rx, L.L.C.

108.    Caremark, L.L.C. is registered to do business in Mississippi and has been since at least 2007. Caremark, L.L.C. may be served through its registered agent: CT Corporation System, 645 Lakeland East Drive, Suite 101, Flowood, Mississippi 39232.

109.    Caremark, L.L.C. holds one active Drug Facility Permit (License #: 15883 / 16.5a), one active PBM Permit (License #:140123 / 14.1) and two active Non-Resident Facility Permits (License #s: 03556 / 7.1 and 16616 / 7.1) with the Mississippi Board of Pharmacy.

110.    During the relevant time period, Caremark, L.L.C. also provided PBM and mail order pharmacy services in Mississippi that gave rise to the Insulin Pricing Scheme, which damaged diabetic Mississippians and the State.

111.    **Defendant CaremarkPCS Health, L.L.C.** is a Delaware limited liability company whose principal place of business is at the same location as CVS Health. CaremarkPCS Health LLC is a wholly owned subsidiary of CVS Health.

112.     CaremarkPCS Health, L.L.C. provides pharmacy benefit management services.

113.    CaremarkPCS Health, L.L.C. is registered to do business in Mississippi and has been since at least 2014.

114.    CaremarkPCS Health, L.L.C. may be served through its registered agent: CT Corporation System, 645 Lakeland East Drive, Suite 101, Flowood, Mississippi 39232.

115.    CaremarkPCS Health, L.L.C. holds an active PBM Permit (License #:140116 / 14.1) with the Mississippi Board of Pharmacy.

116.    During the relevant time period, CaremarkPCS Health, L.L.C. provided PBM services in Mississippi, which gave rise to the Insulin Pricing Scheme and damaged diabetic Mississippians and the State.

19

117.     As a result of numerous interlocking directorships and shared executives, Caremark Rx, L.L.C., CVS Pharmacy, and CVS Health are directly involved in the conduct of and control CaremarkPCS Health, L.L.C and Caremark, L.L.C.'s operations, management and business decisions related to the at-issue formulary construction, Manufacturer Payments and mail order and retail pharmacy services to the ultimate detriment of Mississippi diabetics and the State. For example:

   a.     During the relevant time period, these parent and subsidiaries have had common officers and directors. Examples include:

   - Thomas S. Moffatt was Vice President and Secretary of Caremark Rx, L.L.C., CaremarkPCS Health L.L.C., and Caremark, L.L.C at the same time he was a Vice President, Assistant Secretary, and Assistant General Counsel at CVS Health and Director, Vice President, and Secretary at CVS Pharmacy;

   - Melanie K. Luker was the Assistant Secretary of CVS Pharmacy, Caremark Rx, L.L.C., CaremarkPCS Health, L.L.C, and Caremark, L.L.C. at the same time she was a Senior Manager of Corporate Services at CVS Health;

   - Jonathan C. Roberts was an Executive Vice President and Chief Operating Officer at CVS Health at the same time he was CEO of Caremark Rx, L.L.C.;

   - Daniel P. Davison was the President of CaremarkPCS Health LLC at the same time he was a Senior Vice President at CVS Health;

   - Annie E. Klis was a Vice President at CVS Health at the same time she was CEO of Caremark, L.L.C.

   b.     CVS Health directly or indirectly owns all the stock of CVS Pharmacy, Caremark Rx, L.L.C., Caremark L.L.C. and CaremarkPCS Health LLC.

   c.     All of the executives of CaremarkPCS Health, L.L.C., Caremark, L.L.C., Caremark Rx, L.L.C., and CVS Pharmacy ultimately report to the executives at CVS Health, including the President and CEO of CVS Health.

   d.     CVS Health, as a corporate family, does not operate as separate entities. The public filings, documents and statements of CVS Health presents its subsidiaries, including CVS Pharmacy, CaremarkPCS Health, L.L.C., Caremark, L.L.C. and Caremark Rx, L.L.C. as divisions or

departments of one unified "diversified health services company" that "works together across our disciplines" to "create unmatched human connections to transform the health care experience." The day-to-day operations of this corporate family reflect these public statements. These entities are a single business enterprise and should be treated as such as to all legal obligations discussed in this Third Amended Complaint. The CVS Health enterprise and each of these entities, both individually and collectively, engaged in the at-issue conduct that gave rise to the Insulin Pricing Scheme.

118.    Collectively, Defendants CVS Health, CVS Pharmacy, Caremark Rx, L.L.C., Caremark, L.L.C. and CaremarkPCS Health, L.L.C, including all predecessor and successor entities, are referred to as "CVS Caremark."

119.    CVS Caremark is named as a Defendant in its capacities as a PBM and as mail order and retail pharmacy.

120.    In its capacity as a PBM, CVS Caremark coordinates with Novo Nordisk, Eli Lilly and Sanofi regarding the false list prices for the at-issue diabetes medications, as well as for the placement of these firms' diabetes medications on CVS Caremark's formularies.

121.    CVS Caremark has the largest PBM market share based on total prescription claims managed, representing approximately 40% of the national market and a substantial portion of the Mississippi market.

122.    At all times relevant hereto, CVS Caremark offered pharmacy benefit services to Mississippi payors, and derived substantial revenue therefrom, and, in doing so, made the at-issue misrepresentations (discussed below) and utilized the false prices generated by the Insulin Pricing Scheme to profit off Mississippi diabetics and payors.

123.    At all times relevant hereto, CVS Caremark maintained standard formularies that are used in Mississippi. During the relevant time period, those formularies included the at-issue diabetes medications.

124.    The State currently relies on CVS Caremark to provide the at-issue PBM and pharmacy services to the State's health plan—the State and School Employees Health Insurance Management Board.

125.    From 1996-2005, CVS Caremark also provided the at-issue PBM and pharmacy services to the State's health plan.

126.    At all times relevant hereto, and contrary to all of its express representations, CVS Caremark has knowingly insisted that its payor clients, including the State, use the false list prices produced by the Insulin Pricing Scheme as the basis for payment for the price paid for the at-issue drugs.

127.    At all times relevant hereto, CVS Caremark has concealed its critical role in the generation of those false list prices.

128.    In its capacity as a mail order and retail pharmacy, CVS Caremark received payments from Mississippi diabetics and payors for, and set the out-of-pocket prices paid for, the at-issue drugs based on the false list prices produced by the Insulin Pricing Scheme and, as a result, damaged Mississippi diabetics and payors.

129.    In its capacity as a retail pharmacy, CVS Caremark further and knowingly profited from the false list prices produced by the Insulin Pricing Scheme by pocketing the spread between acquisition cost for the drugs at issue (an amount well below the list price generated by the Insulin Pricing Scheme), and the amounts they received from payors (which amounts were based on the false list prices and, in many cases, were set by CVS Caremark in its capacity as a PBM).

130.  CVS Caremark purchases drugs from manufacturers, including the Manufacturer Defendants, and through drug wholesalers for dispensing by its mail order and retail pharmacies.

131.    At all times relevant hereto, CVS Caremark had express agreements with Defendants Novo Nordisk, Sanofi and Eli Lilly related to the Manufacturer Payments paid to CVS Caremark, as well as agreements related to the Manufacturers' at-issue drugs sold through CVS Caremark's mail order and retail pharmacies, including those located in Mississippi.

132.    **Defendant Evernorth Health, Inc. ("Evernorth"),** formerly known as Express Scripts Holding Company, is a Delaware corporation with its principal place of business at 1 Express Way, St. Louis, Missouri 63121.[6]

133.    Evernorth may be served through its registered agent: The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

134.    Evernorth, through its executives and employees including its CEO and Vice Presidents, is directly involved in shaping the company policies that inform its PBM services and formulary construction, including with respect to the at-issue drugs, related to the Insulin Pricing Scheme.  For example, during the relevant time period Evernorth's CEO Tim Wentworth was involved in communications with the Manufacturer Defendants related to the at-issue drugs and at-issue Manufacturer Payments.

135.    Evernorth's conduct had a direct effect in Mississippi and damaged diabetic Mississippians and the State.

136.    On a regular basis, Evernorth executives and employees communicate with and direct its subsidiaries related to the at-issue PBM services and formulary activities.

137.    Throughout the relevant time period, the Manufacturer Defendants directly engaged with Evernorth executives in furtherance of the Insulin Pricing Scheme.  Each

---

[6] Until 2021, Evernorth Health, Inc. conducted business under the name Express Scripts Holding Company. For the purposes of this Complaint "Evernorth" refers to Evernorth Health, Inc and Express Scripts Holding Company.

Manufacturer Defendant has an entire team of executives dedicated exclusively to interacting with Evernorth.

138.    Manufacturers recognize that effectuating the Insulin Pricing Scheme requires "enhanced relationships at C Suite level" between the Manufacturers and Evernorth to "[i]mprove diabetes patient management through collaboration" and to "work synergistically within [Manufacturer Defendants] to maximize [Evernorth's] business opportunities."

139.    On a regular basis throughout the relevant time period, these Manufacturer executive teams—which at times include the CEOs from these companies—met with Evernorth to discuss their coordinated efforts related to the at-issue drugs. Examples include:

> a.    In 2013, 2014, and 2015 the leaders of Evernorth and Eli Lilly participated in executive meetings which appear to have included discussions in furtherance of the Insulin Pricing Scheme. These meetings included the CEO of Evernorth (George Paz), Senior Director of Express Scripts Pharmaceutical Strategies & Solutions (Jason Zilocchi), CEO of Eli Lilly ███████████, Head of Eli Lilly's diabetes division ███████ ███████, among others.

> b.    In 2013 and 2014, the leaders of Evernorth and Novo Nordisk participated in executive meetings which appear to have included discussions in furtherance of the Insulin Pricing Scheme.

140.    Evernorth is the immediate or indirect parent of pharmacy and PBM subsidiaries that operate throughout Mississippi, which engaged in the activities that gave rise to this Third Amended Complaint.

141.    In December 2018, Evernorth merged with Cigna in a $67 billion deal to consolidate their businesses as a major health insurer, PBM and mail order pharmacy. As a result, the Evernorth corporate family controls the health plan/insurer, the PBM and the mail order pharmacies utilized by approximately 15 million Cigna members in the United

States and in Mississippi. Evernorth controls the entire drug pricing chain for these 15 million Americans.

142.    In each annual report for at least the last decade, Evernorth has repeatedly, continuously and explicitly stated:[7]

> a.    "[Evernorth] is one of the largest PBMs in North America . . . [and Evernorth] help[s] health benefit providers address access and affordability concerns resulting from rising drug costs while helping to improve healthcare outcomes."
>
> b.    "[Evernorth] manage[s] the cost of the drug benefit by . . . assist[ing] clients in selecting a cost-effective formulary [and] leveraging purchasing volume to deliver discounts to health benefit providers."
>
> c.    "[Evernorth] works with clients, manufacturers, pharmacists and physicians to increase efficiency in the drug distribution chain, to manage costs in the pharmacy benefit chain and to improve members' health outcomes."

143.    **Defendant Express Scripts, Inc.** is a Delaware corporation and is a wholly owned subsidiary of Defendant Evernorth. Express Scripts, Inc.'s principal place of business is at the same location as Evernorth.

144.    Express Scripts, Inc. is registered to do business in Mississippi and has been since at least 2010.

145.    Express Scripts, Inc. may be served through its registered agent: Corporation Service Company, 7716 Old Canton Road, Suite C, Madison, Mississippi 39910.

146.    Express Scripts, Inc. is the immediate or indirect parent of pharmacy and PBM subsidiaries that operate throughout Mississippi that engaged in the conduct which gave rise to this Third Amended Complaint.

---

[7] Express Scripts Annual Reports (Form 10-K) (Dec. 31, 2009-2019).

147.    During the relevant time period, Express Scripts Inc. was directly involved in the PBM and mail order pharmacy services which gave rise to the Insulin Pricing Scheme and damaged diabetic Mississippians and the State.

148.    **Defendant Express Scripts Administrators, LLC,** doing business as Express Scripts and formerly known as Medco Health, L.L.C., is a Delaware limited liability company and is a wholly owned subsidiary of Evernorth. Express Scripts Administrators, LLC's principal place of business is at the same location as Evernorth.

149.    Express Scripts Administrators, LLC is registered to do business in Mississippi and has been since at least 2006.

150.    Express Scripts Administrators, LLC may be served through its registered agent: Corporation Service Company, 7716 Old Canton Road, Suite C, Madison, Mississippi 39910.

151.    Express Scripts Administrators, LLC holds an active PBM Permit (License #: 140117 / 14.1) with the Mississippi Board of Pharmacy.

152.    During the relevant time period, Express Scripts Administrators, LLC provided the PBM services in Mississippi discussed in this Third Amended Complaint that gave rise to the Insulin Pricing Scheme that damaged diabetic Mississippians and the State.

153.    **Defendant Medco Health Solutions, Inc. ("Medco")** is a Delaware Corporation with its principal place of business located at 100 Parsons Pond Road, Franklin Lakes, New Jersey.

154.    Medco may be served through its registered agent: CT Corporation System, 645 Lakeland East Drive Ste 101, Flowood, MS 39232.

155.    Prior to 2012, Medco provided pharmacy benefit management services to various health insurance entities throughout the United States and in Mississippi.

156.    In 2012, Express Scripts acquired Medco for $29 billion.

157.    Prior to the merger Express Scripts and Medco were two of the largest PBMs in the United States and in Mississippi.

158.    Prior to the merger, Medco provided the at-issue PBM and mail order services in Mississippi, which gave rise to the Insulin Pricing Scheme and damaged diabetic Mississippians and the State.

159.    Following the merger, all of Medco's PBM and mail order pharmacy functions were combined into Express Scripts.   The combined company (Medco and Express Scripts) continued under the name Express Scripts with all of Medco's payor customers becoming Express Scripts' customers. The combined company covered over 155 million lives at the time of the merger.

160.    At the time of the merger, on December 6, 2011, in his testimony before the Senate Judiciary Committee, then CEO of Medco, David B Snow, publicly represented that "the merger of Medco and Express Scripts will result in immediate savings to our clients and, ultimately, to consumers. This is because our combined entity will achieve even greater [Manufacturer Payments] from drug manufacturers and other suppliers."

161.    The then-CEO of Express Scripts, George Paz, during a Congressional subcommittee hearing in September 2011, echoed these sentiments: "A combined Express Scripts and Medco will be well-positioned to protect American families from the rising cost of prescription medicines."

162.     **Defendant ESI Mail Pharmacy Service, Inc.** is a Delaware corporation and is a wholly owned subsidiary of Defendant Evernorth. ESI Mail Pharmacy Service, Inc.'s principal place of business is at the same location as Evernorth.

163.     ESI Mail Pharmacy Service, Inc. may be served through its registered agent: Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808.

164.     ESI Mail Pharmacy Service, Inc. holds four active Non-Resident Facility Permits (License #s: 13873 / 7.1, 13921 / 7.1, 05805 / 7.1, 02882 / 7.1) with the Mississippi Board of Pharmacy.

165.     During the relevant time period, ESI Mail Pharmacy Services provided the mail order pharmacy services in Mississippi discussed in this Third Amended Complaint, which gave rise to the Insulin Pricing Scheme and damaged diabetic Mississippians and the State.

166.     **Defendant Express Scripts Pharmacy, Inc.** is a Delaware corporation and is a wholly owned subsidiary of Defendant Evernorth. Express Scripts Pharmacy, Inc.'s principal place of business is at the same location as Evernorth.

167.     Express Scripts Pharmacy, Inc. may be served through its registered agent: Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808.

168.     Express Scripts Pharmacy, Inc. holds six active Non-Resident Facility Permits (License #s: 13393 / 7.1, 03645 / 7.1, 04548 / 7.1, 08226 / 7.1, 05397 / 7.1, 05060 / 7.1) with the Mississippi Board of Pharmacy.

169.     During the relevant time period, Express Scripts Pharmacy, Inc. provided the mail order pharmacy services in Mississippi discussed in this Third Amended Complaint, which gave rise to the Insulin Pricing Scheme and damaged diabetic Mississippians and the State.

170.    As a result of numerous interlocking directorships and shared executives, Evernorth and Express Scripts, Inc. are directly involved in the conduct of and control Express Scripts Administrators, LLC, Medco Health Solutions, Inc., ESI Mail Pharmacy Service, Inc. and Express Scripts Pharmacy, Inc's operations, management and business decisions related to the at-issue formulary construction, Manufacturer Payments and mail order pharmacy services to the ultimate detriment of Mississippi diabetics and the State. For example:

a.    During the relevant time period, these parent and subsidiaries have had common officers and directors:

- Officers and/or directors that have been shared between Express Scripts, Inc. and Evernorth include Bradley Phillips, Chief Financial Officer; David Queller, President; Jill Stadelman, Secretary; Timothy Smith, Vice President; and Scott Lambert, Treasury Manager Director;

- Executives that have been shared between Express Scripts Administrators, LLC and Evernorth include Bradley Phillips, Chief Financial Officer; and Priscilla Duncan, Associate Secretary;

- Officers and/or directors that have been shared between ESI Mail Pharmacy Service, Inc. and Evernorth include Bradley Phillips, Chief Financial Officer; Priscilla Duncan, Associate Secretary; and Joanne Hart, Associate Treasurer;

- Officers and/or directors that have been shared between Express Scripts Pharmacy, Inc. and Evernorth include Bradley Phillips, Chief Financial Officer; Jill Stadelman, Secretary; Scott Lambert, Treasury Manager Director; and Joanne Hart, Associate Treasurer; and

- Officers and/or directors that have been shared between Medco Health Solutions, Inc. and Evernorth include David Queller, President and Senior VP of Sales & Accounting, Christine Houston, VP and COO, Timothy Smith, VP and Treasurer and all of the officers of Medco Health Solutions are also officers of Express Scripts, Inc.

b.    Evernorth directly or indirectly owns all of the stock of Express Scripts Administrators, LLC, Medco Health Solutions, Inc., ESI Mail Pharmacy Service, Inc., Express Scripts Pharmacy, Inc. and Express Scripts, Inc.

c.      The Evernorth corporate family does not operate as separate entities. The public filings, documents and statements of Evernorth presents its subsidiaries, including Express Scripts Administrators, LLC, Medco Health Solutions, Inc., ESI Mail Pharmacy Service, Inc., Express Scripts Pharmacy, Inc. and Express Scripts, Inc. as divisions or departments of a single company that "unites businesses that have as many as 30+ years of experience . . . [to] tak[e] health services further with integrated data and analytics that help us deliver better care to more people." The day-to-day operations of this corporate family reflect these public statements. All of these entities are a single business enterprise and should be treated as such as to all legal obligations detailed in this Third Amended Complaint. The Evernorth enterprise and each of these entities, both individually and collectively, engaged in the at-issue conduct that gave rise to the Insulin Pricing Scheme.

d.      All of the executives of Express Scripts Administrators, LLC, Medco Health Solutions, Inc., ESI Mail Pharmacy Service, Inc., Express Scripts Pharmacy, Inc. and Express Scripts, Inc. ultimately report to the executives, including the CEO, of Evernorth.

e.      As stated above, Evernorth's CEO and other executives and officers are directly involved in the policies and business decisions of Express Scripts Administrators, LLC, ESI Mail Pharmacy Service, Inc., Medco Health Solutions, Inc., Express Scripts Pharmacy, Inc. and Express Scripts, Inc. that gave rise to the State's claims in this Third Amended Complaint.

171.   Collectively, Defendants Evernorth Health, Inc., Express Scripts, Inc., Express Scripts Administrators, LLC, Medco Health Solutions, Inc., ESI Mail Pharmacy Service, Inc. and Express Scripts Pharmacy, Inc., including all predecessor and successor entities, are referred to as "Express Scripts."

172.   Express Scripts is named as a Defendant in its capacities as a PBM and mail order pharmacy.

173.   In its capacity as a PBM, Express Scripts coordinates with Novo Nordisk, Eli Lilly and Sanofi regarding the false list prices for the at-issue diabetes medications, as well as for the placement of these firms' diabetes medications on Express Script's formularies.

174.   Prior to merging with Cigna in 2019, Express Scripts was the largest independent PBM in the United States. During the relevant period of this Third Amended Complaint, Express Scripts controlled 30% of the PBM market in the United States. Express Scripts has only grown larger since the Cigna merger.

175.   In Mississippi, during the relevant time period, Express Scripts controlled up to 30% of the PBM market share based on covered lives, including at certain times up to 92% of the commercial insurance market in Mississippi.

176.   In 2017, annual revenue for Express Scripts was over $100 billion.

177.   As of December 31, 2018, more than 98% of all retail pharmacies in the nation participated in one or more of Express Scripts' networks.

178.   At all times relevant hereto, Express Scripts offered pharmacy benefit services, and derived substantial revenue therefrom, in Mississippi and provided the at-issue PBM services to numerous payors in Mississippi.

179.   At all times relevant hereto, and contrary to all of their express representations, Express Scripts has knowingly insisted that its payor clients use the false list prices produced by the Insulin Pricing Scheme as the basis for reimbursement of the at-issue drugs.

180.   At all times relevant hereto, Express Scripts has concealed its critical role in the generation of those false list prices.

181.   At all times relevant hereto, Express Scripts maintained standard formularies that are used in Mississippi. During the relevant time period, those formularies included the at-issue diabetes medications.

182.   During certain years when some of the largest at-issue price increases occurred, including in 2013 and 2014, Express Scripts worked directly with OptumRx to

negotiate Manufacturer Payments on behalf of OptumRx and its clients in exchange for preferred formulary placement. During these same years, OptumRx provided PBM services to the State, including Manufacturer Payment negotiations and formulary construction.

183.  In its capacity as a mail order pharmacy, Express Scripts received payments from Mississippi diabetics and payors for, and set the out-of-pocket price paid for, the at-issue drugs based on the falsely inflated prices produced by the Insulin Pricing Scheme and, as a result, damaged Mississippi diabetics and payors.

184.  At all times relevant hereto, Express Scripts derived substantial revenue providing mail order pharmacy services in Mississippi.

185.  Express Scripts purchases drugs directly from manufacturers for dispensing through its mail order pharmacy.

186.  At all times relevant hereto, Express Scripts received payments from Mississippi diabetics and payors for, and set the out-of-pocket prices paid for, the at-issue drugs based on the false list prices produced by the Insulin Pricing Scheme and, as a result, damaged Mississippi diabetics and payors.

187.  Express Scripts operates the mail order pharmacy and handles the Manufacturer Payment contracting for the PBM Prime Therapeutics. Upon information and belief, through this relationship, during the relevant time period, Express Scripts negotiated Manufacturer Payments related to the at-issue purchases made by the State through its health plan.

188.  At all times relevant hereto, Express Scripts had express agreements with Defendants Novo Nordisk, Sanofi and Eli Lilly related to the Manufacturer Payments paid by the Manufacturer Defendants to Express Scripts, as well as agreements related to the

Manufacturers' at-issue drugs sold through Express Scripts' mail order pharmacies in Mississippi.

189. **Defendant UnitedHealth Group, Inc**. **("UnitedHealth Group" or "UHG")** is a corporation organized under the laws of Delaware with its principal place of business at 9900 Bren Road East, Minnetonka, Minnesota, 55343.

190. UnitedHealth Group, Inc. may be served through its registered agent: The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

191. UnitedHealth Group, Inc. is a diversified managed healthcare company. In 2015, UnitedHealth Group reported revenue in excess of $157 billion, and the company is currently ranked sixth on the Fortune 500 list.

192. One-third of the overall revenues of UnitedHealth Group come from OptumRx.

193. UnitedHealth Group was directly involved in the conduct that caused the Insulin Pricing Scheme and as a result had a direct effect in Mississippi and damaged diabetic Mississippians and the State.

194. UnitedHealth Group, through its executives and employees, is directly involved in its enterprise-wide PBM services and formulary construction, including with respect to the at-issue drugs and related to the Insulin Pricing Scheme. For example, during the relevant time period OptumRx represented to the State that in providing PBM services, *UnitedHealth Group* has an "enterprise-wide commitment to Mississippi" with over "500 Mississippi-based employees as part of UnitedHealth Group, we are confident in our understanding of the market dynamics within [Mississippi] as well as our ability to

lower overall drug costs while providing an unparalleled customer and member experience."

195.    UnitedHealth Group's Sustainability Report states that "OptumRx works directly with pharmaceutical manufacturers to secure discounts that lower the overall cost of medications and create tailored formularies – or drug lists – to ensure people get the right medications. [*UnitedHealth Group*] then negotiate[s] with pharmacies to lower costs at the point of sale . . . [*UnitedHealth Group*] also operate[s] [mail order pharmacies] . . . . [*UnitedHealth Group*] work[s] directly with drug wholesalers and distributors to ensure consistency of the brand and generic drug supply, and a reliance on that drug supply."

196.    UnitedHealth Group executives structure, analyze and direct the company's overarching policies, including with respect to PBM and mail order services, as a means of maximizing profitability across the corporate family.

197.    On a regular basis throughout the relevant time period, executive teams from each Manufacturer Defendant—including at times their CEOs—met with executives from UnitedHealth Group to discuss their coordinated efforts in furtherance of the Insulin Pricing Scheme. Examples include:

> a.    In April 2015, the Executive Vice President at UnitedHealth Group, the Chief Commercial Officer at Optum Analytics, the Vice President of Optum, the Vice President of OptumInsight, among other executives met with Vice President of Market Access and the Executive Vice President of Strategic Accounts, among other executives from Novo Nordisk at UnitedHealth Group's corporate headquarters to discuss their strategic overview and prioritized opportunities in diabetes.
>
> b.    In October 2016, the CEO of OptumRx, Mark Thierer, and the CEO of UnitedHealth Group, Steve Hemsley, met the CEO of Eli Lilly, Dave Ricks, to discuss "strategic initiatives" between UHG/OptumRx and Eli Lilly.

198.    In addition to being a PBM and a mail order pharmacy, UnitedHealth Group owns and controls a major health insurance company, UnitedHealthcare. As a result, UnitedHealth Group controls the health plan/insurer, the PBM and the mail order pharmacies utilized by approximately 26 million UnitedHealthcare members in the United States and in Mississippi.   UnitedHealth Group controls the entire drug pricing chain for these 26 million Americans.

199.    During the relevant time period, UnitedHealth Group has availed itself of Mississippi courts, including in *UnitedHealth Group Incorporated, et al. v. Gallagher*, 3:11cv00329-HTW-LRA (S.D. Mississippi), filed Jun. 1, 2011. In the complaint that initiated that lawsuit, UHG represented that it contracted with Mississippi residents and directly engaged in PBM business and programs in Mississippi related to "advancing the health and well-being of individuals and communities," and that UnitedHealth Group's business interests in Mississippi included providing PBM services to the State.

200.    **Defendant Optum, Inc.**, is a Delaware corporation with its principal place of business located in Eden Prairie, Minnesota. Optum, Inc. is a health services company managing subsidiaries that administer pharmacy benefits, including Defendant OptumRx, Inc.

201.    Optum, Inc. may be served through its registered agent: The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

202.    Optum, Inc. is directly involved, through its executives and employees, in the company policies that inform its PBM services and formulary construction, including with respect to the at-issue drugs and related to the Insulin Pricing Scheme, which had a direct effect in Mississippi and damaged diabetic Mississippians and the State.

35

203.    For example, according to Optum Inc.'s press releases, Optum, Inc. is "UnitedHealth Group's information and technology-enabled health services business platform serving the broad healthcare marketplace, including care providers, plan sponsors, payors, life sciences companies and consumers." In this role Optum, Inc. is directly responsible for the "business units – OptumInsight, OptumHealth and OptumRx" and the CEOs of all these companies report directly to Optum, Inc. regarding their policies, including those that inform the at-issue formulary construction and mail order activities.

204.    OptumRx represented directly to the State that in providing PBM services it "leverage[es] the power of Optum to impact cost of care . . . to address all health and savings opportunities."

205.    **Defendant OptumInsight, Inc. ("OptumInsight")** is a Delaware corporation with a principal place of business at 11000 Optum Circle, Eden Prairie, MN 55344.

206.    OptumInsight is registered to business in Mississippi and has been since 1998. OptumInsight may be served through its registered agent: CT Corporation System, 645 Lakeland East Drive, Suite 101, Flowood, Mississippi 39232.

207.    OptumInsight holds one active Third Party Administrator license in Mississippi (License #:1509323).

208.    OptumInsight provides data, analytics and consulting to companies with the healthcare industry, including the Manufacturer Defendants.

209.    OptumInsight is an integral part of the Insulin Pricing Scheme and during the relevant time period OptumInsight coordinated directly with the Manufacturer Defendants in furtherance of the Insulin Pricing Scheme. OptumInsight analyzed data and

other information from the Manufacturer Defendants to advise the Manufacturers with regard to the profitability of the Insulin Pricing Scheme to the benefit of all Defendants.

210. **Defendant OptumRx Holdings, LLC**, is a Delaware limited liability corporation with a principal place of business at 2300 Main Street, Irvine, California.

211. OptumRx Holdings, LLC provides pharmacy benefit management services through its subsidiaries to various health insurance entities in Mississippi.

212. **Defendant OptumRx, Inc.** is a California corporation with its principal place of business at 2300 Main St., Irvine, California, 92614.

213. OptumRx, Inc. is registered to business in Mississippi and has been since 2007. OptumRx, Inc. may be served through its registered agent: CT Corporation System, 645 Lakeland East Drive, Suite 101, Flowood, Mississippi 39232.

214. OptumRx, Inc. holds one active PBM Permit (License #:140113 / 14.1) and three active Non-Resident Facility Permits (License #s: 07085 / 7.1, 05333 / 2.4, 17495 / 7.1) with the Mississippi Board of Pharmacy.

215. During the relevant time period, OptumRx, Inc. provided the PBM and mail order pharmacy services in Mississippi that gave rise to the Insulin Pricing Scheme, which damaged diabetic Mississippians and the State.

216. As a result of numerous interlocking directorships and shared executives, UnitedHealth Group, OptumRx Holdings, LLC and Optum, Inc are directly involved in the conduct of and control OptumInsight and OptumRx, Inc.'s operations, management and business decisions related to the at-issue formulary construction, negotiations and mail order pharmacy services to the ultimate detriment of Mississippi diabetics and the State. For example:

37

a. These parent and subsidiaries have common officers and directors, including:

- Sir Andrew Witty is president of UnitedHealth Group and CEO of Optum, Inc.;

- Dan Schumacher is president of Optum, Inc, the Chief Strategy and Growth Officer at UnitedHealth Group, Inc. and oversees OptumInsight;

- Terry Clark is a senior vice president and chief marketing officer at UnitedHealth Group and oversees the branding, marketing and advertising for UnitedHealth Group and Optum, Inc.;

- Tom Roos serves as chief accounting officer for UnitedHealth Group and Optum, Inc.;

- Heather Lang is Deputy General Counsel, Subsidiary Governance at UnitedHealth Group, Inc. and Assistant Secretary at OptumRx, Inc.; and

- Peter Gill is Vice President at UnitedHealth Group, Inc. and Treasurer at OptumRx, Inc.

- Timothy Alan Wicks, CFO and Executive Vice President of Optum, Inc., is also a director of OptumRx, Inc.

b. UnitedHealth Group directly or indirectly owns all of the stock of Optum, Inc., OptumRx Holdings LLC, OptumInsight and OptumRx, Inc.

c. The UnitedHealth Group corporate family does not operate as separate entities. The public filings, documents and statements of UnitedHealth Group presents its subsidiaries, including Optum, Inc., OptumRx Holdings LLC, OptumInsight and OptumRx, Inc. as divisions or departments of a single company that is "a diversified family of businesses" that "leverages core competencies" to "help[] people live healthier lives and helping make the health system work better for everyone." The day-to-day operations of this corporate family reflect these public statements. These entities are a single business enterprise and should be treated as such as to all legal obligations detailed in this Third Amended Complaint. The UnitedHealth Group enterprise and each of these entities, both individually and collectively, engaged in the at-issue conduct that gave rise to the Insulin Pricing Scheme.

       d.    All of the executives of Optum, Inc., OptumRx Holdings, LLC, OptumInsight and OptumRx, Inc. ultimately report to the executives, including the CEO, of UnitedHealth Group.

       e.    As stated above, UnitedHealth Group's executives and officers are directly involved in the policies and business decisions of OptumInsight, Optum, Inc., OptumRx Holdings LLC, and OptumRx, Inc. that gave rise to the State's claims in this Third Amended Complaint.

217.    Collectively, Defendants UnitedHealth Group, Inc., OptumInsight, OptumRx, Inc., OptumRx Holdings and Optum, Inc., including all predecessor and successor entities, are referred to as "OptumRx."

218.    OptumRx is named as a Defendant in its capacities as a PBM and mail order pharmacy.

219.    In its capacity as a PBM, OptumRx coordinates with Novo Nordisk, Eli Lilly and Sanofi regarding the false list prices for the at-issue diabetes medications, as well as for the placement of these firms' diabetes medications on OptumRx's drug formularies.

220.    OptumRx provides PBM services to more than 65 million people in the nation through a network of more than 67,000 retail pharmacies and multiple delivery facilities.

221.    In 2019, OptumRx managed more than $96 billion in pharmaceutical spending, with a revenue of $74 billion.

222.    As illustrated in Figure 13, OptumRx rose to power through numerous mergers with other PBMs. For example, in 2012, a large PBM, SXC Health Solutions bought one of its largest rivals, Catalyst Health Solutions Inc. in a roughly $4.14 billion deal. Shortly thereafter, SXC Health Solutions Corp. renamed the company, Catamaran Corp. Following this UnitedHealth Group bought Catamaran Corp in a deal worth $12.8 billion and combined Catamaran with OptumRx.

223.    Prior to merging with OptumRx, Catalyst Health Solutions, Inc. and Catamaran Corp. engaged in the at-issue PBM and mail order activities.

224.    At all times relevant hereto, OptumRx derived substantial revenue providing pharmacy benefits in Mississippi.

225.    From 2006-2015, OptumRx provided the at-issue PBM and pharmacy services to the State's health plan—the State and School Employees Health Insurance Management Board.

226.    At all times relevant hereto, and contrary to all of their express representations, OptumRx has knowingly insisted that its payor clients, including the State, use the false list prices produced by the Insulin Pricing Scheme as the basis for reimbursement of the at-issue drugs.

227.    At all times relevant hereto, OptumRx has concealed its critical role in the generation of those false list prices.

228.    At all times relevant hereto, OptumRx offered pharmacy benefit management services and maintained standard formularies in Mississippi. During the relevant time period, those formularies included diabetes medications, including all of those at issue in this Third Amended Complaint.

229.    In its capacity as a mail order pharmacy, OptumRx received payments from Mississippi diabetics and payors for, and set the out-of-pocket price paid for, the at-issue drugs based on the falsely inflated prices produced by the Insulin Pricing Scheme and, as a result, damaged Mississippi diabetics and payors.

230.    At all times relevant hereto, OptumRx derived substantial revenue through its mail order pharmacies in Mississippi.

231.    At all times relevant hereto, OptumRx had express agreements with Defendants Novo Nordisk, Sanofi and Eli Lilly related to the Manufacturer Payments paid by the Manufacturer Defendants to OptumRx, as well as agreements related to the Manufacturers' at-issue drugs sold through OptumRx's mail order pharmacies, including in Mississippi.

232.    Collectively, CVS Caremark, Optum Rx and Express Scripts are referred to as "PBM Defendants" or "PBMs."

### III.    Sovereign Interest

233.    This action seeks, on behalf of the State of Mississippi and its citizens, legal and equitable relief to redress injury and damage, as well as injunctive relief seeking an end to the Insulin Pricing Scheme. The State of Mississippi has a sovereign interest in protecting the well-being of the hundreds of thousands of diabetic citizens of the State of Mississippi who rely on Defendants' diabetic medications and have been damaged, and continue to be damaged, by the Defendants' unlawful conduct.

234.    Further, as a direct result of Defendants' false and deceptive scheme, the State of Mississippi has been damaged by having to pay millions of dollars per year in overcharges for Defendants' diabetes medications as a payor for and purchaser of the at-issue drugs and having to pay for increased healthcare costs caused by the Insulin Pricing Scheme.

235.    The State of Mississippi is a real party in interest in this action.  Acting as a constitutional officer of the State of Mississippi possessing all the power and authority under the common law and statute, the Attorney General institutes this action to protect the health and economic interests of its residents, its own interests and the integrity of its marketplace.  The Attorney General is authorized to bring this action on behalf of the State

as *parens patriae*, representative of its citizens and chief legal officer, to recover damages, punitive damages, restitution, penalties, disgorgement, injunctive relief and to remediate all harm arising out of—and provide full relief for—violations of Mississippi laws. The Attorney General brings this action on the State's behalf pursuant to her authority granted by Miss. Const. Art. 6, § 173 and Miss. Code Ann. § 7-5-1; Miss. Code Ann. §§ 75-24-1, *et seq.*

## IV.    JURISDICTION AND VENUE

236.    This Court has personal jurisdiction over each Defendant. Each Defendant: (a) transacts business and/or is admitted to do business within Mississippi, (b) maintains substantial contacts in Mississippi, and (c) committed the violations of Mississippi statutes and common law at issue in this lawsuit within Mississippi. The Insulin Pricing Scheme has been directed at, and has had the foreseeable and intended effect of, causing injury to persons residing in, located in, or doing business in Mississippi, and to the State itself. All of the at-issue transactions occurred in Mississippi and/or involved Mississippi residents. This Court has personal jurisdiction over all Defendants pursuant to Fed. R. Civ. P. 4(k)(1)(A) because they would be subject to the jurisdiction of a court of general jurisdiction in Mississippi.

237.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and (c), because each Defendant transacts business in, is found in, and/or has agents in this District, and the actions giving rise to the Complaint took place within this District. In particular, at all times during the relevant time period, Defendants provided pharmacy benefit services, provided mail order pharmacy services, employed sales representatives, promoted and sold diabetes medications and published prices of the at issue drugs in this District.

## V.    FACTUAL ALLEGATIONS

### A.    Diabetes and Insulin Therapy

### <u>Diabetes: A Growing Epidemic</u>

238.    Diabetes is a disease that occurs when a person's blood glucose, also called blood sugar, is too high. In a non-diabetic person, the pancreas secretes the hormone insulin, which controls the rate at which food is converted to glucose, or sugar, in the blood. When there is not enough insulin or cells stop responding to insulin, too much blood sugar stays in the bloodstream. Over time, that can cause serious health problems, such as heart disease, vision loss and kidney disease.

239.    There are two basic types of diabetes. Roughly 90-95% of diabetics developed the disease because they do not produce enough insulin or have become resistant to the insulin their bodies do produce. Known as Type 2, this form of diabetes is often developed later in life. While Type 2 patients can initially be treated with tablets, in the long term most patients have to switch to insulin injections.

240.    Type 1 diabetes occurs when a patient completely ceases insulin production. In contrast to Type 2 patients, people with Type 1 diabetes do not produce any insulin and, without regular injections of insulin, they will die.

241.    Insulin treatments are a necessary part of life for those who have diabetes and interruptions to a diabetic's insulin regimen can have severe consequences. Missed or inadequate insulin therapy can trigger hyperglycemia and then diabetic ketoacidosis. Left untreated, diabetic ketoacidosis can lead to loss of consciousness and death within days.

242.    The number of Americans with diabetes has exploded in the last half century. In 1958, only 1.6 million people in the United States had diabetes. By the turn of the century, that number had grown to over ten (10) million. Fourteen (14) years later, the

count tripled again. Now over thirty (30) million people—9.4% of the country—live with the disease.

243.    Likewise, the prevalence of diabetes in Mississippi has been steadily increasing as well, approximately 400,000 Mississippi adults now live with diabetes and another 750,000 have prediabetes.

244.    The burden of diabetes is not equally distributed in Mississippi.  Diabetes is significantly more prevalent in impoverished regions such as the Mississippi Delta. Nearly 1 in 4 Mississippians who earn less than $25,000 a year have diabetes.

245.    Minority communities are also disproportionally affected by this disease—nearly 20% of Black Mississippians have diabetes.

### Insulin: A Century Old Drug

246.    Despite its potentially deadly impact, diabetes is a highly treatable illness. For patients who are able to follow a prescribed treatment plan consistently, the health complications associated with the disease are avoidable.

247.    Unlike many high-burden diseases, treatment for diabetes has been available for almost a century.

248.    In 1922, Frederick Banting and Charles Best, while working at the University of Toronto, pioneered a technique for removing insulin from an animal pancreas that could then be used to treat diabetes. After discovery, Banting and Best obtained a patent and then sold it to the University of Toronto for $1 (equivalent of $14 today), explaining "[w]hen the details of the method of preparation are published anyone would be free to prepare the extract, but no one could secure a profitable monopoly."

249.    After purchasing the patent, the University of Toronto contracted with Defendants Eli Lilly and Novo Nordisk to scale their production. Under this arrangement,

Eli Lilly and Novo Nordisk were allowed to apply for patents on variations to the manufacturing process.

250.   Although early iterations of insulin were immediately perceived as lifesaving, there have been numerous incremental improvements since its discovery. The earliest insulin was derived from animals and, until the 1980s, was the only treatment for diabetes.

251.   While effective, animal-derived insulin created the risk of allergic reaction. This risk was lessened in 1982 when synthetic insulin, known as human insulin, was developed by Defendant Eli Lilly. Eli Lilly marketed this insulin as Humulin. The development of human insulin benefited heavily from government and non-profit funding through the National Institute of Health and the American Cancer Society.

252.   Over a decade later, Defendant Eli Lilly developed the first analog insulin, Humalog, in 1996.

253.   Analog insulin is laboratory grown and genetically altered insulin. Analogs are slight variations on human insulin that make the injected treatment act more like the insulin naturally produced and regulated by the body.

254.   Other rapid-acting analogs are Defendant Novo Nordisk's Novolog and Defendant Sanofi's Apidra, with similar profiles. Diabetics use these rapid-acting insulins in combination with longer-acting insulins, such as Sanofi's Lantus and Novo Nordisk's Levemir.

255.   Manufacturer Defendants introduced these rapid-acting and long-acting analog insulins between 1996 and 2007.

256.    In 2015, Sanofi introduced Toujeo, another long-acting insulin also similar to Lantus, however Toujeo is highly concentrated, making injection volume smaller than Lantus.

257.    In 2016, Eli Lilly introduced Basaglar, which is a long-acting insulin that is biologically similar to Sanofi's Lantus.

258.    Even though insulin was first extracted nearly one hundred (100) years ago, only Defendants Eli Lilly, Novo Nordisk and Sanofi manufacture insulin in the United States.

259.    Many of the at-issue diabetes medications are now off patent. However, the Manufacturers have engaged in illicit tactics to maintain their complete market dominance.

260.    Due in large part to their ability to stifle all competition, Manufacturer Defendants make 99% of the insulins in the market today.

### Current Insulin Landscape

261.    While insulin today is generally safer and more convenient to use than when originally developed in 1922, there remain questions whether the overall efficacy of insulin has significantly improved over the last twenty (20) years.

262.    For example, while long-acting analogs may have certain advantages over human insulins, such as affording more flexibility around mealtime planning, it has yet to be shown that analogs lead to better long-term outcomes.

263.    A recent study published in the Journal of American Medical Association suggests that older human insulins may work just as well as newer analog insulins for patients with Type 2 diabetes.

264.    When discussing the latest iterations of insulins, Harvard Medical School professor David Nathan recently stated:

> I don't think it takes a cynic such as myself to see most of these [insulins] are being developed to preserve patent protection. The truth is they are marginally different, and the clinical benefits of them over the older drugs have been zero.

265.    Moreover, all of the insulins at issue in this case have either been available in the same form since the late 1990s/early 2000s or are biologically equivalent to insulins that were available then.

266.    Dr. Kasia Lipska, a Yale researcher and author of a 2018 study in the Journal of the American Medical Association on the cost of insulin, explained:

> We're not even talking about rising prices for better products here. I want to make it clear that we're talking about rising prices for the same product . . . there's nothing that's changed about Humalog. It's the same insulin that's just gone up in price and now costs ten times more.

267.    Nor have the production or research and development costs increased. In fact, in the last ten (10) years, the production costs of insulin have decreased as manufacturers simplified and optimized processes. A September 2018 study published in BMJ Global Health calculated that, based on production costs, a reasonable price for a year's supply of human insulin is $48 to $71 per person and between $78 and $133 for analog insulins—which includes delivering a profit to manufacturers.

268.    Another recent study noted anecdotal evidence that the Manufacturers could be *profitable charging under $2 a vial*. While the study estimated the total cost (including device and cold-chain distribution) to produce a vial of analog insulin was $2.50, the study noted:

> If we are wrong on [the $2.50 cost estimate] it would be by *overestimating* them. In short, [while we calculate] costs are likely around $2.50 pen/vial . . . in discussion with Biocon (a foreign insulin manufacturer) we were told

insulin price in India was ~$2/vial and Biocon is "comfortably profitable" at that level. In another discussion we were told Sanofi offered Lantus at under $1.60 in certain emerging markets national tenders.

269.    These figures stand in stark contrast to the $5,705 that a diabetic spent, on average, for insulin in 2016.

270.    Further, while research and development costs often make up a large percentage of the price of a drug, in the case of insulin the initial basic research—original drug discovery and patient trials—was performed one hundred (100) years ago.

271.    Even the more recent costs, such as developing the recombinant DNA fermentation process and the creation of insulin analogs, were incurred decades ago.

272.    Today, Manufacturer Defendants only spend a fraction of the billions of dollars in revenue they generate from the at-issue drugs on research and development.

273.    Despite this decrease in production costs and no new research and development, the reported price of insulins has risen astronomically over the last fifteen (15) years.

### Insulin Adjuncts: Type 2 Medications

274.    Over the past decade, Manufacturer Defendants have also released a number of combination or non-insulin medications that help control the level of insulin in the bloodstream of Type 2 diabetics.

275.    In 2010, Novo Nordisk released Victoza as an adjunct to insulin to improve glycemic control. In 2014, Eli Lilly released a similar drug, Trulicity, and in 2017, Novo Nordisk did the same with Ozempic. In 2016, Sanofi released Soliqua, a combination insulin and insulin adjunct drug.

276.    Victoza, Trulicity and Ozempic are all medications known as glucagon-like peptide-1 receptor agonists ("GLP-1") and are similar to the GLP-1 hormone that is already

produced in the body. Each of these drugs can be used in conjunction with insulins to control diabetes. Soliqua is a combination GLP-1 and long acting human insulin analog.

277. Today, Manufacturer Defendants have a dominant position in the market for all diabetes medications. The following is a list of diabetes medications at issue in this lawsuit.

## Table 1: Diabetes medications at issue in this case

| Insulin Type | Action | Name | Company | FDA Approval | Current Price |
|---|---|---|---|---|---|
| **Human** | **Rapid-Acting** | Humulin R | Eli Lilly | 1982 | $178 (vial) |
| | | Humulin R 500 | Eli Lilly | 1994 | $1,784 (vial) $689 (pens) |
| | | Novolin R | Novo Nordisk | 1991 | $165 (vial) $312 (pens) |
| | **Intermediate** | Humulin N | Eli Lilly | 1982 | $178 (vial) $566 (pens) |
| | | Humulin 70/30 | Eli Lilly | 1989 | $178 (vial) $566 (pens) |
| | | Novolin N | Novo Nordisk | 1991 | $165 (vial) $312 (pens) |
| | | Novolin 70/30 | Novo Nordisk | 1991 | $165 (vial) $312 (pens) |
| **Analog** | **Rapid-Acting** | Humalog | Eli Lilly | 1996 | $342 (vial) $636 (pens) |
| | | Novolog | Novo Nordisk | 2000 | $347 (vial) $671 (pens) |
| | | Apidra | Sanofi | 2004 | $341 (vial) $658 (pens) |
| | **Long-Acting** | Lantus | Sanofi | 2000 | $ 340 (vial) $510 (pens) |
| | | Levemir | Novo Nordisk | 2005 | $ 370 (vial) $ 555 (pens) |
| | | Basaglar (Kwikpen) | Eli Lilly | 2016 | $392 (pens) |
| | | Toujeo (Solostar) | Sanofi | 2015 | $466 (pens) $622 (max pens) |
| | | Tresiba | Novo Nordisk | 2015 | $407 (vial) $610 (pens – 100u) $732 (pens – 200u) |
| **Type 2 Medications** | | Trulicity | Eli Lilly | 2014 | $1,013 (pens) |
| | | Victoza | Novo Nordisk | 2010 | $813 (2 pens) $1,220 (3 pens) |
| | | Ozempic | Novo Nordisk | 2017 | $1,022 (pens) |
| | | Soliqua | Sanofi | 2016 | $927.90 (pens) |

**B.** **The Dramatic Rise in the Price of Diabetes Medications**

278.  In 2003, PBMs began their rise to power (which will be discussed in greater detail in the next section).

279.  That same year, the price of insulin began its dramatic rise to its current exorbitant level.

280.  Since 2003, the list price of certain insulins has increased in some cases by more than 1000%; an astounding increase especially when compared to a general inflation rate of 8.3% and a medical inflation rate of 46% in this time period.

281.  By 2016, the average price per month of the four most popular types of insulin rose to $450 — and costs continue to rise, so much so that now one in four diabetics are skimping on or skipping lifesaving doses. This behavior is dangerous to a diabetic's health and can lead to a variety of complications and even death.

282.  Since 1997, Defendant Eli Lilly has falsely inflated the list price of a vial of Humulin R (500U/ML) from $165 to $1784 (*See* Figure 2).

**Figure 2: Rising reported prices of Humulin R (500U/mL)
from 1997-2021**



283. Since 1996, Defendant Eli Lilly has falsely inflated the list price for a package of pens of Humalog from less than $100 to $663 and from less than $50 for a vial to $342 (*See* Figure 3).

**Figure 3: Rising reported prices of Humalog vials and pens from 1996-2021**



284. Novo Nordisk has falsely inflated its list prices—from 2006 to 2020, Levemir rose from $162 to $555 for pens and from under $100 to $370 per vial (*See* Figure 4).

**Figure 4: Rising reported prices of Levemir from 2006-2021**



285. From 2002 to 2020, Novo Nordisk falsely inflated the list price of Novolog from $108 to $671 for a package of pens and from less than $50 to $347 for a vial (*See* Figure 5).

**Figure 5: Rising reported prices of Novolog vials and pens from 2002-2021**



286.    Defendant Sanofi has kept pace as well, falsely inflating the list price for Lantus, the top-selling analog insulin, from less than $200 in 2006, to over $500 in 2020 for a package of pens and from less than $50 to $340 for a vial (*See* Figure 6).

**Figure 6: Rising reported prices of Lantus vials and pens from 2001-2021**



287.    Manufacturer Defendants' non-insulin diabetes medications have experienced similar recent price increases. For example, since 2015 Eli Lilly has falsely inflated the list price of Trulicity almost 50%.

288.    Driven by these price hikes, payors' and diabetics' spending on diabetes medications has skyrocketed with totals in the tens of billions of dollars.

**Defendant Manufacturers Have Increased Prices in Lockstep**

289.    The timing of the list price increases reveal that each Manufacturer Defendant has not only dramatically increased prices for the at-issue diabetes treatments, they have done so in perfect lockstep.

290.    In thirteen (13) instances since 2009, competitors Sanofi and Novo Nordisk raised the reported prices of their insulins, Lantus and Levemir, in tandem, taking the same price increase down to the decimal point within a few days of each other.

291.    This practice of increasing drug prices in lockstep with competitors is known as "shadow pricing" and, as healthcare expert Richard Evans from SSR Health recently stated, "is pretty much a clear signal that your competitor does not intend to price-compete with you."

292.    In 2016, Novo Nordisk and Sanofi's lockstep increases for the at-issue drugs were responsible for the highest drug price increases in the entire pharmaceutical industry.

293.    Eli Lilly and Novo Nordisk have engaged in the same lockstep behavior with respect to their rapid-acting analog insulins, Humalog and Novolog. Figure 7 demonstrates this collusive behavior with respect to Lantus and Levemir. Figure 8 demonstrates this behavior with respect to Novolog and Humalog.

**Figure 7: Rising reported prices of long-acting insulins**



**Figure 8: Rising reported prices of rapid-acting insulins**



294.    Figure 9 demonstrates this behavior with respect to the human insulins, Eli Lilly's Humulin and Novo Nordisk's Novolin.

**Figure 9: Rising reported price increases for human insulins**



295.    Figure 10 demonstrates Defendants' lockstep price increases for their Type 2 drugs, Trulicity, Victoza, Ozempic and Soliqua.

**Figure 10: Rising reported prices of Type 2 drugs**



296.  Figure 11 shows how, collectively, Manufacturer Defendants have exponentially raised the prices of insulin products in near perfect unison.

**Figure 11: Lockstep insulin price increases**



297.  Because of Manufacturer Defendants' collusive price increases, nearly a century after the discovery of insulin, diabetes medications have become unaffordable for many diabetics.

### C.    Pharmaceutical Payment and Supply Chain

298.  The prescription drug industry consists of a deliberately opaque network of entities engaged in multiple distribution and payment structures. These entities include drug manufacturers, wholesalers, pharmacies, health plans/third party payors, pharmacy benefit managers and patients.

299.  Generally speaking, branded prescription drugs, such as the at-issue diabetes medications, are distributed in one of two ways: (1) from manufacturer to wholesaler, wholesaler to pharmacy and pharmacy to patient or (2) from manufacturer to mail order pharmacy to patient.

300.   The pharmaceutical industry, however, is unique in that the pricing chain is distinct from the distribution chain. The prices for the drugs distributed in the

pharmaceutical chain are different for each participating entity: different actors pay different prices set by different entities for the same drugs. The unifying factor is that the price that each entity in the pharmaceutical chain pays for a drug is directly tied to the manufacturer's list price.

301. There is no transparency in this pricing system; typically, only a brand drug's list price—also known as its Average Wholesale Price (AWP) or the mathematically-related Wholesale Acquisition Cost (WAC)—is available. To note, "Wholesale Acquisition Cost" is not the final price that wholesalers (or any other entity in the pharmaceutical pricing chain) pay for the Manufacturers' drugs. The final price that a wholesaler pays the Manufacturers is less than WAC because of post-purchase discounts.

302. Drug manufacturers self-report AWP or other prices upon which AWP is based to publishing compendiums such as First DataBank, Redbook and others who then publish that price.

303. As a direct result of the PBMs' conduct, AWP persists as the most commonly and continuously used reported price in reimbursement and payment calculations and negotiations for both payors and patients.

### Drug Costs for Diabetics

304. Whether insured or not, all Mississippi diabetics pay a substantial part of their diabetic drug costs based on the false list prices generated by the Insulin Pricing Scheme.

305. Uninsured diabetic must pay the full, point-of-sale prices (based on the false prices generated by the Insulin Pricing Scheme) every time they fill their prescriptions. In Mississippi, 12% of the population—or 357,138 Mississippians are uninsured. Approximately 60,000 of uninsured Mississippians are diabetic. As a direct result of the

Insulin Pricing Scheme, the prices uninsured Mississippians have had to pay for the at-issue life-sustaining drugs has skyrocketed over the last fifteen years.

306.    The uninsured are not the only patients saddled with high costs. Insured diabetics also often pay a significant portion of a drug's price out-of-pocket including in deductibles, coinsurance requirements, and/or copayment requirements.

307.    Thus, nearly all Mississippi diabetics have been damaged by having to pay for diabetes medications out-of-pocket based upon the specific false prices generated by the Insulin Pricing Scheme.  In many cases, the Mississippi diabetics have been priced out of these life-sustaining drugs.

308.    In addition, these exorbitant indefensible out-of-pocket costs make it more difficult for patients to adhere to their medications, resulting in avoidable complications and higher overall healthcare costs. An American Diabetes Association working group recently noted that "people with high cost-sharing are less adherent to recommended dosing, which results in short- and long-term harm to their health." The overall economic impact from the loss of productivity and increased healthcare costs that result from diabetics underdosing on their insulin has been deeply damaging to the State.

### D.    PBMs' Role in the Pharmaceutical Payment Chain

309.    PBMs are at the center of the convoluted pharmaceutical payment chain, as illustrated in Figure 12:

**Figure 12: Insulin distribution and payment chain**



310. The PBM Defendants develop drug formularies, process claims, create a network of retail pharmacies, set the prices in coordination with the Manufacturers that payors and diabetics pay for prescription drugs and are paid by payors for the drugs utilized by a payor's beneficiaries.

311. PBMs also contract with a network of retail pharmacies. Pharmacies agree to dispense drugs to patients and pay fees back to the PBMs. PBMs reimburse pharmacies for the drugs dispensed.

312. PBM Defendants also own mail-order, retail and specialty pharmacies, which purchase and take possession of prescription drugs, including those at-issue here, and directly supply those drugs to patients.

313. Often times—including for the at-issue drugs—the PBM Defendants purchase drugs from the Manufacturers and dispense them to the patients.

314.     Even where PBM Defendant's pharmacies purchase drugs from wholesalers, their costs are set by direct contracts with the Manufacturers.

315.     In addition, and of particular significance here, PBM Defendants contract with pharmaceutical manufacturers, including Manufacturer Defendants. PBMs receive from the Manufacturers rebates, fees and the other consideration that are paid back to the PBM (defined herein as Manufacturer Payments).

316.     These relationships allow PBMs to exert tremendous influence over what drugs are available throughout Mississippi, on what terms and at what prices.

317.     Thus, PBMs are at the center of the flow of money in the pharmaceutical supply chain. In sum:

- PBMs negotiate the price that payors pay for prescription drugs (based on false prices generated by the Insulin Pricing Scheme);

- they separately negotiate a different (and often lower) price that pharmacies in their networks receive for that same drug;

- they set the amount in fees that the pharmacy pays back to the PBM for each drug sold (based on false prices generated by the Insulin Pricing Scheme);

- they set the price paid for each drug sold through their mail order pharmacies (based on false prices generated by the Insulin Pricing Scheme); and

- they negotiate the amount that the Manufacturers pay back to the PBM for each drug sold (based on false prices generated by the Insulin Pricing Scheme).

318.     Yet, for the majority of these transactions, only the PBMs are privy to the amount that any other entity in this supply chain is paying or receiving for the exact same drugs.

319.     In every interaction that PBMs have within the pharmaceutical pricing chain they stand to profit from the false prices generated by the Insulin Pricing Scheme.

## The Rise of the PBMs in the Pharmaceutical Supply Chain

320.    When they first came into existence in the 1960s, PBMs functioned largely as claims processors. Over time, however, they have taken on a larger and larger role in the pharmaceutical industry. Today, PBMs wield significant control over the drug pricing system.

321.    One of the roles PBMs took on, as discussed above, was negotiating with drug manufacturers ostensibly on behalf of payors. In doing so, PBMs affirmatively represented that they were using their leverage to drive down drug prices.

322.    In the early 2000s, PBMs started buying pharmacies.

323.    When a PBM combines with a pharmacy, it has additional incentive to collude with Manufacturers to keep certain prices high.

324.    These perverse incentives still exist today with respect to both retail and mail order pharmacies housed within the PBMs' corporate families.

325.    More recently, further consolidation in the industry has afforded PBMs a disproportionate amount of market power.

326.    In total, nearly forty (40) different PBM entities have merged or otherwise been absorbed into what are now the PBM Defendants.

327.    In addition, each of the PBM Defendants are now owned by other significant players within the pharmaceutical chain: Express Scripts merged with Cigna in a $67 billion-dollar deal, Caremark was bought by the largest pharmacy in the United States, CVS for $21 billion, CVS also now owns Aetna following a $69 billion-dollar deal and OptumRx was acquired by the largest health insurance company in the United States, UnitedHealth Group.

328.    Figure 13 depicts this consolidation within the PBM market.

67

## Figure 13: PBM consolidation



329.    After merging or acquiring all of their competitors and now backed by multi-billion-dollar corporations, PBM Defendants have taken over the market in the past decade—controlling over 75% of the market and managing pharmacy benefits for over 270 million Americans.

330.    Business is booming for PBM Defendants. Together, they report more than $300 billion in annual revenue.

331.    PBMs are able to use the consolidation in the market as leverage when negotiating with other entities in the pharmaceutical pricing chain. Last year, industry expert Lindsay Bealor Greenleaf from the Advice and Vision for the Healthcare Ecosystem (ADVI) consulting described this imbalance in power, "it's really difficult to engage in any

type of fair negotiations when one of the parties has that kind of monopoly power . . . I think that is something that is going to continue getting attention, especially as we see more of these payors and PBMs continue to try to further consolidate."

### Insular Nature of the Pharmaceutical Industry

332.    The insular nature of the PBM and pharmaceutical industry has provided PBM Defendants with ample opportunity for contact and communication with their competitors, as well as with Manufacturer Defendants, in order to devise and agree to the Insulin Pricing Scheme.

333.    Each Manufacturer Defendant is a member of the Pharmaceutical Research and Manufacturers of America ("PhRMA") and has routinely communicated through PhRMA's meetings and platforms in furtherance of the Insulin Pricing Scheme.

334.    David Ricks, CEO of Eli Lilly, Paul Hudson, CEO of Sanofi and Douglas Langa, Executive Vice President of Novo Nordisk, are all part of the members of the  PhRMA board of directors and/or part of the PhRMA executive leadership team.

335.    PBM Defendants also routinely communicate through direct interaction with the PBMs and the Manufacturers at PBM trade associations and industry conferences.

336.     Each year during the relevant time period, the main PBM trade association, the Pharmaceutical Care Management Association ("PCMA"), held several yearly conferences, including its Annual Meeting and its Business Forum conferences.

337.    The current board of the PCMA includes Amy Bricker, President of Express Scripts, Heather Cianfrocco, CEO of OptumRx, and Alan Lotvin, Executive Vice President of CVS Caremark. Past board members include John Prince, President and COO of Optum, Inc. (and former CEO of OptumRx); and Tim Wentworth, CEO of Evernorth.

69

338.    All PBM Defendants are members of and, as a result of their leadership positions, control the PCMA. Each Manufacturer Defendant is an affiliate member of this organization.

339.    The PCMA annual conferences appear to be at the center of the Insulin Pricing Scheme.

340.    Every year, high-level representatives and corporate officers from both PBM and Manufacturer Defendants attend these conferences to meet in person and engage in discussions, including those in furtherance of the Insulin Pricing Scheme.

341.    In fact, for at least the last six (6) years, all of the Manufacturer Defendants have been "Presidential Sponsors" of these PBM conferences.

342.    Notably, many of the forums at these conferences are specifically advertised as offering opportunities for private, non-public communications. For example, as Presidential Sponsors of these conferences, Manufacturer Defendants each hosted "private meeting rooms" that offer "excellent opportunities for . . . one-on-one interactions between PBM and pharma executives."

343.    From at least 2010-2019, representatives from each Manufacturer Defendant met privately with representatives from each PBM Defendant during both the Annual Meetings and Business Forum conferences that the PCMA held each year.

344.    Prior to these meetings dedicated teams of executives from each Defendant would spend weeks preparing PCMA "pre-reads" and reports in preparation for these meetings. These reports not only demonstrate the deep involvement of each Defendant in the Insulin Pricing Scheme, but they also reflect the tangled web that gave rise to the scheme.

345.    In addition, all PCMA members, affiliates and registered attendees of these conferences are invited to join PCMA-Connect, "an invitation-only LinkedIn Group and online networking community." As PCMA members, PCMA-Connect provides PBM and Manufacturer Defendants with a year-round, non-public online forum to engage in private discussions in furtherance of the Insulin Pricing Scheme.

346.    Notably, key at-issue lockstep price increases occurred shortly after the Defendants met at PCMA meetings.  For example, on September 26 and 27, 2017 the  PCMA held its annual meeting where each of the Manufacturer Defendants hosted private rooms  and  executives  from  each  Defendant  engaged  in  several  meetings throughout  the  conference. Several  days  after  the  conference,  on  October  1,  2017, Sanofi  increased  Lantus's  list  price  by  3%  and  Toujeo's  list  by  5.4%.  A  few  weeks later  Novo  Nordisk  recommended  that  the  company  make  a  4%  list  price  increase  on January 1, 2018 to match the Sanofi increase, which was approved Nov 3, 2017.

347.    Likewise,  on  May  31,  2014,  Novo  Nordisk  raised  the  list  price  of  Levemir several  hours  after  Sanofi  took  its  list  price  increase  on  Lantus  and  this  occurred only  a  few  weeks  after a PCMA spring conference in Washington DC.

348.    Communications between PBM Defendants are facilitated by the fluidity and frequency with which executives move from one PBM Defendant to another. Examples include:

- Mark Thierer worked as an executive at the PBM Medco (now Express Scripts) until he became the CEO of OptumRx in 2016;

- Albert Thigpen was a Senior Vice President at CVS Caremark prior to becoming a Senior Vice President at OptumRx in 2011; and

- Bill Kiefer was a Vice President of Express Scripts before becoming a Senior Vice President at OptumRx in 2015.

### E.    The Insulin Pricing Scheme

349.    The market for the at-issue diabetes medications is unique in that it is highly concentrated with little to no generic/biosimilar options and the drugs have similar efficacy and risk profiles.  In fact, PBMs and the Manufacturer Defendants treat the at-issue drugs as commodity products in constructing the PBMs' formularies.

350.    In such a market, where manufacturing costs have significantly decreased, PBMs should have great leverage in negotiating with the Manufacturer Defendants to drive prices down in exchange for formulary placement.

351.    But the PBMs do not want the prices for diabetes medications to go down because they make more money on higher prices. So do the Manufacturers.

352.    As a result, Defendants have found a way to game the system for their mutual benefit—the Insulin Pricing Scheme. Consequently, the insulin market does not function as a normal market in which competition leads to a decrease in prices.

353.    PBM Defendants' formularies are at the center of the Insulin Pricing Scheme. Given the asymmetry of information between payors and PBM Defendants and the costs associated with making formulary changes, most payors accept the standard formularies offered by the PBMs.

354.    Controlling the standard formularies gives PBM Defendants a crucial point of leverage over the system.

355.    Manufacturer Defendants recognize that because PBM Defendants have such a dominant market  share, if they chose to exclude a particular diabetes medication from their standard formularies, or give it a non-preferred position, it could mean billions of dollars in profit loss for Manufacturer Defendants.

356.   For example, Olivier Brandicourt, Sanofi's Chief Executive Officer, in a recent interviewed stressed the importance of the PBMs' standard formularies: "if you look at the way [CVS Caremark] is organized in the U.S . . . 15 million [lives] are part of [CVS Caremark's standard] formulary and that's very strict, all right. So, [if we were not included in CVS Caremark's standard formulary] we wouldn't have access to those 15 million lives."

357.   Manufacturer Defendants also recognize that the PBM Defendants profits are directly tied to the Manufacturers' list prices.

358.   Because the Manufacturer Defendants know that—contrary to their public representations—PBM Defendants make more money from *increasing* prices, over the course of the last fifteen years and working in coordination with the PBMs, the Manufacturers have falsely inflated their list prices for the at-issue drugs exponentially and paid larger and larger amounts of Manufacturer Payments back to the PBMs.

359.   In exchange for the Manufacturers inflating these prices and paying the PBMs substantial amounts in Manufacturer Payments, PBM Defendants grant Manufacturer Defendants' diabetes medications with the most elevated price and that is the most profitable to the PBMs preferred status on their standard formularies.

360.   Thus—and contrary to their public representations—the PBM Defendants' agreements with the Manufacturer Defendants (and the standard formularies that result from these agreements) are incentivizing and are responsible for the precipitous price increases for the at-issue diabetes medications.

361.   At all times relevant hereto the PBM Defendants have known that the list prices for the at-issue drugs are grossly inflated and false for this reason.

362.   Despite this knowledge, PBMs include this false price in their contracts to set the rate that payors pay for the at-issue drugs.

363. As a result of the Insulin Pricing Scheme, every diabetic and payor has been overcharged for the at-issue drugs because of these false list prices.

364. Importantly, the Insulin Pricing Scheme is a coordinated effort between the Manufacturer and PBM Defendants, that each agreed to and participated in and that created enormous profits for all of Defendants. For example:

- Manufacturers and PBMs are in constant communication and regularly meet and exchange information to construct and refine the PBM formularies that fuel the scheme. As part of these communications, the Manufacturers are directly involved in determining not only where their own diabetes medications are placed on the PBMs' formularies and with what restrictions, but also determining the same for competing products;

- Manufacturers and PBMs share confidential and proprietary information with each other in furtherance of the Insulin Pricing Scheme, such as market data gleaned from the PBMs' drug utilization tracking efforts and mail order pharmacy claims, internal medical efficacy studies and financial data. Defendants then use this information in coordination to set the false prices for the at-issue medications and construct their formularies in the manner that is most profitable for both sets of Defendants. The data that is used to further this coordinated scheme is compiled, analyzed and shared either by departments directly housed within the PBM or by subsidiaries of the PBM, as is the case with OptumRx which utilizes OptumInsight and Optum Analytics; and

- Manufacturers and PBMs engage in coordinated outreach programs directly to patients, pharmacies and prescribing physicians to convince them to switch to the diabetes medications that are more profitable for the PBMs and Manufacturers, even drafting and editing letters in tandem to send out to diabetes patients on behalf of the PBMs' clients.

365. Far from using their prodigious bargaining power to lower drug prices as they claim, Defendants use their dominant positions to work together to generate billions of dollars at the expense of Mississippi diabetics and the State.

### F. Defendants Admit That They Have Engaged in The Insulin Pricing Scheme and That It Is Harming Diabetics

366. On April 10, 2019, the United States House of Representatives Committee on Energy and Commerce held a hearing on Defendants' Insulin Pricing Scheme titled, "Priced Out Of A Lifesaving Drug: Getting Answers on the Rising Cost of Insulin."[8]

367. Representatives from all Defendants testified at the hearing and each acknowledged before Congress that the price for insulin has increased exponentially in the past fifteen (15) years.

368. Further, each Defendant explicitly admitted that the price that diabetics have to pay out-of-pocket for insulin is too high. For example:

- Dr. Sumit Dutta, Chief Medical Officer of OptumRx stated, "A lack of meaningful competition allows the [M]anufacturers to set high [reported] prices and continually increase them which is odd for a drug that is nearly 100 years old and which has seen no significant innovation in decades. These price increases have a real impact on consumers in the form of higher out-of-pocket costs."

- Thomas Moriarty, Chief Policy and External Affairs Officer and General Counsel for CVS Health testified, "A real barrier in our country to achieving good health is cost, including the price of insulin products which are too expensive for too many Americans. Over the last several years, [reported] prices for insulin have increased nearly 50 percent. And over the last ten years, [reported] price of one product, Lantus, rose by 184 percent."

- Mike Mason, Senior Vice President of Eli Lilly when discussing how much diabetics pay out-of-pocket for insulin stated "it's difficult for me to hear anyone in the diabetes community worry about the cost of insulin. Too many people today don't have affordable access to chronic medications . . ."

- Kathleen Tregoning, Executive Vice President External Affairs at Sanofi, testified, "Patients are rightfully angry about rising out-of-pocket costs and we all have a responsibility to address a system that is clearly failing too many people. . . we recognize the need to address the very real challenges of affordability . . . Since 2012, average out-of-pocket costs for Lantus have risen approximately 60 percent for patients . . ."

---

[8] https://www.congress.gov/event/116th-congress/house-event/109299?s=1&r=3.

- Doug Langa, Executive Vice President of Novo Nordisk, stated, "On the issue of affordability . . . I will tell you that at Novo Nordisk we are accountable for the [reported] prices of our medicines. We also know that [reported] price matters to many, particularly those in high-deductible health plans and those that are uninsured."

369. Notably, none of the testifying Defendants claimed that the significant increase in the price of insulin was related to competitive factors such as increased costs or improved clinical benefit.

370. None of the Defendants pointed to any other participant in the pharmaceutical pricing chain as responsible for the exorbitant price increases for these diabetes medications—nor could they—for these Defendants collectively are solely responsible for the price of almost every single vial of insulin sold in the United States.

371. Defendants admitted that they agreed to and did participate in the Insulin Pricing Scheme and that the rise in prices was a direct result of the scheme.

372. For example, at the April 2019 Congressional hearing Novo Nordisk's President, Doug Langa, explained Novo Nordisk's and PBM Defendants' role in perpetuating the "perverse incentives" of the Insulin Pricing Scheme:

> [T]here is this perverse incentive and misaligned incentives (in the insulin pricing system) and this encouragement to keep [reported] prices high. And *we've been participating in that system* because the higher the [reported] price, the higher the rebate . . . There is a significant demand for rebates. We spend almost $18 billion in rebates in 2018 . . . [I]f we eliminate all the rebates . . . we would be in jeopardy of losing [our formulary] positions. (Emphasis added).

373. Eli Lilly, too, has admitted that it raises reported prices as a *quid pro quo* for formulary positions. At the April 2019 Congressional hearing, Mike Mason, Senior Vice President of Eli Lilly testified:

> Seventy-five percent of our [reported] price is paid for rebates and discounts to secure [formulary position] . . . $210 of a vial of Humalog is paid for

discounts and rebates. . . We have to provide rebates [to PBMs] in order to provide and compete for [formulary position].

374.    Sanofi has also conceded its participation in the Insulin Pricing Scheme. When testifying at the April 2019 Congressional hearing, Kathleen Tregoning, Executive Vice President for External Affairs of Sanofi, testified:

> The rebates are how the system has evolved. . . I think the system became complex and rebates generated through negotiations with PBMs are being used to finance other parts of the healthcare system and not to lower prices to the patient.

375.    PBM Defendants also admitted at the April 2019 Congressional hearing that they grant preferred, or even exclusive, formulary position because of higher Manufacturer Payments paid by Manufacturer Defendants.

376.    Amy Bricker, President of Express Scripts, when asked to explain why Express Scripts did not grant an insulin with a lower reported price preferred formulary status, answered, "Manufacturers do give higher [payments] for exclusive [formulary] position . . ."

377.    While all of the Defendants acknowledged their participation in the Insulin Pricing Scheme before Congress, in an effort to avoid culpability for the precipitous price increase each Defendant group pointed the finger at the other as the more responsible party.

378.    PBM Defendants specifically testified to Congress that Manufacturer Defendants are solely responsible for their price increases and that the Manufacturer Payments that the PBMs receive are not correlated to rising insulin prices.

379.    This statement is objectively false. A February 2020 study by the Leonard D. Schaeffer Center for Health Policy & Economics at the University of South California titled "The Association Between Drug Rebates and List Prices," found that an increase in the

amount that the Manufacturers pay back to the PBMs is directly correlated to an increase in prices—on average, a $1 increase in Manufacturer Payments is associated with a $1.17 increase in price—and that reducing or eliminating Manufacturer Payments could result in lower prices and reduced out-of-pocket expenditures.

380.　Further, in large part because of the increased list prices, and related Manufacturer Payments, PBMs profit per prescription has grown exponentially over the same time period that insulin prices have been increasing.　By way of example, since 2003 Defendant Express Scripts has seen its profit per prescription increase over 500 percent per adjusted prescription.

381.　The Manufacturers, on the other hand, argued before Congress that the PBMs were to blame for high insulin prices because of their demands for higher Manufacturer Payments in exchange for formulary placement. As a result, the Manufacturers argue, they have not been profiting off insulin due to declining net prices of these drugs.

382.　However, that also is not true.　A 2020 study by JAMA recently published in the *Wall Street Journal* provides data suggesting that the net prices of branded insulin products have actually increased by 51% in the past ten years.

383.　In addition, a 2020 study from the Institute of New Economic Thinking titled, "Profits, Innovation and Financialization in the Insulin Industry," demonstrates that Manufacturer Defendants are still making substantial profits from the sale of insulin products regardless of any Manufacturer Payments they are sending back to the PBMs. During the same time period when insulin price increases were at their steepest, distributions to Manufacturers' shareholders in the form of cash dividends and share repurchases totaled *$122 billion*. In fact, during this time period the Manufacturers spent

a significantly lower proportion of profits on research and development compared to shareholder payouts.

384. In January 2021 the U.S. Senate Finance Committee issued a report titled "Insulin: Examining the Factors Driving the Rising Cost of a Century Old Drug" that detailed Congress's findings after reviewing over 100,000 pages of internal company documents from Sanofi, Novo Nordisk, Eli Lilly, CVS Caremark, Express Scripts, OptumRx and Cigna ("Senate Insulin Report"). The Senate Insulin Report concluded, *inter alia*:

> a.   Manufacturer Defendants are retaining more revenue from insulin than in the 2000s—for example, Eli Lilly has reported a steady increase in Humalog revenue for more than a decade—from $1.5 billion in 2007 to $3 billion in 2018;
>
> b.   Manufacturer Defendants have aggressively raised the list price of their insulin products absent significant advances in the efficacy of the drugs; and
>
> c.   Manufacturer Defendants only spend a fraction of their revenue related to the at-issue drugs on research and development—Eli Lilly spent $395 million on R&D costs for Humalog, Humulin and Basaglar between 2014-2018 during which time the company generated $22.4 billion in revenue on these drugs.

385. The truth is—despite their finger pointing in front of Congress—Manufacturers and PBMs are both responsible for their concerted efforts in creating the Insulin Pricing Scheme. This reality was echoed in the statement from the Senate Insulin Report, summarizing Congress's findings of their two-year probe into the Insulin Pricing Scheme[9]:

> [M]anufacturers and [PBMs] have created a vicious cycle of price increases that have sent costs for patients and taxpayers through the roof . . . This industry is anything but a free market when PBMs spur drug makers to hike

---

[9] https://www.finance.senate.gov/imo/media/doc/Grassley-Wyden%20Insulin%20Report%20(FINAL%201).pdf

list prices in order to secure prime formulary placement and greater rebates and fees.

### G. Defendants Profit Off the Insulin Pricing Scheme

386.    For Manufacturer Defendants, the Insulin Pricing Scheme affords them the ability to pay PBM Defendants significant, yet undisclosed, Manufacturer Payments in exchange for formulary placement—which garners Manufacturer Defendants greater revenues from sales—without decreasing their profit margins. During the relevant time period, PBM Defendants granted preferred formulary position to each at-issue drug in exchange for large Manufacturer Payments and inflated prices.

387.    Manufacturer Defendants also use the inflated price to earn hundreds of millions of dollars in additional tax breaks by basing their deductions for donated insulins on the inflated reported price.

388.    PBM Defendants profit off the false prices created by the Insulin Pricing Scheme in a myriad of ways, including (1) retaining a significant—yet undisclosed—percentage of the Manufacturers Payments, (2) using the inflated price to generate profits from pharmacies in their network and (3) relying on the inflated price to drive up the PBMs' profits through their own mail order pharmacies.

### PBMs Pocket a Majority of Manufacturers' Secret Payments

389.    The first way in which the PBMs profit off the Insulin Pricing Scheme is by keeping a significant portion of the secret Manufacturer Payments.

390.    The amount that the Manufacturers pay back to the PBMs has accelerated to represent a large percentage of the list price of diabetes medications.

391.     Historically, when PBMs contracted with payors, the contract allowed the PBM to keep all or at least some of the Manufacturer Payments they received, rather than pass them along to the payor.

392.     Over time, payors have secured contract provisions guaranteeing them all or some portion of the "rebates" paid by the Manufacturers to the PBMs. But—critically— "rebates" are only a portion of the total secret Manufacturer Payments.

393.     In this regard, PBM and Manufacturer Defendants have created a "hide-the-ball" system where the consideration exchanged between them (and not shared with payors) is labeled and relabeled. As more payors moved to contracts that require PBMs to pass a majority of the manufacturer "rebates" through to the payor, PBMs have begun renaming the Manufacturer Payments in order to keep a larger portion of this money. Payments once known as "rebates" are now called administrative fees, volume discounts, service fees, inflation fees or other industry jargon terms designed to obfuscate and distract from the substantial sums being secretly exchanged.

394.     And these renamed secret Manufacturer Payments are indeed substantial. A recent heavily redacted complaint filed by Defendant Express Scripts revealed that *Express Scripts now retains up to 13 times more in "administrative fees" than it passes through to payors in formulary rebates.*

395.     In addition, the PBMs have come up with numerous ingenious methods to hide these renamed Manufacturer Payments in order keep them for themselves.

396.     For example, with regard to the Manufacturer Payments now known as "inflation fees," the PBMs often create a hidden gap between how much the Manufacturers pay them to increase their prices and the amount in "price protection guarantees" that the PBMs agree to pay back to their client payors.

397.   In particular, the Manufacturer Defendants often pay the PBM Defendants "inflation fees" in order to increase the price of their diabetes medications.  The thresholds for these payments are typically set around 6% to 8%—if the Manufacturer Defendants raise their prices by more than 6% (or 8%) during a specified time period they pay the PBM Defendants an additional "inflation fee" (based on a percentage of the reported prices).

398.   For many of their clients, the PBMs have separate "price protection guarantees" that state that if the overall drug prices for that payor increase by more than a set amount, then the PBMs will revert a portion of that amount back to these clients.

399.   The PBMs set these "price protection guarantees" at a higher rate than the thresholds that trigger the Manufacturers' "inflation fees," usually around 10%-15%.

400.   If the Manufacturers increase their list prices more than the 6% (or 8%) inflation fee rate but less than the 10%-15% client price protection guarantee rate, then the PBMs keep 100% of these "inflation fee" payments.  This is a win-win for the Manufacturers and PBMs—they get to mutually retain and share all of the benefit of these price increases.

401.   Another method that the PBMs have devised to hide the renamed Manufacturer Payments is through the use of "rebate aggregators."

402.   Rebate aggregators, sometimes referred to as rebate group purchasing organizations ("GPOs"), are entities that negotiate for and collect payments from drug manufacturers, including the Manufacturer Defendants, on behalf of a large group of pharmacy benefit managers (including the PBM Defendants) and different entities that contract for pharmaceutical drugs.

403.    These rebate aggregators are often affiliated with or owned by the PBM Defendants, such as Ascent Health Services (Express Scripts), Coalition for Advanced Pharmacy Services and Emisar Pharma Services (OptumRx) and Zinc (CVS Caremark).

404.    The PBMs carefully guard the revenue streams from their rebate aggregator activities, hiding them in complex contractual relationships and not reporting them separately in their quarterly SEC filings.

405.    Certain rebate aggregator companies are located offshore, for example, in Switzerland (Express Scripts' Ascent Health) or in Ireland (Emisar Pharma Services), making oversight even more difficult.

406.    The Senate Insulin Report contained the following observation on these rebate aggregators:

> [I]t is noteworthy that industry observers have suggested that the recent partnership between Express Scripts and Prime Therapeutics may serve as a vehicle to avoid increasing legislative and regulatory scrutiny related to administrative fees by channeling such fees through a Swiss-based group purchasing organization (GPO), Ascent Health. While there are several regulatory and legislative efforts underway to prohibit manufacturers from paying administrative fees to PBMs, there is no such effort to change the GPO safe harbor rules. New arrangements used by PBMs to collect fees should be an area of continued investigative interest for Congress.

407.    Because the PBMs are able to hide (and retain) a majority of the secret Manufacturer Payments that they receive, they are able to make significant profits on the Insulin Pricing Scheme.

408.    Even in the rare cases where certain sophisticated payor clients receive a portion of the Manufacturer Payments from their particular pharmacy benefit manager (whether it is a PBM Defendant or not), those payors are still significantly overcharged as a direct result of the Insulin Pricing Scheme given the extent to which Defendants have falsely inflated the prices of the at-issue drugs.

**Insulin Pricing Scheme Allows PBMs To Profit Off Pharmacies**

409.   A second way that PBM Defendants profit off the Insulin Pricing Scheme is by using the false price generated by the scheme to profit off the pharmacies with whom they contract, including those in Mississippi.

410.   PBM Defendants decide which pharmacies are included in the PBM's network and how much they will reimburse these pharmacies for each drug dispensed.

411.    PBMs pocket the spread between the amount that the PBMs get paid by their clients for the at-issue drugs (which are based on the false prices generated by the Insulin Pricing Scheme) and the amount the PBM reimburses the pharmacy (which is often less).

412.   PBMs do not disclose to their clients or network pharmacies how much the PBM is receiving from or paying to the other.

413.   This spread pricing, like the secret Manufacturer Payment negotiation, happens behind closed doors. There is no transparency, no commitment from PBM Defendants to take into account the cost effectiveness of a drug and no communication to either the payor or the pharmacy to let them know if they are getting a fair deal.

414.   The higher the Manufacturers inflate their prices, the more money the PBMs make off this spread.

415.   PBMs also use the Insulin Pricing Scheme to generate additional profits from pharmacies by charging the pharmacies post-purchase fees, including DIR fees, based on the false prices generated by the scheme—and again, the higher the list price for each diabetes medication sold, the more the PBMs generate in these pharmacy fees.

**Insulin Pricing Scheme Increases PBM Mail Order Profits**

416. A third way PBMs profit off the Insulin Pricing Scheme is through the PBM Defendants own mail order and retail pharmacies. The higher the price that PBM Defendants are able to get their customers, such as Mississippi diabetics and the State, to pay for diabetes medications, the higher the profits PBM Defendants realize through their mail order pharmacies.

417. Because the PBMs base the price they charge for the at-issue diabetes medications on the false list price, the more the Manufacturers inflate these prices, the more money the PBMs make.

418. PBMs also charge the Manufacturer Defendants fees related to their mail order pharmacies, such as pharmacy supplemental discount fees, that are directly tied to the false prices generated by the Insulin Pricing Scheme. Thus, once again, the higher the price is, the more money the PBMs make on these fees.

419. A third way PBMs profit from the false prices generated by the Insulin Pricing Scheme through their pharmacies is by way of an arbitrage purchase scheme. Because of their coordinated efforts with the Manufacturers in furtherance of the Insulin Pricing Scheme, the PBMs often know when the Manufacturers are going to raise their prices. The PBMs use this knowledge to purchase large quantities of the at-issue drugs prior to the price increases at a lower price. The PBMs then charge diabetics and payors the higher price after the increase.

420. In sum, every way that the PBMs make money on diabetes medications is directly tied to the false list prices generated by the Insulin Pricing Scheme. PBMs are not lowering the price of diabetes medications as they publicly represent—rather they are making billions of dollars by fueling these skyrocketing prices.

### H. The State and Mississippi Diabetics Purchase the At-Issue Drugs From Defendants

421. During the relevant time period, Mississippi diabetics were dispensed the at-issue drugs by, and made out of pocket payments based on the false list prices generated by the scheme to, each PBM Defendant's mail order pharmacies and to CVS Caremark's retail pharmacies throughout Mississippi.

422. In addition, as a large government employer, the State provides health benefits to its employees, retirees and their dependents and has spent millions of dollars a year on the at-issue diabetes medications.

423. The State also spends millions of dollars a year purchasing the at-issue diabetes medications for use at in state-run facilities.

424. To administer its health plan's pharmaceutical programs, the State relies on PBMs as administrative agents, for the alleged purposes of limiting administrative burden and controlling pharmaceutical drugs costs.

425. The State currently relies on CVS Caremark to provide the at-issue PBM and pharmacy services to the State's health plan. From 1996-2005, CVS Caremark also provided PBM services to the State. These services included developing and offering formularies for the State's prescription plan, constructing and managing the State's pharmacy network (which included CVS Caremark's retail and mail order pharmacies), processing pharmacy claims and providing mail order pharmacy services to State.

426. In providing these services to the State, CVS Caremark set the amount the State paid for the at-issue drugs in coordination with the Manufacturer Defendants and utilizing the false prices generated by the Insulin Pricing Scheme.

427. During the relevant time period, the State paid CVS Caremark for the at-issue drugs based on the false list prices generated by the Insulin Pricing Scheme.

428. From 2006-2015, OptumRx provided PBM services to the State. These services included developing and offering formularies for the State's prescription plan, constructing and managing the State's pharmacy network (which included OptumRx's mail order pharmacies and CVS Caremark's retail pharmacies), processing pharmacy claims and providing mail order pharmacy services to State.

429. In providing these services to the State, OptumRx set the amount the State paid for the at-issue drugs in coordination with the Manufacturer Defendants and utilizing the false prices generated by the Insulin Pricing Scheme.

430. During the relevant time period, the State paid OptumRx for the at-issue drugs based on the false list prices generated by the Insulin Pricing Scheme.

431. From 2016-2020, the State relied on the PBM Prime Therapeutics for pharmacy benefit services. During this time period, Prime Therapeutics outsourced its Manufacturer Payment contracting to Express Scripts' rebate aggregator entity, Ascent Health Services. Upon information and belief, through this relationship, during the relevant time period, Express Scripts negotiated Manufacturer Payments related to the at-issue purchases made by the State through its health plan.

## I. Defendants Deceived Diabetic Mississippians and the State of Mississippi

432. At no time have either Defendant group disclosed the Insulin Pricing Scheme or the false list prices produced by it.

**Manufacturer Defendants Deceived the State and Mississippi Diabetics**

433.   At all times during the relevant time period, Manufacturer and PBM Defendants knew that diabetics and payors, including the State, relied on the false list prices generated by the Insulin Pricing Scheme to pay for the at-issue drugs. That is, Mississippi diabetics and payors, including the State, relied on the false list prices by purchasing diabetic medications at such prices.

434.   Manufacturer and PBM Defendants further knew that Mississippi diabetics and payors, including the State, expected and desired to pay the lowest fair-market price possible for the at-issue drugs.

435.   Manufacturer and PBM Defendants knew that the artificially inflated list prices generated by the Insulin Pricing Scheme were false and completely untethered from the actual prices that Defendants were paid for the drugs.

436.   As the list prices for the at-issue drugs detached completely from actual prices, the list prices became increasingly misrepresentative to the point of becoming unlawful.

437.   Despite this knowledge, Manufacturer Defendants caused the false list prices generated by the Insulin Pricing Scheme to be published throughout Mississippi through publishing compendia and in various promotional and marketing materials distributed by entities downstream in the drug supply chain.

438.   Manufacturer Defendants also published these prices to the PBMs and their pharmacies who then knowingly use the false prices to set the amount payors, like the State of Mississippi, and diabetics pay for the at-issue drugs.

439.     By publishing their prices throughout Mississippi, the Manufacturers held these prices out as a reasonable price by which to base the prices diabetics and payor pay for the at-issue drugs.

440.     These representations are false. Manufacturer Defendants knew that their false list prices were not remotely related to the actual price Defendants receive for the at-issue drugs and were not based on upon transparent or competitive factors such as cost of production or research and development.

441.     Notably, during the relevant time period, the Manufacturers published prices in Mississippi of $300-$400 for the same at-issue drugs that they had profitably priced at a $1.60 in markets that had not been corrupted by the Insulin Pricing Scheme.

442.     The Manufacturers false list prices were artificially and arbitrarily inflated in furtherance of the Insulin Pricing Scheme to generate profits for the Manufacturer and PBM Defendants.

443.     Manufacturer Defendants affirmatively withheld the truth from Mississippi diabetics and the State and specifically made these misrepresentations in furtherance of the Insulin Pricing Scheme and to induce reliance in payors and diabetics to purchase their at-issue drugs.

444.     PBM Defendants ensured that the Manufacturers' false list prices harmed diabetics and payors by requiring that their contracts with both pharmacies and with payors include such prices as the basis for payment.

445.     PBMs perpetuate the use of the false insulin prices because it allows them to obscure the actual price any entity in the drug pricing chain is paying for the at-issue drugs. This lack of transparency affords Defendants the opportunity to construct and perpetuate the Insulin Pricing Scheme, and to profit therefrom.

### PBM Defendants Deceived the State and Mississippi Diabetics

446.   PBM Defendants have deceived the State of Mississippi and diabetic Mississippians.

447.   The PBM Defendants have consistently and repeatedly represented that: (a) their interests are aligned with their payor clients; (b) they work to lower the price of the at-issue drugs; and (c) that the Manufacturer Payments the PBMs' receive and the PBMs' formulary construction is for the benefit of diabetics and payors and is consistent, and in accordance with, their payor clients' interests of reducing drug costs and improving the health of their beneficiaries.

448.    PBMs understand that their payor clients and diabetics rely on the PBMs to achieve the lowest prices for the at-issue drugs and to construct formularies designed to improve their health.

449.   At no time have the PBM Defendants disclosed their knowledge of the false list prices for the at-issue drugs; to the contrary, the PBMs ensured that their clients and diabetics paid based on those false list prices.

450.   In addition to the general misrepresentations discussed in paragraphs 87-90, 142, 160-61, 194-95, 204 and 209 throughout the relevant time period, PBM Defendants have purposefully, consistently and routinely made misrepresentations specifically about their Manufacturer Payment negotiations and formulary construction related to the at-issue diabetes medications.  Examples include:

- In a public statement issued on May 11, 2010, CVS Caremark represented that it was focused on diabetes to "help us add value for our PBM clients and improve the health of plan members . . . a PBM client with 50,000 employees whose population has an average prevalence of diabetes could save approximately $3.3 million a year in medical expenditures."

- On June 22, 2010, Andrew Sussman, Chief Medical Officer of CVS Caremark stated on national television that "CVS is working to develop programs to hold down [diabetes] costs."

- In a public statement issued in November 2012, CVS Caremark represented that formulary decisions related to insulin products "is one way the company helps manage costs for clients."

- On August 31, 2016, Glen Stettin, Senior Vice President and Chief Innovation Officer at Express Scripts released a statement that stated "[d]iabetes is wreaking havoc on patients, and it is also a runaway driver of costs for payors . . . [Express Scripts] helps our clients and diabetes patients prevail over cost and care challenges created by this terrible disease."

  o Mr. Stettin continued on to represent that Express Scripts "broaden[s] insulin options for patients and bend[s] down the cost curve of what is currently the costliest class of traditional prescription drugs."

- In January 2017, Tim Wentworth, CEO of Express Scripts represented that "without PBMs, and specifically without Express Scripts, our clients would pay [many times] more for [insulin]."

  o Mr Wentworth continued on to state Express Scripts is dedicated to controlling insulin prices because "we stand up for payers and patients."

- On June 1, 2018, Mark Merritt, President of PCMA, in response to a question about PBMs' role in the insulin pricing system stated, "[Through their formulary construction], PBMs are putting pressure on drug companies to reduce insulin prices."

- CVS Caremark's Chief Policy and External Affairs Officer testified during the April 2019 hearings that, CVS Caremark "has taken a number of steps to address the impact of insulin price increases. We negotiate the best possible discounts off the manufacturers' price on behalf of employers, unions, government programs, and beneficiaries that we serve."

- Chief Medical Officer of OptumRx, testified before the U.S. Congress in the April 2019 hearing that for "insulin products . . . we negotiate with brand manufacturers to obtain significant discounts off list prices on behalf of our customers."

- The PCMA website contains the following misrepresentations, "the insulin market is consolidated, hindering competition and limiting alternatives, leading to higher list prices on new and existing brand insulins. PBMs work hard to drive down costs using formulary management and rebates."

451. PBM Defendants not only falsely represent that they negotiate with Manufacturer Defendants to lower the price of the at-issue diabetes medications for *payors*, but also for diabetic *patients* as well. Examples include:

- Express Scripts' publicly available code of conduct states, "[a]t Express Scripts we're dedicated to keeping our promises to *patients and clients* . . . This commitment defines our culture, and all our collective efforts are focused on our mission to make the use of prescription drugs safer and more affordable." (Emphasis added).

- Amy Bricker, President at Express Scripts testified before Congress in April 2019, "At Express Scripts we negotiate lower drug prices with drug companies on behalf of our clients, *generating savings that are returned to patients* in the form of lower premiums and reduced out-of-pocket costs." (Emphasis added).

- Amy Bricker of Express Scripts also testified at the Congressional hearing that "Express Scripts remains committed to . . . *patients* with diabetes and creating affordable access to their medications." (Emphasis added).

- OptumRx's website has stated "[t]he services we provide help *improve health outcomes for patients* while making prescription drugs more affordable for plan sponsors and *individuals*, and more sustainable for the country . . . the reason is simple: drug manufacturers are responsible for the high cost of prescription drugs . . . OptumRx negotiates better prices with drug manufacturers for our customers *and consumers* . . . At OptumRx, *our mission is helping people live healthier lives* and *to help make the health system work better for everyone*. (Emphasis added).

- In its 2017 Drug Report, CVS Caremark stated that the goal of its pharmacy benefit plans is to ensure "that the cost of a drug is aligned with the value it delivers in terms of *patient* outcomes . . . in 2018, we are doing even more to help keep drugs affordable with our new Savings *Patients* Money initiative." (Emphasis added).

- The PCMA website states, "PBMs have kept average out-of-pocket (OOP) payments flat for beneficiaries with commercial insurance."

452. Not only have PBM Defendants intentionally misrepresented that they use their market power to save payors and diabetics money, they have specifically, knowingly and falsely disavowed that their conduct drives the false insulin list prices higher. Examples include:

- On an Express Scripts' earnings call in February 2017, CEO Tim Wentworth stated, "Drugmakers set prices, and we exist to bring those prices down."

- Larry Merlo, head of CVS Caremark sounded a similar refrain in February 2017, "Any suggestion that PBMs are causing prices to rise is simply erroneous."

- In 2017, Express Scripts' Wentworth went on CBS News to again argue that PBMs play no role in rising drug prices, stating that PBMs work to "negotiate with drug companies to get the prices down."

- During the April 2019 Congressional hearings, when asked if PBM-negotiated rebates and discounts were causing the insulin price to increase, OptumRx's Chief Medical Officer answered, "we can't see a correlation when rebates raise list prices."

- In 2019, when testifying under oath before Congress on the rising price of insulins, Senior Vice President Amy Bricker of Express Scripts testified, "I have no idea why the prices [for insulin] are so high, none of it is the fault of rebates."

453.    Throughout the relevant time period, PBM Defendants' have also misrepresented that they are transparent about the Manufacturer Payments that they receive and that they pass along (or do not pass along) to payors. As stated above, this representation is false—PBM Defendants retain many times more in total Manufacturer Payments than the traditional formulary "rebates" they may pass through—in whole or part—to payors.

454.    Despite this, in 2011, OptumRx's President stated: "We want our clients to fully understand our pricing structure . . . [e]veryday we strive to show our commitment to our clients, and one element of that commitment is to be open and honest about our pricing structure."

455.    In a 2017 CBS News interview, Express Scripts' CEO, represented, among other things, that Express Scripts "absolutely transparent" about the Manufacturer

Payments they receive and that payors, "know exactly how the dollars flow" with respect to these Manufacturer Payments.

456.     When testifying before Congress in April 2019, Amy Bricker, President of Express Scripts had the following exchange with Representative John Sarbanes of Maryland regarding the transparency (and lack thereof) of the Manufacturer Payments:

> Ms. Bricker. The rebate system is 100 percent transparent to the plan sponsors and the customers that we service. To the people that hire us, employers of America, the government, health plans, what we negotiate for them is transparent to them. . . [However] the reason I'm able to get the discounts that I can from the manufacturer is because it's confidential [to the public].
>
> Mr. Sarbanes. What about if we made it completely transparent? Who would be for that?
>
> Ms. Bricker. Absolutely not . . . it will hurt the consumer.
>
> Mr. Sarbanes. I don't buy it.
>
> Ms. Bricker – prices will be held high.
>
> Mr. Sarbanes. I am not buying it. I think a system has been built that allows for gaming to go on and you have all got your talking points. Ms. Tregoning [of Sanofi], you have said you want to guarantee patient access and affordability at least ten times, which is great, but there is a collaboration going on here . . . the system is working for both of you at the expense of the patient. Now I reserve most of my frustration for the moment in this setting for the PBMs, because I think the lack of transparency is allowing for a lot of manipulation. I think the rebate system is totally screwed up, that without transparency there is opportunity for a lot of hocus-pocus to go on with the rebates. Because the list price ends up being unreal in certain ways except to the extent that it leaves certain patients holding the bag, then the rebate is negotiated, but we don't know exactly what happens when the rebate is exchanged in terms of who ultimately benefits from that. And I think we need more transparency and I do not buy the argument that the patient is going to be worse off, the consumer is going to be worse off if we have absolute transparency . . . *I know when you started out, I understand what the mission was originally with the PBMs . . . But now things have gotten out of control. You are too big and the lack of transparency allows you to manipulate the system at the expense of the patients.* So I don't buy the argument that the patient and consumer is going to get hurt if we have absolute transparency. (emphasis added)

457. Moreover, in at least, 2005, 2010, 2015 and 2020, each PBM Defendant directly misrepresented to the State that it constructs formularies and negotiates with the Manufacturer Defendants for the benefit of the State and its diabetic beneficiaries by lowering the price of the at-issue drugs and by promoting the health of diabetics. Examples include:

    a. On March 23, 2010, OptumRx represented that its "formulary strategy focuses on clinical efficacy and lowest net cost" and that it "optimizes rebates for its clients" because OptumRx "is not just a vendor, but a partner with the State of Mississippi." OptumRx also represented that its programs "help patients better manage their diabetes therapy" and help "clients realize savings from a greater discount on diabetic supplies."

    b. On March 4, 2015, OptumRx represented that "its purchasing power with manufacturers enables [OptumRx] to . . . drive lower overall costs [for the State]" and that OptumRx's "pricing philosophy is focused on full-disclosure and transparency."

    c. In quarterly reports in 2010, 2011, 2012 and 2013, OptumRx made representations to the State specifically about the at-issue drugs, including:

        • "Diabetes related medications include insulin . . . continue to be a growing trend due to high utilization and costly brand name agents, however many diabetic agents have recently been added to the [OptumRx's formulary management program] and costs are expected to decrease in the coming year."

        • OptumRx's formulary management program "for the insulin class will help manage the trend in this class. Targeted medications include Levemir and Humalog products."

        • "[The State's] spend for Victoza has increased 167% in 2011 but [OptumRx] has a program in place to manage rising costs."

        • "Insulin is the main cause of increased trend in diabetes category; there is a diabetes category in [OptumRx's formulary management program] which helps manage overall trend"

        • "Medications for Diabetes are the top spend for [the State] mainly due to price increases. Insulins are part of [OptumRx's formulary management program], so [the State] is paying the lowest net cost."

     d.     In April 2005, CVS Caremark represented to the State that it "successfully and cost-effectively administered the [State's] pharmacy benefit program."

     e.     On March 22, 2010, CVS Caremark's Vice President of Strategic Proposals represented to the State that CVS Caremark's PBM model "improv[ed] savings for the State of Mississippi."

     f.     On March 4, 2015, CVS Caremark's Vice President of Client Financial Analysis and Proposals represented to the State that "our capabilities allow us to identify unique opportunities that improve member health and reduce total health care costs for our clients" and that CVS Caremark "aggressively negotiat[es] discounts of drug prices."

     g.     On April 15, 2005, Express Scripts represented to the State that "we have decided day in and day out to put our plan sponsors – not drug manufacturers – first. These decisions are reflected in the way we build our formularies, in the way we write our contracts with manufacturers, suppliers, and retail networks . . ." and that Express Scripts formulary selections are based on "products that provide the lowest cost . . ."

     h.     On March 4, 2015, Express Scripts' Senior Vice President of Sales & Account Management represented to the State that "[Express Scripts is] uniquely positioned to provide the [State] and your members with the best path for achieving your goals, with success in providing lowest net cost in the pharmacy benefit and optimal health outcomes" and that Express Scripts "collaborates with our clients to develop formularies and manage rebate contracts proven to drive lowest net cost."

458.    The PBMs representations are false.

459.    Contrary to their representations that their interests are aligned with diabetics and payors, the PBMs have used their power to negotiate Manufacturer Payments, and to construct formularies, to benefit themselves by favoring high-priced diabetic drugs (which generate larger profits for PBMs).

460.    Contrary to their representations that they lower the price of the at-issue drugs for diabetics—as Defendants now have expressly admitted before Congress—PBMs' formulary construction and Manufacturer Payment negotiations have caused the amount that diabetics pay out of pocket to significantly increase.

461. Contrary to their representations that they lower the price for payors, the PBMs' formulary construction and Manufacturer Payment negotiations have significantly driven up the net price paid for payors. Both European payors/consumers and federally administered health care programs, which purchase the at-issue drugs but are not impacted by the Insulin Pricing Scheme, pay significantly lower net/actual prices than payors affected by the Insulin Pricing Scheme, like the State.

462. Contrary to their representations that they work to promote the health of patients, as a result of the PBMs' conduct many diabetics have been priced out of these life-sustaining medications. As discussed further below, the impact of this has been severe—and in some cases fatal.

463. Both PBM and Manufacturer Defendants knew that these representations were false when they made them and affirmatively withheld the truth regarding the false list prices for diabetic treatments from the State and from diabetic Mississippians.

464. Defendants concealed the falsity of these representations by closely guarding their pricing structures, agreements and sales figures.

465. Manufacturer Defendants do not disclose to payors or the public their actual prices they receive for the at-issue drugs or the amount in Manufacturer Payments they offer to and pay to the PBM Defendants.

466. PBM Defendants do not disclose the details of their agreements with Manufacturer Defendants or the Manufacturer Payments they receive from them—nor do they disclose the details related to their agreements with payors and pharmacies.

467. Defendants do not disclose the actual prices for the at-issue drugs.

468. Each Defendant also conceals its false and deceptive conduct by signing confidentiality agreements with any entity in the supply chain who know the actual prices of the at-issue drugs.

469. PBM Defendants have gone as far as suing governmental entities to block the release of details on their pricing agreements with Manufacturers and pharmacies.

470. Even when audited by payors, PBM Defendants often still refuse to disclose their agreements with Manufacturers and pharmacies, relying on overly broad confidential agreements, claims of trade secrets and other unnecessary restrictions.

471. Each Defendant's effort to conceal its pricing structures for the at-issue drugs is evidence that each Defendant knows its conduct is false and deceptive.

472. To make matters worse, Mississippi diabetics, and diabetic beneficiaries of the State's health plans, institutions and programs, have no choice but to pay based on Defendants' false list prices because they need these medications to survive, and Manufacturer Defendants make virtually all of the diabetes medications available in Mississippi.

473. In sum, the entire insulin pricing structure created by the Defendants—from the false price, to the inclusion of the false price in payor contracts, to the non-transparent Manufacturer Payments, to the misuse of formularies, to the PBMs' representations that their interests are aligned with diabetics and payors and that they work to lower prices and promote the health of diabetics—is false.

474. Diabetic Mississippians and the State paid for the at-issue diabetes medications at the false prices generated by the Insulin Pricing Scheme because they relied on these prices as reasonable bases for their life sustaining medications.

475.    Diabetic Mississippians and the State did not know, because the Defendants affirmatively concealed, that (i) the list prices were falsely inflated; (ii) the list prices were manipulated to satisfy PBM profit demands; and (iii) the list prices bore no relationship to the prices paid for, or the pricing structure of, the at-issue drugs as they were sold to PBMs.

### J.      The Insulin Pricing Scheme Has Damaged the State of Mississippi and Diabetic Mississippians

### The Insulin Pricing Scheme Has Damaged the State as Payor and Purchaser of the At-Issue Drugs

476.    Defendants' Insulin Pricing Scheme has cost the State of Mississippi hundreds of millions of dollars in overcharges.

477.    The State of Mississippi has been directly damaged by the Insulin Pricing Scheme as a payor/purchaser of Defendants' at-issue diabetes medications.

478.    The State pays for the at-issue drugs through its health plans and for use in state-run facilities based on false list prices generated by the Insulin Pricing Scheme.

479.    Importantly, because of Defendants' success in hiding the Insulin Pricing Scheme, no payor, including the State, has any idea that the prices for these particular at-issue diabetes medications have been falsely inflated such that the prices are unlawful.

480.    As a result, the State has been unknowingly overpaying millions of dollars every year for Manufacturer Defendants' diabetes medications.

481.    Thus, the Insulin Pricing Scheme has directly and proximately caused the State to substantially overpay for diabetes medications.

482.    Because the State continues to pay for the at-issue drugs based on the false prices generated by the Insulin Pricing Scheme, the harm to the State is ongoing.

**The Insulin Pricing Scheme Has Damaged the State By Increasing its Healthcare Costs and Decreasing Productivity**

483. As discussed below, the rising price for the at-issue drugs has had a devastating effect on the health of diabetics. It has also has caused a staggering increase in healthcare costs to the State.

484. As a direct result of the Insulin Pricing Scheme, 1 in 4 Mississippi diabetics can no longer afford their diabetes medication and are forced to ration and skip doses. This forced lack of adherence to their diabetes medications leads to substantial additional healthcare costs.

485. One national model projected that improved adherence to diabetes medication would avert 699,000 emergency department visits and 341,000 hospitalizations annually, for a saving of $4.7 billion. The model further found that eliminating the loss of adherence would lead to another $3.6 billion in savings, for a combined potential savings of $8.3 billion.

486. Much of the increased healthcare costs caused by the Insulin Pricing Scheme are shouldered by the State. As a result of the Insulin Pricing Scheme, the amount Mississippi spends each year on diabetes-related healthcare costs has risen dramatically during the relevant time period, now totaling more than a $1 billion a year.

487. Dr. Stephen Farrow, executive director of the Biloxi, Mississippi-based National Diabetes and Obesity Research Institute, explained the devastating effect diabetes and lack of adherence this has on the healthcare system, "If we don't do something, our national health system will collapse. There will be too much blindness, too many people on dialysis. Our country will go broke."

488.   Lack of adherence to diabetes medications also has a significant adverse effect on labor productivity in terms of absenteeism (missing work due to health-related reasons), presenteeism (being present at work but not productive), and disability (inability to perform necessary physical tasks at work).

489.   This decrease in work productivity has further damaged the State by injuring its economy and decreasing its tax revenue.

### The Insulin Pricing Scheme Has Damaged Mississippi Diabetics

490.   PBM and Manufacturer Defendants have exploited the drug pricing and payment system to extract billions in profits at the expense of Mississippi diabetics.

491.   As discussed above, Mississippi diabetics have been damaged by Defendants' Insulin Pricing Scheme by having to pay at least a portion of their at-issue purchases out-of-pocket based on Defendants' false prices generated by the Insulin Pricing Scheme.

492.   If Defendants' prices were not falsely inflated as a result of the Insulin Pricing Scheme each of the above-described diabetic Mississippians would have paid significantly less for the at-issue diabetes medications during the relevant time period. Diabetic Mississippians have been overcharged by millions of dollars as a result of the Insulin Pricing Scheme.

493.   In addition to financial losses, for many diabetic Mississippians, the Insulin Pricing Scheme has cost them their health and emotional well-being. Unable to afford Defendants' price increases, many diabetics in Mississippi have begun to engage in highly risky behaviors with respect to their disease such as rationing their insulin, skipping their refills, injecting expired insulin, reusing needles, and avoiding doctors' visits. To compensate for their lack of insulin, some patients starve themselves, foregoing one or

even two meals a day. These practices—which ineffectively control blood sugar levels—can lead to serious complications such as kidney disease and failure, heart disease and heart attacks, infection, amputation, and blindness.

494. Even when diabetics can still afford their diabetic medications, as a direct result of PBM Defendants shifting which diabetes medications are favored on their formularies, diabetics are often forced to switch medications every few years or go through a lengthy appeal process (or try the favored drug first) before receiving the patient's preferred medication.

495. Switching diabetic mediations can be detrimental to a diabetics' health including, negatively impacting their blood sugar control for months causing dizziness, blurred vision, weakness, fainting and shakiness.

496. The Insulin Pricing Scheme has pushed, and will continue to push, access to these lifesaving drugs out of reach for many diabetes patients in Mississippi.

497. Because Mississippi diabetics continue to pay for the at-issue drugs based on the false prices generated by the Insulin Pricing Scheme, the harm is ongoing.

## K. Defendants' Recent Efforts to Address Insulin Pricing Falls Far Short of Addressing the Problem

498. In reaction to the mounting political and public outcry, Defendants recently have introduced programs ostensibly aimed at lowering the cost of insulins.

499. These affordability measures fail to address the structural issues that have given rise to the price hikes. Rather, these steps are merely public relations stunts that do not solve the problem.

500. For example, in March 2019, Defendant Eli Lilly announced that it would produce an authorized generic version of Humalog, "Insulin Lispro," and promised that it

would "work quickly with supply chain partners to make [the authorized generic] available in pharmacies as quickly as possible."

501.    However, in the months after Eli Lilly's announcement, reports raised questions about the availability of "Insulin Lispro" in local pharmacies.

502.    Following this a Congressional staff report was issued examining the availability of this drug.[10]    The investigative report, *Inaccessible Insulin: The Broken Promise of Eli Lilly's Authorized Generic*, concluded that Eli Lilly's lower-priced, authorized generic insulin is widely unavailable in pharmacies across the country, and that the company has not taken meaningful steps to increase insulin accessibility and affordability.

503.    The conclusion of the report was that: "Eli Lilly has failed to deliver on its promise to put a more-affordable insulin product on the shelves. Instead of giving patients access to its generic alternative, this pharmaceutical behemoth is still charging astronomical prices for a drug people require daily and cannot live without."

504.    In 2019, Novo Nordisk partnered with Walmart to offer ReliOn brand insulins for a discounted price at Walmart. However, experts have warned that the Walmart/Novo Nordisk insulins are not substitutes for most diabetics' regular insulins and should only be used in an emergency or when traveling. In particular, for many diabetics, especially Type 1 diabetics, these insulins can be dangerous. In fact, in August 2019, a Type 1 diabetic who could no longer afford his $1,200 a month insulin prescription died months after switching to ReliOn brand insulin due to complications from the disease.

---

[10] https://www.fdanews.com/ext/resources/files/2019/12-16-19-InaccessibleInsulinreport.pdf?1576536304.

505.   Thus, Defendants' "lower priced" insulin campaigns have not addressed the problem. Mississippi diabetics and the State continue to suffer great harm as a result of the Insulin Pricing Scheme.

## VI.   TOLLING OF STATUTE OF LIMITATIONS

506.   Plaintiff State of Mississippi is not subject to any applicable statute of limitations.

507.   Even assuming, *arguendo*, that the State were subject to applicable statutes of limitations, in the alternative, the State asserts that it diligently pursued and investigated the claims asserted in this Third Amended Complaint. Through no fault of its own, the State did not receive inquiry notice nor learn of the factual basis for its claims in this Third Amended Complaint and the injuries suffered therefrom until recently. Consequently, the following tolling doctrines apply.

### A.   Discovery Rule Tolling

508.   Neither the State, nor Mississippi diabetics, had no way of knowing about the Insulin Pricing Scheme.

509.   As discussed above, PBM and Manufacturer Defendants refused to disclose the actual prices of diabetes medications realized by Defendants, the details of the Defendants' negotiations and payments between each other or their pricing structures and agreements—labeling them trade secrets and protecting them with confidentiality agreements.

510.   Each Defendant group also affirmatively blamed the other for the price increases described herein, and disavowed their roles in the Insulin Pricing Scheme, both during their congressional testimonies, directly to client payors and through the media.

511. The State did not discover and did not know of facts that would have caused a reasonable person to suspect, that Defendants were engaged in the Insulin Pricing Scheme, nor would a reasonable and diligent investigation have disclosed the true facts.

512. Even today, lack of transparency in the pricing of diabetes medications and the arrangements, relationships and agreements between and among Manufacturer Defendants and PBM Defendants that result from the Insulin Pricing Scheme continue to obscure Defendants' unlawful conduct from the State.

513. For these reasons, all applicable statutes of limitation have been tolled by operation of the discovery rule with respect to claims identified herein.

## B. Fraudulent Concealment Tolling

514. Any applicable statutes of limitation have also been tolled by the Defendants' knowing and active concealment and denial of the facts alleged herein throughout the time period relevant to this action, as described above.

## C. Estoppel

515. Defendants were under a continuous duty to disclose to the State and Mississippi diabetics the true character, quality and nature of the prices upon which payments for diabetes medications were based, and the true nature of the services being provided.

516. Based on the foregoing, Defendants are estopped from relying on any statutes of limitations in defense of this action.

## D. Continuing Violations

517. Any applicable statutes of limitations are also tolled because Defendants' activities have not ceased and still continue to this day and thus any causes of action are not complete and do not accrue until the tortious and anticompetitive acts have ceased.

## VI.    CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION

### Mississippi Consumer Protection Act. Miss. Code §§ 75-24-1, *et seq*
### (Against All Defendants)

518.    The State, on behalf of itself and as *parens patriae* on behalf of diabetic Mississippians re-alleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs.

519.    The State alleges that any and all possible conditions precedent to filing this Mississippi Consumer Protection Act claim to seek damages have been performed or have occurred.  By correspondence from the Office of the Attorney to the Defendants dated May 17, 2021, prior to filing this lawsuit, the State reasonably attempted to resolve its claims through an informal dispute settlement program approved by the Attorney General with each Defendant. *See* Miss. Code Ann. § 75-24-15(2). Defendants failed to adequately respond to the State's request to resolve these claims.

520.    Defendants are "persons" within the meaning of, and subject to, the provisions of the Mississippi Consumer Protection Act, *e.g.*, Miss. Code § 75-24-3(a).

521.    By engaging in the Insulin Pricing Scheme, as described herein, Defendants have committed acts of unfair and deceptive trade practices and acts in the conduct of trade or commerce within the State, including in this District, as prohibited by Miss. Code § 75-24-5, directly or indirectly, affecting and causing harm to Mississippi diabetics and the State.

522.    Defendants have repeatedly and willfully engaged in the following conduct, which constitutes a deceptive trade practice and a violation of the Mississippi Consumer Protection Act, including but not limited to:

- "[R]epresenting that goods or services have . . . characteristics . . . which they do not have . . ." Miss. Code § 75-24-5(2)(e). In particular:

  o A characteristic of every commodity in Mississippi's economy is its price, which is represented by every seller to every buyer that the product being sold is being sold at a legal, competitive, and fair market value.

  o At no point did Defendants reveal that the prices associated with the lifesaving diabetic treatments at issue herein were not legal, competitive or at fair market value and were completely untethered from the actual prices realized by either Defendant group.

  o At no point did Defendants disclose that the prices associated with the at-issue drugs were generated by the Insulin Pricing Scheme.

  o In furtherance of Defendants' false and deceptive conspiracy, at least once a year for each year during the relevant time period, Defendants reported and published false prices for each at-issue drug and in doing so represented that the reported prices were the actual, legal and fair-market prices for these drugs.

  o Despite knowing these prices were false, PBM Defendants ensured that the Manufacturers' false list prices harmed diabetics and payors by requiring that their contracts with both pharmacies and with payors include such prices as the basis for payment.

  o In addition, with respect to the PBM Defendants, by granting the at-issue drugs preferred formulary position on their standard formularies— formulary positions that the PBMs represent are reserved for reasonably priced drugs and that are meant to promote the health of diabetics—PBM Defendants knowingly and purposefully utilized and profited from the false prices that the PBMs knew were generated by the Insulin Pricing Scheme.

  o By granting the at-issue diabetes medications preferred formulary positions, PBM Defendants ensured that prices generated by the Insulin Pricing Scheme would harm diabetics and payors, including the State.

  o PBM Defendants also misrepresented that their formularies were promoting the health of diabetic Mississippians, including diabetic beneficiaries of the State's health plans and in state-run facilities.

  o Defendants' representations are false, and at all relevant times Defendants knew they were false. Both sets of Defendants knew that the prices they reported and utilized are falsely inflated for the purpose of maximizing profits pursuant to the Insulin Pricing Scheme.

- o Defendants also knew that their formularies were not promoting the health of diabetic Mississippians, including diabetic beneficiaries of the State's health plans, facilities and programs but rather were fueling the precipitous price increases that were driving up the prices paid by diabetics and payors, including the State.

  - o At all times relevant hereto, Defendants affirmatively withheld this truth from diabetic Mississippians and the State even though Defendants knew that the diabetic Mississippians' and the State's intention was to pay the lowest possible fair market price for diabetes medications and expectation was to pay a legal, competitive price that resulted from transparent market forces.

- • "[M]aking false or misleading statements of fact concerning the reasons for, existence of, or amount of price reductions." Miss. Code § 75-24-5(2)(k).

  - o In particular, at all relevant times, PBM Defendants made false and misleading statements concerning the reasons for, existence of, and amount of price reductions by misrepresenting that their formulary construction and the Manufacturer Payments that the PBM Defendants receive lower the overall price of diabetes medications and promote the health of diabetics.

  - o At all times relevant hereto, these representations were false and Defendants knew they were false when they made them. At all relevant times, Defendants knew that the Manufacturer Payments and the PBMs' negotiations with the Manufacturers were not reducing the overall price of diabetes medications but rather are an integral part of the Insulin Pricing Scheme and are responsible for artificially inflating the price of diabetes medications.

- • Defendants continue to make these misrepresentations and publish prices generated by the Insulin Pricing scheme; diabetic Mississippians and the State continue to purchase diabetes medications at Defendants' prices as a result of the ongoing Insulin Pricing Scheme.

523.   Defendants' conduct and practice was also unfair to Mississippi consumers and the State because it was likely to cause substantial injury and cannot be reasonably avoided. *See* Miss. Code § 75-24-5(1). Furthermore, there are no countervailing benefits to consumers that result from Defendants egregiously raising the price of the at-issue drugs. In particular:

- • Mississippi diabetics, including beneficiaries in the State's health plans and in state-run facilities, need these diabetes medications to survive.

- Manufacturer Defendants make nearly every single vial of insulin available in Mississippi.

- The price increases for the at-issue drugs bear no relation to manufacturing or production cost increases or changes in supply and demand conditions.

- In fact, the prices have become so untethered from production costs, that insulins, which the Manufacturer Defendants could *profitably price at less than $2 a vial*, are now priced at up to $400 a vial.

- There are no conceivable benefits to diabetic Mississippians or the State to being forced to pay these egregious prices for medicines they need to stay alive. In fact, the opposite is true—as a direct result of Defendants' egregious price increases, Mississippi diabetics' financial security, health and wellbeing have been severely and detrimentally impacted and the State has overpaid millions of dollars for the at-issue drugs and incurred substantial increased healthcare costs.

524.    Defendants acted knowingly and in a willful, wanton or reckless disregard for the safety of others in committing the violations of the Mississippi Consumer Protection Act described herein.

525.    Each at-issue purchase diabetic Mississippians and the State made for diabetes medications at the prices generated by the Insulin Pricing Scheme constitutes a separate violation of the Mississippi Consumer Protection Act.

526.    The Attorney General has determined that the imposition of an injunction against Defendants prohibiting the conduct set forth herein is in the public interest, and the State is seeking the entry of an injunction prohibiting Defendants' conduct in violation of the Mississippi Consumer Protection Act.

527.    As a direct and proximate result of Defendants' conduct in committing the above and foregoing violations of the Mississippi Consumer Protection Act, Defendants are directly and jointly and severally liable to the State for all equitable relief, restitution, damages, punitive damages, penalties and disgorgement for which recovery is sought herein, including but not limited to, diabetic Mississippians and the State paying inflated

prices generated by the Insulin Pricing Scheme for diabetes medications every time they paid for an at-issue drug. Further, due to the price inflation caused by the Insulin Pricing Scheme, many Mississippi diabetics have been priced out of these life-sustaining drugs, leading to serious health consequences. As result, the State has incurred increased healthcare costs and decreased tax revenues.

## SECOND CAUSE OF ACTION

### Unjust Enrichment
### (Against All Defendants)

528.    The State, on behalf of itself and as *parens patriae* on behalf of diabetic Mississippians re-alleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs.

529.    Defendants knowingly, willfully and intentionally deceived diabetic Mississippians and the State and have received a financial windfall from the Insulin Pricing Scheme at the expense of diabetic Mississippians and the State.

530.    Defendants wrongfully secured and retained unjust benefits from diabetic Mississippians and the State and as a result of the Insulin Pricing Scheme, in the form of amounts paid for diabetes medications and fees and payments collected based on the prices generated by the Insulin Pricing Scheme.

531.    It is inequitable and unconscionable for Defendants to retain these benefits.

532.    Defendants knowingly accepted the unjust benefits of their false and deceptive conduct.

533.    Accordingly, Defendants should not be permitted to retain the proceeds from the benefits conferred upon them by diabetic Mississippians and the State. The State seeks disgorgement of Defendants' unjustly acquired profits and other monetary benefits

resulting from their unlawful conduct and seeks restitution and/or recission, in an equitable and efficient fashion to be determined by the Court.

534.     There is no express contract governing the dispute at-issue. PBMs do not contract with payors, including the State, on an individual drug basis.  Nor do Mississippi diabetics contract on an individual drug basis.   The State's claims do not arise out of a contract, but rather are based on the larger false and deceptive scheme that drove up the at-issue false list prices for all diabetics and payors.

535.     As a direct and proximate cause of Defendants' unjust enrichment at the expense of diabetic Mississippians and the State as referenced above, diabetic Mississippians and the State suffered ascertainable losses and damages as specified herein in an amount to be determined at trial.

### THIRD CAUSE OF ACTION

### Civil Conspiracy
### (Against All Defendants)

536.     The State, on behalf of itself and as *parens patriae* on behalf of diabetic Mississippians re-alleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs.

537.     Defendants' entered into an agreement to artificially and unlawfully inflate the prices of insulin and diabetes medications for their profit and gain.  The Defendants' agreement to engage in such unlawful act constitutes a civil conspiracy, and Defendants' acts in furtherance thereof violated the Mississippi Consumer Protection Act and other state laws referenced in this Third Amended Complaint.

538.    In particular, each of the PBM and Manufacturer Defendants agreed to and carried out acts in furtherance of the Insulin Pricing Scheme that artificially and egregiously inflated the price of diabetes medications.

539.    Each Defendant made a conscious commitment to participate in the Insulin Pricing Scheme.

540.    Manufacturer Defendants work in coordination with each other and the PBMs to raise the price of the at-issue drugs in lockstep and in furtherance of the Insulin Pricing Scheme and then pay back a significant portion of those prices to PBM Defendants.

541.    Contrary to their representations, PBMs worked in coordination with each other and the Manufacturers to grant higher priced at-issue drugs preferred placement on their formularies because these drugs were more profitable for Defendants.

542.    Each Defendant shares a common purpose of perpetuating the Insulin Pricing Scheme and neither PBM Defendants nor Manufacturer Defendants alone could have accomplished the Insulin Pricing Scheme without their co-conspirators.

543.    PBM Defendants need Manufacturer Defendants to inflate the reported price of their diabetes medications and to make secret payments back to PBM Defendants in order for PBM Defendants to profit off the Insulin Pricing Scheme.

544.    Manufacturer Defendants need PBM Defendants to grant their diabetes medications preferred formulary placement in order to maintain access to a majority of payors and diabetics.

545.    As discussed throughout this Third Amended Complaint, the Insulin Pricing Scheme resulted from explicit agreements between the Defendants related to the at-issue Manufacturer Payments and formulary construction, constant communications between the Defendants, regular in-person meetings (which included Defendants' C-suite level

executives) and joint outreach programs between Defendants to construct, refine and promote the standard formularies and related Manufacturer Payments that fuel Defendants' fraudulent conspiracy.

546.    In addition to direct evidence of an agreement, Defendants' conspiracy is also demonstrated by the following indirect evidence that Defendants conspired to engage in false and deceptive conduct:

- Several key lockstep price increases occurred shortly after PCMA conferences, which included private executive exchanges and meetings that appear to be focused on developing and maintaining the Insulin Pricing Scheme, which all Manufacturer and PBM Defendants attended;

- During certain years when some of the largest at-issue price increases occurred, including in 2013 and 2014, certain PBMs worked directly with each other to negotiate Manufacturer Payments in exchange for preferred formulary placement;

- Defendants refuse to disclose the details of their pricing structures, agreements and sales figures in order maintain the secrecy of the Insulin Pricing Scheme;

- Numerous ongoing government investigations, hearings and inquiries have targeted the Insulin Pricing Scheme and the collusion between the Manufacturer and PBM Defendants, including:

  o In 2016, Manufacturer and PBM Defendants received civil investigative demands from at least the State of Washington relating to the pricing of their insulin products and their relationships with PBM Defendants;

  o In 2017, Manufacturer Defendants received civil investigation demands from the States of Minnesota, California and Florida related to the pricing of their insulin products and their relationships with the PBMs;

  o Letters from numerous senators and representatives in recent years to the Justice Department and the Federal Trade Commission asking them to investigate potential collusion among Defendants;

  o A 2017 House Oversight committee investigation into the corporate strategies of drug companies, including Manufacturer Defendants, seeking information on the increasing price of drugs and manufacturers efforts to preserve market share and pricing power;

- o Several 2019 hearings before both the Senate Financing Committee and the House Oversight and Reform Committees on the Insulin Pricing Scheme and the collusion between the PBMs and the Manufacturers; and

- o Senate Finance Committee's recent two-year probe into the Insulin Pricing Scheme and the conspiracy between the Manufacturers and the PBMs that resulted in the Senate Insulin Report.

- The astronomical rise in the price of the at-issue drugs coincides with PBM Defendants' rise to power within the pharmaceutical pricing system starting in 2003.

## VII.   MOTION FOR INJUNCTION PURSUANT TO MISS. CODE 75-24-9

547.    The State, on behalf of itself and as *parens patriae* on behalf of diabetic Mississippians re-alleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs.

548.    By Defendants' violations of the Mississippi Consumer Protection Act, the State and Mississippi diabetic residents have suffered, and will continue to suffer injury, loss and damage, as discussed herein.

549.    The ongoing and threatened injury to the State and Mississippi diabetic residents outweighs the harm that an injunction might do to Defendants.

550.    As a direct and proximate result of the conduct of the Defendants in committing the above and foregoing acts, the State moves this Honorable Court for injunctive relief against the Defendants pursuant to Miss. Code 75-24-9, thereby enjoining Defendants from committing future violations of the Mississippi Consumer Protection Act.

551.    Granting an injunction is consistent with the public interest because it will protect the health and economic interests of Mississippi residents and the State, as well as the integrity of the Mississippi marketplace.

## VIII.   JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff respectfully requests a trial by jury on all issues so triable.

## IX.   PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, the State, bringing this action on behalf of the State of Mississippi in its proprietary capacity on its own behalf, and on behalf of Mississippi residents, respectfully prays for entry of judgment against the Defendants for all the relief requested herein and to which the State may otherwise be entitled, specifically, but without limitation, to-wit:

A.      That the Court determine that Defendants have violated the Mississippi Consumer Protection Act, have been unjustly enriched and have engaged in a civil conspiracy;

B.      That this Court award Plaintiff damages, restitution, penalties, disgorgement and/or all other legal and equitable monetary remedies available under the state laws set forth in this Complaint and the general equitable powers of this Court, with interest and all exemplary and/or punitive damages that may be awarded, as necessary to address the harm caused by Defendants' acts described in this Complaint;

C.      That, in accordance with the Mississippi Consumer Protection Act (Miss. Code 75-24-9), Defendants, their affiliates, successors, transferees, assignees, and the officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, contract, conspiracy or

combination alleged herein in violation of the above stated Mississippi laws, or from entering into any other contract, conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program or device having a similar purpose or effect;

D.     That, in accordance with Miss Code. 75-24-11, this Court make any such additional orders or judgments, including restitution, as may be necessary to restore to the State and Mississippi diabetics any losses and/or damages incurred as a result of the Insulin Pricing Scheme;

E.     That, in accordance with Miss Code. 75-24-19(1)(b), the State of Mississippi be awarded civil penalties of Ten Thousand Dollars ($10,000) for each purchase by the State and any Mississippi diabetic for an at-issue drug in Mississippi during the relevant time period at a price generated by the Insulin Pricing Scheme;

F.     That, in accordance with Miss. Code 11-1-65, the State of Mississippi be awarded punitive damages because Defendants knowingly, willfully intentionally, with actual malice, or with reckless disregard for the rights of the State and its citizens, harmed the health, wellbeing and financial interests of diabetic Mississippians and the State;

G.     That the State be awarded pre- and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

H.     That the State recover its costs of suit, including its reasonable attorney's fees, as provided by law; and

I. That the State be awarded such other, further and different relief as the case may require and the Court may deem just and proper under the circumstances.

RESPECTFULLY SUBMITTED this the 17th day of February, 2022.

LYNN FITCH, ATTORNEY GENERAL
STATE OF MISSISSIPPI

By: */s/ Tricia L. Beale*
Tricia L. Beale (MSB No. 99113)
Ta'Shia S. Gordon (MSB No. 101228)
Consumer Protection Division
Mississippi Attorney General's Office
Post Office Box 220
Jackson, Mississippi 39201
Telephone: 601-359-3680
ta'shia.gordon@ago.ms.gov
tricia.beale@ago.ms.gov

Of Counsel:

W. Lawrence Deas (MS Bar #100227)
lawrence@listondeas.com
LISTON DEAS PLLC
William Liston III (MS Bar #8482)
william@listondeas.com
Post Office Box 14127
Jackson, Mississippi 39236
Tel. (601) 981-1636

Edwin S. Gault, Jr., Esquire
Walter G. Watkins, III, Esquire
Tanya D. Ellis, Esquire
FORMAN WATKINS & KRUTZ, LLP
P. O. Box 22608
Jackson, Mississippi 39225-2608
Tel. (601) 960-8600
Win.gault@formanwatkins.com
trey.watkins@formanwatkins.com
tanya.ellis@formanwatkins.com

Matthew C. McDonald, Esquire
DAVID NUTT & ASSOCIATES
605 Crescent Blvd., Suite 200
Ridgeland, Mississippi 39157
Tel. (601) 898-7302
Mattm@davidnutt.com

Joanne Cicala, Esquire, admitted *pro hac vice*
Josh Wackerly, Esquire, admitted *pro hac vice*
THE CICALA LAW FIRM PLLC
101 College Street
Dripping Springs, Texas 78620
Tel. (512) 275-6550
joanne@cicalapllc.com
josh@cicalapllc.com

## CERTIFICATE OF SERVICE

I, Tanya D. Ellis, counsel of record for the Plaintiff, hereby certify that on this day I electronically filed the foregoing with the Clerk of the Court using the Court's CM/ECF system.

This the 17th day of February, 2022.

/s/ *Tanya D. Ellis*
Tanya D. Ellis
Counsel for Plaintiff