Query     Reports     Utilities     Help     What's New     Log Out

# United States District Court
## District of Puerto Rico (San Juan)
## CIVIL DOCKET FOR CASE #: 3:23-cv-01127-JAG

| | |
|---|---|
| Government of Puerto Rico et al v. Eli Lilly and Company et al | Date Filed: 03/17/2023 |
| Assigned to: Judge Jay A. Garcia-Gregory | Jury Demand: None |
| Cause: 28:1441 Notice of Removal | Nature of Suit: 890 Other Statutory Actions |
| | Jurisdiction: Federal Question |

**Plaintiff**

**Government of Puerto Rico**          represented by     **Andres W. Lopez**
The Law Offices of Andres W. Lopez,
P.S.C.
PO Box 13909
San Juan, PR 00908
787-294-9508
Email: andres@awllaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Eli Lilly and Company**          represented by     **Sylvia M. Arizmendi-Lopez-de-V**
Reichard & Escalera
PO Box 364148
San Juan, PR 00936-4148
9393973879
Fax: 7877654225
Email: arizmendis@reichardescalera.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Andrew A Kassof**
Kirkland & Ellis LLP
300 North Lasalle
Chicago, IL 60654
312-862-2474
Email: akassof@kirkland.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Christopher A. Davila-Rodriguez**
Reichard & Escalera LLC
PO Box 364148
San Juan, PR 00936
787-777-8888
Fax: 787-765-4225

Email: cdavila@reichardescalera.com
*ATTORNEY TO BE NOTICED*

**Diana Watral**
Kirkland & Ellis LLP
300 N. LaSalle
Chicago, IL 60654
312-862-2000
Email: diana.watral@kirkland.com
*ATTORNEY TO BE NOTICED*

**Jason Feld**
Kirkland & Ellis LLP
300 N. LaSalle
Chicago, IL 60654
312-862-3759
Email: jason.feld@kirkland.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**PHV James F. Hurst**
Kirkland & Ellis LLP
300 N. LaSalle
Chicago, IL 60654
312-862-5230
Email: james.hurst@kirkland.com
*ATTORNEY TO BE NOTICED*

**Ryan Moorman**
Kirkland & Ellis LLP
300 N LaSalle
Chicago, IL 60654
312-862-2000
Email: ryan.moorman@kirkland.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Eli Lilly Export S.A.**                    represented by **Sylvia M. Arizmendi-Lopez-de-V**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Andrew A Kassof**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Christopher A. Davila-Rodriguez**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Diana Watral**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jason Feld**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**PHV James F. Hurst**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ryan Moorman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Novo Nordisk, Inc.**                    represented by   **Adrian Jimenez-Torres**
Pietrantoni Mendez & Alvarez LLC
PR
Popular Center 208 Ponce de Leon Ave
Ste 19th Floor
San Juan, PR 00918
787-274-1212
Fax: 787-274-1470
Email: ajimenez@pmalaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Arturo L.B. Hernandez-Gonzalez**
Pietrantoni Mendez & Alvarez LLC
Litigation
Popular Center 19th Floor
208 Ponce de Leon Ave.
San Juan, PR 00918
787-274-5258
Email: ahernandez@pmalaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Oreste Ricardo Ramos-Pruetzel**
Pietrantoni Mendez & Alvarez LLC
Popular Center, 19th Floor
208 Ponce de Leon Ave.
San Juan, PR 00918
787-274-1212
Fax: 787-274-1470
Email: oramos@pmalaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Andrew Yaphe**
Davis Polk & Wardwell LLP
1600 El Camino Real
Menlo Park, CA 94025
650-752-2088

Fax: 650-752-3688
Email: andrew.yaphe@davispolk.com
*ATTORNEY TO BE NOTICED*

**Ian Hogg**
Davis Polk & Wardwell LLP
1600 El Camino Real
Menlo Park, CA 94025
650-752-2066
Fax: 650-752-3666
Email: ian.hogg@davispolk.com
*ATTORNEY TO BE NOTICED*

**James Rouhandeh**
Davis Polk & Wardwell LLP
450 Lexington Ave.
New York, NY 10017
212-450-4000
Email: james.rouhandeh@davispolk.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Neal Potischman**
Davis Polk & Wardwell LLP
1600 El Camino Real
Menlo Park, CA 94025
650-752-2000
Email: neal.potischman@davispolk.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Sanofi-Aventis U. S. LLC**                    represented by **Maria Celeste Colberg-Guerra**
Rodriguez Marxuach PSC
PO Box 16636
San Juan, PR 00908-6636
787-754-9898 787-565-9291
Fax: 787-754-9897
Email: mcc@rmlawpr.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Miguel J. Rodriguez-Marxuach**
Rodriguez Marxuach, P.S.C.
Hato Rey Center, Suite 524
268 Ponce de Leon Ave.
San Juan, PR 00918
787-754-9898
Fax: 787-754-9897
Email: mrm@rmlawpr.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Shirlethia Franklin**
Jones Day - Washington

District of Columbia
51 Louisiana Avenue, NW
Washington, DC 20001
202-879-3892
Fax: 202-626-1700
Email: sfranklin@jonesday.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Theresa Coughlin Martin**
Jones Day - Washington
Jones Day
51 Louisiana Ave NW
Washington, DC 20001
202-879-3617
Email: tcoughlin@jonesday.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**William Coglianese**
Jones Day
51 Louisiana Avenue NW
Washington, DC 20001
202-879-3710
Email: wcoglianese@jonesday.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**<u>Defendant</u>**

**Sanofi-Aventis Puerto Rico Inc.**                 represented by **Maria Celeste Colberg-Guerra**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Miguel J. Rodriguez-Marxuach**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Shirlethia Franklin**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Theresa Coughlin Martin**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**William Coglianese**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Express Scripts, Inc.**                    represented by    **Carlos A. Valldejuly-Sastre**
O'Neill & Borges, LLC
250 Munoz Rivera Ave, Suite 800
San Juan, PR 00918
787-282-5725
Email: carlos.valldejuly@oneillborges.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jason Scherr**
1111 Pennsylvania Avenue, NW
Washington, DC 20004
202-373-6709
Email: jr.scherr@morganlewis.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Lindsey Titus Levy**
1111 Pennsylvania Ave NW
Washington, DC 20001
202-739-5724
Fax: 202-739-3001
Email: lindsey.levy@morganlewis.com
*ATTORNEY TO BE NOTICED*

**Patrick Harvey**
Morgan Lewis & Bockius LLP
DC
1111 Pennsylvania Ave., NW
Washington, DC 20004
202-373-6284
Fax: 202-739-3001
Email: patrick.harvey@morganlewis.com
*ATTORNEY TO BE NOTICED*

**Ricardo J. Casellas-Santana**
O'Neill & Borges
American International Plaza
250 Munoz Rivera Ave.
Suite 800
San Juan, PR 00918-1813
787-764-8181
Fax: 787-753-8944
Email: ricardo.casellas@oneillborges.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**CaremarkPCS Health, LLC**                    represented by   **Enu Mainigi**
Williams & Connolly
Williams & Connolly
680 Maine Avenue SW
20024
Washington, DC 20005
202-434-5420
Email: emainigi@wc.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Adam Joshua Podoll**
Williams & Connolly
District of Columbia
680 Maine Avenue Southwest
Washington, DC 20024
202-434-5092
Email: apodoll@wc.com
*ATTORNEY TO BE NOTICED*

**Alexander Gazikas**
Williams & Connolly
680 Maine Avenue, S.W.
Room 787
Washington, DC 20024
202-434-5636
Email: agazikas@wc.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Atticus DeProspo**
Williams & Connolly
680 Maine Avenue S.W.
Washington, DC 20024
845-480-2847
Email: adeprospo@wc.com
*ATTORNEY TO BE NOTICED*

**Craig Singer**
Williams & Connolly
680 Maine Avenue, S.W.
Washington, DC 20024
202-434-5000
Email: csinger@wc.com
*ATTORNEY TO BE NOTICED*

**Javier Antonio Aquino-Vidal**
McConnell Valdes LLC
Avenida Munoz Rivera 270
San Juan, Puerto Rico, 00918
San Juan, PR 00918
787-250-5621
Fax: 787-759-8282
Email: jav@mcvpr.com

*ATTORNEY TO BE NOTICED*

**Raymond Kennon Poteat , III**
Williams & Connolly
680 Maine Avenue SW
Washington, DC 20024
202-434-5699
Email: kpoteat@wc.com
*ATTORNEY TO BE NOTICED*

**Eduardo A. Zayas-Marxuach**
McConnell Valdes, LLC
P.O. Box 364225
San Juan, PR 00936-4225
787-250-5813
Fax: 787-250-5185
Email: ezm@mcvpr.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Caremark Puerto Rico**                represented by **Enu Mainigi**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Adam Joshua Podoll**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Alexander Gazikas**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Atticus DeProspo**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Craig Singer**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Javier Antonio Aquino-Vidal**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Raymond Kennon Poteat , III**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Eduardo A. Zayas-Marxuach**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**OptumRx, Inc.**                                    represented by **Eric Perez-Ochoa**
Adsuar Muniz Goyco Seda & Perez Ochoa
PSC
PO Box 70294
San Juan, PR 00936-8294
787-756-9000
Fax: 787-756-9010
Email: epo@amgprlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Luis A. Oliver-Fraticelli**
Adsuar Muniz Goyco Seda & Perez Ochoa
PSC
PO Box 70294
San Juan, PR 00936-8294
787-281-1819
Fax: 787-756-9010
Email: loliver@amgprlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 03/17/2023 | 1 | NOTICE OF REMOVAL from Court of First Instance of Puerto Rico, San Juan Part, case number SJ2023CV00319. (Filing fee $ 402 receipt number APRDC-8139325), filed by Express Scripts, Inc.. (Attachments: # 1 Exhibit PR Notice Ex. A - Am Complaint, # 2 Exhibit PR Notice Ex. B - DOD Contract, # 3 Exhibit PR Notice Ex. C - Veteran Summary, # 4 Exhibit PR Notice Ex. D - Matrix)(Casellas-Santana, Ricardo) (Entered: 03/17/2023) |
| 03/17/2023 | 2 | NOTICE of Filing Exhibits Civil Cover Sheet and Attachment re 1 Notice of Removal, filed by Express Scripts, Inc. (Attachments: # 1 Exhibit Attachment to Civil Cover Sheet) (Casellas-Santana, Ricardo) (Entered: 03/17/2023) |
| 03/17/2023 | 3 | ANSWER to Complaint *at Docket No. 1-1* filed by Ricardo J. Casellas-Santana on behalf of Defendant Express Scripts, Inc..(Casellas-Santana, Ricardo) (Entered: 03/17/2023) |
| 03/17/2023 | 4 | NOTICE OF REMOVAL *(Supplemental)* from Commonwealth of Puerto Rico Court of First Instance, San Juan Part, case number SJ2023cv00319. (Filing fee $ 402 receipt number APRDC-8139585), filed by Caremark Puerto Rico, CAREMARKPCS HEALTH LLC. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Zayas-Marxuach, Eduardo) (Entered: 03/17/2023) |
| 03/17/2023 | 5 | Corporate Disclosure Statement byCAREMARKPCS HEALTH LLC, Caremark Puerto Rico identifying Corporate Parent CAREMARKPCS HEALTH LLC for Caremark Puerto Rico.. (Zayas-Marxuach, Eduardo) (Entered: 03/17/2023) |
| 03/20/2023 | 6 | Corporate Disclosure Statement byExpress Scripts, Inc. identifying Corporate Parent The Cigna Group for Express Scripts, Inc... (Casellas-Santana, Ricardo) (Entered: 03/20/2023) |
| 03/20/2023 | 7 | MEMORANDUM OF THE CLERK: This case was first open in CM/ECF on 03/17/2023 (see, Docket No. 1). As per the Supplemental Notice of Removal filed by Caremark Puerto Rico, Caremark PCS Health, LLC (see, Docket No. 4), counsel inadvertently submitted a |

| | | | |
|---|---|---|---|
| | | | Filing fee $ 402, Receipt Number APRDC-8139585. This matter has been referred to the Finance Section for reimbursement. Signed by Clerk on 03/20/2023. (ft) (Entered: 03/20/2023) |
| 03/20/2023 | 8 | | NOTICE of Filing Exhibits Category Sheet re 1 Notice of Removal, filed by Express Scripts, Inc. (Casellas-Santana, Ricardo) (Entered: 03/20/2023) |
| 03/21/2023 | 9 | | NOTICE OF JUDGE ASSIGNMENT: Case has been assigned to Judge Jay A. Garcia-Gregory. (arg) (Entered: 03/21/2023) |
| 03/24/2023 | 10 | | Corporate Disclosure Statement byOptumRx, Inc.. (Oliver-Fraticelli, Luis) (Entered: 03/24/2023) |
| 03/24/2023 | 11 | | NOTICE of Appearance by Luis A. Oliver-Fraticelli on behalf of OptumRx, Inc. (Oliver-Fraticelli, Luis) (Entered: 03/24/2023) |
| 03/24/2023 | 12 | | NOTICE of Appearance by Carlos A. Valldejuly-Sastre on behalf of Express Scripts, Inc. (Valldejuly-Sastre, Carlos) (Entered: 03/24/2023) |
| 03/24/2023 | 13 | | Motion to allow Jason R. Scherr to appear pro hac vice (Pro Hac fee $300 receipt number APRDC-8149734) filed by Carlos A. Valldejuly-Sastre on behalf of Express Scripts, Inc. Responses due by 4/10/2023. NOTE: Pursuant to FRCP 6(a) an additional three days does not apply to service done electronically. (Attachments: # 1 Appendix Scherr - List of Court Admissions)(Valldejuly-Sastre, Carlos) Modified on 3/27/2023 to correct phv's name (ab). (Entered: 03/24/2023) |
| 03/24/2023 | 14 | | Motion to allow Patrick Harvey to appear pro hac vice (Pro Hac fee $300 receipt number APRDC-8149740) filed by Carlos A. Valldejuly-Sastre on behalf of Express Scripts, Inc. Responses due by 4/10/2023. NOTE: Pursuant to FRCP 6(a) an additional three days does not apply to service done electronically. (Attachments: # 1 Appendix Harvey - List of Court Admissions)(Valldejuly-Sastre, Carlos) (Entered: 03/24/2023) |
| 03/24/2023 | 15 | | Motion to allow Lindsey Levy to appear pro hac vice (Pro Hac fee $300 receipt number APRDC-8149744) filed by Carlos A. Valldejuly-Sastre on behalf of Express Scripts, Inc. Responses due by 4/10/2023. NOTE: Pursuant to FRCP 6(a) an additional three days does not apply to service done electronically. (Valldejuly-Sastre, Carlos) (Entered: 03/24/2023) |
| 03/24/2023 | 16 | | MOTION for extension of time until May 2, 2023 to submit motions to dismiss or otherwise plead, and take notice of the parties' stipulation regarding the stay of all briefing regarding motions to dismiss in the event remand is requested on or before such date. filed by Miguel J. Rodriguez-Marxuach on behalf of All Parties. Responses due by 4/10/2023. NOTE: Pursuant to FRCP 6(a) an additional three days does not apply to service done electronically. (Rodriguez-Marxuach, Miguel) Modified on 3/27/2023 to correct filers (ab). (Entered: 03/24/2023) |
| 03/27/2023 | 17 | | NOTICE of Appearance by Javier Antonio Aquino-Vidal on behalf of Caremark Puerto Rico, CaremarkPCS Health, LLC (Aquino-Vidal, Javier) (Entered: 03/27/2023) |
| 03/29/2023 | 18 | | Motion to allow Adam Joshua Podoll to appear pro hac vice (Pro Hac fee $300 receipt number 105157) filed by Eduardo A. Zayas-Marxuach on behalf of Caremark Puerto Rico, CaremarkPCS Health, LLC Responses due by 4/12/2023. NOTE: Pursuant to FRCP 6(a) an additional three days does not apply to service done electronically. (Attachments: # 1 Exhibit EXHIBIT A, Payment receipt 105157 Adam Joshua Podll PRO HAC VICE) (Zayas-Marxuach, Eduardo) (Entered: 03/29/2023) |
| 03/29/2023 | 19 | | Motion to allow Alexander Gazikas to appear pro hac vice (Pro Hac fee $300 receipt number 105155) filed by Eduardo A. Zayas-Marxuach on behalf of Caremark Puerto Rico, CaremarkPCS Health, LLC Responses due by 4/12/2023. NOTE: Pursuant to FRCP 6(a) an additional three days does not apply to service done electronically. (Attachments: # 1 |

| | | |
|---|---|---|
| | | Exhibit EXHIBIT A Admitted to Practice Alexander Gazikas PRO HAC VICE, # 2 Exhibit EXHIBIT B, Payment receipt 105155 Alexander Gazikas PRO HAC VICE)(Zayas-Marxuach, Eduardo) (Entered: 03/29/2023) |
| 03/29/2023 | 20 | Motion to allow Atticus DeProspo to appear pro hac vice (Pro Hac fee $300 receipt number 105156) filed by Eduardo A. Zayas-Marxuach on behalf of Caremark Puerto Rico, CaremarkPCS Health, LLC Responses due by 4/12/2023. NOTE: Pursuant to FRCP 6(a) an additional three days does not apply to service done electronically. (Attachments: # 1 Exhibit EXHIBIT A Admitted to Practice Atticus DeProspo PRO HAC VICE, # 2 Exhibit EXHIBIT B Payment receipt 105156 Atticus DeProspo PRO HAC VICE)(Zayas-Marxuach, Eduardo) (Entered: 03/29/2023) |
| 03/29/2023 | 21 | Motion to allow Craig D. Singer to appear pro hac vice (Pro Hac fee $300 receipt number 105158) filed by Eduardo A. Zayas-Marxuach on behalf of Caremark Puerto Rico, CaremarkPCS Health, LLC Responses due by 4/12/2023. NOTE: Pursuant to FRCP 6(a) an additional three days does not apply to service done electronically. (Attachments: # 1 Exhibit EXHIBIT A Admitted to Practice Craig D. Singer PRO HAC VICE, # 2 Exhibit EXHIBIT B Payment receipt 105158 Craig D. Singer PRO HAC VICE)(Zayas-Marxuach, Eduardo) (Entered: 03/29/2023) |
| 03/29/2023 | 22 | Motion to allow Enu Mainigi to appear pro hac vice (Pro Hac fee $300 receipt number 105159) filed by Eduardo A. Zayas-Marxuach on behalf of Caremark Puerto Rico, CaremarkPCS Health, LLC Responses due by 4/12/2023. NOTE: Pursuant to FRCP 6(a) an additional three days does not apply to service done electronically. (Attachments: # 1 Exhibit EXHIBIT A Admitted to Practice Enu Mainigi PRO HAC VICE, # 2 Exhibit EXHIBIT B Payment receipt 105159 Enu Mainigi PRO HAC VICE)(Zayas-Marxuach, Eduardo) (Entered: 03/29/2023) |
| 03/29/2023 | 23 | Motion to allow R. Kennon Poteat, III to appear pro hac vice (Pro Hac fee $300 receipt number 105160) filed by Eduardo A. Zayas-Marxuach on behalf of Caremark Puerto Rico, CaremarkPCS Health, LLC Responses due by 4/12/2023. NOTE: Pursuant to FRCP 6(a) an additional three days does not apply to service done electronically. (Attachments: # 1 Exhibit EXHIBIT A Payment receipt 105160 R. Kennon Poteat, III PRO HAC VICE)(Zayas-Marxuach, Eduardo) (Entered: 03/29/2023) |
| 03/30/2023 | 24 | NOTICE of Appearance by Sylvia M. Arizmendi-Lopez-de-V on behalf of Eli Lilly Export S.A., Eli Lilly and Company (Arizmendi-Lopez-de-V, Sylvia) (Entered: 03/30/2023) |
| 03/30/2023 | 25 | Motion to allow James Hurst to appear pro hac vice (Pro Hac fee $300 receipt number APRDC-8157284) filed by Sylvia M. Arizmendi-Lopez-de-V on behalf of Eli Lilly Export S.A., Eli Lilly and Company Responses due by 4/13/2023. NOTE: Pursuant to FRCP 6(a) an additional three days does not apply to service done electronically. (Attachments: # 1 Exhibit List of Admitted Courts)(Arizmendi-Lopez-de-V, Sylvia) (Entered: 03/30/2023) |
| 03/30/2023 | 26 | Motion to allow Ryan Moorman to appear pro hac vice (Pro Hac fee $300 receipt number APRDC-8157310) filed by Sylvia M. Arizmendi-Lopez-de-V on behalf of Eli Lilly Export S.A., Eli Lilly and Company Responses due by 4/13/2023. NOTE: Pursuant to FRCP 6(a) an additional three days does not apply to service done electronically. (Arizmendi-Lopez-de-V, Sylvia) (Entered: 03/30/2023) |
| 03/30/2023 | 27 | Motion to allow Diana Watral to appear pro hac vice (Pro Hac fee $300 receipt number APRDC-8157348) filed by Sylvia M. Arizmendi-Lopez-de-V on behalf of Eli Lilly Export S.A., Eli Lilly and Company Responses due by 4/13/2023. NOTE: Pursuant to FRCP 6(a) an additional three days does not apply to service done electronically. (Arizmendi-Lopez-de-V, Sylvia) (Entered: 03/30/2023) |

| 03/30/2023 | 28 | Motion to allow Jason Feld to appear pro hac vice (Pro Hac fee $300 receipt number APRDC-8157363) filed by Sylvia M. Arizmendi-Lopez-de-V on behalf of Eli Lilly Export S.A., Eli Lilly and Company Responses due by 4/13/2023. NOTE: Pursuant to FRCP 6(a) an additional three days does not apply to service done electronically. (Arizmendi-Lopez-de-V, Sylvia) (Entered: 03/30/2023) |
|---|---|---|
| 03/30/2023 | 29 | Corporate Disclosure Statement byEli Lilly Export S.A., Eli Lilly and Company identifying Corporate Parent Eli Lilly and Company for Eli Lilly Export S.A... (Arizmendi-Lopez-de-V, Sylvia) (Entered: 03/30/2023) |
| 03/30/2023 | 30 | NOTICE of Appearance by Christopher A. Davila-Rodriguez on behalf of Eli Lilly Export S.A., Eli Lilly and Company (Davila-Rodriguez, Christopher) (Entered: 03/30/2023) |
| 04/04/2023 | 31 | ORDER granting 13 Motion to Appear PHV. Signed by Judge Jay A. Garcia-Gregory on 4/4/2023. (ABO) (Entered: 04/04/2023) |
| 04/04/2023 | 32 | ORDER granting 14 Motion to Appear PHV. Signed by Judge Jay A. Garcia-Gregory on 4/4/2023. (ABO) (Entered: 04/04/2023) |
| 04/04/2023 | 33 | ORDER granting 15 Motion to Appear PHV. Signed by Judge Jay A. Garcia-Gregory on 4/4/2023. (ABO) (Entered: 04/04/2023) |
| 04/04/2023 | 34 | ORDER granting 18 Motion to Appear PHV. Signed by Judge Jay A. Garcia-Gregory on 4/4/2023. (ABO) (Entered: 04/04/2023) |
| 04/04/2023 | 35 | ORDER granting 19 Motion to Appear PHV. Signed by Judge Jay A. Garcia-Gregory on 4/4/2023. (ABO) (Entered: 04/04/2023) |
| 04/04/2023 | 36 | ORDER granting 20 Motion to Appear PHV. Signed by Judge Jay A. Garcia-Gregory on 4/4/2023. (ABO) (Entered: 04/04/2023) |
| 04/04/2023 | 37 | ORDER granting 21 Motion to Appear PHV. Signed by Judge Jay A. Garcia-Gregory on 4/4/2023. (ABO) (Entered: 04/04/2023) |
| 04/04/2023 | 38 | ORDER granting 22 Motion to Appear PHV. Signed by Judge Jay A. Garcia-Gregory on 4/4/2023. (ABO) (Entered: 04/04/2023) |
| 04/04/2023 | 39 | ORDER granting 23 Motion to Appear PHV. Signed by Judge Jay A. Garcia-Gregory on 4/4/2023. (ABO) (Entered: 04/04/2023) |
| 04/04/2023 | 40 | ORDER granting 25 Motion to Appear PHV. Signed by Judge Jay A. Garcia-Gregory on 4/4/2023. (ABO) (Entered: 04/04/2023) |
| 04/04/2023 | 41 | ORDER granting 26 Motion to Appear PHV. Signed by Judge Jay A. Garcia-Gregory on 4/4/2023. (ABO) (Entered: 04/04/2023) |
| 04/04/2023 | 42 | ORDER granting 27 Motion to Appear PHV. Signed by Judge Jay A. Garcia-Gregory on 4/4/2023. (ABO) (Entered: 04/04/2023) |
| 04/04/2023 | 43 | ORDER granting 28 Motion to Appear PHV. Signed by Judge Jay A. Garcia-Gregory on 4/4/2023. (ABO) (Entered: 04/04/2023) |
| 04/05/2023 | 44 | Motion to allow Andrew Kasoff to appear pro hac vice (Pro Hac fee $300 receipt number APRDC-8165292) filed by Sylvia M. Arizmendi-Lopez-de-V on behalf of Eli Lilly Export S.A., Eli Lilly and Company Responses due by 4/19/2023. NOTE: Pursuant to FRCP 6(a) an additional three days does not apply to service done electronically. (Attachments: # 1 Exhibit List of Admitted Courts)(Arizmendi-Lopez-de-V, Sylvia) (Entered: 04/05/2023) |
| 04/05/2023 | 45 | NOTICE TO PRO HAC VICE Jason R. Scherr, Patrick Harvey, Lindsey Levy,Adam Joshua Podoll, Alexander Gazikas, Atticus DeProspo, Craig D. Singer, Enu Mainigi, R. |

| | | |
|---|---|---|
| | | Kennon Poeteat, III, James Hurst, Ryan Moorman, Diana Watral, Jason Feld re: 36 Order on Motion to Appear PHV, 35 Order on Motion to Appear PHV, 37 Order on Motion to Appear PHV, 31 Order on Motion to Appear PHV, 32 Order on Motion to Appear PHV, 41 Order on Motion to Appear PHV, 34 Order on Motion to Appear PHV, 42 Order on Motion to Appear PHV, 38 Order on Motion to Appear PHV, 33 Order on Motion to Appear PHV, 40 Order on Motion to Appear PHV, 43 Order on Motion to Appear PHV, 39 Order on Motion to Appear PHV : The Court has granted your pro hac vice application. In order to start receiving notifications, you must file a notice of appearance using your upgraded PACER account. For more information, visit the following link: **https://www.prd.uscourts.gov/nextgen-cmecf-what-it-means-you**. (gav) (Entered: 04/05/2023) |
| 04/10/2023 | 46 | NOTICE of Appearance by Atticus DeProspo on behalf of Caremark Puerto Rico, CaremarkPCS Health, LLC (DeProspo, Atticus) (Entered: 04/10/2023) |
| 04/10/2023 | 47 | NOTICE of Appearance by Jason Scherr on behalf of Express Scripts, Inc. (Scherr, Jason) (Entered: 04/10/2023) |
| 04/10/2023 | 48 | NOTICE of Appearance by Patrick Harvey on behalf of Express Scripts, Inc. (Harvey, Patrick) (Entered: 04/10/2023) |
| 04/10/2023 | 49 | NOTICE of Appearance by Lindsey Titus Levy on behalf of Express Scripts, Inc. (Levy, Lindsey) (Entered: 04/10/2023) |
| 04/10/2023 | 50 | NOTICE of Appearance by Craig Singer on behalf of Caremark Puerto Rico, CaremarkPCS Health, LLC (Singer, Craig) (Entered: 04/10/2023) |
| 04/10/2023 | 51 | NOTICE of Appearance by Enu Mainigi on behalf of Caremark Puerto Rico, CaremarkPCS Health, LLC (Mainigi, Enu) (Entered: 04/10/2023) |
| 04/10/2023 | 52 | NOTICE of Appearance by Raymond Kennon Poteat, III on behalf of Caremark Puerto Rico, CaremarkPCS Health, LLC (Poteat, Raymond) (Entered: 04/10/2023) |
| 04/10/2023 | 53 | NOTICE of Appearance by Adam Joshua Podoll on behalf of Caremark Puerto Rico, CaremarkPCS Health, LLC (Podoll, Adam) (Entered: 04/10/2023) |
| 04/10/2023 | 54 | NOTICE of Appearance by PHV James F. Hurst on behalf of Eli Lilly Export S.A., Eli Lilly and Company (Hurst, PHV James) (Entered: 04/10/2023) |
| 04/10/2023 | 55 | NOTICE of Appearance by Ryan Moorman on behalf of Eli Lilly Export S.A., Eli Lilly and Company (Moorman, Ryan) (Entered: 04/10/2023) |
| 04/10/2023 | 56 | NOTICE of Appearance by Diana Watral on behalf of Eli Lilly Export S.A., Eli Lilly and Company (Watral, Diana) (Entered: 04/10/2023) |
| 04/10/2023 | 57 | NOTICE of Appearance by Jason Feld on behalf of Eli Lilly Export S.A., Eli Lilly and Company (Feld, Jason) (Entered: 04/10/2023) |
| 04/10/2023 | 58 | NOTICE of Appearance by Maria Celeste Colberg-Guerra on behalf of Sanofi-Aventis Puerto Rico Inc., Sanofi-Aventis U. S. LLC (Colberg-Guerra, Maria) (Entered: 04/10/2023) |
| 04/10/2023 | 59 | NOTICE of Appearance by Alexander Gazikas on behalf of Caremark Puerto Rico, CaremarkPCS Health, LLC (Gazikas, Alexander) (Entered: 04/10/2023) |
| 04/11/2023 | 60 | Motion to allow Shirlethia Franklin to appear pro hac vice (Pro Hac fee $300 receipt number APRDC-8169462) filed by Miguel J. Rodriguez-Marxuach on behalf of Sanofi-Aventis Puerto Rico Inc., Sanofi-Aventis U. S. LLC Responses due by 4/25/2023. NOTE: Pursuant to FRCP 6(a) an additional three days does not apply to service done |

| | | |
|---|---|---|
| | | electronically. (Attachments: # 1 Exhibit A)(Rodriguez-Marxuach, Miguel) (Entered: 04/11/2023) |
| 04/11/2023 | 61 | Motion to allow William Coglianese to appear pro hac vice (Pro Hac fee $300 receipt number APRDC-8169514) filed by Miguel J. Rodriguez-Marxuach on behalf of Sanofi-Aventis Puerto Rico Inc., Sanofi-Aventis U. S. LLC Responses due by 4/25/2023. NOTE: Pursuant to FRCP 6(a) an additional three days does not apply to service done electronically. (Attachments: # 1 Exhibit A)(Rodriguez-Marxuach, Miguel) (Entered: 04/11/2023) |
| 04/11/2023 | 62 | Motion to allow Theresa Martin to appear pro hac vice (Pro Hac fee $300 receipt number APRDC-8169536) filed by Miguel J. Rodriguez-Marxuach on behalf of Sanofi-Aventis Puerto Rico Inc., Sanofi-Aventis U. S. LLC Responses due by 4/25/2023. NOTE: Pursuant to FRCP 6(a) an additional three days does not apply to service done electronically. (Rodriguez-Marxuach, Miguel) (Entered: 04/11/2023) |
| 04/11/2023 | 63 | ORDER granting 44 Motion to Appear PHV; granting 60 Motion to Appear PHV; granting 61 Motion to Appear PHV; granting 62 Motion to Appear PHV. Signed by Judge Jay A. Garcia-Gregory on 4/11/2023. (ABO) (Entered: 04/11/2023) |
| 04/11/2023 | 64 | ORDER granting 16 Motion for Extension of Time. Motion for Remand, if any, due by 5/1/2023. If no motion to remand is filed, answer(s) and/or motion(s) to dismiss due by 5/2/2023. Signed by Judge Jay A. Garcia-Gregory on 4/11/2023. (ABO) (Entered: 04/11/2023) |
| 04/12/2023 | 65 | NOTICE of Appearance by Andrew A Kassof on behalf of Eli Lilly Export S.A., Eli Lilly and Company (Kassof, Andrew) (Entered: 04/12/2023) |
| 04/12/2023 | 66 | NOTICE TO PRO HAC VICE Shirlethia Franklin, William Coglianese and Theresa Martin re: 63 Order on Motion to Appear PHV: The Court has granted your pro hac vice application. In order to start receiving notifications, you must file a notice of appearance using your upgraded PACER account. For more information, visit the following link: **https://www.prd.uscourts.gov/nextgen-cmecf-what-it-means-you**. (ab) (Entered: 04/12/2023) |
| 04/12/2023 | 67 | NOTICE of Appearance by William Coglianese on behalf of Sanofi-Aventis Puerto Rico Inc., Sanofi-Aventis U. S. LLC (Coglianese, William) (Entered: 04/12/2023) |
| 04/12/2023 | 68 | NOTICE of Appearance by Shirlethia Franklin on behalf of Sanofi-Aventis Puerto Rico Inc., Sanofi-Aventis U. S. LLC (Franklin, Shirlethia) (Entered: 04/12/2023) |
| 04/12/2023 | 69 | Corporate Disclosure Statement bySanofi-Aventis Puerto Rico Inc., Sanofi-Aventis U. S. LLC. (Rodriguez-Marxuach, Miguel) (Entered: 04/12/2023) |
| 04/19/2023 | 70 | NOTICE of Appearance by Theresa Coughlin Martin on behalf of Sanofi-Aventis Puerto Rico Inc., Sanofi-Aventis U. S. LLC (Martin, Theresa) (Entered: 04/19/2023) |
| 04/25/2023 | 71 | NOTICE of Appearance by Eric Perez-Ochoa on behalf of OptumRx, Inc. (Perez-Ochoa, Eric) (Entered: 04/25/2023) |
| 04/27/2023 | 72 | NOTICE of Appearance by Oreste Ricardo Ramos-Pruetzel on behalf of Novo Nordisk, Inc. (Ramos-Pruetzel, Oreste) (Entered: 04/27/2023) |
| 04/27/2023 | 73 | NOTICE of Appearance *on Behalf of Novo Nordisk Inc.* by Arturo L.B. Hernandez-Gonzalez on behalf of Novo Nordisk, Inc. (Hernandez-Gonzalez, Arturo) (Entered: 04/27/2023) |
| 05/01/2023 | 74 | MOTION to Remand to State Court filed by Andres W. Lopez on behalf of All Plaintiffs Responses due by 5/15/2023. NOTE: Pursuant to FRCP 6(a) an additional three days does |

| | | not apply to service done electronically. (Lopez, Andres) (Entered: 05/01/2023) |
|---|---|---|
| 05/04/2023 | 75 | Joint MOTION for extension of time until June 2, 2023 to File Opposition to Motion to Remand filed by Eduardo A. Zayas-Marxuach on behalf of Caremark Puerto Rico, CaremarkPCS Health, LLC, Government of Puerto Rico and Express Scripts, Inc. Responses due by 5/18/2023. NOTE: Pursuant to FRCP 6(a) an additional three days does not apply to service done electronically. (Zayas-Marxuach, Eduardo) Modified on 5/5/2023 to add filers (mcm). (Entered: 05/04/2023) |
| 05/11/2023 | 76 | ORDER granting 75 Motion for Extension of Time to File Opposition to Motion to Remand. Responses to Motion to Remand due by 6/2/2023. Responses shall not exceed fifteen (15) pages per Local Rule 7(e). Reply to Responses due by 6/16/2023. Signed by Judge Jay A. Garcia-Gregory on 5/11/2023. (ABO) (Entered: 05/11/2023) |
| 05/31/2023 | 77 | MOTION for Leave to Appear filed by Adrian Jimenez-Torres on behalf of Novo Nordisk, Inc. Responses due by 6/14/2023. NOTE: Pursuant to FRCP 6(a) an additional three days does not apply to service done electronically. (Jimenez-Torres, Adrian) (Entered: 05/31/2023) |
| 05/31/2023 | 78 | Motion to allow Andrew Yaphe to appear pro hac vice (Pro Hac fee $300 receipt number APRDC-8238975) filed by Adrian Jimenez-Torres on behalf of Novo Nordisk, Inc. Responses due by 6/14/2023. NOTE: Pursuant to FRCP 6(a) an additional three days does not apply to service done electronically. (Jimenez-Torres, Adrian) (Entered: 05/31/2023) |
| 05/31/2023 | 79 | Motion to allow Ian Hogg to appear pro hac vice (Pro Hac fee $300 receipt number APRDC-8239023) filed by Adrian Jimenez-Torres on behalf of Novo Nordisk, Inc. Responses due by 6/14/2023. NOTE: Pursuant to FRCP 6(a) an additional three days does not apply to service done electronically. (Jimenez-Torres, Adrian) (Entered: 05/31/2023) |
| 05/31/2023 | 80 | Motion to allow Neal Potischman to appear pro hac vice (Pro Hac fee $300 receipt number APRDC-8239046) filed by Adrian Jimenez-Torres on behalf of Novo Nordisk, Inc. Responses due by 6/14/2023. NOTE: Pursuant to FRCP 6(a) an additional three days does not apply to service done electronically. (Jimenez-Torres, Adrian) (Entered: 05/31/2023) |
| 05/31/2023 | 81 | ORDER granting 78 Motion to allow Andrew Yaphe to appear pro hac vice; 79 Motion to allow Ian Hogg to appear pro hac vice; 80 Motion to allow Neal Potischman to appear pro hac vice. Signed by Judge Jay A. Garcia-Gregory on 5/31/2023. (ABO) (Entered: 05/31/2023) |
| 05/31/2023 | 82 | ORDER noting 77 Motion for Leave to Appear. Signed by Judge Jay A. Garcia-Gregory on 5/31/2023. (ABO) (Entered: 05/31/2023) |
| 05/31/2023 | 83 | Motion to allow James Rouhandeh to appear pro hac vice (Pro Hac fee $300 receipt number APRDC-8239062) filed by Adrian Jimenez-Torres on behalf of Novo Nordisk, Inc. Responses due by 6/14/2023. NOTE: Pursuant to FRCP 6(a) an additional three days does not apply to service done electronically. (Jimenez-Torres, Adrian) (Entered: 05/31/2023) |
| 05/31/2023 | 84 | MOTION for Disclosure *Novo Nordisk, Inc.* filed by Adrian Jimenez-Torres on behalf of Novo Nordisk, Inc. Responses due by 6/14/2023. NOTE: Pursuant to FRCP 6(a) an additional three days does not apply to service done electronically. (Jimenez-Torres, Adrian) (Entered: 05/31/2023) |
| 05/31/2023 | 85 | ORDER granting 83 Motion to Appear PHV. Signed by Judge Jay A. Garcia-Gregory on 5/31/2023. (ABO) (Entered: 05/31/2023) |
| 05/31/2023 | 86 | ORDER noting 84 Motion for Disclosure. Signed by Judge Jay A. Garcia-Gregory on 5/31/2023. (ABO) (Entered: 05/31/2023) |

| 06/01/2023 | 87 | NOTICE TO PRO HAC VICE **Andrew D. Yaphe, Ian Hogg, Neal A. Potischman and James P. Rouhandeh** re: 85 Order on Motion to Appear PHV, 81 Order,, Terminate Motions, : The Court has granted your pro hac vice application. In order to start receiving notifications, you must file a notice of appearance using your upgraded PACER account. For more information, visit the following link: **https://www.prd.uscourts.gov/nextgen-cmecf-what-it-means-you**. (rim) (Entered: 06/01/2023) |
|---|---|---|
| 06/02/2023 | [88](#) | MEMORANDUM in Opposition *to the Government's Motion to Remand* filed by Express Scripts, Inc. Re: [74](#) MOTION to Remand to State Court filed by Government of Puerto Rico filed by Express Scripts, Inc.. (Casellas-Santana, Ricardo) (Entered: 06/02/2023) |
| 06/02/2023 | [89](#) | MEMORANDUM in Opposition *to Motion to Remand* filed by Caremark Puerto Rico, CaremarkPCS Health, LLC Re: [74](#) MOTION to Remand to State Court filed by Government of Puerto Rico filed by Caremark Puerto Rico, CaremarkPCS Health, LLC. (Attachments: # [1](#) Exhibit A)(Zayas-Marxuach, Eduardo) (Entered: 06/02/2023) |
| 06/13/2023 | [90](#) | NOTICE of Appearance by James Rouhandeh on behalf of Novo Nordisk, Inc. (Rouhandeh, James) (Entered: 06/13/2023) |
| 06/14/2023 | [91](#) | NOTICE of Appearance by Ian Hogg on behalf of Novo Nordisk, Inc. (Hogg, Ian) (Entered: 06/14/2023) |
| 06/14/2023 | [92](#) | NOTICE of Appearance by Andrew Yaphe on behalf of Novo Nordisk, Inc. (Yaphe, Andrew) (Entered: 06/14/2023) |
| 06/14/2023 | [93](#) | NOTICE of Appearance by Neal Potischman on behalf of Novo Nordisk, Inc. (Potischman, Neal) (Entered: 06/14/2023) |

# IN THE UNITED STATES DISTRICT COURT
## FOR DISTRICT OF PUERTO RICO

| | |
|---|---|
| THE GOVERNMENT OF PUERTO RICO<br><br>                   *Plaintiff,*<br><br>    v.<br><br>ELI LILLY AND COMPANY; ELI LILLY EXPORT S.A.; NOVO NORDISK INC.; SANOFI-AVENTIS U.S. LLC; SANOFI-AVENTIS PUERTO RICO, INC.; EXPRESS SCRIPTS, INC.; CAREMARKPCS HEALTH, LLC; CAREMARK PUERTO RICO LLC; AND OPTUMRX INC.<br><br>                   *Defendants.* | Civil Action No. _____ |

## NOTICE OF REMOVAL

Pursuant to and in accordance with 28 U.S.C. §§ 1442(a) and 1446, Defendant Express Scripts, Inc. ("Express Scripts") hereby removes *The Government of Puerto Rico v. Eli Lilly, et al.* (Case No. SJ2023CV00319) from the Court of First Instance of Puerto Rico, San Juan Part, to the United States District Court for the District of Puerto Rico. A true and correct copy of Puerto Rico's amended complaint is attached hereto as **Exhibit A**.

## INTRODUCTION

1.      Express Scripts is a significant contractor with the federal government. Express Scripts currently contracts with the United States Department of Defense ("DoD") to provide services to members of the DoD's TRICARE health care program, including in Puerto Rico. A true and correct copy of the publicly available contract between the Department of Defense and Express Scripts, Inc., Contract No. HT-9402-14-D-0002 (the "TRICARE Contract"), with certain redactions consistent with the Freedom of Information Act, is attached hereto as **Exhibit B**.

1

2.     Under the TRICARE Contract, Express Scripts provides pharmacy benefit management services for the DoD, including active-duty service members, their families, and veteran retirees.  Many of those veterans, including those in Puerto Rico, depend on TRICARE for their prescription drugs, including insulin.

3.     Express Scripts relies on other Express Scripts entities as subcontractors to administer the mail order pharmacy portions of the TRICARE Contract.  Under those agreements, Express Scripts is directed to use the formulary developed and adopted by TRICARE, to charge TRICARE beneficiaries only such copayments as are dictated by the DoD, and to dispense medications purchased by the DoD at rates negotiated directly between the federal government and drug manufacturers.

4.     In this action, the Government of Puerto Rico ("Puerto Rico") alleges that the prices paid by the citizens of Puerto Rico for certain insulin products are artificially inflated by a sprawling "scheme" involving certain Pharmacy Benefit Managers ("PBMs") and insulin manufacturers.

5.     Some of those Puerto Rico citizens allegedly injured by the scheme are TRICARE beneficiaries.  Certain TRICARE beneficiaries acquire insulin products through the TRICARE Home Delivery/Mail Order Pharmacy ("TMOP") administered by Express Scripts under the TRICARE Contract.  The formulary used for TRICARE beneficiaries, the prices the federal government pays for the insulin products, and the copayments Express Scripts must ensure beneficiaries pay, are all dictated by federal law and the TRICARE Contract.

6.     Puerto Rico alleges that the scheme injured its citizens directly because they pay higher "out-of-pocket" costs as a result of the scheme.  *See, e.g.*, Amended Complaint ("Am.

Compl.") ¶¶ 20, 108, 116.  Puerto Rico specifically alleges that such "out-of-pocket" costs include copayments.  *Id.* ¶¶ 65, 67–69, 116.

7.      Puerto Rico seeks to recover in this action the out-of-pocket costs by requesting the Court to require Express Scripts "to pay all consumer restitution that may be owed to Puerto Rico consumers affected by Defendants' unlawful acts and practices."  Am. Compl. at 39 § D.

8.      By seeking to recover out-of-pocket costs any Puerto Rico citizen has paid for insulin, Puerto Rico necessarily seeks to recover the fixed copayments contractually mandated by the federal government that Express Scripts must ensure TRICARE beneficiaries pay for insulin products.

9.      Puerto Rico also asks for a permanent injunction to enjoin Defendants "from engaging in unfair and deceptive practices and unfair methods of competition in violation of 10 L.P.R.A. § 259."  Am. Compl. at 39 § C.

10.      Puerto Rico alleges that the scheme forms the basis for the allegations of deceptive and unconscionable trade practices, and that the out-of-pocket costs arose from the scheme.  *See, e.g.*, Am. Compl. ¶¶ 140, 146.

11.      Thus, Puerto Rico also seeks to prohibit Express Scripts from continuing to ensure the collection of copayments from all Puerto Rico diabetics, including TRICARE beneficiaries from whom Express Scripts is required by the federal government to secure copayments.

12.      Under the TRICARE Contract, Express Scripts had no choice but to ensure the charging of the copayments from TRICARE beneficiaries that Puerto Rico now seeks as restitution and seeks to enjoin permanently.

13.      Apart from copayments, Puerto Rico alleges that Express Scripts' treatment of biosimilars perfectly illustrates some of the allegedly wrongful conduct on which its claims are

premised. Am. Compl. ¶¶ 97–98. Puerto Rico assigns blame to Express Scripts for preferring a higher-priced alternative and "exclud[ing] the lower-priced biologic (Insulin Glargine)" from its formularies. Am. Compl. ¶ 100. But the TRICARE formulary that Express Scripts is required to apply excludes Insulin Glargine from coverage, so Puerto Rico is assigning blame to Express Scripts for an alleged wrong that is mandated by the federal government through TRICARE.

14. While Puerto Rico attempts to artfully plead around TRICARE in a transparent effort to avoid federal officer removal, its vague and circular disclaimer is insufficient to block federal officer removal as explained in detail below.

15. Accordingly, and as more fully explained below, Express Scripts has colorable government contractor immunity and preemption defenses to Puerto Rico's claims, permitting Express Scripts to remove the entire action under 28 U.S.C. § 1442(a)(1).

## BACKGROUND

16. On January 17, 2023, Puerto Rico filed a complaint in the Court of First Instance, Superior Part of San Juan. On January 24, 2023, Puerto Rico filed an Amended Ccomplaint.

17. On February 17, 2023, Express Scripts accepted service of the Amended Complaint.

18. Puerto Rico brings its action against two categories of defendants: "Manufacturer Defendants" and "Pharmacy Benefit Manager Defendants."

- The State alleges that the "Manufacturer Defendants" are Eli Lilly and Company, Eli Lilly Export S.A., Sanofi-Aventis U.S. LLC, Sanofi-Aventis Puerto Rico, Inc., and Novo Nordisk Inc.

- The State alleges that the "PBM Defendants" are CaremarkPCS Health, L.L.C., Caremark Puerto Rico LLC, Express Scripts, Inc., and OptumRx, Inc.

19. Puerto Rico alleges a scheme involving the Manufacturer Defendants and the PBM Defendants to artificially inflate the price of insulin and other diabetes medications. *See* Am.

Compl. ¶¶ 5–20. Puerto Rico seeks injunctive relief, restitution, disgorgement, civil penalties, and damages for claims under the Fair Competition Act. *See* Am. Compl. ¶¶ 21, 126–150.

20.  Puerto Rico seeks to recover injuries allegedly suffered by Puerto Rico diabetics and itself (*see, e.g.*, Am. Compl. ¶¶ 116, 148).

## VENUE

21.  Venue is proper in this Court under 28 U.S.C. § 1442(a) because this Court sits in the federal judicial district and division embracing the Court of First Instance of Puerto Rico, San Juan Superior Part, the court from which removal is sought. *See* 28 U.S.C. § 106.

## GROUNDS FOR FEDERAL-OFFICER REMOVAL

22.  The federal-officer removal statute permits any person "acting under" a federal officer who is sued "for or relating to any act under color of such office" to remove a case to federal court. 28 U.S.C. § 1442(a)(1).

23.  The Supreme Court has "rejected a 'narrow, grudging interpretation' of the [federal-officer-removal] statute." *Jefferson Cnty. v. Acker*, 527 U.S. 423, 431 (1999) (quoting *Willingham v. Morgan*, 395 U.S. 402, 406–07 (1969)).  Rather, "[b]ecause the right of removal is a crucial procedural vehicle in the exercise of legitimate federal authority, Section 1442 receives a liberal construction." *Com. Of Puerto Rico v. Perez Casillas*, 624 F. Supp. 822, 826 (D.P.R. 1985).

24.  A party removing under the federal-officer-removal statute must show that "(1) [it] has acted under the direction of a federal officer, (2) there was a causal connection between the defendant's actions and the official authority, (3) the defendant has a colorable federal defense to the plaintiff's claims, and (4) the defendant is a 'person' within the meaning of the statute." *Administracion de Seguros de Salud de P.R. v. Triple-S Salud, Inc.*, 212 F. Supp. 3d 283, 288 (D.P.R. 2015).  Express Scripts satisfies all four elements here.

### A.     The Express Scripts Removing Entities are "Persons" Within the Statute's Meaning.

25.     Express Scripts is a "person" under the federal-officer removal statute because the "person" contemplated by the federal officer removal statute includes corporations.  *See Camacho v. Autoridad de Telefonos de Puerto Rico*, 868 F.2d 482, 486 (1st Cir. 1989); *Goncalves by and through Goncalves v. Rady Children's Hosp. San Diego*, 865 F.3d 1237, 1244 (9th Cir. 2017).

### B.     Express Scripts Acted Under a Federal Officer.

26.     Congress authorizes removal of actions not just by officers of the United States but also "any person acting under that officer."  28 U.S.C. § 1442(a)(1).

27.     The words "acting under" "describes a relationship between private entity and federal superior typically involving 'subjection, guidance, or control.'"  *Watson v. Philip Morris Cos., Inc.*, 551 U.S. 142, 147 (2007)).  Private entities are "acting under" a federal officer when involved in "an effort to *assist*, or to help *carry out*, the duties or tasks of the federal superior."  *Watson*, 551 U.S. at 143.

28.     The DoD is required by law to engage companies like Express Scripts for the provision of healthcare services to TRICARE members.  *See* 10 U.S.C. § 1073a. Congress also has required the Secretary of Defense to establish an "effective, efficient, integrated pharmacy benefits program" for TRICARE.  10 U.S.C. § 1074g.

29.     The DoD contracted with Express Scripts, Inc. to provide pharmacy benefits to members of the DoD's TRICARE health care program across the country, including in Puerto Rico.  *See* Exhibit B.  As of 2017, over 79,000 veterans reside in Puerto Rico.[1]

---

[1] *See, e.g.*, National Center for Veterans Analysis and Statistics, Puerto Rico State Summary, available at https://www.va.gov/vetdata/docs/SpecialReports/State_Summaries_Puerto_Rico.pdf. A true and correct copy is attached as **Exhibit C.**

30.     Express Scripts provides PBM services and administers TMOP, the DoD's mail-order pharmacy program, under the detailed requirements of the TRICARE Contract and lengthy Statement of Work with the DoD. The Statement of Work is "Section C" of the TRICARE Contract and is available on pages 63–121 of Exhibit B.

31.     The DoD dictates nearly every aspect of Express Scripts' responsibilities in supporting TRICARE.  The TRICARE Contract requires the use of a "DoD Uniform Formulary, a tiered cost sharing structure, and a preference for generic over branded products."  Ex. B at § C.1.4.  The DoD formulary is "managed by the DoD Pharmacy and Therapeutics P&T Committee."  *Id.*  When it serves as a pharmacy benefit manager administering benefits at retail pharmacies, Express Scripts serves in a capacity as a "fiscal intermediary *on behalf of DoD* to pay for all authorized pharmaceutical and supplies dispensed for eligible beneficiaries at retail pharmacies."  Ex. B at § C.1.6 (emphasis added).  Or, as the TRICARE Contract puts it, "the Government will be acquiring covered drugs with Government funds for use by the Government" when a TRICARE prescription is dispensed at retail network pharmacies.  *Id.*

32.     These requirements are all mandated by Congress.  10 U.S.C. § 1074g(a)(2)(A) (requiring program to include a "uniform formulary" and that inclusion on the formulary "shall be based on the relative clinical and cost effectiveness of the agents"); § 1074g(b) (requiring the establishment of a "Pharmacy and Therapeutics Committee").  Congress not only requires cost-sharing that favors generics, but it spelled out the precise cost-sharing amounts for the years 2018 through 2027 in a table written into the statute:

| For: | The cost-sharing amount for a 30-day supply of a retail generic is: | The cost-sharing amount for a 30-day supply of a retail formulary is: | The cost-sharing amount for a 90-day supply of a mail order generic is: | The cost-sharing amount for a 90-day supply of a mail order formulary is: | The cost-sharing amount for a 90-day supply of a mail order non-formulary is: |
|---|---|---|---|---|---|
| 2018 | $11 | $28 | $7 | $24 | $53 |
| 2019 | $11 | $28 | $7 | $24 | $53 |
| 2020 | $13 | $33 | $10 | $29 | $60 |
| 2021 | $13 | $33 | $10 | $29 | $60 |
| 2022 | $14 | $38 | $12 | $34 | $68 |
| 2023 | $14 | $38 | $12 | $34 | $68 |
| 2024 | $16 | $43 | $13 | $38 | $76 |
| 2025 | $16 | $43 | $13 | $38 | $76 |
| 2026 | $16 | $48 | $14 | $44 | $85 |
| 2027 | $16 | $48 | $14 | $44 | $85 |

10 U.S.C. § 1074g(a)(6)(A).

33.    Express Scripts supports TRICARE's pharmacy benefit program under the careful direction of the DoD.  When it abides by TRICARE's formulary and causes any copayment to be charged to any TRICARE beneficiary for any product, including the insulin products at issue in this action, it does so in the manner and according to the directions carefully prescribed by the DoD.  Ex. B at § C.8.1.1 ("The Contractor shall comply with the provisions of the DoD Uniform Formulary and its copayment structure").

34.    For TMOP, Express Scripts must collect copayments from beneficiaries in accordance with the specific cost-sharing matrix set forth in the TRICARE Reimbursement Manual ("TRM").[2]  *Id.* at § C.8.2 ("Copayments shall be charged to beneficiaries in accordance with the TRM, Chapter 2, Addendum B.  The Contractor shall be responsible for collecting beneficiary copayments when dispensing prescriptions through TMOP").  Express Scripts has a

---

[2]    The matrix included in the TRICARE Reimbursement Manual is available at https://manuals.health.mil/pages/DisplayManualHtmlFile/2021-09-03/AsOf/TR15/C2ADB.html. A true and correct copy of the matrix is attached hereto as **Exhibit D.**

similar obligation to "ensur[e] that the appropriate copayment is collected at retail network pharmacies." *Id.*

35.     In short, as the Fourth Circuit put it, Express Scripts is "essentially acting as the statutorily authorized *alter ego* of the federal government, as the TRICARE statute requires the Secretary of Defense to contract out the administration of the TMOP program." *Cnty. Bd. of Arlington Cnty. v. Express Scripts Pharmacy, Inc.*, 996 F.3d 243, 253–54 (4th Cir. 2021).

36.     Express Scripts performs the day-to-day administration pursuant to a lengthy and detailed contract from which Express Scripts lacks the discretion to depart.  Express Scripts is thus "acting under" a federal officer when carrying out the TRICARE pharmacy program.

### C.     A Causal Connection Exists Between Puerto Rico's Challenged Acts and Express Scripts' Contractual Obligations.

37.     To show a nexus or connection between the conduct and official authority, a defendant need only show that the conduct "relate[s] to" the asserted authority. 28 U.S.C. § 1442(a)(1).  The standard "is not a causal requirement and is not to be understood as anything more than a 'related to' nexus." *Moore v. Electric Boat Corp.*, 25 F.4th 30, 35 (1st Cir. 2022).

38.     Puerto Rico alleges that the scheme injured its citizens directly because they pay higher "out-of-pocket" costs, including higher "co-pays, deductibles, or uninsured care tied to the WAC price," due in part to conduct such as excluding lower-priced alternatives from PBM formularies.  Am. Compl. ¶¶ 97–101, 116.

39.     As explained above, for those Puerto Rico citizens receiving insulin through TRICARE from retail pharmacies or through the TMOP, both the selection of available products and the out-of-pocket costs those citizens must pay—and that Express Scripts must ensure are collected—are dictated by federal law and Express Scripts' contract with the DoD.

40. Thus, when it concerns Express Scripts' obligations to cause the collection of copayments through TRICARE for particular drugs, a causal nexus exists between Express Scripts' actions at the direction of a federal officer from the DoD and Puerto Rico's claims.

41. To be sure, Puerto Rico attempts to artfully plead around federal officer removal. *See* Am. Compl. ¶¶ 23, 149. And disclaimers can be effective to avoid federal officer removal when the "disclaimers at issue explicitly renounced claims of a *specific* nature." *Hayden v. 3M Co.*, 2015 WL 4730741, at *3 (E.D. La. Aug. 10, 2015) (emphasis added). But an effective disclaimer will "employ language in [its] disclaimer actually eliminating any claim . . . potentially triggering federal officer removal." *Kite v. Bill Vann Co.*, 2011 WL 4499345, at *2 n.5 (S.D. Ala. Sept. 29, 2011).

42. Puerto Rico has not disclaimed claims of a specific nature that would eliminate any claim that could trigger federal officer removal. Instead, Puerto Rico asserts only that it "is not seeking relief *relating to* any federal program (e.g., Medicaid, Medicare) or any contract related to a federal program. . . ." Am. Compl. ¶ 23 (emphasis added), *see also* ¶ 149 (same).

43. Insofar as it is directed to Express Scripts' federal contractor work under TRICARE[3], Puerto Rico's disclaimer is question begging. Whether the relief Puerto Rico seeks is "related to" the work Express Scripts performed under a federal officer to support TRICARE is exactly the question Express Scripts has the right to have decided by a federal court under 28 U.S.C. § 1442(a). In this way, Puerto Rico's disclaimer does not expressly eliminate the question of whether Express Scripts' government contractor and preemption defenses are applicable—it creates it.

---

[3] On its face, it is not even clear that Puerto Rico intends its disclaimer to apply to claims involving TRICARE beneficiaries at all. The amended complaint does not purport to exclude service members, veterans, or family members from the class of residents for whose benefit it is acting; neither does it include TRICARE among its examples of federal programs akin to Medicaid and Medicare. Am. Compl. ¶¶ 23, 149.

44. Circular disclaimers seeking to artfully plead around federal officer jurisdiction without eliminating the claim that could trigger a federal officer defense are routinely found insufficient to preclude federal officer removal. *See. e.g.*, *Marley v. Elliot Turbomachinery Co., Inc.*, 545 F.Supp. 2d 1266, 1274 (S.D. Fla. 2008) (rejecting as "circular" a disclaimer of "any claim arising from an act or omission on a federal enclave, or any federal office of the U.S. or agency or person acting under him occurring under color of such office."); *In re Asbestos Prod. Liab. Litig. (No. VI)*, 770 F. Supp. 2d 736, 740 (E.D. Pa. 2011) (denying remand based on disclaimer of claims "caused by the acts or omissions of defendants committed at the specific and proven direction of an officer of the United States government acting in his official capacity").

45. Puerto Rico's circular disclaimer is therefore insufficient to destroy the causal nexus between Express Scripts' conduct and Puerto Rico's claims.

### D. Express Scripts Has Colorable Federal Defenses.

46. For federal-officer removal purposes, a defense only needs to be colorable. *Jefferson Cnty.*, 527 U.S. at 431. "Colorable" is a low bar; a "federal defendant need not show that he is entitled to prevail in order to have access to the federal forum." *Conjugal P'ship Comprised by Jones v. Conjugal P'ship Comprised of Pineda*, 22 F.3d 391, 396 (1st Cir. 1994) (quoting *Venezia v. Robinson*, 16 F.3d 209, 212 (7th Cir. 1994)).

47. Here, Express Scripts can raise a colorable government-contractor immunity defense and a colorable preemption-based defense despite Puerto Rico's circular and insufficient disclaimer as noted above.

48. The federal government contractor defense originally developed in the context of government contractors facing claims based on equipment manufactured by the contractor to government direction. Under a traditional tort liability formulation, the defense applies when (1)

11

the United States approved reasonably precise specifications; (2) the contractor's work product (equipment) conformed to those specifications; and (3) the supplier warned the United States about the risks or exposures in the use of the equipment known to the supplier but not to the United States. *Boyle v. United Techs. Corp.*, 487 U.S. 500, 512 (1988). Notwithstanding the origins of the defense, "it is at least plausible that the government contractor defense could apply outside the military procurement contract context." *Bennett v. MIS Corp.*, 607 F.3d 1076, 1090 (6th Cir. 2010); *see also Jacks v. Meridian Res. Co., LLC*, 701 F.3d 1224, 1235 (8th Cir. 2012); *abrogated on other grounds by BP P.L.C. v. Mayor & City Council of Baltimore*, 141 S. Ct. 1532, 1543 (2021) ("Neither does our lack of precedent regarding the availability of the *Boyle* defense to non-military service contractors defeat the plausibility of the defense.") (citing *Bennett*, 607 F.3d at 1089). Regardless of the context, the defense "applies if a contractor's obligations to the government conflict with state law such that the contractor may not comply with both." *Arlington Cnty.*, 996 F.3d at 255.

49.     Puerto Rico alleges that the Fair Competition Act compels Express Scripts to charge prices and assess copays to Puerto Rico residents—necessarily including TRICARE beneficiaries—lower than it actually charged them pursuant to the directives of federal law and the terms of the DoD contract.

50.     Based on Puerto Rico's allegations, Express Scripts cannot simultaneously comply with its obligations under the TRICARE Contract and contrary Puerto Rico law, which makes a federal contractor immunity defense colorable.

51.     Puerto Rico seeks to collect as restitution for the alleged violations of Puerto Rico law the money that Puerto Rico consumers allegedly overpaid as a result of the supposed violations. Am. Compl. at 39, § D. Those alleged overpayments include "co-pays, deductibles,

or uninsured care." Am. Compl. ¶ 116. For those citizens who are TRICARE beneficiaries, Express Scripts had no choice but to cause the charging of the specific copayments required by the TRICARE Contract. *See* Ex. B at § C.8.1.1 ("The Contractor shall comply with the provisions of the DoD Uniform Formulary and its copayment structure"); *id.* at § C.8.2. ("Copayments shall be charged to beneficiaries in accordance with the TRM, Chapter 2, Addendum B. The Contractor shall be responsible for collecting beneficiary copayments when dispensing prescriptions through TMOP"); *see also* 10 U.S.C. § 1074g(a)(6)(A).

52. Puerto Rico also seeks an injunction that could require Express Scripts to stop charging the copayments required under the TRICARE Contract. Specifically, Puerto Rico seeks an injunction against Defendants enjoining them "from engaging in unfair and deceptive practices and unfair methods of competition in violation of 10 L.P.R.A. § 259." Am. Compl. at 39 § C. Puerto Rico contends that the scheme "inflat[es] the price for insulin products and restrict[s] consumers' access to" insulin. Am. Compl. ¶ 141; *see also id.* ¶¶ 135–136. Puerto Rico therefore seeks an injunction that, if granted, could purport to prohibit Express Scripts from collecting the copayments from TRICARE beneficiaries that federal law and the TRICARE Contract mandate be collected—thereby creating another conflict between Puerto Rico law and Express Scripts' obligations under the TRICARE Contract.

53. And insofar as Puerto Rico is challenging decisions about whether particular diabetes medications are included or excluded from the formularies on which its residents' claims are based, that decision is mandated by federal law as to TRICARE beneficiaries. Am. Compl. ¶ 100. For instance, Puerto Rico faults Express Scripts for not including the biosimilar Insulin Glargine on its National Preferred Formulary. *Id.* But the Department of Defense, which controls the formularies for TRICARE, also has not added to the formulary for TRICARE beneficiaries.

54.    In addition to government-contractor immunity, Express Scripts can raise the defense of preemption based on the federal TRICARE statute, which provides the statutory authorization for the Secretary of Defense to enter into group health-insurance contracts. *See* 10 U.S.C. §§ 1071, 1072(7), 1073(a), 1074g. The statute and accompanying federal regulations contain express preemption provisions. *See* 10 U.S.C. § 1103(a) ("A law or regulation of a State or local government relating to health insurance, prepaid health plans, or other health care delivery or financing methods shall not apply to any contract entered into pursuant to this chapter by the Secretary of Defense," to the extent the state law is inconsistent, or preemption is necessary to implement or administer the contract); 32 C.F.R. § 199.17(a)(7).

55.    The same conflict between Puerto Rico law and Express Scripts' obligations under the TRICARE Contract described above provides Express Scripts a colorable government contractor defense also permits Express Scripts to raise a preemption defense.

## SUPPLEMENTAL JURISDICTION

56.    The Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) over all other claims in this action because they form part of the same case or controversy under Article III of the United States Constitution.

## ALL OTHER REMOVAL REQUIREMENTS ARE SATISFIED.

### A.  The Notice of Removal Is Timely.

57.    This Notice of Removal is timely because it is filed within 30 days of service of the Petition on the removing Defendants. 28 U.S.C. § 1446(b)(1). Removing Defendant accepted service on February 17, 2023.

**B. Consent is not Required.**

58.     The federal-officer-removal statute does not require other Defendants to consent to removal. *Hilbert v. McDonnell Douglas Corp.*, 529 F.Supp.2d 187, 195 (D. Mass. 2008); 28 U.S.C. 1442(a).

**C. Written Notice Of Removal.**

59.     In accordance with 28 U.S.C. § 1446(d), Express Scripts will give written notice of the filing of this Notice of Removal to all adverse parties of record in this matter and will file a copy of this Notice with the clerk of the state court.

60.     Pursuant to 28 U.S.C. § 1446(a), Express Scripts includes a copy of all process, pleadings, and orders served on it with Exhibit A.

## <u>CONCLUSION</u>

WHEREFORE, Express Scripts removes this Action to this Court for further proceedings according to law.

**RESPECTFULLY SUBMITTED**, in San Juan, Puerto Rico, on this 17th day of March, 2023.

O'NEILL & BORGES LLC
*Attorneys for Express Scripts, Inc.*
250 Muñoz Rivera Ave., Ste.800
San Juan, PR  00918-1813
Telephone: (787) 764-8181
Facsimile: (787) 753-8944


*s/ Carlos A. Valldejuly*
Carlos A. Valldejuly-Sastre
USDC No. 209505
Email: carlos.valldejuly@oneillborges.com


*s/ Ricardo J. Casellas-Santana*
Ricardo J. Casellas-Santana
USDC No. 302003
Email: ricardo.casellas@oneillborges.com


and


Jason R. Scherr (*pro hac vice forthcoming*)
Patrick A. Harvey (*pro hac vice forthcoming*)
**MORGAN, LEWIS & BOCKIUS LLP**
1111 Pennsylvania Ave., NW
Washington, DC 20004
T: 202.739.3000
jr.scherr@morganlewis.com
patrick.harvey@morganlewis.com

**CERTIFICATE OF SERVICE**

I, Carlos A. Valldejuly, hereby certify that on March 17, 2023 I caused a true and correct copy of the foregoing to be mailed via first class mail and emailed to attorneys for Plaintiff at:

> Domingo Emanuelli
> Secretary of Justice
> Guarionex Díaz Martínez
> Assistant Secretary
> Department of Justice of Puerto Rico
> P.O. Box 9020192
> San Juan, PR 00902-0192
> gdiaz@justicia.pr.gov
>
> Andres W. Lopez
> The Law Offices of Andres W. Lopez, P.S.C.
> P.O. Box 13909
> San Juan, PR 00908
> andres@awllaw.com
>
> Linda Singer
> Elizabeth Paige Boggs
> Motley Rice LLC
> 401 9th Street NW, Suite 630
> Washington, D.C. 20004
> lsinger@motleyrice.com
> pboggs@motleyrice.com
>
> *Attorneys for Plaintiff*
>
> <u>*s/ Carlos A. Valldejuly*</u>
> Carlos A. Valldejuly

17

# EXHIBIT A

## THE GOVERNMENT OF PUERTO RICO
## COURT OF FIRST INSTANCE
## SUPERIOR COURT, SAN JUAN PART

| | |
|---|---|
| **THE GOVERNMENT OF PUERTO RICO** | **CASE NO. SJ2023CV00319 (504)** |
| **Plaintiff,** | |
| **v.** | |
| **ELI LILLY AND COMPANY; ELI LILLY EXPORT S.A.; NOVO NORDISK INC.; SANOFI-AVENTIS U.S. LLC; SANOFI-AVENTIS PUERTO RICO, INC.; EXPRESS SCRIPTS, INC.; CAREMARKPCS HEALTH, LLC; CAREMARK PUERTO RICO LLC; and OPTUMRX INC.** | |
| **Defendants.** | |

1.      Plaintiff the Government of Puerto Rico ("Puerto Rico" or "the Government"), brings this action against Eli Lilly and Company; Eli Lilly Export S.A.; Novo Nordisk Inc.; Sanofi-Aventis U.S. LLC; and Sanofi-Aventis Puerto Rico, Inc. (collectively, "Manufacturing Defendants") and against Express Scripts, Inc.; CaremarkPCS Health, LLC; Caremark Puerto Rico LLC; and OptumRx Inc. (collectively, "PBM Defendants") pursuant to Puerto Rico's Fair Competition Act to redress all Defendants' misleading, deceptive and unlawful activity concerning their marketing and sale of insulin products to the residents of Puerto Rico, including, but not limited to artificially inflating the cost of insulin products. This practice, in effect, amounts to price gouging vulnerable Puerto Ricans whose lives depend on having access to insulin.

## INTRODUCTION

2.  Diabetes is a full-fledged public health epidemic in Puerto Rico. According to the International Diabetes Federation, more than 20% of Puerto Rico's adult population suffers from diabetes, totaling more than 413,000 individuals altogether.[1] In 2019, diabetes was the second leading cause of death in Puerto Rico.[2] A recent study found that nearly half of Puerto Rico's population has diabetes or pre-diabetes.[3]

3.  For example, in Plan Vital—the Government's health plan—there are approximately 200,000 people with diabetes. Insulin is the second most utilized drug in the plan, and it is second only to non-insulin-based diabetes medications.

4.  Approximately thirty percent of Puerto Ricans suffering from diabetes—like individuals around the world with the same condition—depend upon regular treatments of insulin to survive.[4] Insulin is one of the oldest biologic drugs (*i.e.*, drugs made from living organisms) in modern medicine. It was created nearly 100 years ago and has been widely prescribed for decades to individuals suffering from diabetes.[5]

5.  Yet despite the fact that insulin has remained widely available and is critical to the care of millions of individuals throughout the nation, the Manufacturing Defendants and PBM

---

[1] International Diabetes Federation, *Puerto Rico*, https://idf.org/our-network/regions-members/south-and-central-america/members/90-puerto-rico.html (last updated Apr. 4, 2022).
[2] Institute for Health Metrics and Evaluation, *Puerto Rico,* https://www.healthdata.org/puerto-rico (last visited Nov. 16, 2022).
[3] Marga Parés Arroyo, *Jóvenes puertorriqueñas relatan los retos que sobrellevan para vivir con diabetes*, El Nuevo Día (Nov. 16, 2022), https://www.elnuevodia.com/noticias/locales/notas/jovenes-puertorriquenas-relatan-los-retos-que-sobrellevan-para-vivir-con-diabetes/.
[4] Departamento de Salud, *Diabetes Puerto Rico 2020,* https://www.salud.gov.pr/CMS/DOWNLOAD/5675 (last updated Nov, 11, 2021).
[5] U.S. Food & Drug Admin., *100 Years of Insulin*, https://www.fda.gov/about-fda/fda-history-exhibits/100-years-insulin (last updated June 8, 2022).

Defendants have continued to artificially inflate their profits at the cost of patients and third-party payers.

6.     Drug costs in the United States are considerably higher than drugs costs in comparable countries (*e.g.*, Australia, Canada, France, Germany, United Kingdom). For example, Humalog, which sells for over $300 in the United States, is only $30.23 in Canada.[6]

7.     The PBM Defendants play a key role in skyrocketing drug prices. They deceptively represent that they work to reduce prescription drug costs. Yet, over time, they have developed a business model that does just the opposite, and in doing so, evolved business practices designed to maximize their own profit, to the detriment of consumers with diabetes.

8.     Pharmacy benefit managers ("PBMs"), which operate only in the United States, are administrators hired by third-party payers (*e.g.*, government entities, insurers, employers) to design and administer prescription drug programs, including by creating drug formularies—lists of prescription drugs covered by health plans tiered according to consumers' cost-share obligations (*e.g.*, tier 1 drugs require a $5 co-payment, tier 2 drugs require a $10 co-payment, and so forth).

9.     Inclusion on drug formularies is crucial to the profitability and sales of prescription drugs. If a drug is not included on a PBM's formulary, consumers must pay out-of-pocket for it— making the drug unaffordable for many consumers. Formulary and insurance coverage thus affect all levels of the health care industry. Prescription drug manufacturers recognize this fact and dedicate substantial marketing and other resources to ensure that their prescription drugs are included on PBMs' drug formularies.

---

[6] Vincent Rajkumar, *The High Cost of Insulin in the United States: An Urgent Call to Action*, 95(1) Mayo Clinic Proc. 22 (Jan. 1, 2020), https://doi.org/10.1016/j.mayocp.2019.11.013; Ontario Drug Benefit Formulary/Comparative Drug Index, https://www.formulary.health.gov.on.ca/formulary/results.xhtml?q=Humalog&type=2 (last visited Nov. 16, 2022).

10.     Prescription drug manufacturers establish the wholesale acquisition cost ("WAC") (known as the "list price" or "sticker price") for their drugs. But the list price typically bears little to no resemblance to the prices consumers and third-party payers actually pay for drugs. This complex and opaque pricing system allows middlemen—like the PBM Defendants—to siphon increasing amounts of money from the pharmaceutical supply chain while significantly increasing prices for consumers, employers, and other health care payers.

11.     Prescription drug manufacturers pay rebates and other fees to PBMs to ensure their drugs will receive preferential placement on PBMs' drug formularies. Rebates are post-sale discounts that drug manufacturers pay to the PBMs, not consumers, based on the number of consumers that fill a prescription for the manufacturers' drug. Again, these rebates are not passed on to individual consumers.

12.     The three PBM Defendants collectively manage 80% of drug benefits for more than 220 million Americans. As such, the prospect of placement on these three PBMs' drug formularies is a significant bargaining chip when negotiating rebates with prescription drug manufacturers.

13.     Around 2012, the PBM Defendants began increasingly exerting their leverage against prescription drug manufacturers to demand higher rebates and other payments—of which PBMs typically retain a percentage. One tactic the PBM Defendants use to maximize drug rebates is to exclude one or more drugs used to treat the same condition to intensify competition among manufacturers.

14.     In response to this rebating strategy, prescription drug manufacturers began to increase the WAC price, or list price, for their drugs as a way to maintain their profit margins. For example, if Drug Manufacturer A's list price for a given drug was $100, and a PBM wanted a $20

4

rebate, Drug Manufacturer A would give the PBM the $20 rebate and increase the list price to $120, to keep its profit margin.

15.     Since 2014, there has been a fundamental shift in payments from prescription drug manufacturers to PBMs. Manufacturer payments to PBMs and other intermediaries have risen by over 16% per annum and now constitute 40% or more of branded prescription drug costs.[7]

16.     In 2021, the U.S. Senate Finance Committee released the results of their bipartisan investigation into the skyrocketing price of insulin. One of their key findings was that rebates for insulin products have increased "exponentially" since 2013.[8]  For example, in 2013, the manufacturer Sanofi offered rebates between 2% and 4% for insulin products to gain preferred placement on CVS Caremark's formulary. By contrast, in 2018, Sanofi's rebates for insulin products were as high as 56% for preferred formulary placement.[9]

17.     Not surprisingly, the list price of insulin rose along with the rebates. In 1996, when Eli Lilly launched Humalog, the price for a 1-month supply of insulin was $21.[10] That same vial of insulin was $35 in 2001 and around $275 in 2019—*a 1200% increase from the original price*.[11]

18.     This artificial price increase is almost entirely due to Defendants' rebate practices. Neither manufacturing costs nor distribution costs justify such a massive increase. A 2018 study

---

[7] Emery P. Weinstein and Kevin Schulman, *Exploring Payments in the U.S. Pharmaceutical Market 2011-2019: Update on Pharmacy Benefit Manager Impact*, 227 Am. Heart J. 107-110 (2020), https://doi.org/10.1016/j.ahj.2020.06.017.
[8] United States Senate Finance Committee, *Insulin: Examining the Factors Driving the Rising Cost of a Century Old Drug*, at 7 (Jan. 14, 2021), https://www.finance.senate.gov/imo/media/doc/Grassley-Wyden%20Insulin%20Report%20(FINAL%201).pdf (hereinafter referred to as "Senate Insulin Report").
[9] *Id*. at 82.
[10] Danielle K. Roberts, *The Deadly Costs of Insulin*, AJMC (June 10, 2019), https://www.ajmc.com/view/the-deadly-costs-of-insulin.
[11] *Id*.

5

Case 3:23-cv-01860-ADC Document 3-1 Filed 03/22/23 Page 7 of 44

found that, depending on the type of insulin, one vial of insulin costs around $2 to $6 to produce. Further, it found that insulin manufacturers could profit by selling their insulin products at $72 per patient per year or less for human insulin and $133 per patient per year or less for analog insulins.[12]

19.     This pricing scheme benefits Manufacturing Defendants because it allows them to essentially buy market share and thereby guarantee the success of their insulin products. It also benefits PBM Defendants because it allows them to profit from growing rebates and other fees tied to the WAC price. But the scheme harms the most vulnerable: diabetic consumers.

20.     Many consumers' out-of-pocket payments for insulin are tied to the WAC price— so that consumers' out-of-pocket payments increase when the WAC price increases. Also, the PBM Defendants' tactics increase the risk of non-medical switching—altering a patient's drug therapy for reasons other than a drug's efficacy, side effects, or clinical outcome, which happens when PBMs exclude drugs and switch patients to competing drugs for which the PBMs were able to extract higher rebates. Further, it overlooks the fact that even though drugs may treat the same condition, some drugs produce better outcomes for certain patients.

21.     This action seeks injunctive relief, restitution, disgorgement, civil penalties, and damages, to address the harm caused by the Defendants.

## PARTIES

*Plaintiff Government of Puerto Rico*

22.     Plaintiff, Government of Puerto Rico, by and through the Secretary of Justice of Puerto Rico, Domingo Emanuelli Hernández, brings this action to protect the interests of Puerto Rico and its residents. The Secretary of Justice brings this action pursuant to his statutory authority

---

[12] Dzintars Gotham et al., *Production costs and potential prices for biosimilars of human insulin and insulin analogues*, BMJ Glob Health (Sept. 25, 2018), https://gh.bmj.com/content/3/5/e000850.info.

under 10 L.P.R.A. § 269 to enforce the Puerto Rico laws prohibiting unfair methods of competition and unfair or deceptive acts or practices in trade or commerce.

23.     The Government is not seeking relief relating to any federal program (*e.g.*, Medicaid, Medicare) or any contract related to a federal program. Moreover, the Government's claims do not arise out of a written contract, but rather are based on the larger unfair and deceptive scheme that violates the Fair Competition Act and increased prices and reduced access to insulin products for Puerto Rico consumers.

### Defendants Eli Lilly and Company and Eli Lilly Export S.A.

24.     Defendant Eli Lilly and Company is an Indiana corporation with its principal place of business in Indiana. Eli Lilly manufactures, promotes, and sells several insulin medications, including Humulin N, Humulin R, Humalog, and Basaglar, all of which are dispensed in Puerto Rico to Puerto Rico residents.

25.     Eli Lilly and Company's affiliate in Puerto Rico is Eli Lilly Export S.A. ("Eli Lilly Export") (hereinafter Eli Lilly and Company and Eli Lilly Export will be referred to collectively as "Eli Lilly"). Eli Lilly Export is a Puerto Rico corporation that has spent at least hundreds of thousands of dollars from 2015 to 2021 to market Eli Lilly and Company's products—including insulin products—to physicians in Puerto Rico.[13]

26.     Eli Lilly employs sales representatives in Puerto Rico to promote and sell insulin products. Eli Lilly also directs advertising and informational materials to Puerto Rico physicians, payers, and diabetics for the specific purpose of selling more insulin products in Puerto Rico.

---

[13] Open Payments, *Eli Lilly Export S.A. Puerto Rico Branch*,
https://openpaymentsdata.cms.gov/company/100000000331 (last visited Nov. 27, 2022).

27.     At all times relevant to this complaint, Eli Lilly caused its artificially inflated list prices to be published throughout the United States, including Puerto Rico, with the express knowledge that Puerto Rico residents with diabetes's payments and reimbursements would be based on those prices. Eli Lilly promoted its insulin products in Puerto Rico, including through its in-person sales representatives.

### Defendant Novo Nordisk Inc.

28.     Novo Nordisk Inc. ("Novo Nordisk") is a Delaware corporation with its principal place of business in New Jersey. Novo Nordisk is registered to do business in Puerto Rico. Novo Nordisk manufactures, promotes, and sells several insulin medications, including Novolin R, Novolin N, Novolog, Levemir, and Tresiba, all of which are dispensed in Puerto Rico to Puerto Rico residents.

29.     Novo Nordisk employs sales representatives in Puerto Rico to promote and sell insulin products. Upon information and belief, Novo Nordisk also directs advertising and informational materials to Puerto Rico physicians, payers, and diabetics for the specific purpose of selling more insulin products in Puerto Rico.

30.     At all times relevant to this complaint, Novo Nordisk caused its artificially inflated list prices to be published throughout the United States, including Puerto Rico, with the express knowledge that Puerto Rico residents with diabetes's payments and reimbursements would be based on those prices. Novo Nordisk promoted its insulin products in Puerto Rico, including through its in-person sales representatives.

### Defendants Sanofi-Aventis U.S. LLC and Sanofi-Aventis Puerto Rico, Inc.

31.     Defendant Sanofi-Aventis U.S. LLC is a Delaware limited liability company with its principal place of business in New Jersey. Sanofi manufactures, promotes, and sells several

insulin products, including Lantus, Toujeo, Soliqua, and Apidra, all of which are dispensed in Puerto Rico to Puerto Rico residents.

32.     Sanofi U.S.'s affiliate in Puerto Rico is Sanofi-Aventis Puerto Rico Inc. Sanofi-Aventis Puerto Rico Inc. is a Puerto Rico corporation (hereinafter Sanofi-Aventis U.S. LLC and Sanofi-Aventis Puerto Rico Inc. will be collectively referred to as "Sanofi").

33.     Sanofi employs sales representatives in Puerto Rico to promote and sell Lantus, Toujeo, Soliqua, and Apidra. Upon information and belief, Sanofi also directs advertising and informational materials to Puerto Rico physicians, payers, and diabetics for the specific purpose of selling more insulin products in Puerto Rico.

34.     At all times relevant to this complaint, Sanofi caused its artificially inflated list prices to be published throughout the United States, including Puerto Rico, with the express knowledge that Puerto Rico residents with diabetes's payments and reimbursements would be based on those prices. Sanofi promoted its insulin products in Puerto Rico, including through its in-person sales representatives.

35.     Collectively, Eli Lilly, Novo Nordisk, and Sanofi are known as the "Manufacturer Defendants."

### Defendants CaremarkPCS Health, LLC and Caremark Puerto Rico LLC

36.     Defendant CaremarkPCS Health, LLC (operating as CVS Caremark) is a Delaware limited liability company that maintains its principal place of business in Rhode Island. At all times relevant to this complaint, CVS Caremark provided pharmacy benefit management services in Puerto Rico.

37.     CaremarkPCS Health, LLC's affiliate in Puerto Rico is Caremark Puerto Rico LLC (hereinafter CaremarkPCS Health, LLC and Caremark Puerto Rico LLC will be collectively

referred to as "CVS Caremark"). Caremark Puerto Rico LLC is a Puerto Rico limited liability company.

38.     At all relevant times, CVS Caremark had agreements with the Manufacturer Defendants related to payments for placement on CVS Caremark's standard formularies.

39.     CVS Caremark has the largest PBM market share based on total prescription claims managed, representing approximately 33% of the national market.[14]

### *Defendant Express Scripts, Inc.*

40.     Defendant Express Scripts, Inc. ("Express Scripts") is a Delaware corporation that maintains its principal place of business in Missouri and is registered to do business in Puerto Rico. At all times relevant to this complaint, Express Scripts provided pharmacy benefit management services in Puerto Rico.

41.     At all relevant times, Express Scripts had agreements with the Manufacturer Defendants related to payments for placement on Express Scripts' standard formularies.

42.     Prior to merging with Cigna in 2019, Express Scripts was the largest independent PBM in the United States. During the relevant period of this Complaint, Express Scripts controlled 30% of the PBM market in the United States.[15]

### *Defendant OptumRx, Inc.*

43.     Defendant OptumRx, Inc. ("OptumRx) is a California corporation that maintains its principal place of business in California and is registered to do business in Puerto Rico. At all times relevant to this complaint, OptumRx provided pharmacy benefit management services in Puerto Rico.

---

[14] Adam J. Fein, *The Top Pharmacy Benefit Managers of 2021: The Big Get Even Bigger*, Drug Channels (Apr. 5, 2022), https://www.drugchannels.net/2022/04/the-top-pharmacy-benefit-managers-of.html.
[15] *Id.*

44.     At all relevant times, OptumRx had agreements with the Manufacturer Defendants related to payments for placement on OptumRx's standard formularies.

45.     During the relevant period of this Complaint, OptumRx controlled 21% of the PBM market in the United States.[16]

46.     Collectively, CVS Caremark, Express Scripts, and OptumRx are referred to as "PBM Defendants."

47.     Collectively, the "PBM Defendants" and the "Manufacturer Defendants" are referred to as "Defendants."

## JURISDICTION AND VENUE

48.     This Court has jurisdiction over this case pursuant to 10 L.P.R.A. § 269, which confers jurisdiction on this Court to award the relief sought by the Government, including injunctions and such other further relief as may be appropriate.

49.     This Court has personal jurisdiction over Defendants in this matter pursuant to Puerto Rico Rules of Civil Procedure 3.1(a), 32 L.P.R.A. App. V, R. 3.1(a), as well as the due process clause of the United States Constitution, by transacting business in Puerto Rico and participating in tortious acts within Puerto Rico.

## BACKGROUND

I.     **The Importance of Insulin Therapy in Diabetes**

50.     Diabetes is a condition affecting approximately 37 million people nationwide (roughly one in 10) and 430,000 people in Puerto Rico (roughly 2 in 13).[17] Diabetes is manageable

---

[16] *Id.*

[17] U.S. Centers for Disease Control and Prevention, *The Facts, Stats, and Impacts of Diabetes*, https://www.cdc.gov/diabetes/library/spotlights/diabetes-facts-stats.html (last updated Jan. 24, 2022); International Diabetes Federation, *Puerto Rico*, https://idf.org/our-network/regions-members/south-and-central-america/members/90-puerto-rico.html (last updated Apr. 4, 2022).

with injections of insulin, but missing insulin doses can produce excessive blood sugar leading to

a toxic condition called ketoacidosis.[18]

51.     Even though insulin was first extracted nearly 100 years ago, three companies, Eli

Lilly, Novo Nordisk, and Sanofi, manufacture virtually all of the insulin in the United States.[19]

52.     There are different types of insulin. The first insulins were derived from animals.[20]

In 1982, Eli Lilly developed the first biosynthetic human insulin known as Humulin.[21] In 1996,

Eli Lilly developed an analog insulin called Humalog. Analog insulins, which have largely

replaced human insulins, are similar to biosynthetic human insulin but are modified to mimic the

body's natural pattern of insulin release and have more predictable duration of action.[22]

53.     Insulins are also categorized by differences in onset—typically, fast-acting insulins,

intermediate-acting insulins, and long-acting insulins.[23] Diabetics take a combination of insulins

to control their blood sugar based on numerous factors, including activity level, diet, and age.

---

[18] U.S. Centers for Disease Control and Prevention, *Diabetic Ketoacidosis*,
https://www.cdc.gov/diabetes/basics/diabetic-ketoacidosis.html (last updated Mar. 25, 2021).
[19] William T. Cefalu et al., *Insulin Access and Affordability Working Group: Conclusions and Recommendations*, 41 Diabetes Care 1299 (2018),
https://diabetesjournals.org/care/article/41/6/1299/36487/Insulin-Access-and-Affordability-Working-Group.
[20] American Diabetes Association, *The History of a Wonderful Thing We Call Insulin* (July 1, 2019), https://diabetes.org/blog/history-wonderful-thing-we-call-insulin.
[21] *Id.*
[22] University of California, San Francisco, *Diabetes Education Online-Insulin Analogs*,
https://dtc.ucsf.edu/types-of-diabetes/type2/treatment-of-type-2-diabetes/medications-and-therapies/type-2-insulin-rx/types-of-insulin/insulin-analogs/ (last visited Nov. 16, 2022).
[23] University of California, San Francisco, *Diabetes Education Online-Types of Insulin*,
https://dtc.ucsf.edu/types-of-diabetes/type2/treatment-of-type-2-diabetes/medications-and-therapies/type-2-insulin-rx/types-of-insulin/ (last visited Nov. 16, 2022).

## II.     Insulin Prices Have Skyrocketed Over the Last Couple of Decades

54.     Insulin is a prime example of skyrocketing drug costs. From 2014 to 2020, drug prices increased by 33%, outpacing inflation and price increases for any other medical commodity or service.[24]

55.     In 1996, Eli Lilly's Humalog was priced at $21.[25] That same vial of insulin increased to $35 in 2001 and to $275 in 2019—*a 1200% increase from the original price*.[26]

56.     The staggering price increases in the United States—the only country that uses PBMs—are not matched globally. In the Province of Ontario, Canada, Eli Lilly marketed Humalog for $30.23 in 2021.[27]

57.     For an insulin-dependent diabetic person with commercial insurance, the annual cost of insulin nearly doubled from approximately $3,200 in 2012 to $5,900 in 2016.[28]

58.     The rising cost of insulin has dire consequences. A study from New Haven, Connecticut revealed that one in four people with diabetes at an urban medical center reported cost-related insulin underuse. Diabetics who reported financial challenges associated with insulin

---

[24] Tori Marsh, *Prices for Prescription Drugs Rise Faster Than Prices for Any Other Medical Good or Service*, GoodRx Health (Sept. 17, 2020), https://www.goodrx.com/healthcare-access/drug-cost-and-savings/prescription-drugs-rise-faster-than-medical-goods-or-services; Stephen W. Schondelmeyer and Leigh Purvis, *Trends in Retail Prices of Brand Name Prescription Drugs Widely Used by Older Americans, 2006 to 2020*, AARP Public Policy Institute at 1 (June 2021), https://www.aarp.org/content/dam/aarp/ppi/2021/06/trends-in-retail-prices-of-brand-name-prescription-drugs-widely-used-by-older-americans.10.26419-2Fppi.00143.001.pdf.
[25] Roberts, *supra* note 10.
[26] *Id*.
[27] Ontario Drug Benefit Formulary/Comparative Drug Index, https://www.formulary.health.gov.on.ca/formulary/results.xhtml?q=Humalog&type=2 (last visited Jan. 30, 2022).
[28] Jean Fuglesten Biniek and William Johnson, *Spending on Individuals with Type 1 Diabetes and the Role of Rapidly Increasing Insulin Prices*, Health Care Cost Institute (Jan. 21, 2019), https://healthcostinstitute.org/diabetes-and-insulin/spending-on-individuals-with-type-1-diabetes-and-the-role-of-rapidly-increasing-insulin-prices.

prices were more likely to have poor glycemic control (clinical management of their diabetes), which leads to negative health outcomes, such as blindness, amputations, and even death.[29]

## III.    The PBM Defendants Provide Services to Consumers

59.     The PBM Defendants provide services to consumers by administering prescription drug benefits. As CVS Caremark explains to consumers through its welcome kit: "We manage your prescription drug benefits just like your health insurance company manages your medical benefits."[30]

60.     The PBM Defendants provide identification cards to consumers with their company logos to present to pharmacies for the purpose of determining consumers' prescription drug coverage.

61.     All of the PBM Defendant families have consumer-facing websites representing that they "serve" consumers and that consumers are their "members."[31]

---

[29] Darby Herkert et al., *Cost-Related Insulin Underuse Among Patients With Diabetes*, 179(1) JAMA Intern Med. 112, 112-114 (Jan. 2019), https://jamanetwork.com/journals/jamainternalmedicine/fullarticle/2717499; Mary Caffrey, *Gathering Evidence on Insulin Rationing: Answers and Future Questions*, AJMC (Sept. 26, 2019), https://www.ajmc.com/view/gathering-evidence-on-insulin-rationing-answers-and-future-questions.

[30] CVS Caremark, *Welcome Kit*, https://benefits.vmware.com/wp-content/uploads/2018/10/CVS-Caremark-Sample-Welcome-Kit_ID-Card.pdf (last visited Nov. 16, 2022).

[31] CVS Caremark, https://www.caremark.com/welcome-center.html#tab_link_tabs_2 (last visited Nov. 16, 2022); CVS Caremark, https://www.caremark.com/about-us.html (last visited Nov. 16, 2022).

Express Scripts, Inc., https://www.express-scripts.com/corporate/about (last visited Nov. 16, 2022); Express Scripts, Inc., *Frequently Asked Questions*, https://www.express-scripts.com/frequently-asked-questions/about (last visited Nov. 16, 2022); Express Scripts, Inc., *Who We Help Overview*, https://www.express-scripts.com/corporate/who-we-help/members (last visited Nov. 16, 2022).

OptumRx Inc., optumrx.com (last visited Nov. 16, 2022); OptumRx Inc., *OptumRx Welcome Video*, https://optumrx.video.uhc.com/media/OptumRx+Welcome+Video/0_ug0m5mm2 (last visited Nov. 16, 2022).

62.     The PBM Defendants further represent on their websites that giving consumers access to necessary prescription drugs at an affordable price is a top priority.[32]

## IV.     The PBM Defendants Are Middlemen in a Complex Drug Pricing System

63.     PBMs—like the PBM Defendants—act as intermediaries between their third-party payers, such as government entities, insurers, and employers, and other entities in the drug distribution chain, such as prescription drug manufacturers and pharmacies (as shown in the chart below).[33] PBMs are involved in, and benefit from, almost every link in the chain.

**Figure 1: The Role of Pharmacy Benefit Managers**



64.     Consumers pay premiums to their employers or insurance companies (third-party payers) for health insurance. Third-party payers then pay PBMs to administer prescription drug benefits for consumers. PBMs in turn negotiate and contract with pharmacies to determine the

---

[32] *Id.*

[33] Dan Fleshler, *Opening Up the Black Box on PBMs (Pharmacy Benefit Managers)*, healthline (Sept. 21, 2018), https://www.healthline.com/diabetesmine/PBM-primer.

amount PBMs will pay pharmacies for prescription drugs (minus any cost-share amounts that consumers pay directly to pharmacies).

<u>Consumer Costs Are Typically Linked to the WAC Price</u>

65.    Consumers' out-of-pocket costs for drugs are determined by whether they have insurance and the terms of their coverage. Consumer payments range from high to low from 1) the cash price (either because consumers are uninsured or have a high-deductible plan), to 2) a cost-share payment based on a percentage of drug costs, to 3) what is typically the least expensive option, a flat copayment.

66.    Consumers without insurance pay the "usual and customary" price (*i.e.*, the "cash price")—typically greater than the WAC price, which federal law defines as the manufacturer's list price to wholesalers and direct purchasers (not including rebates or other discounts). *See* 42 USC § 1395w-3a(c)(6)(B). For example, the WAC price for Lantus (Sanofi's top-selling insulin) is $283.56 per vial and the average retail price for Lantus is $343 per vial.[34]

67.    In addition, an increasing number of consumers have high-deductible plans, which require consumers to pay the cash price for drugs until they meet their deductible—averaging nearly $2,200 a year.[35]

---

[34] Sanofi-Aventis U.S. LLC, *Lantus Pricing Sheet*, https://www.lantus.com/-/media/EMS/Conditions/Diabetes/Brands/lantus-final/Header/Lantus-Pricing.pdf (last visited Nov. 16, 2022); Benita Lee, *How Much Does Insulin cost? Here's How 28 Brands and Generics Compare*, GoodRx Health (Jan. 26, 2022), https://www.goodrx.com/healthcare-access/research/how-much-does-insulin-cost-compare-brands.

[35] Gary Claxton et al., *Employer Health Benefits 2020 Annual Survey, Kaiser Family Foundation*, at 137 (Oct. 8, 2020), https://files.kff.org/attachment/Report-Employer-Health-Benefits-2020-Annual-Survey.pdf.

68.     About 30-50% of insured consumers pay a coinsurance amount, which is a percentage of the WAC price (not including rebates).[36]

69.     Other insured consumers pay a flat copayment amount, such as $5 for generic drugs and $10 for preferred brand-name drugs. The copayment is not directly tied to the WAC price; however, the overall cost of drugs factors into a plan's decision when determining health insurance premiums and consumer copayment amounts.

<u>PBMs Obtain Payments from Manufacturers Classified as Rebates, Administrative Fees, and Price Protections</u>

70.     In addition to relationships with third-party payers and pharmacies, PBMs negotiate and contract for various payments from prescription drug manufacturers. The bulk of these payments are for rebates.

71.     Manufacturers typically offer rebates only for branded drugs, not generics. Typically, branded drugs account for a small percentage of drug utilization but the vast majority of drug spending. For example, for Plan Vital, the branded drug utilization rate is less than 10%, but branded drugs account for approximately 80% of drug spending.

72.     Prescription drug rebates are reductions from the WAC price redeemed from manufacturers after the transaction. Yet, unlike traditional rebates, manufacturers pay prescription drug rebates to PBMs, not to insured (or uninsured) consumers who paid the WAC price.

73.     In a quid pro quo agreement, prescription drug manufacturers pay rebates and other fees to PBMs for the purpose of securing placement on the PBMs' drug formularies.

---

[36] Lisa L. Gill, *The Shocking Rise of Prescription Drug Prices: Here's why prices keep going up, plus how to combat the sticker shock—and still protect your health*, Consumer Reports (Nov. 26, 2019), https://www.consumerreports.org/drug-prices/the-shocking-rise-of-prescription-drug-prices/.

74.     A drug formulary is a list of generic and brand name prescription drugs covered by health plans. Formularies are usually divided into three to five tiers that determine consumers' cost-share amounts (*e.g.*, the co-payment or co-insurance) consumers must pay toward the cost of a prescription. The lower tiers have lower cost-share amounts than the higher tiers. For example, a typical three-tier formulary may be designed as follows:

- Tier 1 contains generic drugs with the lowest cost-share amount for consumers.

- Tier 2 contains preferred brand-name drugs with a cost-share amount that is higher than tier 1 but lower than tier 3.

- Tier 3 contains non-preferred brand-name drugs with the highest payment by consumers.

75.     Generally, prescription drug manufacturers pay higher rebates for preferred formulary placement (*i.e.*, tier 2 status instead of tier 3 status). This is because prescribers are more likely to write prescriptions and consumers to fill prescriptions for drugs with lower cost-share amounts.

76.     The rebates PBMs negotiate are highly confidential and, for the most part, the exact terms of the agreements between PBMs and prescription drug manufacturers are unknown to others in the supply chain—creating a pricing black box.

77.     Drug rebates are usually based on the WAC price. For example, a manufacturer may offer the PBM a rebate of 40% of the WAC price for a particular drug.

78.     In addition to prescription drug rebates, manufacturers pay various fees to PBMs, including administrative fees and fees for price protection.

79.     In another quid pro quo agreement, manufacturers pay PBMs administrative fees for administering rebates, which are separate from any administrative fees PBMs may charge third-

party payers. Like rebates, administrative fees are tied to the WAC price and paid according to PBMs' confidential contracts with manufacturers. Administrative fees typically range from 3% to 5% of the WAC price.[37]

80.    Price protection is another way that PBMs extract payments. PBMs present price protection as a means to reduce costs, but the Senate Finance Committee's investigation of insulin pricing revealed price protection does very little to keep costs down. Price protection establishes a cap on the amount by which prescription drug manufacturers can increase the WAC price for a particular drug (ranging from 0% to 12%).[38] Any price increase by manufacturers above the established cap triggers additional rebate payments to PBMs known as "price protection." For example, if there is a 5% cap on the WAC price, and the manufacturer increases the WAC price by more than 5%, the manufacturer must pay additional rebates (*e.g.*, 50% of the WAC price instead of 45% of the WAC price) of which PBMs typically retain a portion. Price protection does not provide any discount to consumers at the point of sale.

81.    Under a traditional PBM pricing model, PBMs retain a portion of the payments they receive from prescription drug manufacturers and return the remainder to third-party payers.

### FACTUAL ALLEGATIONS

**I.    The PBM Defendants Deceptively Represent That They Lower Drug Prices**

82.    The PBM Defendants have made numerous deceptive representations about their role in the market—mainly that they serve to lower prices.

83.    CVS Caremark represents "[w]e reduce prescription drug costs" and that "[a]s the health care system becomes increasingly complex and drugs become more expensive, our work

---

[37] Senate Insulin Report, *supra* note 8 at 82.
[38] *Id*. at 84.

has never been more important."[39] CVS Caremark further claims "[w]e work hard to keep prices

down because we know that people who take their medications as prescribed have better outcomes

and lower health care costs."[40] CVS Caremark also represents:

- "MYTH: Rebates negotiated by PBMs are driving up the prices of prescription drugs for consumers and plan sponsorship. FACT: Pharmaceutical manufacturers set the list price for a given drug. PBMs then negotiate with manufacturers to secure the drug at a lower cost for their plan sponsors and their members."[41]

- "MYTH: PBMs increase cost-sharing burdens for beneficiaries. FACT: Plan designs are determined by clients – employers and health plans – who decide how they subsidize their members' coverage."[42]

- "MYTH: PBMs lower drug costs by restricting patient access to needed medication. FACT: PBMs help ensure that beneficiaries have access to the prescriptions they need to stay healthy, at a price they can afford."[43]

- "As a PBM and an Employer, We Know Rebates and Innovation Lower Drug Costs"[44]

- Making sure you have access to affordable medication and convenient options for filling is our priority"[45]

84.      In its 2017 Drug Report, CVS Caremark stated that the goal of its pharmacy benefit

plans is to ensure "that the cost of a drug is aligned with the value it delivers in terms of patient

---

[39] CVS Health, *Prescription Drug Coverage*, https://www.cvshealth.com/our-services/prescription-drug-coverage (last visited Nov. 16, 2022).
[40] CVS Health, *Prescription Drug Savings*, https://www.cvshealth.com/our-services/prescription-drug-coverage/prescription-drug-savings (last visited Nov. 16, 2022).
[41] CVS Health, *Myths vs. Fact Pharmacy Benefit Management*, at 2 (Jan. 2021), https://www.cvshealth.com/sites/default/files/cvs-health-myth-vs-fact-pbm-2021-01.pdf.
[42] *Id*. at 3.
[43] *Id*. at 4.
[44] @CVSHealth, Twitter (Oct. 31, 2018, 11:11 AM), https://twitter.com/CVSHealth/status/1057651382155653121.
[45] CVS Caremark, caremark.com (last visited Jan. 25, 2022).

outcomes . . . in 2018, we are doing even more to help keep drugs affordable with our new Saving Patients Money initiative."[46]

85.     On August 31, 2016, an Express Scripts news release quoted Glen Stettin, Senior Vice President and Chief Innovation Officer at Express Scripts as stating: "Diabetes is wreaking havoc on patients, and it is also a runaway driver of costs for payers . . . [Express Scripts] helps our clients and diabetes patients prevail over cost and care challenges created by this terrible disease." The statement further represented that Express Scripts "broaden[s] insulin options for patients and bend[s] down the cost curve of what is currently the costliest class of traditional prescription drugs."[47]

86.     Express Scripts claims it "works with plan sponsors to provide a benefit that delivers the best clinical outcome and the lowest possible cost."[48] It also represents:

- "PBMs provide better care and lower cost with every prescription, every time."[49]

- "Rebates do not raise drug prices, drug makers raise drug prices, and they alone can lower them. Consider the cost of Humalog® (insulin lispro): over the past seven years, the list price for this medication has increased dramatically, yet the net cost has remained relativity constant. Without PBMs, and specifically without Express Scripts, plan sponsors would have paid exponentially more for their prescription drugs."[50]

---

[46] CVS Caremark, Drug Trend Report 2017, at 3 (2017), https://payorsolutions.cvshealth.com/sites/default/files/cvs-health-payor-solutions-2017-drug-trend-report-feature-april-2017.pdf.
[47] Express Scripts, Inc., *Express Scripts Launches Diabetes Care Value Program, Guaranteeing More Affordable, Higher-Quality Diabetes Care*, Cison (Aug. 31, 2016), https://www.prnewswire.com/news-releases/express-scripts-launches-diabetes-care-value-program-guaranteeing-more-affordable-higher-quality-diabetes-care-300320485.html.
[48] Paul Reyes, *What's a Pharmacy Benefit Manager*, Express Scripts (Aug. 1, 2019), https://www.express-scripts.com/corporate/articles/whats-pharmacy-benefit-manager.
[49] *Id*.
[50] Express Scripts, Inc., *The Rebate Debate* (June 29, 2017), https://www.express-scripts.com/corporate/articles/rebate-debate.

- "We . . . negotiate with drug manufacturers so no one pays more than they need to."[51]"FACT: Public disclosure of negotiated rebates will not lower prescription drug costs. #PBMs Express Scripts negotiates with drug manufacturers to increase competition and lower costs for patients."[52]

87.    Further, Express Scripts' publicly available code of conduct states, "[a]t Express Scripts we're dedicated to keeping our promises to patients and clients[.]"[53]

88.    OptumRx claims "Rebates are a longstanding tool used by PBMs to negotiate with drug manufacturers to achieve lower prescription drugs costs for clients."[54] It also represents:

- "PBMs develop pharmacy networks, negotiate with drug companies for the best medication prices, process pharmacy claims, and may operate a home delivery pharmacy."[55]

- "Learn how we make the consumer experience a top priority to create better outcomes, lower costs, and improve the overall healthcare system."[56]

- "Helping millions of people get medication safely, conveniently and at the best price."[57]

- "We strive to contain medication costs and our clinical programs are designed to provide better care and outcomes."[58]

89.    OptumRx's Chief Executive Officer testified before Congress that: "OptumRx's pharmacy care services business is achieving better health outcomes for

---

[51] Reyes, *supra* note 48.
[52] @ExpressScripts, Twitter (Apr. 9, 2019, 3:10 PM),
https://twitter.com/ExpressScripts/status/1115693403285741568.
[53] Express Scripts Inc., *Code of Conduct*, at 4 (Dec. 2015), https://www.express-scripts.com/aboutus/codeconduct/ExpressScriptsCodeOfConduct.pdf.
[54] OptumRx, *Regulatory developments affecting pharmacy*, (Feb. 2022),
https://www.optum.com/business/resources/library/regulatory-updates-q1-2022.html.
[55] Kevira Voegele, *Who is OptumRx?*, OptumRx (Sept. 4, 2018),
https://optumrx.video.uhc.com/media/Who+is+OptumRxF/0_8lrxn39l.
[56] @OptumRx, Twitter (Sept. 8, 2020),
https://twitter.com/OptumRx/status/1303226564751036416.
[57] Kevira Voegele, *What is a formulary?*, OptumRx (Aug. 8, 2019),
https://optumrx.video.uhc.com/media/What+is+a+formularyF/1_tnrtatvy.
[58] *Id.*

patients, lowering costs for the system, and improving the health care experience for consumers." [59]

90.     These statements do not accurately represent the way the PBM Defendants impact drug pricing. As discussed below, the PBM Defendants significantly contribute to, and benefit from, the dysfunctional market dynamic they create—a dynamic that harms consumers.

91.     The PBM Defendants' deceptive representations mask their impact on the market, making the black box of drug pricing even more difficult to understand and regulate.

## II.     The PBM Defendants Drive Up Drug Prices by Leveraging Formulary Decisions to Extract Increasingly Steeper Payments from Manufacturers

92.     The PBM industry is heavily concentrated. The PBM Defendants are the three largest PBMs and are owned by large healthcare conglomerates: (1) CVS Caremark (owned by CVS Health which also owns CVS Pharmacy—the largest retail pharmacy chain in the United States); (2) Express Scripts (owned by Cigna); and (3) OptumRx (owned by UnitedHealth Group).

93.     Collectively, the PBM Defendants manage 80% of drug benefits for more than 220 million Americans—making preferred placement on their drug formularies a significant bargaining chip when negotiating payments from prescription drug manufacturers.[60] On information and belief, the PBM Defendants similarly dominate the market for drug benefits in Puerto Rico as well.

94.     The PBM Defendants began increasingly exerting their leverage in 2012 by excluding drugs from certain therapeutic classes from their formularies to intensify competition

---

[59] *Testimony of John M. Prince, Chief Executive Officer, OptumRx, Before the United States Senate Committee on Finance "Drug Pricing in America: A Prescription for Change, Part III"*, at 1 (Apr. 9, 2019), https://www.finance.senate.gov/imo/media/doc/John%20Prince%20OptumRx%20Testimony%20Senate%20Finance%20Committee_04.09.19.pdf

[60] Senate Insulin Report, *supra* note 8 at 68.

among manufacturers for rebates. The threat of exclusion fundamentally changed drug pricing. Rebates went from modest discounts to steep payments that manufacturers were all but forced to make because not paying the PBM Defendants could ruin a drug's chance of success. Over time, rebates have become a significant factor manufacturers consider when setting drug prices.

**A.    The PBM Defendants Exclude Drugs from Their Formularies to Increase Rebates**

95.    CVS Caremark started excluding drugs from its formulary in 2012. Express Scripts and OptumRx began the practice in 2014 and 2016, respectively (see graph below showing the number of exclusions by PBM per year).[61] On information and belief, these formulary changes are made on a nationwide basis and affect benefits offered to Puerto Rico residents.

**Figure 2: PBM Formulary Exclusions from 2012-2022**



96.    The number of medicines excluded from the PBM Defendants' formularies increased 961% from 2014 (109 unique drugs exclusions) to 2022 (1,156 unique drug

---

[61]Adam Fein, *Five Takeaways from the Big Three PBMs' 2022 Formulary Exclusions,* Drug Channels (Jan. 19, 2022), https://www.drugchannels.net/2022/01/five-takeaways-from-big-three-pbms-2022.html.

Case 3:23-cv-01080-ADC Document 4-1 Filed 03/31/23 Page 26 of 44

exclusions).[62] Drugs used to treat chronic conditions—including insulin, antidepressants, antipsychotics, and antiarrhythmics—are most frequently excluded by the PBM Defendants.

97.     On the surface, excluding products from formularies would seem to be a cost control measure, allowing the PBM Defendants to steer prescriptions to a cheaper drug. In practice, it creates an auction for the PBM Defendants to sell their formulary space to the highest bidding drug company. The overall amount prescription drug manufactures paid in rebates and other fees nationally doubled from 2013 ($83 billion) to 2018 ($166 billion).[63] For example, Sanofi increased its rebates from 2-4% in 2013 to 56% in 2018.[64] This would not have happened without the credible threat of exclusion. A Tufts University study found that when PBMs excluded one drug in the same therapeutic class as another drug they did include, the more cost-effective drug was excluded half the time.[65]

98.     The PBM Defendants' treatment of biosimilars perfectly illustrates the perverse incentives in drug pricing. A biosimilar is an FDA-approved biologic that is highly similar to, and has no clinically meaningful difference from, another biologic that is already FDA-approved (referred to as the reference product or original biologic).[66] Biosimilars directly compete with

---

[62] Xcenda, *Skyrocketing growth in PBM formulary exclusions continues to raise concerns about patient access* at 2 (May 2022), https://www.xcenda.com/-/media/assets/xcenda/english/content-assets/white-papers-issue-briefs-studies-pdf/xcenda_pbm_exclusion_may_2022.pdf.
[63] Gill, *supra* note 36.
[64] Senate Insulin Report, *supra* note 8 at 67.
[65] Joshua P. Cohen et al., *Rising Drug Costs Drive the Growth of Pharmacy Benefit Managers Exclusion Lists: Are Exclusion Decisions Value-Based?*, 53 (Supp 1) Health Servs. Rsch., 2767, 2764 (Aug. 2018), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6056588/pdf/HESR-53-2758.pdf.
[66] U.S. Food and Drug Administration, *Biosimilar and Interchangeable Products*, https://www.fda.gov/drugs/biosimilars/biosimilar-and-interchangeable-products (last updated Oct. 23, 2017).

existing biologic products but are generally lower priced. Yet, despite being cheaper, two out of every three approved biosimilar product is excluded by one of the PBM Defendants.[67]

99.     For example, Viatris (a company formed by the merger between Mylan and Upjohn) launched two identical biosimilar insulins that are fully interchangeable with Sanofi's top-selling Lantus.[68] One product is a branded biosimilar insulin called Semglee. The other product is a generic biosimilar insulin (Insulin Glargine). Semglee has a WAC price 5% below Lantus. Insulin Glargine has a WAC price 65% lower than Lantus. Semglee and Insulin Glargine are the exact same product—the only difference between the two products is price.

100.    In their 2022 formularies, none of the PBM Defendants preferred the insulin product with the lowest WAC price (Insulin Glargine).[69] OptumRx preferred Lantus and excluded Semglee but failed to even mention Insulin Glargine. Express Scripts preferred the higher-priced biologic (Semglee) and excluded the lower-priced biologic (Insulin Glargine)—even though Semglee and Insulin Glargine are identical. CVS Caremark excluded Lantus and preferred Basaglar—a product that is not even a biosimilar to Lantus—without mentioning Semglee or Insulin Glargine.[70]

101.    Often CVS Caremark's preferred or recommended products are excluded by Express Scripts, and vice versa—further suggesting exclusions are not evidence- or value-based.[71]

---

[67] Xcenda, *supra* note 62.

[68] Adam Fein, *Why PBMs and Payers Are Embracing Insulin Biosimilars with Higher Prices— And What That Means for Humira*, Drug Channels (Nov. 9, 2021), https://www.drugchannels.net/2021/11/why-pbms-and-payers-are-embracing.html.

[69] *Id*.

[70] *Id*.

[71] Cohen, *supra* note 65.

26

B.     **The PBM Defendants' Rebate Tactics Lead to WAC Price Inflation**

102.    With respect to both insulin and other prescription drugs, manufacturers compensate for rising rebates and other payments to PBM Defendants by increasing the WAC price to maintain profit margins and to buy space on formularies. Over time, the gap between the WAC price and the net price (the price the manufacturer receives for selling the drug) has become significant.

103.    From 2011 to 2019, the prescription drug manufacturer payments (mostly rebates to PBMs) nearly tripled.[72] In 2011, manufacturers paid 29.2% of their net revenue ($50.1 billion) to generate $171.8 billion in net sales. By 2019, the same manufacturers paid over twice that amount: 67.4% of net revenue ($141.4 billion) to generate $209.9 billion in net sales.

104.    One of the Senate Finance Committee's key findings is that WAC prices for insulin rose sharply between 2013 and 2019 in step with an exponential increase in rebates for these products.[73]

105.    Around 2014—when the PBM Defendants' exclusion tactics created a rise in rebates—WAC prices and payments from manufacturers began growing disproportionately higher than manufacturers' net revenue (as shown in the graph below).

---

[72] Gill, *supra* note 36.
[73] Senate Insulin Report, *supra* note 8 at 7.

**Figure 3: Prescription Drug Manufacturer Revenue & Payments from 2011-2019**



106.    A 2020 study found that for prescription drugs sold from 2016 to 2018, on average, a $1 increase in rebates was associated with a $1.17 increase in the WAC price.[74]

107.    The Manufacturing Defendants have artificially inflated list prices for their insulin products to purchase formulary coverage from the PBM Defendants' while maintaining profit margins. For example: [75]

      a.    Eli Lilly increased the WAC price for its rapid-acting insulin, Humalog 50-50 Kwikpen, from $323 in 2013 to $530 in 2017—an increase of $207 (or 64%) in four years;

      b.    Novo Nordisk increased the WAC price for its long-acting insulin pens, Levemir FlexTouch, from $303 in May 2014 to approximately $462 in

---

[74] Neeraj Sood et al, *The Association Between Drug Rebates and List Prices*, USC Schaeffer Center (Feb. 11, 2020), https://healthpolicy.usc.edu/research/the-association-between-drug-rebates-and-list-prices/.
[75] Senate Insulin Report, *supra* note 8 at 6.

January 2019—an increase of $159 (or 52%) in a little more than five years;
and

c.      Sanofi increased the WAC price for its long-acting insulin pens, Lantus
Solostar, from $303 in 2014 to $404 in 2019—an increase of $100 (over
33%) in 5 years.

108.    Driven by these price hikes, payers' and diabetics' spending on insulin products
has skyrocketed with totals in the tens of billions of dollars. Upon information and belief, the
PBM Defendants' practices also increase the price and consumers' out-of-pocket costs for non-
insulin medications.

**III.     Defendants Profit from Inflated WAC Prices and High Rebates**

109.    The market for insulin products is unique in that it is highly concentrated with, until
recently, little to no generic/biosimilar options and the drugs have similar efficacy and risk profiles.
In fact, the PBM Defendants treat insulin products as commodity products in constructing their
formularies. In such a market, where manufacturing costs have significantly decreased, the PBM
Defendants should have great leverage in negotiating with manufacturers to drive prices down in
exchange for formulary placement. But the PBM Defendants do not want the prices for insulin
products to go down because they make more money on higher prices, as do the Manufacturer
Defendants. As a result, Defendants have found a way to game the system for their mutual benefit.

110.    The PBM Defendants are incentivized to drive up WAC prices. Typically, they
retain a portion of the manufacturer payments they negotiate. Thus, the larger the spread between
manufacturer payments and WAC prices, the greater the potential for the PBM Defendants to
profit.

111.    CVS Health (CVS Caremark's parent company) admitted that CVS Caremark
profits from the inflated list price/high rebate dynamic in 2019 when CVS Health reported that

CVS Health missed its projected earnings, because CVS Caremark "was experiencing a squeeze related to . . . rebates" and "seeing slower growth than it . . . expected in the list prices of branded drugs."[76]

112.     The PBM Defendants claim that the Manufacturing Defendants—not PBMs—are responsible for inflating WAC prices. This is misleading. The Manufacturing Defendants set the WAC price for their drugs; however, the PBM Defendants indirectly control list prices by negotiating drug rebates so high that manufacturers must raise the WAC price to protect both companies' profit margins.

113.     Internal documents from Novo Nordisk show that in 2018 the company considered, but ultimately decided against, lowering the WAC prices for its insulin products by 50%. The company's pricing committee warned that reducing the WAC price posed significant financial risk to the company—even though the manufacturer's net price would remain the same. One of Novo Nordisk's primary concerns was facing retributive action from other entities in the pharmaceutical supply chain that derive payments based on the WAC prices (like the PBM Defendants). Novo Nordisk specifically identified as downsides "formulary removal" and "CVS, ESI, & Optum push to be kept whole." In other words, Novo Nordisk worried that if it set the WAC prices for its insulin products at their true cost (Novo Nordisk's net price) instead of an inflated price with a 50% rebate, Novo Nordisk risked being removed from the PBM Defendants' formularies or having to pay the PBM Defendants their cut of the now eliminated 50% rebate.

114.     By inflating the WAC prices in response to the PBM Defendants' practices, the Manufacturing Defendants are able to protect their revenues by buying access to formularies, even

---

[76] Sharon Terlep and Joseph Walker, *Generic-Drug Trends Squeeze Walgreens Profit*, Wall St. J. (Apr. 2, 2019), https://www.wsj.com/articles/walgreens-cuts-earnings-guidance-after-a-challenging-second-quarter-11554204891.

SJ2023CV00319 24/01/2023 06:35:34 pm Entrada Núm. 3 Página 31 de 41

at the expense of margin. The Senate Finance Committee found that as rebates increased, the net prices decreased, though the WAC price for insulin medications doubled in some cases. Sanofi's Lantus's net price was $87.48 in 2016, which was $32 lower than the 2014 net price, but still double the net price of $36.92 in 2005. Eli Lilly's Humalog KwikPen's list price increased from $57 to $106 from 2013 to 2016, while the net price remained relatively constant, going from $26 in 2013 to a high of $28 in 2015 and $24 in 2018[77].

115.    As the Senate report further notes, "average net prices for insulin—that is, the revenue manufacturers receive after paying rebates—have declined in recent years due to the growth of rebate sizes. However, manufacturers are still retaining higher average net prices, and, thus, generating *more revenue per unit of insulin* than they were during the first decade of the 21st century."[78] (emphasis added).

### IV.    Defendants' Manipulation of Drug Pricing Harms Consumers

116.    Defendants' tactics to manipulate drug pricing harm Puerto Rico consumers. The most obvious harm is increased prices. These increased prices are not absorbed by other payers, as consumers pay more for any out-of-pocket costs, such as co-pays, deductibles, or uninsured care tied to the WAC price.

117.    At an April 2019 Congressional hearing on the rising cost of insulin, Novo Nordisk's President acknowledged that the "perverse incentive" in drug pricing harms consumers:

> [T]here is this perverse incentive and misaligned incentives and this encouragement to keep list prices high, and we've been participating in that system because the higher the list price, the higher the rebate. . . . There's a significant demand for rebates. . . . [W]e're spending almost $18 billion a year in rebates, discounts, and fees, and we have people with insurance with diabetes that don't get the benefit of that.[79]

---

[77] Senate Insulin Report, *supra* note 8 at 44-45.
[78] Senate Insulin Report, *supra* note 8 at 89.
[79] *Priced Out Of A Lifesaving Drug: Getting Answers On The Rising Cost Of Insulin Before the Subcomm. On Oversight and Investigations*, 116th Cong. 86, 88 (2020) (Statement of Doug

Case 3:23-cv-01080-AO Document 1-1 Filed 03/31/23 Page 66 of 74

118.    At that same hearing, an executive from Sanofi stated: "I think the system became complex and rebates generated through negotiations with PBMs are being used to finance other parts of the healthcare system and not to lower prices to the patient."[80]

119.    Beyond pricing, drug exclusions present harm by forcing non-medical switching, altering a consumer's drug therapy for reasons other than a drug's efficacy, side effects, or clinical outcome. In other words, the choice of drugs available to consumers becomes driven not by which drug is safest or most effective for consumers, but on financial side-deals governing whether and at what cost-share a drug is placed on a PBM's formulary.

120.    Even when diabetics can still afford their diabetic medications, as a direct result of PBM Defendants shifting which insulin products are favored on their formularies ("non-medical switching"), diabetics are often forced to switch medications every few years or go through a lengthy appeal process (or try the favored drug first) before receiving the patient's preferred medication.

121.    Non-medical switching for biologic drugs, such as insulin products, causes increased health problems for diabetics and increased healthcare costs for diabetics, payers, and the healthcare system.

122.    In 2008, CVS Caremark entered into a $38.5 million settlement agreement with 28 State Attorneys General to resolve allegations that the PBM engaged in deceptive business practices by encouraging doctors to switch consumers to different brand-name drugs by saying the

---

Langa, President of Novo Nordisk), https://www.congress.gov/event/116th-congress/house-event/LC65499/text?s=1&r=1.
[80] *Id*. at 112 (Statement of Kathleen Tregoning, Executive Vice President for External Affairs of Sanofi).

consumers or their health plans would save money without disclosing that the drug switching would benefit CVS Caremark.[81]

123.    In the intervening years, the basic business practices have not changed, but have only become more profitable to the PBM Defendants, still at consumers' expense. The PBM Defendants have claimed that formulary exclusions only affect a small percentage of consumers. However, each of the PBM Defendants manage prescription drug coverage for tens of millions of consumers. This means that hundreds of thousands of individuals may be forced to switch from their current medication to their PBM's preferred alternative each year. Further, because medications to treat chronic diseases are among the most frequently targeted by formulary exclusions, vulnerable patients with chronic illnesses—like diabetes—are disproportionately affected.[82]

124.    For these patients, who often have treatment regimens involving multiple medications that need to work together, having access to their choice of medications can be critical. Frequent changes can be particularly problematic, as changes in one medication can trigger the need for other changes and disrupt treatment.[83]

125.    Moreover, because each of the PBM Defendants exclude different medications, and different health plans contract with different PBMs, consumers who change jobs and/or health plans may find their current medications are not covered.[84]

---

[81] Illinois Attorney General, *Madigan, 28 Attorneys General Reach Settlement with Caremark for Drug Switching Practices* (Feb. 14, 2008),
https://www.illinoisattorneygeneral.gov/pressroom/2008_02/20080214.html.
[82] *Id*. at 11.
[83] *Id*.
[84] *Id*.

## CLAIMS FOR RELIEF

## COUNT ONE

### Violation of the Fair Competition Act 10 L.P.R.A. § 259
### Deceptive Acts and Practices

126.     The Government re-alleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs.

127.     10 L.P.R.A. § 259 prohibits unfair methods of competition and unfair or deceptive acts or practices in trade or commerce.

128.     At all times relevant to this Complaint, the PBM Defendants engaged in deceptive acts or practices in trade or commerce in violation of 10 L.P.R.A. § 259 by:

a.     Misrepresenting that the PBM Defendants function to lower the cost of insulin products;

b.     Misrepresenting that rebates and other payments from the Manufacturing Defendants lower the cost of insulin products;

c.     Misrepresenting that rebates and other payments from the Manufacturing Defendants do not inflate the WAC price for insulin products;

d.     Misrepresenting that formulary decisions are evidence and/or value based;

e.     Failing to disclose that the cost share payments insured consumers pay for insulin products are tied to inflated WAC prices rather than the prices that the PBM Defendants and/or third-party payers actually pay for insulin products;

f.     Failing to disclose that the PBM Defendants financially benefit from inflated WAC prices which allow them to negotiate substantial rebates and

other payments from the Manufacturing Defendants for insulin products; and

g.     Failing to disclose that the PBM Defendants financially benefit from preferring and/or excluding certain insulin products in their formularies.

129.    At all times relevant to this Complaint, the Manufacturing Defendants engaged in deceptive acts or practices in trade or commerce in violation of 10 L.P.R.A. § 259 by:

a.     Misrepresenting that rebates and other payments from the Manufacturing Defendants lower the cost of insulin products;

b.     Misrepresenting that rebates and other payments from the Manufacturing Defendants do not inflate the WAC price for insulin products;

c.     Misrepresenting that the WAC price the Manufacturing Defendants advertise for insulin products is an approximate price that the PBM Defendants and/or third-party payers actually pay for the insulin products;

d.     Failing to disclose that the WAC price the Manufacturing Defendants advertise for insulin products is not an approximate price that the PBM Defendants and/or third-party payers actually pay for the insulin products;

e.     Failing to disclose that the WAC price is substantially higher than the price the PBM Defendants and/or third-party payers actually pay for insulin products;

f.     Failing to disclose that the cost share payments insured consumers pay for insulin products are tied to inflated WAC prices rather than the prices that the PBM Defendants and/or third-party payers actually pay for the insulin products; and

g.      Failing to disclose that the Manufacturing Defendants purchase preferred placement on the PBM Defendants' formularies by inflating WAC prices and offering substantial rebates and other payments to the PBM Defendants and third-party payers.

130.    Upon information and belief, the Government believes Defendants' conduct is ongoing.

131.    The Defendants' misrepresentations and omissions were material and likely to mislead consumers and third-party payers.

132.    The Defendants' deceptive practices constitute multiple violations of 10 L.P.R.A. § 259.

## COUNT TWO

### Violation of the Fair Competition Act 10 L.P.R.A. § 259
### Unfair Acts and Practices

133.    The Government re-alleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs.

134.    10 L.P.R.A. § 259 prohibits unfair methods of competition and unfair or deceptive acts or practices in trade or commerce.

135.    At all times relevant to this Complaint, the Defendants engaged in unfair acts or practices in trade or commerce in violation of 10 L.P.R.A. § 259 by engaging in a scheme to inflate the WAC price for insulin products to allow the PBM Defendants to extract higher fees and the Manufacturer Defendants to secure preferred formulary placement thereby guaranteeing success for their insulin products.

136.    Defendants' unfair acts and practices are likely to cause substantial injury to consumers that consumers cannot reasonably avoid. These unfair acts and practices are also not outweighed by any countervailing benefit to consumers or to competition.

137.    Upon information and belief, the Government believes Defendants' conduct is ongoing.

## COUNT THREE

### Violation of the Fair Competition Act 10 L.P.R.A. § 259
### Unfair Methods of Competition

138.    The Government re-alleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs.

139.    10 L.P.R.A. § 259 prohibits unfair methods of competition, and unfair or deceptive acts or practices in trade or commerce.

140.    Defendants' business practices described herein constitute unfair methods of competition, including Defendants' practice of artificially inflating the WAC price for insulin products to allow the PBM Defendants to extract higher fees and to allow the Manufacturer Defendants to secure preferred formulary placement thereby guaranteeing success for their insulin products.

141.    Defendants' practices harm competition because they distort the market for insulin products by inflating the price for insulin products beyond their fair market value and restricting consumers' access to these life-saving medications. In addition, Defendants' practices disadvantage manufacturers unwilling to pay exorbitant rebates and other payments—even if those manufacturers make a superior or more cost-effective insulin product. Defendants' practices also disadvantage PBMs that are not engaging in similar practices because it makes them less

37

competitive in the PBM market and lessens their abilities to lower drug costs for their clients and ultimately consumers.

142.    Upon information and belief, the Government believes Defendants' conduct is ongoing.

## COUNT FOUR

### Violation of the Fair Competition Act 10 L.P.R.A. 268(b)
### Government Damages

143.    The Government re-alleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs.

144.    10 L.P.R.A. § 268 states "Whenever the Commonwealth of Puerto Rico . . . shall suffer damages caused by any person by reason of acts or intended acts forbidden or declared unlawful by the provisions of this chapter, it may sue therefor for the recovery of damages[.]"

145.    Defendants are "persons" under 10 L.P.R.A. § 257 because they are corporations.

146.    As described above, Defendants' unfair and deceptive scheme to inflate the WAC price for insulin products allowed the PBM Defendants to extract higher fees and the Manufacturer Defendants to secure preferred formulary placement thereby guaranteeing success for their insulin products. This scheme ultimately resulted in artificially inflated prices across the market for Manufacturer Defendants' products because the Manufacturers WAC price remains constant regardless of who is purchasing that product.

147.    The Government did not contract directly with the PBM Defendants in this action. However, it was still forced to pay inflated WAC prices for insulin and other drugs because the PBM Defendants and Manufacturer Defendants' illegal scheme resulted in the higher WAC price for those drugs.

148.    Defendants' unlawful conduct thus damaged the Government by increasing the price the Government paid for insulin products.

149.    The Government is not seeking relief relating to any federal program (*e.g.*, Medicaid, Medicare) or any contract related to a federal program. Moreover, the Government's claims do not arise out of a written contract, but rather are based on the larger unfair and deceptive scheme that violates the Fair Competition Act.

150.    Upon information and belief, the Government believes Defendants' conduct is ongoing.

**PRAYER FOR RELIEF**

The Government of Puerto Rico prays for entry of judgment against Defendants individually, and jointly and severally, for all the relief requested herein and to which the Government may otherwise be entitled, including, without limitation:

A.      The Court enter an Order and Judgment against Defendants and in favor of the Government for each violation alleged in this Complaint;

B.      Declare that Defendants' acts and practices alleged herein are unfair and deceptive practices and/or constitute unfair methods of competition in violation of 10 L.P.R.A. § 259; and that Defendants' conduct breached and violated the statutory causes of action alleged herein;

C.      Enjoin Defendants from engaging in unfair and deceptive practices and unfair methods of competition in violation of 10 L.P.R.A. § 259.

D.      Require Defendants to pay all consumer restitution that may be owed to Puerto Rico consumers affected by Defendants' unlawful acts and practices;

E.      Require Defendants to disgorge ill-gotten gains;

F.   Require Defendants to pay for the damages incurred by the Government as a result of Defendants' unfair and deceptive scheme resulting in increased insulin prices pursuant to 10 L.P.R.A. § 268(b).

G.   Given the repeated and ongoing violations of the law, punish violations of 10 L.P.R.A. § 259 by an Order requiring Defendants to pay maximum civil penalties under 10 L.P.R.A. § 269 for each and every violation of section 259;

H.   Assess and award a judgment in favor of the Government and against Defendants for attorneys' fees and costs and pre- and post-judgment interest; and

I.   Award any and all other relief this Court deems appropriate.

**RESPECTFULLY SUBMITTED**.

In San Juan, Puerto Rico, this 24th day of January, 2023.

**DOMINGO EMANUELLI**
**SECRETARY OF JUSTICE**
**DEPARTMENT OF JUSTICE**
**OF PUERTO RICO**

/s/ *Guarionex Díaz Martínez*
**GUARIONEX DÍAZ MARTÍNEZ**
Assistant Secretary
Department of Justice
RUA 20516
P.O. Box 9020192
San Juan, PR 00902-0192
Tel. (787) 721-2900
gdiaz@justicia.pr.gov

/s/ *Andres W. Lopez*
**ANDRES W. LOPEZ**
TSPR 15185
**THE LAW OFFICES OF**
**ANDRES W. LOPEZ, P.S.C**.
P.O. Box 13909
San Juan, PR 00908
Tel. (787) 294-9508
andres@awllaw.com

**LINDA SINGER**
**ELIZABETH PAIGE BOGGS**
*Pro Hac Vice* to be submitted
Motley Rice LLC
401 9th Street, NW, Suite 630
Washington, DC 20004
Tel. (202) 386-9626
Fax. (202) 386-9622
lsinger@motleyrice.com
pboggs@motleyrice.com

SJ2023CV00319 01/02/2023 10:38:33 am Entrada Núm. 7 Página 1 de 2



Estado Libre Asociado de Puerto Rico
TRIBUNAL GENERAL DE JUSTICIA
**Tribunal de Primera Instancia**
Sala ☑Superior, ☐ Municipal de San Juan

| | |
|---|---|
| Gobierno de Puerto Rico | CASO NÚM. _SJ2023CV00319_ |
| _Nombre de la(s) Parte(s) Demandante(s)_ | Salón Núm. _504_ |
| v. | |
| Express Scripts, Inc. | Acción Civil de: _____ |
| _Nombre de la(s) Parte(s) Demandada(s)_ | _Materia o Asunto_ |

**EMPLAZAMIENTO**

ESTADOS UNIDOS DE AMERICA, SS
EL PRESIDENTE DE LOS ESTADOS UNIDOS
EL ESTADO LIBRE ASOCIADO DE PUERTO RICO

A:   Express Scripts, Inc.
_____
_Nombre de la parte demandada que se emplaza_
361 San Francisco st, STE 4, SAN JUAN, PR, 00901
_____
_Dirección de la parte demandada que se emplaza_

POR LA PRESENTE se le emplaza para que presente al tribunal su alegación responsiva a la demanda dentro de los ___60___ días de haber sido diligenciado este emplazamiento, excluyéndose el día del diligenciamiento, notificando copia de la misma al (a la) abogado(a) de la parte demandante o a ésta, de no tener representación legal. Si usted deja de presentar su alegación responsiva dentro del referido témino, el tribunal podrá dictar sentencia en rebeldía en su contra y conceder el remedio solicitado en la demanda, o cualquier otro, si el tribunal, en el ejercicio de su sana discreción, entiende que procede.

Andres W. Lopez, The Law Offices of Andres W. Lopez, P.S.C.
_____
_Nombre del (de la) abogado(a) de la parte demandante, o de la parte, si no tiene representación legal_
15185
_____
_Número ante el Tribunal Supremo, si es abogado(a)_
PO Box 13909
_____
San Juan, PR, 00908
_____
_Dirección_
787-294-9508
_____
_Número de teléfono; número de fax_
andres@awllaw.com
_____
_Correo electrónico_

Expedido bajo mi firma y sello del Tribunal, hoy _15_ de _febrero_ de _2023_

GRISELDA RODRIGUEZ COLLADO
SECRETARIA REGIONAL
_____
_Nombre del (de la) Secretario(a) Regional_

Por: _JOHANNA RODRIGUEZ BENITEZ_
_____
_Nombre del (de la)_
Secretario(a) Auxiliar del Tribunal

_____
_Firma del (de la)_
Secretario(a) Auxiliar del Tribunal

OAT 1578 Emplazamiento
(Rev. Junio 2015)
_Reglas de Procedimiento Civil de 2009_

Página 1 de 2

SJ2023CV00319 01/02/2023 10:38:33 am Entrada Núm. 7 Página 2 de 2

CASO NUM. _____

## CERTIFICADO DE DILIGENCIAMIENTO POR ALGUACIL(A)

Yo, _____ Alguacil(a) del Tribunal de Primera
Instancia de Puerto Rico, Sala de _____

**CERTIFICO** que el diligenciamiento del emplazamiento y de la demanda del caso de referencia
fue realizado por mí, el _____ de _____ de _____ , de la siguiente forma:

☐ Mediante entrega personal a la parte demandada en la siguiente dirección física:
_____

☐ Accesible en la inmediata presencia de la parte demandada en la siguiente dirección
física: _____

☐ Dejando copia de los documentos a un(a) agente autorizado(a) por la parte demandada
o designada por ley para recibir emplazamientos en la siguiente dirección física:
_____

☐ No se pudo diligenciar el emplazamiento personalmente debido a que:
_____
_____

En _____ , Puerto Rico, a _____ de _____ de _____ .

_____          _____
*Nombre del (de la)*                       *Nombre del (de la) Alguacil(a) de Primera Instancia*
*Alguacil(a) Regional*                    *y Número de Placa*

                                                  _____
                                                  *Firma del (de la) Alguacil(a) de Primera Instancia*

## DILIGENCIAMIENTO DEL EMPLAZAMIENTO POR PERSONA PARTICULAR

Yo _____ , declaro tener capacidad legal conforme la
Regla 4.3 de Procedimiento Civil de Puerto Rico, y certifico que el diligenciamiento del
emplazamiento y de la demanda del caso de referencia fue realizado por mí, el _____
de _____ de _____ , de la siguiente forma:

☐ Mediante entrega personal a la parte demandada en la siguiente dirección física:
_____

☐ Accesible en la inmediata presencia de la parte demandada en la siguiente dirección
física: _____

☐ Dejando copia de los documentos a un(a) agente autorizado(a) por la parte demandada
o designada por ley para recibir emplazamientos en la siguiente dirección física:
_____

☐ No se pudo diligenciar el emplazamiento personalmente debido a que:
_____
_____

## COSTOS DEL DILIGENCIAMIENTO

$ _____

## DECLARACIÓN DEL (DE LA) EMPLAZADOR(A)

Declaro bajo pena de perjurio, conforme a las leyes del Estado Libre Asociado de Puerto Rico,
que la información provista en el diligenciamiento del emplazamiento es verdadera y correcta.
Y PARA QUE ASÍ CONSTE, suscribo la presente en _____ , Puerto Rico,
hoy _____ de _____ de _____ .

_____          _____
*Firma del (de la) emplazador(a)*        *Dirección del (de la) emplazador(a)*

AFFIDÁVIT NÚM. _____ [en caso de ser juramentado ante un(a) notario(a)]

Jurado(a) y suscrito(a) ante mí por _____ ,
de las circunstancias personales anteriormente mencionadas, a quien doy fe de conocer
_____
*(conocimiento personal o, en su defecto, la acreditación del medio supletorio provisto por la Ley Notarial)*
En _____ , Puerto Rico, hoy _____ de _____ de _____ .

                                       Por: _____
_____                    _____
*Nombre del Notario o*                        *Nombre del (de la)*
*Secretario(a) Regional*                      *Secretario(a) Auxiliar del Tribunal*

                                              _____
                                              *Firma del (de la)*
                                              *Secretario(a) Auxiliar del Tribunal*